UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIMOTHY REAVES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION |
| ) | NO.  15-40100 |
| DEPARTMENT OF CORRECTION, CAROL ) | |
| HIGGINS O'BRIEN, PAMELA MACEACHERN, ) | |
| MICHAEL RODRIGUES, STEPHANIE ) | |
| COLLINS, MASSACHUSETTS PARTNERSHIP ) | |
| FOR CORRECTIONAL HEALTHCARE, MHM ) | |
| CORRECTIONAL SERVICES, GERALDINE ) | |
| SOMERS, LEIGH PARISEAU, JULIE IRELAND, ) | |
| KHALID KHAN, BONNIE DAMIGELLA, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF TIMOTHY REAVES'
MOTION FOR PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff Timothy M. Reaves is a fifty-year-old, quadriplegic man living in a maximum

security prison.  He is suffering from incompetent medical care, a total failure to accommodate

his disabilities to allow participation in the programs and services of the prison, and near total

isolation and sensory deprivation.  His physical condition is the worst spinal cord injury

specialist Dr. Leslie Morse has seen in over fourteen years of treating spinal cord injury patients.

[Ex. A at ¶ 11]

Dr. Morse explains that Mr. Reaves is "an extreme example" of the progression of

disabling and life-threatening complications that were "preventable with appropriate supportive

care."  [Ex. A at ¶ 10]  Dr. Morse has identified major deficiencies in Mr. Reaves' medical care

that have directly led to the profound deterioration of his physical condition.  These include the

failure to provide:  (1) a spinal cord injury specialist to oversee Mr. Reaves' care, [Ex. A at ¶ 24];

(2) physical and occupational therapy, including passive range of motion and assessments by a qualified professional for other interventions to prevent and potentially reverse contractures, [Ex. A at ¶ 33]; (3) evaluation by qualified professionals for appropriate bracing, splinting, and adaptive equipment to treat Mr. Reaves' contractures and give him a modicum of functional independence, [Ex. A at ¶ 53]; and (4) a daily bowel management care plan and other preventative measures to avoid autonomic dysreflexia, [Ex. A at ¶ 56].

Unless the Court orders Defendants to provide Mr. Reaves the care that medical experts say is necessary, even if that requires sending him to a specialized care facility until his condition improves such that Defendants are capable of providing the care in the prison,[1] he will suffer further irreversible physical and mental harm. Mr. Reaves' physical condition will deteriorate, his joints will become further deformed and rigid with contractures, the chance to regain functions he has lost will recede, the limited personal autonomy that is precious to Mr. Reaves will be lost, and he will suffer needless pain, isolation and trauma. Mr. Reaves will also continue to suffer physical and mental harm from his isolation and lack of medical care and accommodations for his quadriplegia and complications of quadriplegia.

Mr. Reaves is already a prisoner of the Massachusetts Department of Correction (DOC). With every day that passes and his medical needs go unmet, he becomes more and more a prisoner of his own body. Mr. Reaves asks this Court to order preliminary relief to preserve his current health and abilities and to prevent further physical and mental deterioration until this case reaches final resolution. Specifically, he asks the Court to order the DOC Commissioner to place Mr. Reaves in an appropriate medical facility until such time as Defendants are able to provide

---

[1] Massachusetts statutory authority permits DOC to transfer prisoners to appropriate medical facilities when their medical needs "cannot safely or properly" be cared for in prison. Mass. G. L., c. 127, § 117.

adequate medical treatment.

## I.   BACKGROUND

Mr. Reaves suffers from quadriplegia as a result of incomplete fractures to his C-5 and C-6 vertebrae.  [Ex. A at ¶ 8]  Mr. Reaves sustained these injuries in a car accident during the 1994 incident that resulted in the conviction for which he is currently serving a life sentence without possibility of parole.  *Commonwealth v. Reaves*, 434 Mass 383 (2001).   Mr. Reaves also suffers from a frontal lobe injury and bilateral hearing loss.  [Ex. D at 5; Ex. E]

When Mr. Reaves entered DOC in 1996, he could perform a wide variety of daily tasks with limited assistance, including: feed himself solid foods and liquids with the assistance of adaptive equipment; shave with an electric razor; wash his hands and face and brush his teeth independently; sit comfortably in his wheelchair for three to five hours; operate an electric wheelchair.  [Ex. B at ¶ 2; Ex. F at 2]  His arms, hands and fingers could be extended to a fully open position.  [Ex. B at ¶ 2]

Mr. Reaves' condition has declined severely during the nearly twenty years he has been in the care and custody of DOC.  [Ex. B at ¶ 5]  He can no longer feed himself as he could before.  [Ex. A at ¶ 15; Ex. B at ¶ 6]  He can no longer shave with an electric razor.  [Ex. B at ¶ 6]  He can no longer wash his hands and face or brush his teeth independently.  [Ex. B at ¶ 6]  His hips and knees can no longer be bent to allow him to sit in a wheelchair, much less operate one.  [Ex. A at ¶ 18; Ex. B at ¶ 6; Ex. G at 3]  His elbows cannot be unlocked from a bent position, nor can he open his hands and fingers from a clenched fist.  [Ex. A at ¶¶ 13-14; Ex. B at ¶ 6; Ex. C at 2, 4-7]  He can no longer hold a piece of paper in his hands to read.  [Ex. B at ¶ 6]

Mr. Reaves previously had medical equipment including a hand clip, hand and foot splints, a foot drop pillow, and sleeves to maintain elbow extension.  [Ex. B at ¶ 4]  He no longer

has any of this medical equipment.  [Ex. A at ¶ 16; Ex. B at ¶ 7]

"[I]t is rare to see" a person with Mr. Reaves' level of spinal cord injuries deteriorate to this point.  [Ex. A at ¶ 11]  Dr. Morse, a spinal cord injury specialist at Spaulding Rehabilitation Hospital and Program Director of the Spaulding-Harvard Spinal Cord Injury Model System, examined Mr. Reaves on January 7, 2014 and reviewed Mr. Reaves' medical records from March to September 2013, and from August 2014 to May 2015.  [Ex. A at ¶¶ 1-3]  She also reviewed photographs of Mr. Reaves, including some taken as recently as June 8, 2015.  [Ex. A at ¶ 6; Ex. C]  In her expert opinion, Mr. Reaves is suffering from severe complications of quadriplegia that basic supportive care would have prevented.  [Ex. A at ¶ 10]  Dr. Morse opines that absent intervention from this Court, Mr. Reaves will suffer further life-threatening complications during the pendency of this litigation.  [Ex. A at ¶ 22]

Mr. Reaves also suffers from inadequate medical care and accommodations for his partial deafness.  Mr. Reaves' hearing loss "interfere[s] with everyday communication needs," and so he requires hearing aids to communicate with his family, attorneys, and correctional and health care staff.  [Ex. E]  Compounding barriers to Mr. Reaves' communication due to his inability to write, Defendants nevertheless fail to provide Mr. Reaves with working hearing aids that would enable effective verbal communication.  [Ex. B at ¶ 31; Ex. E]

In addition, Defendants have deprived Mr. Reaves of recreation time, programming, activities, access to common areas and the ability to interact with his peers for over seven years.  [Ex. B at ¶ 45]  He has not been permitted outdoors for recreational purposes in over sixteen years, and he has no access to fresh air from within his cell.  [Ex. B at ¶¶ 46 & 50]  Defendants withhold basic hygiene measures and meals when he acts out, to punish him.  [Ex. B at ¶¶ 39-41]  These deprivations are uniquely and acutely traumatic for Mr. Reaves [Ex. B at ¶ 47], as he is

4

incapable of reading a book, journaling, or even doing a cross-word puzzle without the assistance of others.

## II.    ARGUMENT

A preliminary injunction is a mechanism that allows the court to prevent further injury pending litigation of the merits. *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 72 (1st Cir. 2004).  In determining whether to issue a preliminary injunction, a trial court weighs several factors:  (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm to the movant absent an injunction; "(3) the balance of the movant's hardship if relief is denied versus the nonmovant's hardship if the relief is granted; and (4) the effect, if any, of the decision on the public interest." *Me. Educ. Ass'n Benefits Trust v. Cioppa*, 695 F.3d 145, 152 (1st Cir. 2012). The First Circuit Court of Appeals approaches the propriety of a preliminary injunction with a "sliding scale," *Braintree Laboratories, Inc. v. Citigroup Global Markets, Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (citation omitted), meaning that "the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown," *id.*, 622 F.3d at 42-43 (quoting *Mass. Coal. of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 75 (1st Cir. 1981)).

### A.    <u>Mr. Reaves Is Likely to Succeed on His Claims That Defendants' Refusal to Provide Necessary Medical Care, Accommodations for His Quadriplegia and Hearing Loss, and Constitutional Conditions of Confinement Violates His Rights.</u>

Likelihood of success on the merits is "the main bearing wall" of the four-factor preliminary injunction test. *W Holding Co. v. AIG Ins. Co.—Puerto Rico*, 748 F.3d 377, 383 (1st Cir. 2014) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996)).  Mr. Reaves is likely to succeed on his claims that Defendants' refusal to provide him adequate medical care and accommodations for his quadriplegia and hearing loss, as well as

5

Defendants' insistence on withholding care as punishment and needlessly isolating him from the prison population, violates the Eighth Amendment and federal disability rights laws.

> **1.    Defendants' Failure to Treat Mr. Reaves' Quadriplegia, Hearing Loss, and Other Serious Medical Problems According to Prudent Professional Standards Constitutes Deliberate Indifference to His Serious Medical Needs Under the Eighth Amendment.**

"[D]eliberate indifference to serious medical needs of prisoners constitutes . . . 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). This proscription springs from the recognition that "[i]t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." *Id.* at 104 (quotation omitted). To succeed on an Eighth Amendment claim based on inadequate medical care, a plaintiff must satisfy both a subjective and objective standard. *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 497 (1st Cir. 2011).

To satisfy the objective component of the Eighth Amendment, a prisoner must have a serious medical need and "show that the medical care provided is not adequate, as measured against prudent professional standards." *Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 142 (1st Cir. 2014) (internal quotation marks omitted). To meet the subjective standard, the prisoner must demonstrate that an official acts with deliberate indifference in providing inadequate medical care. The prisoner must show that the official "knows of and disregards an excessive risk to inmate health . . . the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1970).

**a.     Mr. Reaves' Quadriplegia, Resulting Complications and Hearing Loss Are Serious Medical Needs.**

Without question, Mr. Reaves has several serious medical needs.  *See Leavitt*, 645 F.3d 497 (serious medical need is a need that has "been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention").

Quadriplegia is a serious medical need.  *See Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993) (ignoring serious medical needs of paraplegic was deliberate indifference).  The significant medical complications he is experiencing from his quadriplegia are serious medical needs, as well.  These complications include contractures that prevent Mr. Reaves from moving his arms, legs, hands and fingers, and thus restrict his ability to perform activities of daily living.  *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (serious medical need may include, *inter alia*, medical condition that significantly affects an individual's daily activities).  Without treatment for these contractures, they will worsen and make critical hygiene procedures extremely difficult, if not impossible.  [Ex. A at ¶¶ 45-47]  Autonomic dysreflexia is a potentially deadly complication of quadriplegia, and can be triggered by constipation, urinary tract infections, and ingrown nails.  [Ex. A at ¶¶ 57-59]  *See Leavitt*, 645 F.3d at 501 (holding that evidence showing that deprivation of care that left plaintiff "more likely to be susceptible to opportunistic infections" supported Eighth Amendment claim).

Mr. Reaves also suffers from hearing loss so grave that his audiologist found it "interfere[s] with everyday communication needs" and prescribed him hearing aids.  [Ex. E]  Without hearing aids Mr. Reaves cannot participate meaningfully in telephone conversations.  [Ex. B at ¶ 32]  Nor can he hear medical and correctional staff, unless he is able to read their lips

while they are speaking to him.  [Ex. B at ¶¶ 34-35]  Mr. Reaves' "[s]ubstantial hearing loss that can be remedied by a hearing aid . . . present[s] an objectively serious medical need" triggering Eighth Amendment protection.  *Gilmore v. Hodges*, 738 F.3d 266, 276 (11th Cir. 2013); *see id.* at 275 (collecting cases).

In short, Mr. Reaves' quadriplegia, secondary complications thereof, and hearing loss are serious medical needs that require Defendants to provide medical care that meets professional standards.

### b.      Defendants' Care of Mr. Reaves Falls Far Short of Prudent Professional Norms.

While the objective prong of the Eighth Amendment does not impose on Defendants a duty to "provide care that is ideal, or of the prisoner's choosing," *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) *cert. denied sub nom. Kosilek v. O'Brien*, No. 14-1120, 2015 WL 1206262 (U.S. May 4, 2015), Defendants are "constitutionally obligated to provide medical services to inmates . . . on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards," *United States v. Derbes*, 369 F.3d 579, 583 (1st Cir. 2004).  The similar recommendations of those spinal cord injury doctors who have evaluated Mr. Reaves demonstrates that the care he is seeking in this case is not extraneous care that is "ideal or of [his] choosing," *see Kosilek*, 774 F.3d at 82, but rather is "on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards," *Derbes*, 369 F.3d at 583.

Rather than provide Mr. Reaves with the care that the Constitution requires, Defendants blame Mr. Reaves for his drastic physical decline.  Defendants suggest that Mr. Reaves' at times unpleasant demeanor and speech justifies withholding care [Ex. B at ¶¶ 38-41], and accuse him

of causing his own physical deterioration by hunger striking and refusing treatment.  [Ex. S –

2015.03.12 Letter at 2]  Defendants conveniently forget that at times when Mr. Reaves has

refused food, he has most often done so when feeling sick or constipated.  [Ex. I at 83:10-18; *see*

Ex. N at 12]  Defendants cannot refuse to provide medical care to Mr. Reaves because, at times,

he demonstrates emotional lability.

i.   **Defendants' Medical Treatment of Mr. Reaves Is Not Founded in Spinal Cord Injury Expertise or Knowledge and Has Resulted in Inadequate Care.**

"Spinal Cord Injury medicine is a complex subspecialty that requires training and

expertise in autonomic dysreflexia, neurogenic bowel, neurogenic bladder, and tone

management."  [Ex. A at ¶ 25]  As Dr. Morse explains, "prudent professional standards" require

that Mr. Reaves receive treatment from a spinal cord injury specialist so as to treat and prevent

the serious secondary complications he has suffered under Defendants' care, including joint

contractures and autonomic dysreflexia.  [Ex. A at ¶¶ 27-29]  Dr. Morse concludes that Mr.

Reaves requires "regular visits with a physiatrist" whether  at an outside facility or at the prison.

[Ex. A at ¶ 31]

In direct conflict with prudent professional standards, Mr. Reaves is under the care of

physicians who lack expertise in spinal cord injuries, who repeatedly refuse to seek the expertise

of a spinal cord injury specialist to inform their care of Mr. Reaves, and who flagrantly ignore

the opinions of spinal cord injury specialists when provided.  In Dr. Morse's expert opinion, "the

lack of spinal cord injury expertise in directing Mr. Reaves' medical care directly caused [his]

physical deterioration."  [Ex. A at ¶ 32]  A physician caring for a person with spinal cord injuries

of Mr. Reaves' level must have deep and specific knowledge of both the baseline care needed

and the medical complications that can arise in a spinal cord injury patient and be able to

recognize and address complications in timely fashion, according to prudent professional standards.  [Ex. A at ¶¶ 27, 32]

Neither Mr. Reaves' current primary care provider nor his last provider have this necessary expertise.  Dr. Khan, the Director of Medicine at Bridgewater State Hospital ("Bridgewater"), is an internist with no expertise in spinal cord injury care.  [Ex. H - 1 at 1]  Dr. Khan admittedly does not possess the clinical background to assess the relative benefits of a spinal cord specific physical therapy program versus a vitamin regimen.  [Ex. I at 45:22-46:6] He attempted to justify denying Mr. Reaves physical therapy, stating that, as Mr. Reaves' "bones are very thin because of osteoporosis," physical therapy was not appropriate.  [Ex. I at 107:17-25]  However, physical therapy is an absolute bedrock portion of the care plan for patients with motor complete spinal cord injury, even though they all suffer from severe osteoporosis.  [Ex. A at ¶ 48]

Dr. Geraldine Somers, the Medical Director at Souza-Baranowski Correctional Center ("Souza-Baranowski") where Mr. Reaves is now incarcerated, is a general practitioner and also has no expertise in spinal cord injury care.  [Ex. H - 2]  In addition to her lack of spinal cord injury expertise, Dr. Somers has very limited contact with Mr. Reaves.  From August 29, 2014 through May 4, 2015, she examined Mr. Reaves four times.  [Ex. J; Ex. K]  Another 145 times, she marked down that Mr. Reaves refused to be treated [Ex. J; Ex. K], despite the fact that Mr. Reaves does not recall her coming into his cell to attempt to meet with him or examine him on most of those days.  [Ex. B at ¶ 29]

Despite the lack of expertise possessed by his primary care providers, Defendants do not supplement their lack of knowledge by seeking guidance from specialists in rehabilitative spinal cord injury medicine.  This was not always the case.  From the time of his incarceration in 1996

through 2006, DOC and its then medical provider periodically sought the expertise of spinal cord injury specialists regarding Mr. Reaves' care, although they did not always follow the recommendations provided.  Review of the reports of these spinal cord injury specialists demonstrates the great need to have a specialist direct Mr. Reaves' care, as the majority of these recommendations are the same recommendations pressed by Dr. Morse today.

On January 30, 1998, Defendants sent Mr. Reaves to New England Medical Center's Department of Rehabilitation Medicine for evaluation.  [Ex. F at 1]  The evaluating physiatrists recommended, among other things: a bowel program that would result in daily or every other day bowel movements; frequent repositioning and very close follow-up to prevent further skin breakdown; therapy and adaptive equipment to improve bed mobility; passive range of motion exercises at least twice a day; and various splints to prevent contractures and maximize upper extremity function.  [Ex. F at 4-5]  Between October 2003 and January 2005, while Mr. Reaves was at Souza-Baranowski, DOC and its medical provider sent him to New England Medical Center's Department of Rehabilitation Medicine for another three evaluations.  [Ex. F at 6-10]  On each of these visits physiatrist Dr. Joseph Hanak examined Mr. Reaves, over that time recommending:  medication to reduce muscle spasticity; a bowel regimen to achieve bowel movements every other day; improved wound care; aggressive physical therapy for upper and lower extremities twice a day; podiatry care; and close follow up by a physiatrist.  [Ex. F at 6-10]

On March 24, 2006, Defendants sent Mr. Reaves for an outpatient evaluation by Gregory C. Malloy, M.D., a physiatrist at Whittier Rehabilitation Hospital.  [Ex. L at 1]  Dr. Malloy's recommendations included:  splinting; aggressive wound care management; a scheduled bowel program with daily suppository and digital stimulation; a behavioral evaluation by a neuropsychologist; ongoing counseling around mobility; and reevaluation of Mr. Reaves'

wheelchair.  [Ex. L at 3]  Dr. Malloy stated that in order to address mobility, Mr. Reaves'

"complex constellation of needs as a C5 quadriplegic" and "complex equipment needs" would be

best addressed at a specialized care facility.  [Ex. L at 4]  Yet Mr. Reaves stayed in DOC

facilities lacking the ability to provide this specialized care.

      From 2006 through 2013, Mr. Reaves did not see a spinal cord injury rehabilitation

specialist.  After receiving several requests from Mr. Reaves that he be seen by such a specialist

[Ex. O at 1-4], Defendants instead sent him to an orthopedic surgeon on June 6, 2013 and then to

a neurologist on November 20, 2013, both at Shattuck Hospital.  [Ex. Q at 1 & 3]  Dr. Morse

explains that "[t]hese consultations do not indicate that Mr. Reaves' medical care is under the

oversight of a spinal cord injury specialist."  [Ex. A at ¶ 26]  The orthopedic surgeon's

consultation resulted in nothing but a determination that Mr. Reaves' contractures were so far

entrenched that he would not recover the ability to get into a wheelchair.  [Ex. Q at 2]  The

orthopedic surgeon did not opine as to Mr. Reaves' rehabilitative needs for his upper extremities

and did not prescribe any treatments or supportive care for Mr. Reaves.  [Ex. Q at 2]  As for the

neurologic consultation, Dr. Morse explains that it was "largely irrelevant, as Mr. Reaves has a

stable neurologic injury that does not require neurologic surgery."  [Ex. A at ¶ 26]  Nevertheless,

the neurologist did emphasize the importance of passive physical therapy for Mr. Reaves to

prevent contractures.  [Ex. Q at 5]

      Mr. Reaves' counsel have arranged for him to be independently examined by spinal cord

injury specialists on several occasions to assist in advocating for Mr. Reaves to receive

appropriate medical care.  These consultations further demonstrate the importance of having an

expert in spinal cord injury rehabilitation direct Mr. Reaves' care.

On May 15, 2001, Edward Phillips, M.D., a physiatrist and Director of Outpatient Medical Services at Spaulding Rehabilitation Hospital, examined Mr. Reaves [Ex. M at 1-2] and found him "greatly compromised in regard to his physical condition" as compared to his condition upon entering DOC, with "worsening joint contractures, decreased mobility, reduced self-care, [and] a history of skin breakdown." [Ex. M at 4]  Dr. Phillips conducted a second independent physical evaluation of Mr. Reaves on October 24, 2008 at MCI Shirley.  [Ex. M at 6-7]  Dr. Phillips found that as compared with Mr. Reaves' condition during the 2001 examination, Mr. Reaves had  "worsening contractures, decreased mobility, reduced self-care, and marked worsening of his skin breakdown." [Ex. M at 15]  He opined that "Mr. Reaves is challenged by multiple, preventable complications that will most likely shorten his life."  [Ex. M at 15]  His recommendations included:  physical and occupational therapy for both upper and lower extremities so as to avoid skin breakdown and to ensure staff are able to provide adequate hygiene; better nutrition; a more sophisticated system of relieving pressure on Mr. Reaves' body; and more contact and external stimuli.  [Ex. M at 16-17]

Dr. Morse examined Mr. Reaves in January 2014 at Bridgewater and reviewed relevant records.  [Ex. A at ¶¶ 1-6; Ex. N at 1]  In her report, which counsel provided to DOC and its medical providers in June 2014 [Ex. R - 2014.06.11 Letter at 7], Dr. Morse noted the pattern of similar recommendations from physiatrists who had evaluated Mr. Reaves over the years [Ex. N at 2], and the unsanitary conditions in which Mr. Reaves was held [Ex. N at 13-14].  Her recommendations included oversight of Mr. Reaves' care by a rehabilitation medicine specialist, physical and occupational therapy to increase functional independence and prevent further loss of function, improved hygiene practices and wound care, implementation of a bowel care

program, immediate and regular podiatry care, and education of the medical providers about the risks of autonomic dysreflexia.  [Ex. N at 12-16]

The absence of direction from a spinal cord injury specialist is evident in the multiple deficiencies Dr. Morse identifies in Mr. Reaves' current treatment.  [Ex. A at ¶¶ 28-30, 48, 61-62]  Dr. Morse notes that Defendants' care plan for Mr. Reaves is inadequate and demonstrates a stark lack of understanding of Mr. Reaves' current condition.  [Ex. A at ¶ 30]  In one example of inadequate care attributable to the lack of a spinal cord injury specialist, the nursing plan states that Mr. Reaves has a "Patient established bedrest limitation" and dictates that medical staff should "[p]eriodically encourage wheelchair use . . . as an alternative positioning option."  [Ex. P at 1]  Yet according to Dr. Morse, "there is no question that Mr. Reaves is not physically able to sit up in a wheelchair" and "[t]rying to place him in a wheelchair given his contractures could cause fractures and other soft tissue injuries."  [Ex. A at ¶ 30]  The absence of medical direction from a spinal cord injury specialist also has lead to DOC and its medical providers' failure to provide physical therapy, supportive and adaptive equipment, and care for Mr. Reaves' neurogenic bowel and vulnerability to autonomic dysreflexia, causing Mr. Reaves to suffer unnecessarily and putting him at risk for death due to unrecognized or untreated symptoms.  [Ex. A at ¶¶ 28-29]

In sum, prudent professional standards require that a person with the severity of spinal cord injury complications that Mr. Reaves suffers receive ongoing treatment from a specialist in this medical field.  [Ex. A at ¶¶ 24-27]  In defiance of these standards, Mr. Reaves remains in the exclusive care of doctors who lack this necessary expertise.

ii.   **Defendants' Failure to Evaluate Mr. Reaves to Determine an Appropriate Physical Therapy Regimen and Provide Appropriate Physical Therapy is Contrary to Prudent Professional Standards and the Recommendations of Those Professionals Who Have Examined Him.**

To meet prudent professional standards for spinal cord injury care, Defendants must provide Mr. Reaves with physical and occupational therapy to stem his decline and regain function. Those providers with expertise who have evaluated Mr. Reaves are united on this point. [Ex. F at 4, 7; Ex. M at 16; Ex. Q at 5; Ex. A at ¶ 38] According to Dr. Morse, Mr. Reaves' "decline in function and loss of the ability to operate a wheelchair" were caused by Mr. Reaves being confined to his bed "without appropriate range of motion and stretching exercise." [Ex. A at ¶ 41] It is now "critical that physical and occupational therapy . . . be initiated immediately to prevent further loss of function and to increase Mr. Reaves' functional independence." [Ex. A at ¶ 33] If Defendants persist in refusing to care for Mr. Reaves' serious medical needs, he will lose further functioning as well as any chance to regain functions he has lost. [Ex. A at ¶¶ 42-47]

The medical providers at Bridgewater, under Dr. Khan's direction under MHM and MPCH, provided no physical therapy whatsoever to Mr. Reaves. [Ex. I at 43:4 – 45:21; Ex. B at ¶ 12] At Souza-Baranowski, medical providers under Dr. Somers' direction have not conducted an evaluation of Mr. Reaves to prescribe an appropriate course of physical therapy. [Ex. A at ¶ 39; Ex. B at ¶ 17] Although the newly created December 2014 nursing plan calls for medical staff to "assess level of ROM [range of motion]/ joint mobility to establish a baseline" [Ex. P at 1], this still has not been done. [Ex. A at ¶¶ 39, 49; Ex. B at ¶ 17]

The current nursing plan also prescribes "joint ROM during complete care and dressing changes using gentle PROM [passive range of motion]." [Ex. P at 1] The sole member of the

15

medical staff who performs any range of motion on Mr. Reaves does so on Mr. Reaves' lower extremities exclusively [Ex. B at ¶ 18], and does so without any instruction from a physical therapist or spinal cord injury specialist [Ex. A at ¶ 49].  Without direction from a medical professional with up-to-date information regarding Mr. Reaves' condition, range of motion therapy could cause fractures and harm Mr. Reaves further.  [Ex. A at ¶ 50]

Contrary to prudent professional standards of care for a person with quadriplegia and contractures, the medical Defendants have not arranged for Mr. Reaves to be assessed for other well-established therapies such as gentle stretching and heat therapy.  [Ex. A at ¶ 51] Reasonable professional standards also require that Mr. Reaves be evaluated for dynamic splinting trials and serial casting in order to try to reverse some of the damage done by the contractures, yet Mr. Reaves has not been assessed for these interventions.  [Ex. A at ¶ 51]

As the predictable result of going without physical therapy, most of Mr. Reaves' joints, including his elbows, fingers, hips and knees, now are contracted.  [Ex. A at ¶¶ 13-14, 36]

Nevertheless, he currently retains a precious few functional abilities.  He can "move his shoulders and upper arms in jerky movements."  [Ex. A at ¶ 13; Ex. B at ¶ 9]  This ability enables him to adjust his pillow, albeit roughly, to push the call button in his room for help, to use handicapped accessible tools like a remote control, and to use his elbow to support himself during critical hygiene procedures while medical staff temporarily have him positioned on his side.  [Ex. B at ¶ 9]  His right wrist retains some flexibility, which could allow him to feed himself and brush his teeth if he were provided appropriate adaptive equipment.  [Ex. A at ¶ 47; Ex. B at ¶ 9]  And his hips are not yet so contracted that his legs have crossed or curled in together.  [Ex. A at ¶ 46; Ex. B at ¶ 9]

If Defendants continue to deny Mr. Reaves necessary physical and occupational therapy,

16

he stands to lose these remaining capabilities.  [Ex. A at ¶¶ 44-47]  Contractures at his hips likely

will worsen to the point that it will be extremely difficult to access Mr. Reaves' groin area for

vital hygiene procedures.  [Ex. A at ¶ 46]

Moreover, Dr. Morse opines that while Mr. Reaves' joint contractures are advanced,

there are still rehabilitation goals that could be met.  [Ex. A at ¶ 43]  Dr. Morse noted that Mr.

Reaves could regain the ability to participate in activities of daily living including upper

extremity dressing, bathing, and eating.  [Ex. A at ¶ 76]  Activities such as pulling on a

sweatshirt, washing one's face, brushing one's hair and teeth, and eating food independently, are

so automatic that most persons never contemplate their importance.  But for Mr. Reaves, they are

key to achieving some small degree of control over his life.  [Ex. B at ¶ 8]  Absent a change in

his current treatment, he will remain unable to perform these self-care activities and will stay

entirely dependent on the vicissitudes of DOC's medical care providers.  [Ex. A at ¶¶ 33, 44]

Additionally, Defendants' physical therapist, who last saw Mr. Reaves on July 9, 2014

for a neck spasm [Ex. B at ¶ 17; Ex. G at 2], responded to a request from Dr. Somers in late

September 2014 about Mr. Reaves' ability to sit in a wheelchair [Ex. G at 3].  Without

examining him [Ex. B at ¶ 16], the physical therapist opined that Mr. Reaves has the potential to

regain the ability to sit up for a wheelchair transfer.  [Ex. G at 3]  She further stated that for Mr.

Reaves "to achieve sitting posture [he] would need intensive rehab for ROM [range of motion],

positioning (i.e. tilt table – monitoring vitals)."  [Ex. G at 3]  Defendants' physical therapist

concluded by stating that the necessary daily physical therapy services and equipment are not

available at the prison where he is held.  [Ex. G at 3]  This opinion is significant, as it

demonstrates that even according to Defendants' own  treatment staff, Mr. Reaves will not regain

the ability to sit in an upward position or sit in his wheelchair unless this Court intervenes and

requires Defendants to send Mr. Reaves to an inpatient rehabilitation program.

### iii. Defendants' Failure to Assess Mr. Reaves for Medically Appropriate Splints, Orthotics, and Other Supports is Contrary to Prudent Professional Standards.

Dr. Morse explains that "[p]rudent professional standards require that Mr. Reaves be assessed by a medical professional with experience caring for patients with motor complete spinal cord injury for medically appropriate splints, orthotics, and other adaptive equipment." [Ex. A at ¶ 53]  Appropriate orthotics would "prevent further deterioration" and adaptive equipment would "permit independent activity and increase functional ability."  [Ex. A at ¶ 53] DOC's own medical specialists have prescribed Mr. Reaves new hand and ankle splints to prevent contractures and tenodesis splints to allow him to form a pincher-type grasp using his thumbs and wrist extension.  [Ex. F at 4-5]  Deprived of this supportive equipment, Mr. Reaves' fingers have curled inwards unobstructed [Ex. C at 4-6, 18-20], and his feet are bent and deformed [Ex. C at 8-14].  Mr. Reaves still has no orthotics and no splints.  [Ex. A at ¶ 54; Ex. B at ¶ 7]

In addition, Mr. Reaves requires the evaluation and assistance of an occupational therapist, and provision of a hand clip to use utensils such as a fork and toothbrush.  [Ex. A at ¶¶ 53, 55]  The nursing plan directs medical staff to "[a]ssess [Mr. Reaves'] ability to feed [him]self[] using adaptive device (built up spoon with cuff)."  [Ex. P at 1]  Again, this directive has been wholly ignored.  [Ex. B at ¶ 22]  Mr. Reaves' inability to brush his own teeth using an adaptive tool is particularly concerning, as medical staff have neglected to brush his teeth for extended periods, most recently as long as one month, and as he has not seen a dentist in over five years.  [Ex. B at ¶ 36]

### iv. Prudent Professional Norms Require a Daily Bowel Management Plan for Mr. Reaves' Neurogenic Bowel and Measures to Prevent and Recognize Autonomic Dysreflexia.

Prudent professional norms mandate that Defendants provide Mr. Reaves with monitoring and preventative care for the life-threatening syndrome known as autonomic dysreflexia, and that they develop and implement a daily bowel management plan for Mr. Reaves' neurogenic bowel.  [Ex. A at ¶¶ 56, 65]  As will be explained, the two needs are linked.

Autonomic dysreflexia is a dangerous clinical syndrome that occurs regularly in spinal cord injury patients.  [Ex. A at ¶ 57]  It is best understood as an "elevation in blood pressure in response to a painful stimulus in an insensate area."  [Ex. A at ¶ 59]  Triggers for autonomic dysreflexia include constipation, urinary tract infection, and ingrown nails.  [Ex. A at ¶ 59]  Autonomic dysreflexia must be recognized immediately, as it is a medical emergency.  [Ex. A at ¶ 60]

As a result of his spinal cord injury, Mr. Reaves suffers from neurogenic bowel, which means that his bowel does not function normally and instead requires medical intervention to make regular bowel movements.  [Ex. A at ¶ 64-65]  Lack of daily bowel care thus puts Mr. Reaves at risk for extreme constipation.  [Ex. A at ¶ 65]  Constipation is a life-threatening complication as it can cause autonomic dysreflexia and bowel perforation.  [Ex. A at ¶¶ 59, 65]

For these reasons, "[s]tandard of care requires . . . a regular bowel care program . . . so that Mr. Reaves has a daily bowel movement."  [Ex. A at ¶ 64]  "[L]ack of a bowel movement after two to three days should raise strong suspicion for constipation," and spur action to resolve it.  [Ex. A at ¶ 65]  Moreover, "[a]ll caregivers, practitioners, and therapists who interact with [Mr. Reaves] must be aware of [autonomic reflexia], recognize the symptoms, and understand the causes and treatment."  [Ex. A at ¶ 57]

19

There is currently no daily bowel management plan in place for Mr. Reaves.  [Ex. A at ¶ 66]  He regularly exhibits signs of constipation and goes days without moving his bowels without Defendants evaluating or treating him for constipation.  [Ex. S – 2015.03.12 Letter at 1]  After reviewing Mr. Reaves' medical records, Dr. Morse identified several "instances of elevated blood pressures . . . consistent with autonomic dysreflexia," and a lack of appropriate responsive action taken by medical staff.  [Ex. A at ¶ 61]

In addition, upon reviewing recent photographs of Mr. Reaves' finger and toe nails, Dr. Morse found him at risk of developing autonomic dysreflexia from ingrown nails due to substandard nail care.  [Ex. A at ¶ 68; Ex. C at 19]  Mr. Reaves does not receive assistance caring for his fingernails, and he attempts to keep them trim by chewing them with his teeth, but he cannot reach every nail.  [Ex. B at ¶ 36; Ex. C at 19]

Defendants' failure to have treatment plans for monitoring and preventing autonomic dysreflexia and for providing daily neurogenic bowel care fall below prudent professional norms. [Ex. A at ¶¶ 56, 62, 65]  *See Leavitt*, 645 F.3d at 501 (citing *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("holding that correctional officers may not ignore medical conditions that are 'very likely to cause serious illness and needless suffering' in the future, and that such prospective harm can be the basis of an Eighth Amendment claim, even if the inmate has 'no serious current symptoms'") and *Smith v. Carpenter*, 316 F.3d 178, 188 (2d Cir. 2003) ("holding that 'an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm'")).  Defendants' failure to comport with the standard of care for autonomic dysreflexia and neurogenic bowel is a dangerous and inexcusable practice that subjects Mr. Reaves to needless daily discomfort and risk of death.

###### v. **Defendants' Failure to Provide Mr. Reaves with Working Hearing Aids Falls Below Prudent Professional Standards.**

Mr. Reaves' hearing loss can be largely remedied with a working hearing aid, properly placed in his ear.  [Ex. E]  The audiology specialist to whom Defendants referred Mr. Reaves prescribed hearing aids that would enable him to communicate effectively and provided detailed instructions for inserting the hearing aids and for maintaining them in working condition.  [Ex. E]  *See Gilmore*, 738 F.3d at 277 (noting the importance of the potential for hearing aids to remedy hearing loss in weighing an Eighth Amendment violation).

Yet Defendants routinely fail to provide Mr. Reaves with the hearing aids that the audiologist prescribed and routinely fail to follow the audiologist's recommendations for insertion and maintenance.  [Ex. B at ¶ 31]  *See Williamson v. Correct Care Solutions LLC*, 890 F. Supp. 2d 487, 496-97 (D. Del. 2012) (allegation that physician was aware of prisoner's serious medical conditions but refused to follow-up on an order for prisoner's specialty knee brace stated an Eighth Amendment claim).  Defendants sent Mr. Reaves to a recent court hearing without his hearing aids, causing much difficulty for Mr. Reaves as well as the court.  [Ex. I at 4:6 – 5:8; 11:20-22; 89:25; 90:12; 106:1-3]  Counsel for Mr. Reaves has requested that his hearing aids be provided during attorney visits to facilitate communication, whereupon medical staff have been unable to correctly insert the hearing aids.  [Ex. R - 2014.06.13 Letter]  After years of Mr. Reaves going without working hearing aids, Defendants stated that they requested an audiology consult to resolve the issue [Ex. S - 2015.03.12 Letter at 1], but have taken no action.  Mr. Reaves remains without working hearing aids, unable to communicate adequately with health care providers, correctional staff and attorneys.  Defendants' failure to provide  hearing aids to Mr. Reaves as prescribed is the picture of inadequate medical care.

c.    **Defendants Have Acted in Conscious Disregard of Mr. Reaves'
Serious Medical Needs in Various Ways Which, Taken Alone as Well
as Together, Constitute Deliberate Indifference.**

The deliberate indifference standard "is satisfied by something less than acts or omissions

for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511

U.S. at 835.  A defendant need not intend to harm a prisoner to be deliberately indifferent; he or

she need only know of the substantial risk of harm and act or fail to act in disregard of the risk.

*Id.* at 842; *see also Battista v. Clarke*, 645 F.3d 449, 453 (1st Cir. 2011) ("deliberate intent to

harm is not required").  "[S]ubjective intent is often inferred from behavior" and "it is enough for

the prisoner to show a wanton disregard sufficiently evidenced 'by denial, delay, or interference

with prescribed health care.'"  *Battista*, 645 F.3d at 453 (quoting *DesRosiers v. Moran*, 949 F.2d

15, 19 (1st Cir. 1991)).

Defendants are well aware of Mr. Reaves' serious medical needs as a quadriplegic

patient, yet they continue to ignore the treatment advice of specialists in spinal cord injury care.

Counsel for Mr. Reaves provided Defendants with Dr. Morse's report detailing the failings in

Mr. Reaves' care and severe consequences to his health over a year ago.  [Ex. R - 2014.06.11 at

7; Ex. N]  That report outlined specific steps Defendants needed to take to provide Mr. Reaves

with medically appropriate care, including the actions addressed in this motion.  [Ex. N at 14-16]

Dr. Morse's report was not the first time that Defendants were made aware of Mr.

Reaves' needs.  Defendants' nursing plan prescribes range of motion therapy for Mr. Reaves.

[Ex. P at 1]  Spinal cord injury specialists have consistently advised DOC and its medical

providers of the need for range of motion therapy [Ex. F at 4, 7; Ex. M at 16; Ex. Q at 5],

supportive equipment [Ex. F at 4-5; Ex. L at 3], autonomic dysreflexia monitoring [Ex. F at 2, 6]

and bowel management [Ex. F at 4, 7; Ex. L at 3].  DOC's own specialist consultant opined that

Mr. Reaves' rehabilitative needs were so great that they should be treated at an outside facility, as has Defendants' physical therapist.  [Ex. L at 4; Ex. G at 3]  Hearing specialists have pointedly advised Defendants of Mr. Reaves' profound hearing deficit.  [Ex. E]

Mr. Reaves himself has notified Defendants of deficiencies in his care on multiple occasions.  Through counsel, he wrote to the then-Director of Clinical Programs at MHM, the then-Assistant Deputy Commissioner of Clinical Services at DOC, and the then-DOC Commissioner on January 24, 2013, bringing to their attention Defendants' failure to provide him with access to a spinal cord injury specialist, physical therapy, proper wound care, and rehabilitative treatment.  [Ex. R - 2013.01.24 Letter at 2]  In a July 22, 2014 letter to Souza Baranowski Medical Director Dr. Somers, MPCH Health Services Administrator Julie Ireland, and Souza Baranowski Deputy Superintendent Michael Rodrigues, counsel for Mr. Reaves asked Defendants to address Mr. Reaves' poor nutrition and to provide him with foods that are high in fiber to alleviate his constipation, citing the risk of autonomic dysreflexia.  [Ex. R – 2014.07.22 Letter at 1-2]  Counsel for Mr. Reaves raised concerns about the lack of care for Mr. Reaves' neurogenic bowel, lack of attention to the risk of autonomic dysreflexia, hearing deficit, need for Mr. Reaves to receive proper range of motion therapy, Mr. Reaves' need for proper adaptive equipment, and the necessity of spinal cord expertise in his medical care in a January 22, 2015 letter sent to Souza Baranowski Medical Director Dr. Somers, MPCH Health Services Administrator Julie Ireland, Souza Baranowski Director of Nursing Leigh Pariseau, Souza Baranowski Deputy Superintendent Michael Rodrigues, DOC Assistant Deputy Commissioner Stephanie Collins, and DOC Commissioner Carol Higgins O'Brien.  [Ex. R – 2015.01.22 Letter at 1-2]  In a May 28, 2015 letter to the same parties who received the January 22, 2015 letter,

counsel for Mr. Reaves again addressed his constipation, concerns about the lack of attention to

autonomic dysreflexia, and hearing loss.  [Ex. R – 2015.05.28 Letter at 1-2]

Mr. Reaves has also filed written grievances addressing his need for a spinal cord

specialist [Ex. O at 1-4]; physical therapy [Ex. O at 5-6]; bowel management [Ex. B at ¶ 52];

orthotics [Ex. O at 11]; a universal cuff [Ex. O at 9-10]; and hearing aids [Ex. O at 7-8].

The aforementioned evidence leads to just one conclusion:  Defendants are aware of Mr.

Reaves' desperate medical needs and deliberately refuse to provide necessary treatment.

**2.**      **Defendants' Refusal to Provide Mr. Reaves With Socialization Opportunities, Time Outside, Mental Stimulation, Hearing Aids and Appropriate Assistive Devices Violates the Americans With Disabilities Act and the Rehabilitation Act.**

Mr. Reaves also is likely to prevail on his Americans with Disabilities Act (ADA) and

Rehabilitation Act claims.

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  42 U.S.C. § 12132; 28 C.F.R. § 35.152(b) (ADA regulations for jails, detention and

correctional facilities).  Prisons are public entities for purposes of the ADA.  *See Pa. Dep't of*

*Corrs. v. Yeskey*, 524 U.S. 206, 210 (1998).  The Rehabilitation Act applies to those entities that

receive federal funding and "has been held to apply to prisoner claims as a general matter."

*Clarkson v. Coughlin*, 898 F. Supp. 1019, 1036 (S.D.N.Y. 1995).[2]

"A plaintiff can press several different types of claims of disability discrimination."

_____

[2] Liability standards for the Rehabilitation Act are the same as those for Title II of the ADA.  *Quiles-Quiles v. Henderson*, 439 F.3d 1, 5 (1st Cir. 2006).

*Nunes v. Mass. Dep't of Corr.*, 766 F.3d 136, 144 (1st Cir. 2014).  The First Circuit recognizes three types of disability discrimination, all of which violate the ADA:  disparate treatment of a person with a disability, disparate impact of a seemingly neutral policy or practice, and refusal to accommodate a disability where such accommodation was needed to provide "meaningful access to a public service." *Id.* at 144-45 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273-76 (2d Cir. 2003)).  As public entities, prisons have an obligation to make reasonable accommodations that permit disabled prisoners access to services or participation in programs or activities. *See Nunes*, 766 F.3d at 144-45; 28 C.F.R. §§ 35.130(b)(7), 35.130(b)(1)(ii).

To prevail on an ADA claim under Title II, a plaintiff generally must establish that:  "(1) he has a disability; (2) he was either excluded from participation in or denied the benefits of the prison's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Bibbo v. Mass. Dep't of Corr.*, No. 08-10746, 2010 WL 2991668, *1 (D. Mass. July 26, 2010) (citing *Parker v. Universidad de Puerto Rico*, 225 F.3d at 1, 5 & n.5 (1st Cir. 2000)).

As to the first element, a disability is "a physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Mr. Reaves' quadriplegia and bilateral hearing loss are disabilities under this standard.  The second and third requirements will be discussed in the context of the particular instances of disability discrimination alleged.

### a.  **Outdoor Recreation**

DOC bars Mr. Reaves from going outdoors because of his quadriplegia.  [Ex. S – 2014.11.13 Letter at 2; Ex. W at 1]  As a DOC prisoner, he is "otherwise qualified" for this service.  According to DOC, "[t]he Department offers a wide variety of staff supervised recreational and leisure time activities designed to reduce inmate idleness and teach pro-social

skills to use their time constructively" and "[t]hese services are available at all facilities." [Ex. U at 5]  Even prisoners held in departmental segregation units are entitled to "daily exercise and recreation period of at least one hour a day at least five days per week, outside if weather permits." 103 Mass Code Regs. § 421.20(2)(c); *see also* 105 Mass. Code Regs. § 451.212 (Department of Public Health, *Required Minimum Health and Sanitation Standards*).  At Souza-Baranowski, "[i]nmates can avail themselves of recreation activities via the block recreation deck, tier time, yard, gym, and the weight room." [Ex. V at 54]

Defendants exclude Mr. Reaves from these services and benefits because of his disabilities.  Mr. Reaves has requested "outside time" and "yard." [Ex. W at 5; Ex. O at 13-15] Defendants candidly admit that they do not permit Mr. Reaves outdoor time because he is disabled and cannot sit up in a wheelchair. [Ex. S – 2014.11.13 Letter at 2; Ex. W at 1]  In light of his disability, Deputy Superintendent Rodrigues states that "it is the Department of Correction's view that his safety would be compromised and therefore can not allow him outdoor access at this time." [Ex. S – 2014.11.13 Letter at 2; Ex. W at 1]

DOC could provide Mr. Reaves access to the outdoors by bringing him to the recreation deck or yard on the wheeled bed.  DOC has wheeled him out of his cell and through the prison on other occasions.  DOC would need only to take the same reasonable steps to protect Mr. Reaves' safety as if he were in a wheelchair, including having a correctional officer or prisoner companion stay with Mr. Reaves outdoors.  That DOC denies Mr. Reaves this reasonable accommodation, at the same time that it denies Mr. Reaves the physical therapy necessary to meet the criteria it has set before he can go outdoors, violates federal disability law.

### b.  Opportunities to Socialize with Peers and Access Common Areas

Defendants refuse to allow Mr. Reaves to socialize with peers, access common areas of

the prison, or engage in any form of congregate recreation.  [Ex. B at ¶ 45]  As with outdoor

recreation, these are services and activities for which Mr. Reaves, as a DOC prisoner, is qualified

[*see* Ex. U at 5, "wide variety of staff supervised recreational and leisure time activities designed

to reduce inmate idleness and teach pro-social skills to use their time constructively"] and which

are available at Souza Baranowski [Ex. V at 53 *et seq.*].

Defendants' segregation of Mr. Reaves from the general population reflects the

misplaced assumption that Mr. Reaves' physical disabilities render him unable to participate in

prison life.  Such assumptions are precisely the sort of baseless stereotypes that federal disability

laws aim to root out of public institutions.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581,

600-01 (1999).[3]

"Unjustified isolation" of persons with disabilities thus constitutes "discrimination based

on disability."  *Id.* at 597.  Instead of isolating persons with disabilities, "[a] public entity shall

administer services . . . in the most integrated setting appropriate to the needs of qualified

individuals with disabilities," 28 C.F.R. § 35.130(d), "i.e., in a setting that enables individuals

with disabilities to interact with non-disabled persons to the fullest extent possible," 28 C.F.R.

Pt. 35, app. B.  The Justice Department's 1991 Preamble to its regulations implementing Title II

explained: "Integration is fundamental to the purposes of the Americans with Disabilities Act.

Provision of segregated accommodations and services relegates persons with disabilities to

second-class status."  28 C.F.R. pt. 35, app. A.  A covered entity may not provide unequal

---

[3] *Olmstead* recognizes two legislative judgments that inform the statute's interpretation:  (1) segregation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and (2)  "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  527 U.S. at 600-01.

services to individuals with disabilities, 28 C.F.R. § 35.130(b)(1)(ii), and may not provide

different or separate services to people with disabilities unless the different or separate services

are necessary in order to afford those individuals an equal benefit.  28 C.F.R. § 35.130(b)(1)(iv).

This integration mandate applies in equal measure to prisons and jails.  *See Henderson v.*

*Thomas*, 913 F. Supp. 2d 1267, 1288 (M.D. Ala. 2012); 28 C.F.R §35.152(b).

   Defendants could easily provide Mr. Reaves with opportunities to integrate with peers

and access common areas by wheeling his medical bed to a common area during recreation

hours, by stationing a correctional officer or fellow prisoner to assist Mr. Reaves during out-of-

cell time, by regularly having a companion come to Mr. Reaves' cell to talk or play a card game,

and by providing Mr. Reaves with working hearing aids.  These workable accommodations do

not require "a fundamental alteration in the nature of a service, program, or activity or [result] in

undue financial or administrative burdens."  *McNally v. Prison Health Servs.*, 46 F. Supp. 2d 49,

57 (D. Me. 1999) (quoting 28 C.F.R. § 35.150(a)(3)).  Defendants' reflexive refusal to provide

these accommodations [Ex. W at 1, 5] and their forced isolation of Mr. Reaves from his peers

betrays Defendants' stereotyped perception of Mr. Reaves as non-functioning in both body *and*

mind, and violates the ADA's requirement that individuals with disabilities receive services in

the most integrated setting possible.  28 C.F.R. § 35.130(d).

### c.  Programming

   Souza-Baranowski offers programming opportunities to prisoners.  [Ex. X; Ex. U at 12-

14]  Yet because of his disabilities, Defendants do not provide Mr. Reaves with *any*

programming opportunities.  [Ex. B at ¶¶ 45, 51]  Mr. Reaves could, with appropriate

accommodations, participate in programs such as the computer skills program, which provides

prisoners with "skills to effectively use word processing, spreadsheets, database, and

presentation software." [Ex. V at 54]  Mr. Reaves wants to participate in this course and learn to use computers as an adaptive technology.  [Ex. W at 3]

Through counsel, Mr. Reaves has pressed Defendants for "computer classes, or any other programs that SBCC offers that could be made available to him with reasonable accommodations . . . . [so as] to keep [Mr. Reaves'] mind busy so that he is not left lying alone in bed all day with no outlet for his thoughts."  [Ex. R – 2014.08.28 Letter at 2]  Despite Mr. Reaves' direct request and expressed interest [Ex. W at 2-3], and Deputy Superintendent Rodrigues' acknowledgment that Mr. Reaves likely qualifies for the program [Ex. S – 2014.11.13 Letter at 2], he has not been allowed to participate in the computer skills program or any other program [Ex. B at ¶ 51].  Mr. Reaves has not been either evaluated for or allowed to participate in any of the therapeutic programs that DOC offers prisoners at Souza Baranowski.[4] [Ex. B at ¶ 51]  His DOC Personalized Programming Plan, where programming need areas should be listed, identified no programming plans aside from assessing his educational needs under the standard Test of Adult Basic Education.  [Ex. Y]  As a result, Mr. Reaves is side-lined from participating in programs that would break the monotony of his isolation, such as the Able Minds program, which aims to "alter behavior through literary exploration and . . . discussion sessions."  [Ex. V at 57]

DOC's refusal to allow Mr. Reaves to participate in the programs available to other prisoners is a manifestation of Defendants' bias against Mr. Reaves on account of his disabilities and violates the ADA.

---

[4] These programs include: Alternatives to Violence, Emotional Awareness and Healing,  Mens Work, Toastmasters, Motivational Enhancement Program, Criminal Thinking Program, Violence Reduction Program, Moving Forward, Thinking for a Change, Art, and Able Minds.  [Ex. X; Ex. V at 55-59]

#### d.  <u>Access to Shower Facilities</u>

As a DOC prisoner, Mr. Reaves is qualified to use the showers of the institution where he is held.  Even prisoners in the restrictive Departmental Segregation Units are entitled to "at least three showers each week."  103 Mass. Code Regs. § 421.20(2)(b).  Mr. Reaves has requested that Defendants make the shower facilities accessible to him so that he does not have to be bathed in his bed.  [Ex. W at 4]  Yet Defendants refuse to accommodate Mr. Reaves' disability by providing him with a workable shower stretcher or modifying the shower facilities.  [Ex. W at 1; Ex. S – 2014.11.13 Letter at 2]  Getting out of his cell to use the shower would provide Mr. Reaves increased privacy, as there is a window on his door allowing passersby to view him while he is being bathed in bed.  [Ex. B at ¶ 44]  It also would give Mr. Reaves an opportunity to get out of his cell and use a separate bathing facility, as other prisoners are able to do.  [Ex. B at ¶ 44]  And a shower would clean his body more thoroughly, particularly as he defecates in his bed. [Ex. B at ¶ 44]

Deputy Superintendent Rodrigues has advised Mr. Reaves that "the shower stretcher is too large to fit in the shower" and that "[u]ntil an alternative stretcher can be found you will continue to [be] cleaned in bed."  [Ex. W at 1]  Nearly a year after this response, nothing has changed.  Defendants' unreasonable refusal to grant Mr. Reaves' accommodation request violates federal disability law.  *See Outlaw v. City of Dothan*, No. CV-92-A-1219, 1993 WL 735802, at *4 (M.D. Ala. Apr. 27, 1993) (unpublished) (ruling that "the Americans with Disabilities Act required the City of Dothan to make the shower in its jail readily accessible to and usable by the plaintiff").

#### e.  <u>Meals</u>

Defendants refuse to accommodate Mr. Reaves' disability so that he can feed himself the

30

same meals that DOC provides to those in its care and custody.  Contractures prevent Mr. Reaves

from using the eating utensils that DOC provides to its prisoners, and DOC refuses to provide

Mr. Reaves with a modified utensil that would enable him to eat DOC meals independently.

[Ex. B at ¶¶ 6-7, 22]  Mr. Reaves has asked to be evaluated for a universal cuff/ hand clip so that

he can hold eating utensils.  [Ex. R – 2015.01.22 Letter at 2]  Defendants purport to recognize

the importance of this accommodation for Mr. Reaves' physical wellbeing and independence, as

their nursing plan calls for medical staff to "assess ability to feed self, using adaptive device

(built up spoon with cuff)."  [Ex. P at 1]  Six months after this nursing plan was put in place, Mr.

Reaves has not been assessed for his ability to feed himself, has not been evaluated for an

appropriate clip or cuff, and is without the assistive device needed to allow him meaningful

access to the DOC's meal services.  [Ex. B at ¶ 22]

### f.  Telephone Access

As a prisoner of DOC, Mr. Reaves is entitled to "access . . . telephone services."  103

Mass. Code Regs. § 482.01.  This telephone access right includes protections for making phone

calls to attorneys, which even prisoners on disciplinary sanctions are entitled to make.  103 Mass.

Code Regs. § 482.07(1); § 482.08.  Mr. Reaves' partial deafness makes it extremely difficult and

nearly impossible for him to use the DOC telephone service.  [Ex. B at ¶ 32, 33]

Prisons have an affirmative duty under the ADA to make reasonable accommodations so

that their telephone services are accessible to hearing-disabled prisoners. *Chisolm v.*

*McManimon*, 275 F.3d 315, 329 (3d Cir. 2001); *Thomas v. Mar*, No. 3:10-cv-0282, 2010 WL

2954131, at *5 (D. Nev. July 23, 2010) (unpublished) (allegations that prisoner could not hear,

was denied replacement hearing aid, and could not use telephone that other prisoners accessed

stated an ADA claim); *Clarkson*, 898 F. Supp. at 1032.  Mr. Reaves has repeatedly sought the

reasonable accommodation of working hearing aids so that he can make telephone calls to family members and his attorneys.  [Ex. R – 2014.06.13 Letter; Ex. R – 2014.08.28 Letter at 4]  His last audiologist report demonstrates that, "[w]hen [his hearing aids are] put in correctly . . . Mr. Reaves' hearing [is] adequate for his communication demands."  [Ex. E]  Alternatively, Defendants should provide a Telecommunication Device for the Deaf (TDD or TTY) service that is usable by Mr. Reaves so that he can communicate on the telephone.  *See Chisolm*, 275 F.3d at 329-30.

### g.  <u>Communications with Medical Providers</u>

As a DOC prisoner, Mr. Reaves is qualified to receive "medical . . . services needed to maintain [his] basic health."  103 D.O.C. § 630.01.  Defendants' refusal to provide Mr. Reaves with working hearing aids leaves him unable to meaningfully communicate with medical staff and severely affects his ability to access critical medical services.  [Ex. B at ¶ 34]  Unless he is looking at them and lip-reading, Mr. Reaves cannot understand what his nurses and caretakers say to him.  [Ex. B at ¶ 35]  The audiology report confirms that his hearing loss "interfere[s] with everyday communication demands."  [Ex. E]  As could be expected, Mr. Reaves' inability to hear his nurses and caretakers has to lead to miscommunication and confusion.  [Ex. B at ¶ 34]  Mr. Reaves infers that medical staff at times mistake his non-responsiveness for a refusal of medical care, when in reality Mr. Reaves has not heard what the medical staff member said.  [Ex. B at ¶ 34]  Mr. Reaves' lack of meaningful access to DOC's medical services obligates Defendants to accommodate his hearing disability by providing him with working hearing aids. Defendants' refusal to provide him with working aids, despite Mr. Reaves' repeated requests [Ex. O at 7-8; Ex. R – 2014.06.13 Letter], violates the ADA.

### h.  **Access to the Grievance Process**

Mr. Reaves' status as a DOC prisoner entitles him to utilize the institutional and medical grievance processes that DOC and its medical contractor, MPCH, make available to prisoners. *See generally* 103 Mass. Code Regs. § 491 *et seq.*; § 491.08(1).  The DOC and MPCH grievance processes offer an administrative mechanism for prisoners to alert administrators to problems and attempt to resolve them.  Prisoners generally are expected to exhaust the grievance process before seeking to vindicate their rights in court.  Yet because of DOC's refusal to accommodate Mr. Reaves' quadriplegia, he lacks meaningful access to this important service.

The institutional and medical grievance processes both require the filing of written grievances detailing the prisoner's complaint and requested remedy.  103 Mass. Code Regs. § 491.09.  [Ex. V at 19-21, 51-52; Ex. Z]  Mr. Reaves is unable to write or to manipulate papers due to his disability.  [Ex. B at ¶ 23]  He has, therefore, asked to record his grievances on audio tapes[5] or dictate grievances using a speak-to-text dictation program.  [Ex. B at ¶ 25]  Defendants refuse to provide either accomodation.  [Ex. B at ¶ 25]  Defendants' current proffered accommodation, that all of Mr. Reaves' writing and organizational needs be satisfied with the assistance of a prisoner whom Defendants restrict to assisting Mr. Reaves for one hour a day, a maximum of five days a week, is far from adequate, as the length of time is insufficient, and as it deprives Mr. Reaves of reasonable and appropriate autonomy and requires that he divulge private legal and medical information to a fellow prisoner.  [Ex. B at ¶ 25]  Defendants further refuse to

---

[5] This accommodation would require only equipment that DOC is already obligated to provide to Mr. Reaves under a Settlement Agreement in *Reaves v. Corr. Med. Servs., et al.*, Suffolk Superior Court 00-02363.  [Ex. AA at ¶ 6(d), (e)]

allow counsel for Mr. Reaves to submit grievances on his behalf, despite the fact that no rule

bars this practice.  [Ex. B at ¶ 25; Ex. O at 19]

Defendants also block Mr. Reaves' access to the grievance process by refusing

commonsense accommodations of his inability to sign documents.  Historically, Defendants

allowed Mr. Reaves' prisoner writing assistant to sign documents on his behalf by either writing

Mr. Reaves' name and noting that he is unable to sign, or by inking Mr. Reaves' thumb to make

a thumbprint on papers, including medical and institutional grievances.  [Ex. B at ¶ 26; *see* Ex. O

at 9; Ex. W at 2-5]  Recently, Deputy Superintendent Rodrigues imposed a new policy barring

Mr. Reaves' writing assistant from assisting him in making a thumbprint to indicate his

signature, i.e., holding Mr. Reaves' thumb to an ink pad and then pressing Mr. Reaves' thumb on

a document so as to leave an imprint.  [Ex. B at ¶ 26]  Defendants have since refused to accept

grievances marked with a thumbprint, where the writing assistant assisted Mr. Reaves in making

the thumbprint on the grievance.  [Ex. B at ¶ 26]  Defendants also have since refused to accept

grievances that are signed by Mr. Reaves' writing assistant and that state that Mr. Reaves is

unable to sign due to his disability.  [Ex. B at ¶ 26; Ex. O at 18, 20]  Instead, Defendants now

require that a member of medical staff thumbprint documents for Mr. Reaves, including

grievances.  [Ex. B at ¶ 26; Ex. O at 20]  However, when Mr. Reaves asked a nurse to mark his

thumbprint, she said she did not know anything about this requirement and did not assist Mr.

Reaves with leaving his thumbprint.  [Ex. B at ¶ 26]  Defendants' new requirement unreasonably

involves medical staff in personal affairs with which they have no concern, forces Mr. Reaves to

present grievances against particular nurses from whom he receives care on a daily basis to those

same nurses for a thumbprint, and generally presents an obstacle to the grievance processes due

to the difficulties and the time delays involved.

34

DOC has not met its obligation to Mr. Reaves under the ADA in this regard, and so Mr.

Reaves is likely to succeed on his claim that Defendants' refusal to modify their grievance

policies and provide Mr. Reaves with recording and/or dictation technologies or more frequent

writing assistance, as well as their refusal to allow Mr. Reaves' writing assistant to assist him in

thumbprinting grievances, violates federal disability law.

**3.**     **Defendants' Prolonged and Extreme Isolation of Mr. Reaves in Unsanitary Conditions Violates the Eighth Amendment.**

The Eighth Amendment "imposes duties on [prison] officials," *Farmer*, 511 U.S. at 832,

including the responsibility to "provide humane conditions of confinement" for those in their

custody, *id.*  Conditions of confinement run afoul of the ban against cruel and unusual

punishment when (1) they are "sufficiently serious," *id.* at 834 (quoting *Wilson v. Seiter*, 501

U.S. 294, 298 (1991)), meaning that they "result in the denial of 'the minimal civilized measure

of life's necessities,'" *id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)), and (2) they

are imposed with "'deliberate indifference' to [the prisoner's] health or safety," *id.* (quoting

*Wilson*, 501 U.S. at 302-03).

**a.**     **Defendants Are Holding Mr. Reaves in Conditions That Deprive Him of Basic Human Needs Including Physical and Mental Stimulation, Personal Hygiene, and Clothing.**

"[C]onditions of confinement may establish an Eighth Amendment violation 'in

combination' when each would not do so alone . . .  when they have a mutually enforcing effect

that produces the deprivation of a single, identifiable human need." *Wilson*, 501 U.S. at 304.  A

prisoner's individual characteristics, here Mr. Reaves' quadriplegia and hearing loss, are part of

the Eighth Amendment calculus.  *See Anderson v. Colorado*, 887 F. Supp. 2d 1133, 1140 (D.

Colo. 2012) (considering prisoner's mental illness when determining whether confinement

without "any meaningful exposure to fresh air" violated the Eighth Amendment). One court has thus held that leaving a prisoner with incomplete quadriplegia to lie in his own waste for even a relatively short duration could violate the Eighth Amendment. *Havens v. Clements*, No. 13-cv-00452, 2014 WL 1213804, at *7 (D. Colo. Mar. 24, 2014).

Mr. Reaves will likely succeed on his claim that the conditions in which the Defendants are holding him deprive him of "identifiable, human need[s]," *Wilson*, 501 U.S. at 304, including sanitary conditions, clothing, and physical and mental exercise with time outdoors.

### i.       Mr. Reaves Is Denied Sustenance, Left Unclothed and in His Own Waste for Extended Periods.

"[D]eprivation of basic elements of hygiene" amount to "prison conditions . . . so base, inhuman and barbaric that they violate the Eighth Amendment." *Palmer v. Johnson*, 193 F.3d 346, 352 (5th. Cir. 1999) (internal quotation omitted). Defendants have persistently and repeatedly forced Mr. Reaves to endure grossly unsanitary conditions. Grime coats his bed. [Ex. B at ¶ 37; Ex. C at 4-5] Medical staff often tell Mr. Reaves that they do not have time to provide certain basic care, including hygiene care and meals. [Ex. B at ¶¶ 41, 42] Nurses have repeatedly left basic hygiene procedures unfinished, often as punishment or at the direction of correctional officers. [Ex. B at ¶¶ 38-40] Dr. Phillips lamented this practice in his 2001 report, noting that DOC dealt with Mr. Reaves' behavioral difficulties punitively, by doing things like taking away his wheelchair, rather than through "psychiatric and psychological intervention to address the root causes of his behavior." [Ex. M at 4] This practice has caused and will continue to cause Mr. Reaves to lie uncleaned in urine or excrement, to lie cold, wet and exposed on his bed, and to go without meals, bathing or changes to the dressings on his leg wounds. [Ex. B at ¶¶ 38, 43]

In an example of this practice, on September 16, 2014, Nurse Daria left Mr. Reaves in bed unbathed, unclothed, and with no blankets covering him, because an officer asked her to leave the cell when Mr. Reaves swore.  [Ex. B at ¶ 39]  Mr. Reaves remained cold and completely exposed for several hours until other providers came in and clothed him.  [Ex. B at ¶ 39]

Another example of this practice occurred January 20, 2015, when Nurse Carmen and Nurse Dori came to Mr. Reaves' cell to bathe him.  [Ex. B at ¶ 40]  Nurse Dori refused to change Mr. Reaves' catheter because he would not respond to questions.  [Ex. B at ¶ 40]  In the course of the bed bath, Nurse Carmen and Nurse Dori refused to clean Mr. Reaves' genital area.  [Ex. B at ¶ 40]  After an angry exchange, correctional officer Cupp declared that medical staff should leave the cell.  [Ex. B at ¶ 40]  All staff left Mr. Reaves in the room partially bathed and wet, unclothed, and with no blankets covering him for approximately an hour.  [Ex. B at ¶ 40]

The following day, correctional officer Gallagher came to Mr. Reaves' cell at lunch time and asked him to choose whether he wanted his lunch or a bath.  [Ex. B at ¶ 40]  When Mr. Reaves insisted that he needed both his lunch and a bath, correctional officer Gallagher advised that Mr. Reaves would get neither one.  [Ex. B at ¶ 40]  Staff did not feed Mr. Reaves lunch that day and did not give him his bath until the next shift at 6:00 pm.  [Ex. B at ¶ 40]

Yet another incident occurred June 14, 2015, when Mr. Reaves pressed his call button to request assistance with drinking.  [Ex. B at ¶ 41]  Approximately an hour and a half later, a nurse arrived.  [Ex. B at  ¶ 41]  However, she informed Mr. Reaves that she was to do his dressing change and did not have time to assist him with drinking.  [Ex. B at ¶ 41]  She told Mr. Reaves that he would have to wait until supper for his drink, which Mr. Reaves knew would be another hour or more.  [Ex. B at ¶ 41]  Frustrated, Mr. Reaves swore at the nurse.  [Ex. B at ¶ 41]  In

37

response to Mr. Reaves' verbal outburst, the nurse left without changing his dressings or assisting him with drinking.  [Ex. B at ¶ 41]  The result was that Mr. Reaves was left thirsty for approximately three hours and denied his dressing change for approximately three and a half hours.  [Ex. B at ¶ 41]

This practice of refusing to provide care to Mr. Reaves has left him lying in his own waste.  [Ex. B at ¶ 38]  "[E]xposure to human waste carries particular weight in the conditions calculus," *Havens*, No. 13-cv-00452, 2014 WL 1213804 at *7 (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)), "because exposure to human waste, like few other conditions of confinement, evokes both health concerns and the more generalized standards of dignity embodied in the Eighth Amendment," *id.*  Defendants' practice has also resulted in Mr. Reaves lying naked and wet, exposed to the cold and passersbys' stares.  [Ex. B at ¶¶ 38, 43]  Leaving a quadriplegic prisoner unclothed and sopping wet implicates the dual concerns of healthy and dignity, as well.  Unlike able-bodied prisoners, Mr. Reaves is not able to clean his own bed, to rub his hands against his upper arms for warmth, or even to roll over to avoid lying in his own waste.

The risk to Mr. Reaves' health is particularly acute in light of his vulnerable physical condition and malnourished state.  [*See* Ex. T]  Mr. Reaves has compromised skin integrity and open wounds on his lower extremities that leave him highly susceptible to infection.  [Ex. A ¶ 19]  In light of his vulnerabilities, Dr. Morse explains that appropriate nutrition is particularly important for Mr. Reaves, [Ex. A at ¶ 71] and interfering with medical procedures such as feeding, bathing and dressing changes for punitive reasons violates standards of care [Ex. A at ¶ 72].  Taken together, these deprivations create cruel and unusual carceral conditions.

ii.     **Defendants Deprive Mr. Reaves of Human Contact and Fresh Air.**

Like all prisoners, Mr. Reaves has a basic need for access to the outdoors to prevent both physical and psychological decline.  "Deprivation of outdoor exercise violates the Eighth Amendment rights of inmates confined to continuous and long-term segregation."  *Keenan v. Hall*, 83 F.3d 1083, 1089-90 (9th Cir. 1996) (citing *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (Kennedy, J.) ("There is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of [prisoners].") and *Toussaint v. Yockey*, 722 F.2d 1490, 1492-93 (9th Cir. 1984) (upholding preliminary injunction requiring outdoor exercise)).

In *Keenan v. Hall*, the Ninth Circuit Court of Appeals held that a prisoner's claim that he was not allowed any outdoor exercise for six months should proceed to trial on an Eighth Amendment theory.  *Id.* at 1090.  More recently, a Colorado district court found that "denial of any opportunity to be outdoors and to engage in some form of outdoor exercise for a period of 12 years is a serious deprivation of a human need . . . according to any reasonable concept of what constitute[s] the civilized measure of life's necessities."  *Anderson*, 887 F. Supp. 2d at 1139.  *See also Thomas v. Ponder*, 611 F.3d 1144, 1151 (9th Cir. 2010) (prisoner who was denied outdoor exercise for thirteen months stated an Eighth Amendment claim); *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000) (prisoner who was denied outdoor exercise for six and a half weeks stated an Eighth Amendment claim); *Perkins v. Kan. Dep't of Corrs.*, 165 F.3d 803, 810 (10th Cir. 1999) (prisoner who was denied outdoor exercise for nine months stated an Eighth Amendment claim); *Paylor v. Young*, No. 5:12-CT-3103, 2014 WL 773499, at *5 (E.D.N.C. Feb. 25, 2014) (prisoner who was confined to his cell for twenty-three hours a day and was not

permitted any fresh air or outdoor recreation stated an Eighth Amendment claim).  Binding

regulations from the Massachusetts Department of Public Health similarly appreciate the

importance of outdoor recreation for prisoners' health, requiring that unless security or safety

considerations dictate otherwise, "[e]ach inmate in general population shall be afforded not less

than one hour per day of exercise outside his cell. . . . [o]utdoor[s] . . . when weather permits."

105 Mass. Code Regs. § 451.212(A), (C).

In addition, courts increasingly are recognizing the basic human need for social contact to

stave off psychological decline and acknowledging that "[y]ears on end of near-total isolation

exact a terrible price." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

"[H]uman beings require the company of other humans to stay healthy." *United States v.

Corozzo*, 256 F.R.D. 398, 401 (E.D.N.Y. 2009).  "Substantial research" has confirmed this basic

intuition and "demonstrates the psychological harms" of living without human contact.  *Id.* at

401-02 (citing Craig Haney, *Mental Health Issues in Long–Term Solitary and "Supermax"

Confinement*, 49 Crime & Delinquency 124, 148 (2003) ("The range of psychopathological

reactions to this form of confinement is broad, many of the reactions are serious, and the existing

evidence on the prevalence of trauma and symptomatology indicates that they are widespread.

The mental health risks posed by this new form of imprisonment are clear and direct.") and

Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U.J.L. & Pol'y 325, 354

(2006) ("The restriction of environmental stimulation and social isolation associated with

confinement in solitary are strikingly toxic to mental functioning, producing a stuporous

condition associated with perceptual and cognitive impairment and affective disturbances.")).

The First Circuit has indicated that deprivation of social contact paired with restriction to

one's cell could violate the Eighth Amendment, explaining that "23 hours' daily confinement in

a cell permitting communication among inmates may well be constitutional, even over extended

periods, while 23 hours per day in a closed cell for a shorter period might not be permissible."

*Morris v. Travisono*, 707 F.2d 28, 32 n.9 (1st Cir. 1983).  Accordingly, courts in this Circuit

recognize "idleness" contributing to psychological decay as part of the Eighth Amendment

picture.  *See Morales Feliciano v. Romero Barcelo*, 672 F. Supp. 591, 620 (D.P.R. 1986).

Simply stated, the constitutional requirement that prisoners have access to the outdoors is

about more than staying fit and trim.  Rather, the requirement embodies recognition of the

psychological benefits of leaving one's cell for even a short time, varying one's otherwise

monotonous perspective, feeling fresh air and sunshine on one's skin, and congregating with

other prisoners:

> [A]n inmate can preserve his cardiovascular fitness and overall muscle tone by
> running in place or by engaging in other forms of exercise that are feasible
> without leaving the cell; but this misses the point.  The opportunity to exercise or
> *even just to stand around, outside, in the company of other prisoners*, is the
> inmate's principal break from what otherwise is solitary confinement except for
> his limited opportunities to visit other parts of the prison on specific and tightly
> supervised missions.

*Davenport v. DeRobertis*, 844 F.2d 1310, 1314 (7th Cir. 1988) (emphasis added).

In defiance of these constitutional standards, Defendants confine Mr. Reaves to his cell

with no access to the outdoors, fresh air, or opportunities for social interaction.  [Ex. B at ¶¶ 45-

46]  From October 11, 2007 to January 20, 2011, Defendants held Mr. Reaves in the Health

Services Unit of MCI-Shirley in near complete isolation in a single cell.  [Ex. B at ¶ 48]  He had

no social interaction with peers whatsoever.  [Ex. B at ¶ 48]  From January 20, 2011 to January

13, 2014, Defendants held him in the Health Services Unit of Bridgewater State Hospital in a

four-person dormitory room that he was not allowed to leave.  [Ex. B at ¶ 49]

Since January 13, 2014, Defendants have restricted Mr. Reaves to a single cell in the

41

Souza-Baranowski Health Services Unit, nearly identical to the cell in which he was held in when previously at Souza-Baranowski.  [Ex. B at ¶ 50]  Mr. Reaves' cell has one window to the outside, but because of the way his bed is positioned Mr. Reaves can only see one angle out of the window, and the window does not open to bring in fresh air.  [Ex. B at ¶ 50]  As discussed in the context of Mr. Reaves' disability discrimination claims, he is barred from recreation hours, common areas and outdoor areas that able-bodied prisoners regularly access.  [Ex. B at ¶ 51]  The result is that Mr. Reaves now has lived over seven years without access to common areas for recreation.  [Ex. B at ¶ 45]  The last time he went outdoors for recreation was November 1998.  [Ex. B at ¶ 46]

Mr. Reaves' hearing loss and quadriplegia make the isolation even more crushing.  As long ago as 2001, Dr. Phillips informed DOC and its medical providers that Mr. Reaves was "isolated" with "decreased stimuli," partially "due to his long-standing hearing deficit."  [Ex. M at 4]  Mr. Reaves cannot break the monotony of his isolation by having a meaningful conversation over the phone.  [Ex. B at ¶ 32]  And while there are other prisoners in the Health Services Unit, Mr. Reaves cannot hear their voices through the cell walls, even with the door open.  [Ex. B at ¶ 50]  Moreover, unlike able-bodied prisoners who can exercise in their cell by running in place or doing push-ups, Mr. Reaves depends on the Defendants to give his body the physical exercise it needs.  Defendants' refusal to provide prescribed physical therapy means that Mr. Reaves has no opportunity to exercise.

These deprivations have severe consequences for Mr. Reaves' physical and mental health.  Lack of physical exercise is harming Mr. Reaves by causing his muscles to atrophy and his joints to contract.  [Ex. B at ¶ 47]   The isolation and lack of stimulation has increased Mr.

Reaves' depression, hopelessness, and emotional lability, making it increasingly difficult for him to maintain relationships with others.  [Ex. B at ¶ 47]

> **b.     Defendants' Refusals to Provide Mr. Reaves With Time Outdoors, Opportunities To Socialize With Other Prisoners And a Sanitary Cell Constitute Deliberate Indifference.**

Finally, Mr. Reaves is likely to prove that Defendants are deliberately indifferent to the unconstitutional conditions in which he is held.  "It can be inferred that, due to [Mr. Reaves'] condition" as an obviously bedbound, quadriplegic prisoner, "Defendants were aware" that if they did not take Mr. Reaves outdoors, provide him with socialization opportunities, clothe him, feed him, cover him with blankets, change his bedsheets and wash his body and bed, he would be left isolated, exposed and in unsanitary conditions.  *Havens*, No. 13-cv-00452, 2014 WL 1213804 at *7 (ruling that prisoner satisfied deliberate indifference requirement where court charged defendants with knowing "that without assistance in toileting [a quadriplegic prisoner] would likely soil himself and would be unable to remedy the problem").  But lest there be any doubt, Mr. Reaves has brought these matters to Defendants' attention on multiple occasions, without success.  [Ex. O at 13-15; Ex. W; Ex. R – 2014.08.28 Letter at 3; Ex. S – 2014.11.13 Letter at 2]

## B.     Irreparable Harm Will Occur Absent a Preliminary Injunction.

Absent a court order forcing the Defendants to meet their obligations to Mr. Reaves under the Constitution and federal and state laws, he will suffer irreparable harm through permanent loss of physical capacity [Ex. A at ¶ 22], and continued exposure to horrible, degrading and inhumane conditions of confinement.

Irreparable harm is established where the movant shows that his "legal remedies are inadequate."  *Ross-Simons of Warwick, Inc.*, 102 F.3d at 18.  "If the plaintiff suffers a substantial

injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Id.* at 19 (citations omitted); *see Hazelton v. N.H. Dep't of Corrs.*, No.08-cv-419, 2009 WL 229664, at *9 (prison officials' conduct "without regard for the exceptions or allowances necessitated by [the prisoner's] genuine and serious medical conditions" was "demonstrably likely to cause irreparable harm if allowed to continue," justifying a preliminary injunction).  The deprivation of a substantive constitutional right is generally sufficient to establish irreparable harm. *Hannon v. Allen*, 241 F. Supp. 2d 71, 78 (D. Mass. 2003); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984); *see Roy v. N.H. State Prison*, No. 07-cv-353, 2008 WL 2795868, at *11 (D.N.H. July 18, 2008) ("Injury to constitutional rights is not typically adequately compensated by money damages.").  Violations of federal disability law may also qualify as irreparable where the monetary damages cannot reverse the harm caused by a public entity's failure to provide a reasonable accommodation.  *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 121-22 (1st Cir. 2003)  (lack of access to a sign language interpreter can amount to irreparable harm).

Here, the lack of adequate medical care will cause irreparable physical harm to Mr. Reaves.  Absent court intervention, it is more likely than not that during the pendency of this litigation Mr. Reaves will lose functions he now retains, including the ability to move his shoulders and upper arms in jerky movements and flexibility in his right wrist. [Ex. A at ¶ 44-47]  He also stands to lose remaining flexibility in his hips, which would make cleaning his genital area extremely difficult and would expose him to life-threatening infections.  [Ex. A at ¶ 46]  And without a court order mandating physical therapy, Mr. Reaves is likely to lose the chance to regain functions that would allow him "to participate in activities of daily living including upper extremity dressing, bathing, and eating."  [Ex. A at ¶ 76]

In addition, monetary relief cannot adequately compensate Mr. Reaves for living without the ability to feed himself and brush his teeth using a hand clip; for living in partial deafness without an effective hearing aid, unable to communicate over the phone with attorneys and family, and unable to effectively communicate with medical and correctional staff; for the indignity of being forced to lie naked and exposed or in his own waste for extended periods of time; nor for the torture of being cut off from all social interaction for years.

Defendants segregate Mr. Reaves from his peers, deny him recreation and access to the outdoors, and refuse reasonable accommodations that would let him benefit from Defendants' meal services, telephone services, medical services, and grievance processes.  "Defendants' continuing failure to provide effective accommodations for its prisoners easily establishes the threat of future injury," *Flynn v. Doyle*, 672 F. Supp. 2d 858, 880 (E.D. Wisc. 2009), and no amount of monetary damages will undo the harm Mr. Reaves will continue to suffer from Defendants' knowing refusal to follow federal anti-discrimination laws.

**C.    A Preliminary Injunction Will Impose Less of a Burden on Defendants Than Its Absence Will Impose on Mr. Reaves.**

The burden of a preliminary injunction on Defendants is largely financial:  Defendants will have to pay for Mr. Reaves' constitutionally required medical care and accommodations. However, if the Court orders Defendants to transfer Mr. Reaves to a specialized care facility as a temporary measure to ensure that he receives constitutionally required medical care during the course of this litigation, in one sense the burden on the Defendants will be less, as other medical care providers will step in to provide Mr. Reaves' daily medical care.[6]  Transferring Mr. Reaves

---

[6] It is also feasible that the federal government would pay for Mr. Reaves' inpatient stay at an outside care specialty under the Medicaid program.  *See* Christine Vestal, *States Missing Out on Millions in Medicaid for Prisoners*, Pew

to an outside medical facility will offset the Defendants' current expensive, inefficient problem of caring for Mr. Reaves in a facility not designed for persons with his disabilities and health needs.  At any rate, it should not be considered a burden on Defendants to comply with the law. Mr. Reaves is incarcerated and as such, he is the Defendants' responsibility, no less so because his needs are greater than those of other prisoners.

**D.**     **Preliminary Injunctive Relief Will Promote the Public Interest.**

The public interest will be served by prompt injunctive relief in this case.  The public interest is always served when constitutional rights are upheld.  *See Roy*, 2008 WL 2795868 at *11 ("Both the public interest and the equities favor requiring the [prison] to administer its rules and policies in a constitutionally effective manner").  The public also has a strong interest in ensuring that medical providers deliver medical care in keeping with prudent professional standards.  Moreover, enforcing anti-discrimination laws promotes the equal participation of persons with disabilities in society, and thus is in the public interest.

Finally, prisons are public institutions, and the public has an especially strong interest in ensuring that its prisons are operated in a safe, constitutional, and non-discriminatory manner. "The degree of civilization in a society can be judged by entering its prisons."  *Davis*, 135 S. Ct. at 2210 (Kennedy, J., concurring) (quoting The Yale Book of Quotations 210 (F. Shapiro ed. 2006)).  *Brown v. Plata* states the degree of civilization it requires of these public institutions in no uncertain terms:  "A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society."  131 S. Ct. 1910, 1928 (2011).  "If government fails to fulfill this obligation,

Charitable Trusts (June 25, 2013),  http://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2013/06/25/states-missing-out-on-millions-in-medicaid-for-prisoners.

the courts have a responsibility to remedy the resulting Eighth Amendment violation" and "must not shrink from their obligation to enforce the constitutional rights of all 'persons,' including prisoners." *Id.* (internal quotation marks and citations omitted). Requiring Defendants immediately to conform their treatment of a quadriplegic prisoner to the law promotes the public interest in the safe, civilized, non-discriminatory, and constitutional running of state-run prisons.

## III.   CONCLUSION

For the foregoing reasons, Plaintiff Timothy Reaves respectfully requests that this Court grant his motion for a preliminary injunction and enter an order directing the Commissioner to temporarily place Mr. Reaves in an appropriate medical facility until such time as Defendants are able to provide minimally adequate medical treatment.

In the event that Mr. Reaves remains in, or returns to, a DOC facility, he respectfully requests that this Court enter an order directing Defendants to remedy the violations alleged herein by directing Defendants to take the following actions:

1. Have Mr. Reaves evaluated monthly by a mutually agreed upon specialist in spinal cord injury rehabilitative medicine;

2. Provide said specialist free and unfettered access to Mr. Reaves' medical records;

3. Have said specialist meet personally with the members of the nursing care staff treating Mr. Reaves at his current facility to explain the standards of care and direct their care;

4. Comply with all recommendations of said specialist that are characterized as "medically necessary," including but not limited to monitoring and prevention of autonomic dysreflexia, bowel care management, appropriate diet, and nail care;

5. Have Mr. Reaves assessed by a physical therapist with spinal cord injury expertise;

6. Comply with all recommendations of said physical therapist that are characterized as "medically necessary," including but not limited to: range of motion exercises, stretching exercises, adaptive equipment, orthotics, dynamic splinting, and serial casting;

7. Have Mr. Reaves assessed by an occupational therapist with spinal cord injury expertise;

8. Comply with all recommendations of said occupational therapist that are characterized as "medically necessary," including but not limited to providing Mr. Reaves with a universal cuff or hand clip tool;

9. Have Mr. Reaves assessed by an audiologist annually;

10. Comply with all recommendations of said audiologist that are characterized as "medically necessary," including daily insertion of hearing aids into Mr. Reaves' ears and immediate follow-up if the hearing aids are found not to be in working order;

11. Offer to bring Mr. Reaves outdoors for recreation one hour each day, seven days a week, as weather permits;

12. Offer to bring Mr. Reaves to common areas for recreation or allow other prisoners of his choosing to come to his cell a minimum of three hours each day, seven days a week;

13. Provide Mr. Reaves with the immediate opportunity to engage in programming, including but not limited to a computer skills course;

14. Provide Mr. Reaves with a word processor equipped with speak-to-text dictation software for use in correspondence and the filing of grievances;

15. Provide Mr. Reaves with showers on a shower stretcher in a shower facility;

16. Accept Mr. Reaves' thumbprint as indicative of his consent, regardless of who assists Mr. Reaves in leaving his thumbprint;

17. Provide Mr. Reaves with needed hygiene care and regular meals at regular, set intervals without interruption and cease the practice of withholding needed medical or hygiene care and meals as behavioral control;

18. Provide Mr. Reaves with a list of agreed upon accommodations for his disabilities;

19. Discuss treatment plans with Mr. Reaves and actively engage him in treatment decisions.

Respectfully submitted,

Plaintiff Timothy Reaves,
By his attorneys,

 */s/ Lauren Petit*
Lauren Petit, BBO #640410
lpetit@plsma.org

 */s/ Maggie Filler*
Maggie Filler, California Bar #287836, *pro hac vice*
mfiller@plsma.org

Prisoners' Legal Services of Massachusetts
10 Winthrop Square, 3d Floor
Boston, MA 02110
(617) 482-2773

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon Michael Rodrigues and Stephanie Collins by first-class mail, the attorney for Department of Correction, Carol Higgins O'Brien, and Pamela MacEachern by first-class mail, and the attorney for each other party by electronic mail on August 13, 2015.

 */s/ Maggie Filler*
Maggie Filler