## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **TIMOTHY M. REAVES,** ) | |
| ) | **CIVIL ACTION** |
| *Plaintiff,* ) | |
| ) | **NO. 4:15-CV-40100-TSH** |
| **v.** ) | |
| ) | |
| **DEPARTMENT OF CORRECTION,** ) | |
| **CAROL HIGGINS O'BRIEN, MICHAEL** ) | |
| **RODRIGUES, PAMELA MACEACHERN,** ) | |
| **STEPHANIE COLLINS, MHM** ) | |
| **CORRECTIONAL SERVICES, INC.,** ) | |
| **MASSACHUSETTS PARTNERSHIP FOR** ) | |
| **CORRECTIONAL HEALTHCARE,** ) | |
| **GERALDINE SOMERS, LEIGH** ) | |
| **PARISEAU, JULIE IRELAND, KHALID** ) | |
| **KHAN, AND BONNIE DAMIGELLA,** ) | |
| ) | |
| *Defendants.* ) | |

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION (Docket No. 14)

### July 15, 2016

**HILLMAN, D.J.**

Timothy M. Reaves brought this suit against the Department of Correction (DOC), the DOC's contractual medical provider, and various individuals, asserting claims for deliberate indifference to serious medical needs and violations of Title II of the Americans with Disabilities Act, among other causes of action. He moves for preliminary injunctive relief, seeking immediate changes to his medical care and accommodations for his disabilities. For the reasons set forth and explained below, Reaves's motion (Docket No. 14) is ***granted*** in part and ***denied*** in part.

I find that Reaves is likely to succeed on the merits of his claim that the DOC and its medical providers have been deliberately indifferent to his serious medical needs by failing to have his care overseen by a spinal cord injury specialist; failing to provide comprehensive physical and occupational therapy; failing to provide a comprehensive bowel program; failing to prevent and treat autonomic dysreflexia; and failing to maintain functioning hearing aids.  I also find that the DOC's current medical provider has made commitments in recent months to improving Reaves's care.  Due to the fluid nature of this situation, and because it is too early to determine whether these commitments are serious, comprehensive equitable relief is not appropriate at this time.  Instead, I elect to give the DOC and its medical provider an opportunity to rectify the aspects of Reaves's care that appear to be deficient.  I use my inherent authority to appoint a monitor, who will receive and transmit to the court reports on Reaves's ongoing medical care until the final resolution of this case.

I find that Reaves is likely to succeed on the merits of his claim that the DOC has violated Title II of the ADA by failing to provide him with outdoor and indoor recreation, socialization, access to programming, reasonable accommodations in the shower facilities, and confidentiality in his mental health care.  I find that the record is not sufficiently developed to determine his likelihood of success on his claims of insufficient access to a writing assistant and lack of appropriate confidentiality in his medical care.  I further find that Reaves has shown a potential for irreparable harm, that the balance of burdens tips in his favor, and that the public interest will be served by the issuance of an injunction.  I order the DOC to remedy the above-noted violations, and I grant the monitor the authority to observe and report on the implementation of this remedy.

## Background[1]

Timothy M. Reaves (Plaintiff) is a fifty-one-year-old quadriplegic inmate serving a life sentence without the possibility of parole.  He is currently incarcerated in the Health Services Unit of the Massachusetts Correctional Institution at Shirley (MCI Shirley).  In 1994, he was involved in a high-speed motor vehicle chase, during which he was a passenger in the back seat of a vehicle being pursued by the police.  The chase occurred immediately after a drive-by shooting and ended when the vehicle crashed at a high rate of speed.  Reaves suffered a spinal cord injury, which resulted in quadriplegia.  He was later convicted of first-degree murder on a theory of joint venture and was sentenced to serve the remainder of his life in prison. *See Commonwealth v. Reaves*, 750 N.E.2d 464, 466 (Mass. 2001).  In addition to the spinal cord injury, Reaves suffered a frontal-lobe brain injury. (Docket Nos. 15-6 at 5; 15-19 at 4.)  He has been diagnosed with a personality disorder and episodes of atypical depression. (Docket No. 15-19 at 4, 5.)  He is hearing-impaired and requires hearing aids. (P ex. 50 at 1.)

Reaves has been incarcerated for twenty years.  For approximately the past seventeen years, he has been unable to use a wheelchair and has been confined to his bed. (P ex. 2.)  The DOC has transferred him five times between three different correctional facilities in Massachusetts.  He began serving his sentence in 1996 at MCI Shirley; in 1999, he was moved to Souza-Baranowski Correctional Center (SBCC); in 2007 he was moved back to MCI Shirley; in 2011 he was moved to Bridgewater State Hospital (BSH); in 2014 he was moved back to SBCC; and, most recently, on January 25, 2016, during the pendency of this lawsuit, he was moved back to MCI Shirley.  He has also had several inpatient stays at the Lemuel Shattuck Hospital (LSH).

---

[1] This section focuses on the facts relating to Reaves's Eighth Amendment claim.  Additional facts will be provided *infra* in relation to his discrimination claim.

There are two groups of Defendants in this case—one group affiliated with the DOC and one group affiliated with the DOC's contractual medical provider, Massachusetts Partnership for Correctional Healthcare (MPCH).  The first group consists of the DOC and four officials: Carol Higgins O'Brien, Commissioner of the DOC; Michael Rodrigues, Deputy Superintendent of Programs and Treatment at SBCC; Pamela MacEachern, Deputy Superintendent of Programs and Treatment at BSH; and Stephanie Collins, Assistant Deputy Commissioner of Clinical Services and Director of Health Services Division of the DOC (collectively, the DOC Defendants).  The second group consists of MHM Correctional Services, Inc. and MPCH, as well as five individual employees of MPCH: Geraldine Somers, MD, Medical Director at SBCC; Leigh Pariseau, RN, Director of Nursing at SBCC; Julie Ireland, RN, Health Services Administrator at SBCC; Khalid Khan, MD, Medical Director at BSH; and Bonnie Damigella, RN, Director of Nursing at BSH (collectively, the MPCH Defendants).

MPCH is a subsidiary of MHM Correctional Services.  MPCH has been responsible for providing medical and mental health care for inmates in Massachusetts since July 1, 2013.  Prior to that date, MHM provided mental health services and the University of Massachusetts Correctional Health Program was responsible for medical care.  The bulk of the evidence presented in this case relates to MPCH's care of Reaves during his most recent period of incarceration at SBCC, from January 13, 2014 to January 25, 2016.  Some additional evidence predates his stay at SBCC, and some relates to his treatment at MCI Shirley since January 25, 2016.  Six witnesses testified over the course of seven days of hearings, spanning nearly three months, in relation to the instant motion.

Two of Reaves's former medical providers—who are also Defendants in this case— testified on behalf of MPCH.  Geraldine Somers, MD, is the Medical Director at SBCC and was

Reaves's primary care provider from January of 2014 until January of 2016.  Dr. Somers has no specific educational background in spinal cord injury medicine, and no significant experience treating patients with these types of injuries.  She testified that when caring for Reaves she relied on outside consultations as she felt necessary, and she would implement the outside providers' suggestions if she agreed with their recommendations.  Specialists' recommendations could not be implemented unless she or another MPCH provider wrote an order.  The second medical-provider Defendant to testify was Julie Ireland, who is a Registered Nurse and a Health Services Administrator at SBCC.  In this capacity, she administratively oversaw the medical and mental health care provided to Reaves while he was housed at SBCC.

Reaves's condition has significantly deteriorated during his twenty years of incarceration.  When he was in rehabilitation shortly after his injury, he was able to shave the left side of his face, brush his teeth, and feed himself.  He could sit in a wheelchair and take a shower on a shower stretcher.  Now, he is unable to do any of those things.  His hip and knee joints are frozen and can no longer be bent to sit in a wheelchair, while his elbows cannot be unlocked from a bent position.  He cannot open his hands and fingers from clenched fists.  The skin on his legs is susceptible to long-lasting open wounds and requires daily care and bandaging.  He is underweight.  He testified that his condition continued to worsen during his most recent stay at SBCC, during which he lost weight, muscle tone, and flexibility in his lower extremities, and incurred increased tightness in his arms and left wrist.  He testified that he does not understand what it means to be "healthy" as a quadriplegic.

### *Dr. Morse's Findings*

In January of 2014, Reaves's counsel retained Leslie Morse, DO, a physiatrist[2] who specializes in spinal cord injuries, to examine Reaves and write a report on his condition.  She testified as a spinal cord injury specialist, and her report was admitted into evidence.  Dr. Morse is board certified in physical medicine and rehabilitation.  She is the Program Director of the Spaulding Harvard Spinal Cord Injury Model System, as well as an Associate Director of Research at the Department of Physical Medicine and Rehabilitation at Harvard Medical School and an Assistant Professor at Harvard Medical School.  She sees spinal cord injury patients as a direct provider and also in the course of her research.  She supervises medical students and residents in the field of spinal cord injury; has produced numerous publications on the topic; and performs patient and provider education regarding the standards of care for spinal cord injury.

Dr. Morse identified Reaves's injury as a "C6 ASIA B" spinal cord injury.  "ASIA" stands for "American Spinal Injury Association."  "C6" refers to the injury's level in the spine.  "B" classifies the injury as motor complete, meaning that Reaves cannot contract any muscles below the level of injury; but sensory incomplete, meaning that he has some preserved sensation. According to Dr. Morse, a person with a C6 ASIA B spinal cord injury would be expected to achieve modified independence, including the abilities to sit in and operate a wheelchair, help dress and feed oneself, and exercise some control over one's environment with the assistance of adaptive equipment.  Reaves, however, cannot do these things.  After examining Reaves, Dr. Morse concluded that he suffers from severe complications of his injury, which are due to a lack of proper medical attention.  She explained:

---

[2] A physiatrist is a physician who specialize in physical medicine. Stedman's Medical Dictionary 1362 (26th ed. 1995).

> Mr. Reaves is an extreme example of untreated secondary complications of spinal cord injury that were, for the most part, preventable with appropriate supportive care. These secondary complications were entirely foreseeable for a quadriplegic individual persistently left without the basic supportive care required, which is why care plans for individuals with spinal cord injury, under the care of a provider competent to care for such an individual, would always require this basic care.

(Docket No. 15-2 at 2.)

Reaves suffers from spasticity[3] and contractures,[4] which means that many of his joints are fixed in either extension or flexion. Some joints are completely fixed, while others retain partial mobility. He has contractures in his toes, ankles, knees, hips, elbows, wrists, and fingers. Because of the contractures, he is unable to bend at the hips, meaning that his body cannot be moved into a seated position. Dr. Morse explained that contractures are typically prevented and/or treated with daily range of motion (ROM) therapy, as well as heat, splinting, bracing, casting, Botox, medications, and surgery. Reaves's contractures have developed progressively over the past twenty years, and much of his decline occurred before MPCH began caring for the Massachusetts prison population in 2013. For example, in 2013 he had already lost the ability to sit in a wheelchair. Dr. Morse testified that, in her fourteen years of practice, she had never seen contractures to the degree of those in Reaves's body. She attributed this to a lack of preventative therapies and treatments.

Dr. Morse testified that Reaves should be receiving ROM therapy twice per day to manage his contractures. This would involve moving the areas of his body that can be moved through their full range of motion. If this is not done, his joints will continue to fix, and his legs will begin to

---

[3] Spasticity is "[a] state of increased muscular tone with exaggeration of the tendon reflexes." Stedman's Medical Dictionary 1641 (26th ed. 1995).

[4] Contracture is "[s]tatic muscle shortening due to tonic spasm or fibrosis, or to lack of muscular balance, the antagonist being paralyzed." Stedman's Medical Dictionary 389 (26th ed. 1995).

curl permanently inward, compromising his groin hygiene, and bladder and bowel care, and putting him at risk for infections.  Dr. Morse explained that ROM therapy consists of specific movements; merely moving a patient's limbs in the process of putting on clothes, for example, does not suffice.  Moreover, she testified that uneducated implementation of ROM therapy could result in accidental fractures of Reaves's delicate bones.  The medical records reveal that Reaves did not arrive at SBCC in January of 2014 with a written ROM therapy plan in place, and the staff at SBCC were not formally trained in the performance of ROM therapy until nearly two years later, in December of 2015.

It is not clear how often Reaves was offered or received ROM therapy during his two years at SBCC.  It is undisputed that only one nurse performed ROM therapy on his lower extremities.  Dr. Somers testified that this occurred approximately four times per week, while Ireland testified that it was offered at least once per day.  Despite the lack of a written order or any type of documentation, Dr. Somers also testified that Reaves had received ROM therapy on his upper extremities every day at SBCC.  Ireland, on the other hand, testified that he was not offered upper-extremity ROM therapy until at least December of 2015.  The upper extremity ROM therapy was allegedly performed by a Certified Nursing Assistant (CNA), during bathing or around Reaves's mealtime.  Reaves testified that a CNA performed ROM therapy on his upper extremities on only one occasion at SBCC, on his left arm in the fall of 2015.  Dr. Somers did not write a physician's order for any type of ROM therapy until January 22, 2016—six months after he had filed this lawsuit, and three days before he was transferred out of SBCC.

In addition to ROM therapy, Dr. Morse emphasized that Reaves should have a comprehensive physical therapy program that is developed, prescribed, and overseen by a medical professional who specializes in spinal cord injuries.  Although much of his body is wrought by

contractures, he currently retains some strength and mobility in his shoulders, upper back, and neck, which he will lose without ongoing therapy.

Dr. Morse also testified that Reaves should receive occupational therapy, which would involve an assessment for adaptive equipment and working toward achieving a more upright position for his body, with the goal of increasing his independence in the activities of daily living. Dr. Morse emphasized that this program should be constructed by an individual with spinal cord injury expertise and should be integrated with his physical therapy plan. Reaves testified that, at some point in the past, he had a "universal cuff," which he used to brush his teeth, shave his face, operate a wheelchair, use an accessible remote control, and use the telephone. He testified that the cuff was confiscated in 2009. He had wrist weights that were also taken away. He testified that he was not evaluated for adaptive equipment at SBCC. He was given several adaptive feeding devices in December of 2015, but he is unable to use them his current condition.

Dr. Morse further explained that Reaves is at serious risk for autonomic dysreflexia (AD), which is a potentially fatal condition unique to individuals with spinal cord injuries. AD is a dangerous elevation in blood pressure in response to a painful stimulus in an insensate area. AD is considered a medical emergency, because it can result in a stroke or death. According to Dr. Morse, it is essential for Reaves's healthcare providers to be fully educated regarding AD. Such knowledge includes symptoms, signs, triggers, and treatments.

According to Dr. Morse, the symptoms of AD are unique to each patient but can include headache, flushing, sweating, nasal congestion, goose bumps, and pounding in the ears. With the help of an educated provider, patients can learn to identify their own symptoms. The most significant sign of AD is an increase in blood pressure. AD is most commonly triggered by constipation, urinary tract infections, bladder blockages, ingrown toenails, or a sharp object in the

patient's bedding.  Although these are the most common causes, any painful stimulus below the level of injury can trigger an AD response.  Dr. Morse testified that the immediate response to an AD event should be to find and remove the offending stimulus.

Dr. Morse testified that any blood pressure reading that is twenty millimeters of mercury greater than baseline in the systolic reading should be cause for concern for AD, prompting medical personnel to conduct a full physical examination in order to identify the cause.  Dr. Somers testified that she was aware of the risks of AD and that Reaves did not have any signs or symptoms during his two years at SBCC.  However, the medical records show multiple instances of heightened blood pressures, which indicate potential AD events, with no corresponding notes of an assessment for the offending stimulus.[5]  Dr. Somers explained that she considered any blood pressure reading above 120/80 to be high for Reaves, but that if he "otherwise looked perfectly fine," she would not do anything except continue to monitor him.  Dr. Somers did not formally instruct her staff about AD or write a care plan to address AD until January of 2016—two years after she began caring for him and six months after the initiation of this lawsuit.

When Dr. Morse examined Reaves in 2014, his finger and toe nails were overgrown.  She explained that this presents a risk of AD, because the nails could grow into his skin, causing a painful stimulus in an insensate area.  Constipation presents a similar problem.  After examining Reaves, Dr. Morse concluded that he suffers from chronic constipation.  In addition to being a

---

[5] Dr. Morse testified that the records from SBCC showed several such instances.  For example, on July 7, 2014, Reaves's blood pressure was 130/88, and on October 9, 2015 it was 136/93. (P exs. 15, 17.)  Dr. Morse explained that Reaves has a low baseline blood pressure with a systolic reading of approximately 100.  On admission to SBCC in January of 2014, his blood pressure was recorded as 149/91. (D ex. 3 at 49.)  His blood pressure fluctuations were also noted by a provider at LSH in January of 2016, to whom he was taken for a consultation after he became hypotensive during a dental appointment.  The provider recorded Reaves's blood pressure as 198/70 and noted that he had a history of blood pressure fluctuations from hypotensive to hypertensive. (D ex. 13 at 500-01.)

trigger for AD, constipation can cause a life-threatening obstruction or rupture, as well as a loss of appetite.[6]

Reaves has a neurogenic bowel, which means that he cannot control his bowel movements. Dr. Morse testified that all spinal cord injury patients, including Reaves, need a comprehensive bowel plan to manage bowel movements and prevent constipation. She explained that an appropriate bowel plan for Reaves would include scheduled laxatives, stool softeners, and digital stimulation, with a goal of achieving regular and predictable bowel movements every other day. Dr. Morse emphasized that educating Reaves about the need for a bowel plan would be crucial, because spinal cord injury patients are often initially reluctant to accept bowel management. Dr. Morse explained that if Reaves were not open to adopting a bowel management plan, it would not be sufficient for providers to merely offer him as-needed laxatives, which is the current mode of treatment. Rather, he should be part of a patient-provider partnership, with a provider who is skilled in this particular area of medicine, so that he can be made to appreciate the life-threatening nature of having an unmanaged neurogenic bowel. She emphasized that patient education is crucial to many aspects of his care, and she opined that his brain injury makes this type of education especially important.

Reaves does not currently have regular, predictable bowel movements. According to Ireland and Dr. Somers, he is not constipated and there is no problem with his present situation. Dr. Somers explained that nurses and CNAs are supposed to keep track of his bowel movements in a nursing log, but they do not always do so. According to Dr. Somers, he had a bowel movement

---

[6] Reaves has been monitored in the past for refusing food. The cause of these refusals is not clear. In 2006, the then-Commissioner of the DOC sought and received a permanent order allowing the DOC and its healthcare providers to use a nasogastric tube to provide nourishment and conduct intravenous hydration. (Docket No. 41-15 at 2.)

every two to three days at SBCC.  According to Ireland, he had a bowel movement every other day.  Ireland explained that if he did not have a bowel movement after three days, he was offered Milk of Magnesia or a laxative suppository.  His medical records show periods of five or more days with no documented bowel movements and no laxatives provided, both at SBCC and more recently at MCI Shirley.[7]

In addition to preventing constipation, regular bowel movements are necessary to avoid infection.  Reaves defecates in his bed, and he must call staff to come to his cell to clean him after he has had a bowel movement.  The unpredictability of this situation means that his skin is vulnerable to infection, because it is exposed to fecal matter after every evacuation.[8]

According to Dr. Morse, it is necessary that a physician who has expertise in spinal cord injury medicine direct Reaves's care.  She testified that he is at risk of further serious and potentially irreversible injury if his medical care does not improve.  She explained:

> A spinal cord injury specialist is an absolutely critical component of Mr. Reaves' care at this point in time, as his condition has deteriorated so far and the complications he is experiencing are so grave that he requires prompt spinal cord expertise in managing these complications to avoid premature death.

(Docket No. 15-2 at 5.)

---

[7] For example, the infirmary daily flow records from SBCC show that for a five-day period in December of 2015, Reaves did not have a bowel movement, and he was not given laxatives. (P exs. 56, 76.)  The records from MCI Shirley show a similar nine-day period in January of 2016. (P exs. 73, 74.)

[8] Reaves also testified that he does not eat red meat or pork because they cause digestive issues. He recalled that his bowel movements were more regular during his inpatient stays at LSH, during which he was fed more fruits and vegetables.  He asked for a diet without red meat or pork at SBCC, but this request was denied.  Dr. Somers testified that she is only allowed to prescribe certain medically-necessary diets; for other restrictions, she has to get permission from the nutritionist.  She did not seek permission from the nutritionist to switch Reaves to a diet without pork or red meat, or to a diet with more roughage.

Dr. Morse's report was given to Dr. Somers in June of 2014, approximately five months after Reaves arrived at SBCC.  Dr. Somers did not respond to Dr. Morse's suggestions.

*Pre-Lawsuit Medical Care at SBCC*

The medical records show a marked increase in medical care after Reaves filed this suit on July 7, 2015.  In the eighteen months during which he was housed at SBCC before he initiated the suit, he was treated inpatient at LSH for dermatitis and had one physical therapy assessment at SBCC for neck pain.  One nursing plan was drafted in relation to his ongoing care, which did not address his hearing deficit, bowel care, or AD.  In the six months after he filed suit, he was admitted to LSH for a short inpatient stay to "start rehab" and was then seen by three physiatrists, an audiologist, a podiatrist, a urologist, and an orthopedic surgeon.  Additional appointments were scheduled in the future for further testing.  He had two mental health consultations and was given several adaptive devices.  Three additional care plans were drafted, which addressed AD and bowel care.  The medical staff were trained, for the first time, on AD and ROM.  Despite this precipitous uptick in interventions, the MPCH Defendants maintain that Reaves's care has always been adequate.  Reaves's pre- and post-lawsuit care is explained in more detail below.

In the spring of 2014, Reaves had a one-month inpatient stay at LSH to treat his lower-extremity dermatitis. (D ex. 1 at 9.)  While at LSH, he had a nutritional assessment and was deemed to be underweight. (D ex. 1 at 13-14.)  Dr. Somers testified that, when he returned from LSH, he was offered a health shake three times per day.  He also had an occupational therapy assessment at LSH, in which he was assessed for hand-splinting.  The splinting was deemed unsuccessful on his left hand. (D ex. 1 at 9.)  Dr. Somers testified that the occupational therapy consultation was provided at LSH's initiative, not her own.  The discharge notes from this in-patient stay at LSH also contain a recommendation that Reaves see a podiatrist every six to eight weeks for nail care.

(D ex. 1 at 9.)  According to Dr. Somers, Reaves was already receiving this frequency of nail care. However, the medical records indicate that aside from his two inpatient stays at LSH he did not see a podiatrist at SBCC until the fall of 2015.

The pre-lawsuit records contain one "physical therapy progress note" from September of 2014.  The purpose of this visit was apparently to address pain and stiffness in Reaves's neck.  The physical therapist noted that, in order for Reaves to achieve a sitting position, he would need intensive physical therapy involving equipment that was not available at SBCC. (P ex. 9.)

One nursing care plan, dated December 1, 2014, predated the initiation of this lawsuit.  This plan provided for "joint ROM" but did not contain any specifics regarding which joints, how to perform the ROM therapy, or for what duration.  The plan contained no mention of AD, bowel care, or Reaves's hearing deficit. (D ex. 2 at 43, 46-47.)

<u>Medical Care during the Pendency of this Lawsuit</u>

Reaves filed this lawsuit on July 7, 2015.  Approximately three weeks later, he was admitted to LSH to "start rehab." (D ex. 1 at 15.)  He remained at LSH for three weeks and was discharged on August 21, 2015.  Dr. Somers testified that she requested this inpatient stay after speaking with the prison's physical therapist, who said that it would not be possible to conduct the therapy necessary to improve Reaves's mobility while he was at SBCC.

While at LSH, Reaves had a physical therapy evaluation, during which he reported to the therapist that he wanted to get stronger and regain the ability to sit in a wheelchair.  The therapist concluded that he should receive thirty minutes of ROM therapy three times per week. (D ex. 1 at 21-22.)  The notes for this evaluation do not specify the parts of his body on which the ROM therapy should be performed or the specific types of movements.  Reaves testified that medical staff at LSH performed ROM therapy for thirty to forty-five minutes at a time during his stay, and

that his flexibility increased as a result.  The physical therapy discharge notes from LSH indicate that he had a spasm during a physical therapy session. (D ex. 1 at 18.)  He testified that, since approximately 2010, he has been having spasms that cause his back to arch.  At least one such spasm occurred during his testimony in this case.

According to Dr. Morse, the physical therapy that Reaves received at LSH during his inpatient stay in the summer of 2015 was inadequate.  No formal program was created to increase his range of motion or strength; LSH is not a hospital that normally provides rehabilitative therapy to quadriplegic patients; and the providers do not have experience with spinal cord injury patients.  According to Dr. Morse, an order for unspecified ROM therapy three times per week is not sufficient to maintain Reaves's physical condition, let alone improve it.

Reaves also had an occupational therapy evaluation at LSH.  The occupational therapist fitted him with a palm protector[9] and hand splints.  The splint on his left hand caused skin irritation and was discontinued. (P ex. 13 at 2-3.)  According to Reaves, no work was done at LSH with adaptive tools.  In December of 2015, two weeks before the hearings began in this case, he was given a Velcro strap for utensils to slide into, but it was not properly fitted onto his hand. He was also given an adaptive spoon, bowl, plate, and cup.  According to Reaves and Dr. Morse, Reaves is unable to use these devices in his current condition.

On October 8, 2015, approximately two months after Reaves filed the instant motion for preliminary injunction, Dr. Somers sent him to Anthony Lee, MD, who is an outside provider unaffiliated with MPCH.  Dr. Somers testified that she sent Reaves to Dr. Lee because she felt that he should be seen by a physiatrist.  Dr. Lee is a physiatrist, but he does not specialize in spinal

---

[9] A palm protector is a piece of soft material that protects his palm from being macerated by his fingernails.

15

cord injuries.  He noted this in his report and suggested that Reaves see a provider with the appropriate expertise.[10]

Although Dr. Lee is not a spinal cord injury specialist, he evaluated Reaves and made a number of suggestions for changes to his care. (P ex. 28 at 1-3.)  He noted irritation around Reaves's penis and scrotum and recommended switching to a non-latex catheter, as well as a urology follow-up.[11]  Dr. Lee noted extensive skin breakdown on the fronts of Reaves's legs, as well as an ulcer in his sacral area, and he recommended continued wound care and regular turning. Because there were small areas of dried blood on Reaves's feet, Dr. Lee recommended that he see a dermatologist, as well as a podiatrist every two-to-three months for nail care.  He recommended a follow-up with an ear, nose, and throat doctor (ENT) to unclog his left ear and noted that he should see an ENT at least once per year.  Dr. Lee recommended ROM therapy on all joints, as well as one full contraction of each muscle group to prevent atrophy.  He also recommended "tilt table" training to increase Reaves's tolerance for being upright.  He noted that this would take some time, because Reaves has been lying down for approximately seventeen years.  Dr. Lee noted as a long-term goal that Reaves should be able to sit upright and feed himself with an adaptive cuff.  He recommended that Reaves see a surgeon to discuss possible surgical release of his contractures and noted that "[t]here was a question of amputation," but he did not recommend it.[12]

---

[10] He stated: "Although I am a physiatrist, I am not fellowship trained in spinal cord injury. My medical practice consists of patients with back or neck pain or other pain syndromes. I would recommend that Mr. Reaves see a spinal cord injury specialist who is fellowship-trained in spinal cord injury to manage him further. Although not urgent, I recommend that he see such specialist within the next 2-3 months." (P ex. 28 at 3.)
[11] Like his bowel, Reaves also has a neurogenic bladder.
[12] Reaves learned for the first time during his visit with Dr. Lee that Dr. Somers had asked Dr. Lee to assess him for potential amputation of his legs.  Reaves was extremely upset when he learned this.  He is adamantly opposed to amputation.

After Reaves visited Dr. Lee, Dr. Somers requested an in-house podiatry consultation; issued an order for repositioning; scheduled a surgical consultation; scheduled an orthopedic consultation; scheduled an appointment with an audiologist; and scheduled a urology consultation. The orthopedic consultation occurred at LSH, with Adriana Carrillo, MD, who is not a spinal cord injury specialist. Dr. Carrillo evaluated Reaves for potential surgical release of his contractures and determined that he would not benefit from this treatment. Dr. Carrillo noted that she was familiar with Reaves and that he had previously been "deemed not a candidate for any rehabilitation." (P ex. 8 at 1.)

Dr. Somers also testified that she provided ROM therapy in response to Dr. Lee's recommendation that Reaves should receive physical therapy to exercise his joints. However, the medical records do not indicate the frequency of ROM therapy, nor do they indicate that Reaves received ROM therapy on his upper extremities. Reaves was also given a feeding cuff, although it appears that he is unable to use it in his current condition.

On November 13, 2015, Reaves saw an audiologist who characterized his hearing loss as "moderately severe" to "profound" in both ears. The provider noted that Reaves needed new hearing aids but had to have wax removed before he could be fitted. (P ex. 48.) He saw an ENT for wax removal and was then fitted with new hearing aids on December 11, 2015, the week before the hearings began in this case. (P exs. 51, 52.) After several nurses tried unsuccessfully to insert the hearing aids into his ears, Ireland had a phone consultation with the audiologist to assist with the process. Reaves cannot insert the hearing aids himself because he cannot use his hands. The hearing aids were adjusted for feedback issues on December 28, 2015.

Reaves had previously been seen by an audiologist in 2013, who similarly found that his hearing loss was "moderate to severe" in his right ear and "moderately severe to severe" in his left

hear.  This provider noted that Reaves had been wearing hearing aids for more than ten years.  (Docket No. 15-7.)  He arrived at SBCC in 2014 with five individual hearing aids, but they did not work properly or were not consistently and/or correctly inserted into his ears.  Reaves testified that, when his hearing aids are not inserted correctly or are not functioning properly, he becomes frustrated because he cannot hear what people are saying to him.  According to Reaves, medical personnel do not always check to see if he can hear them.  He testified that, prior to December of 2015, the last time he was given new hearing aids was after a hearing in Superior Court in 2013.

Although the medical records unquestionably indicate that Reaves is hearing impaired, Dr. Somers testified that she performed a "whisper test" several months before the hearings began in this case.  She testified that she conducted this test because Reaves would often "ignore her" when she spoke to him.   Having recently suggested that Reaves share his room with an inmate in a vegetative state as a response to his request for socialization, and knowing that Reaves was adamantly opposed to this idea, Dr. Somers walked into his room and "whispered" to the nurse, "Today we're going to get Mr. Reaves a roommate."  According to Dr. Somers, Reaves "exploded" in response.

In response to Dr. Lee's recommendation that Reaves see a physiatrist who specializes in spinal cord injuries, on December 2, 2015 Dr. Somers sent him to Faren Williams, MD.  Dr. Williams is a physiatrist, but it is not clear that she has any appreciable experience treating patients with spinal cord injuries.  Dr. Williams noted that Reaves's risk for AD is low because he "is supine most of the time." (P ex. 29 at 3.)  According to Dr. Morse's description of AD and its causes, the fact that Reaves is confined to a supine position does not eliminate his risk.  Dr. Williams also noted that Reaves would not benefit from physical and/or occupational therapy,

because his contractures are longstanding and fixed, and she did not recognize a need to work on his functioning muscle groups for atrophy prevention. She did recommend a urology assessment.

On December 8, 2015, Ireland authored a "feeding procedure." This procedure listed the adaptive bowl, plate, cup, utensils, and Velcro strap that Reaves was given at around the same time, which were the first adaptive devices he received at SBCC. The feeding plan also stated, "Bilateral upper extremity passive range of motion to be offered and provided before or after noon meal," and "Passive range of motion to include wrist, elbow, shoulder and fingers." (P ex. 14.) This is the first record to indicate provision of upper-extremity ROM therapy at SBCC. No further description was given regarding the duration of the therapy, the specific movements to be performed, or whether staff were instructed on how to perform the ROM therapy.

On December 15, 2015—the day before the hearings began in this case—Reaves was taken to a third physiatrist, Heidi Wennemer, DO. Unlike Drs. Lee and Williams, Dr. Wennemer is a spinal cord injury specialist. Dr. Somers testified that she sent Reaves to Dr. Wennemer because Drs. Lee and Williams had disagreed with one another in their findings and recommendations. Dr. Somers provided Dr. Wennemer with the notes of Drs. Lee, Williams, and Carrillo, as well as a list of "Specific Physiatry-related questions pertaining to patient Tim Reaves' care plan":

- Bowel Management Plan
- Autonomic Dysreflexia
- Sacral Ulcer
- Dynamic Splinting and/or Serial Casting
- Adaptive Equipment
- Nutritional Needs
- Nail Care
- Sleep Surface
- Repositioning
- Physical and Occupational Therapy (including frequency and type of care)
- Frequency of follow-up care w/ spinal cord injury expert

(D ex. 13 at 480A.)

Dr. Wennemer examined Reaves and issued a written report, dated December 15, 2015. (P ex. 32.)  Her overall impression was as follows:

> C5 Asia A complete tetraplegia[13] with worsening orthostatic hypotension, worsening autonomic dysreflexia and worsening spasticity.  The patient has severe contractures in all 4 extremities. No functional use of arms and legs.  Neurogenic bowel and bladder. Bilateral lower extremity skin breakdown and wounds consistent with a fungal dermatitis, healed stage IV sacral ulcer and obvious psychologic overlay.  Severe hearing loss.

(P ex. 32 at 3.)

Many of Dr. Wennemer's recommendations mirrored those of Dr. Morse, who is the only other spinal cord injury specialist to have evaluated Reaves in recent history.  In her report, Dr. Wennemer noted that Reaves had an AD event during his visit, with no clear inciting source.  His supine blood pressure readings were 154/100 and 140/88.  Because the event corresponded with urination, she suspected that he had a urinary tract infection.  She was also concerned about incomplete bladder emptying and recommended bladder studies to ensure that he is not retaining urine, as this would increase his risk of reflux to the kidneys, kidney damage, and pyelonephritis.[14] She noted that although he is at a high risk for pressure ulcers on his skin, his skin appeared to be well cared for.  She found that he may benefit from spasticity treatments for his contractures, although his options are limited because he has severe orthostatic hypotension.[15]  She

---

[13] Dr. Morse explained that the words "quadriplegia" and "tetraplegia" are interchangeable.  She disagreed with Dr. Wennemner's opinion that Reave's injury is C5 ASIA A rather than C6 ASIA B but explained that this distinction would not have a significant effect on his treatment.

[14] Pyelonephritis is "[i]nflamation of the renal parenchyma, calyces, and pelvis, particularly due to local bacterial infection." Stedman's Medical Dictionary 1471 (26th ed. 1995).

[15] "Orthostatic" relates to "an erect posture or position," and "hypotension" is "[s]ubnormal arterial blood pressure." Stedman's Medical Dictionary 839, 1263 (26th ed. 1995).  Thus, Reaves's blood pressure drops when his head is elevated.

recommended a Baclofen pump trial.  She suspected that his spasms, as well as his shoulder and neck pain, may be caused by a posttraumatic syringomyelia.[16]  She recommended an MRI.

Regarding Reaves's bowel, Dr. Wennemer recommended that he take a daily suppository to schedule his bowel movements.  She noted, however, that he did not seem open to this suggestion. (P ex. 32 at 4.)  She recommended an annual x-ray of his kidney, ureter, and bladder (KUB) to check for obvious obstructions, noting that patients with inadequate bowel evacuation are at risk for developing megacolon.  She recommended an annual EKG to assess his heart function.  She recommended that medications be available as needed for AD, including nitroglycerin paste to lower his blood pressure.  She noted that the most likely triggers for AD are bowel and bladder issues and pressure ulcers, and that staff should be educated on the signs and symptoms of AD.  Because AD is potentially fatal, she was concerned to learn from Dr. Somers that Reaves often refuses to have his blood pressure checked.

Dr. Wennemer further recommended an annual chest x-ray and pneumococcal vaccination and an antifungal cream for a rash on his lower extremities.  She recommended physical therapy and hand splints for his contractures.  She noted that his spasticity and contractures would need to be addressed with physical therapy by a spasticity specialist before he could begin to attempt to sit

---

[16] A syringomyelia, also called a "syrinx," is defined as:

> The presence in the spinal cord of longitudinal cavities lined by dense, gliogenous tissue, which are not caused by vascular insufficiency.  [Syringomyelia] is marked clinically by pain and paresthesia, followed by muscular atrophy of the hands and analgesia with thermoanesthesia of the hands and arms, but with the tactile sense preserved; later marked by painless whitlows, spastic paralysis in the lower extremities, and scoliosis of the lumbar spine. Some cases are associated with low grade astrocytomas or vascular malformations of the spinal cord.

Stedman's Medical Dictionary 1749 (26th ed. 1995).  Dr. Wennemer noted in her report that "[a]pproximately 25% of patients with traumatic spinal cord injury will develop a posttraumatic syringomyelia," and that "[t]his can occur many years after the initial injury." (P ex. 32 at 3.)

up.   After addressing the contractures, medications could be used to combat his orthostatic hypotension.   She noted that if physical therapists were able to address his hip and knee contractures, and if his spasticity could be controlled to prevent back extension spasms, he may achieve the ability to use a wheelchair.  She noted that he has "clear anger and frustration with his current situation" and a history of noncompliance, and that he would benefit from psychological support.  (P ex. 32 at 4-5.)

At the time of Dr. Wennemer's evaluation, Reaves was already scheduled to see a urologist pursuant to Dr. Lee's recommendation.  The urologist's notes, dated December 18, 2015, indicated that he was referred for irritation on his penis, not for bladder studies.  According to Dr. Somers, the urologist reported that Reaves should have an ultrasound before beginning bladder studies. The report made no mention of bladder studies but did state that Reaves should have a yearly renal ultrasound to check for changes in his upper urinary tract, and that he had not had a renal ultrasound in approximately six years. (D ex. 13 at 486.)  Reaves had this ultrasound on February 2, 2016, and the report showed no evidence of hydronephrosis. (D ex. 19E at 758.)  The report made no mention of bladder studies, and the records do not indicate whether Reaves has since been evaluated for bladder studies, as Dr. Wennemer recommended.

In response to Dr. Wennemer's recommendations, Dr. Somers provided Reaves with a mental health consultation on December 22, 2015.  This appears to be his first mental health visit since arriving at SBCC.  Reaves told the clinician, "I don't talk to Mental Health.  I talk to myself," and "Stay out of trouble, don't talk to too many people." (D ex. 13 at 488.)  Reaves had a second mental health consultation on January 15, 2016, for the purpose of addressing his refusals of medical treatments and interventions.  Despite Dr. Somers's testimony that Reaves often refuses beneficial treatments, this appears to be the only time that she referred him to mental health to

address his noncompliance.  Reaves told the clinician that he does not refuse treatment, and that adequate treatment has not been offered to him.  He explained that mental health staff would not be of use to him unless he is seen at least five days per week, a frequency that the provider told him "was not feasible."  The clinician noted that Reaves appeared angry with his access to mental health services and that he "employed sarcasm as [a] means of conveying this."  The clinician noted that Reaves's "presentation appeared to soften" when she attempted to learn what had been helpful to him in the past. (P ex. 78.)

Reaves also complained to the mental health clinician about the lack of confidentiality in his care.  All of Reaves's medical and mental health care occurs with a correctional officer in the room.  Ireland explained that able-bodied inmates are shackled to a chair during their mental health visits, without a correctional officer in the room.  With Reaves, who cannot be shackled to a chair because he cannot sit up, the presence of the correctional officer is purportedly for the safety of the mental health professional, because he has a history of "verbal outbursts" and "spitting."

Dr. Somers also scheduled an MRI in response to Dr. Wennemer's recommendation. Reaves was not told about the appointment until 12:30 a.m. on the day that it was to occur, and he refused to go. (D ex. 19G at 771.)  It is undisputed that Reaves does not react well to being woken up during the night.  He had an arrangement with staff at SBCC to not wake him for repositioning. The MRI incident occurred after his most recent transfer to MCI Shirley.  It is not clear from the medical records whether the MRI occurred at a later date and, if so, what the test revealed.

Dr. Somers testified that she scheduled an appointment for Reaves to see a neurosurgeon to evaluate him for hand splints and a possible Baclofen pump trial.  The records do not indicate whether this appointment occurred or what the results were.  Dr. Somers ordered nitroglycerin paste to have on hand for AD episodes, although she maintains that she has never seen Reaves

have any signs or symptoms of AD.  Dr. Somers testified that she wrote an order for laxatives but

Reaves refused to take them, as he has done many times in the past.  There is no indication of any

other interventions for the purpose of establishing a bowel program.  Reaves was offered a chest

x-ray and a pneumococcal vaccine, but he refused both.  Dr. Somers ordered a KUB, and Reaves

initially refused that as well.  He later agreed to have the KUB after being educated about its

benefits.  This test revealed that he has a "[p]ossible megacolon," with "[l]arge amount of fecal

material present in colon."  The radiologist noted that a prior x-ray from January of 2011 had

"showed the presence of marked, acute distended colon," and that there were "marked

degenerative changes and loss of joint space of both femoral heads." (Docket No. 75-1 at 1.)  It is

not clear what, if anything, has been done in response to these findings.

In response to Dr. Wennemer's recommendation, the staff at SBCC were trained on the

signs and symptoms of AD.  This training occurred in late December of 2015 or early January of

2016 and included written materials. (D ex. 16 at 521-24.)  There was also an in-service training

on ROM therapy, which was referred to as a "read and sign" training and included written materials

with instructions for performing ROM. (D ex. 15 at 504-20.)  According to Ireland, staff read the

materials, signed off in acknowledgment of having done so, and then a physical therapist assistant

spoke to them about what they had read.  The written materials are not specific to Reaves, nor are

they specific to spinal cord injury patients.  The list of exercises includes movements that Reaves

is unable to do in his current condition, and which could be dangerous if attempted.  According to

Ireland, both of these trainings have also been conducted at MCI Shirley.

Dr. Somers testified that Reaves is a difficult patient and often refuses care.  Pursuant to

the DOC's policies, medical staff are required to document such refusals, indicating what care was

refused, and that the medical provider attempted to counsel the patient and explain the benefits of

24

the proposed care or treatment. 103 DOC 630.19.   The record contains 470 "release of responsibility" forms dated April 14, 2014 to February 5, 2016.   Of these refusals, 247 were for vital signs; 167 were for repositioning; and 159 were for tooth brushing.   During those twenty-two months, Reaves refused ROM therapy nineteen times.   With the exception of one ROM therapy refusal in September of 2015, the remainder occurred between December of 2015 and February of 2016.   Reaves testified that he refused ROM therapy only when it was offered late at night, because the physical stimulation prevents him from falling asleep.

Reaves acknowledges that he sometimes refuses to have his blood pressure checked.   He explained that in the past when his blood pressure was high or low, nothing was done about it.   He is aware that blood pressure variations are potentially dangerous.   Unless some action will be taken as a result, he prefers not to know about the fluctuations because they make him anxious.   He has also refused some medications because he is concerned about side effects and liver damage.   He does not take vitamins because he thinks that they cause liver damage and blurred vision.   He testified that he is interested in improving his health, and he denied having refused care for the purpose of hurting himself.   He acknowledges that he refused food for a period of time after he learned that his mother had passed away.   He testified that he was not aware of any of the hundreds of release-of-responsibility forms that were completed as a result of his refusals of care.[17]

-------

[17] In 2006, the DOC sought and received a permanent order allowing the DOC and its healthcare providers to use reasonable force to take vital signs; conduct physical examinations; use subcutaneous and intravenous medication; and take other reasonable medical procedures necessary to evaluate and monitor Reaves's medical condition, including but not limited to repositioning, bathing, and changing dressings on his lower extremities. (Docket No. 41-15 at 2.)   In 2013, the DOC sought to expand this order to include the use of reasonable force to compel Reaves to receive medications orally and rectally, and to insert a urethral catheter.   This petition was denied. (Docket No. 41-15 at 8.)   In her written decision, the judge noted that Reaves's refusals of certain treatments "seem[ed] to be rooted, in part, in misinformation or lack of information about his ailments and the treatments that have been offered to alleviate them." (Docket No. 41-15 at 8.)

It is undisputed that Reaves has special medical needs. The DOC's policies require written treatment plans for each individual who has special medical needs, including:

> [S]hort-term and long term goals, adaptation to the correctional environment, specific interventions, instructions about diet, exercise, and medication, the type and frequency of laboratory and diagnostic testing, the frequency of follow-up for medical evaluation, and provisions for referral to supportive and/or rehabilitative services when necessary.

103 DOC 620.04. The records do not indicate that Reaves arrived at SBCC with a written treatment plan. During his stay, three "nursing plans" were drafted. Ireland explained that nursing plans are written documents that include identification of patient problems, goals for resolution or mitigation of those problems, and interventions designed to accomplish those goals.

The first nursing plan, dated December 1, 2014—approximately eleven months after Reaves arrived at SBCC—listed the following problems: impaired physical mobility; bilateral foot drop; wrist and hand contractures; spasticity; self-care deficit; "patient established bed rest limitation"; sensory deficits; labile emotional stability and mood irritability; impaired coping; impaired decision making and problem solving; anger at staff; "instutionalization syndrome" and refusing treatment; knowledge deficit; risk for impaired skin integrity; low weight; urinary and bowel incontinence; venous insufficiency lesions; and non-healing wounds on lower extremities. (D ex. 2 at 43, 46-47.) For interventions, the plan included a directive to "assess level of ROM / joint mobility to establish a baseline" and to "give joint ROM during complete care and dressing changes using gentle PROM." (D ex. 2 at 43.) The plan also directed the staff to "periodically encourage wheelchair use (stored in cell) as an alternative positioning option." (D ex. 2 at 43.) It is undisputed that Reaves cannot be moved into a seated position, and that this has been his condition since before he arrived at SBCC. The plan does not mention bowel care, AD, or Reaves's hearing deficit. The plan refers to use of adaptive devices; however, Reaves was not

26

provided with any adaptive devices at SBCC until approximately one year after the plan was written.

The second nursing plan was dated in the late fall of 2015, after Reaves's visit with Dr. Lee.[18] This plan listed the following problems: deafness and wax buildup; impaired dentition; risk for constipation and bowel incontinence; and risk for impaired skin integrity. (D ex. 2 at 42, 44-45, 48.) This is the first plan to address Reaves's bowel management. As a goal, it stated "maintain passage of soft, formed stool every 1-3 days without straining."[19] (D ex. 2 at 45.) As interventions, the plan provided: "document bowel movement frequency," "encourage fluid and fiber intake," "listen to bowel sounds," "provide incontinence care as needed," and "encourage frequent repositioning and attempts to get out of bed." (D ex. 2 at 45.) Once again, it is undisputed that Reaves is unable to get out of bed in his current condition, and that it would be unsafe for him to try to do so. This plan did not mention laxatives or stool softeners and contained no reference to AD.

The third nursing plan was dated January 6, 2016, approximately two years after Reaves arrived at SBCC. This plan addressed AD. (D ex. 14 at 503.) The plan stated that AD is considered a medical emergency and listed numerous interventions, including monitoring sudden changes in blood pressure, checking urinary drainage, and checking for fecal impactions. The plan specified that a blood pressure elevation of 20-40 millimeters of Mercury above baseline would be cause for concern. The plan did not provide a baseline and listed "establish a baseline blood pressure" as a

---

[18] The month is not visible on the exhibit provided; however, the plan refers to Dr. Lee's assessment, which occurred on October 8, 2015.

[19] Ireland conceded, however, that because of Reaves's injury, he is physically incapable of straining.

needed intervention.  Ireland, Dr. Somers, and Dr. Morse each testified that Reaves's baseline blood pressure is approximately 100 in the systolic reading.

On January 25, 2016, Reaves was transferred from SBCC to MCI Shirley.  Neither Dr. Somers nor Ireland are in charge of Reaves's care at MCI Shirley, but the recommendations and treatment plans from SBCC traveled with him, and Ireland met with staff to ensure that there is continuity of care.  On the day of the transfer, Maria L. Angeles, MD, who is the primary care provider at MCI Shirley, completed a "physician's order form." (D ex. 19C at 752.)  This form provides that an MD should be called if Reaves's blood pressure is higher than 160 in the systolic reading, which is twenty-to-forty millimeters of Mercury higher than what is listed as a risk for AD on the January 6, 2016 nursing care plan, using Ireland and Drs. Somers and Morse's estimated baseline.  This form also contains an order to assist Reaves into a chair, which, as noted above, is not possible or safe for him at this time.  The order contains no entries relating to bowel management.

Ireland created another care plan, also dated January 25, 2016, which was crafted in response to Dr. Wennemer's report for the purpose of establishing continuity of care between SBCC and MCI Shirley.  The plan contains cut and pasted items from Dr. Wennemer's report, organized by category, with MPCH's response or plan for each item.  The plan includes Reaves's then-upcoming appointments, including an MRI, a renal ultrasound, and a neurosurgical consultation.  Regarding physical therapy, under Dr. Wennemer's opinion that Reaves could achieve a seated position with appropriate therapies to address his contractures, the plan states "potential future goal." (D ex. 19B at 751.)  The plan contains no upcoming physical therapy appointments or plans for treatment other than twice-daily ROM therapy on his upper and lower extremities.  MPCH employs one physical therapist who works on a per diem basis and a physical

therapist assistant who is at MCI Shirley three-to-five days per week.  As of February 22, 2016, Reaves had not seen either of these providers, and no physical therapy appointments had been scheduled.  The plan makes no mention of occupational therapy.   Regarding bowel care, the plan notes that "a suppository was ordered on 1/11/16 to provide a bowel regimen.  [Reaves] is currently refusing." (D ex. 19B at 749.)

### *This Lawsuit*

Reaves filed this lawsuit on July 7, 2015, asserting the following claims: cruel and unusual punishment by deliberate indifference to serious medical needs, in violation of the Eight Amendment to the U.S. Constitution and Article 26 of the Massachusetts Declaration of Rights (counts I & II); violation of Title II of the Americans with Disabilities Act (ADA) (count III); violation of the Rehabilitation Act (count IV); violation of Article 114 of the Constitution of the Commonwealth of Massachusetts (count V); cruel and unusual punishment by conditions of confinement, in violation of the Eighth Amendment to the U.S. Constitution and Article 26 of the Massachusetts Declaration of Rights (counts VI and VII); cruel and unusual punishment by failure to protect, in violation of the Eighth Amendment to the U.S. Constitution and Article 26 of the Massachusetts Declaration of Rights (counts VIII and IX); violation of procedural due process pursuant to the Fourteenth Amendment to the U.S. Constitution and Articles 1, 10, and 12 of the Massachusetts Declaration of Rights (counts X and XI); violation of the Massachusetts Civil Rights Act (count XII); medical malpractice (count XIII); and intentional infliction of emotional distress (count XIV).

Reaves moved for a preliminary injunction on August 13, 2015, seeking immediate changes to his medical care and accommodations for his disabilities.[20]  This Court conducted seven days of hearings between December of 2015 and March of 2016.  Although his medical care has been ongoing, the parties have been unable to agree to supplement the record since the final day of the evidentiary portion of the proceedings, which was February 22, 2016.

The parties submitted revised proposed orders in March of 2016.  In regard to his medical care, Reaves seeks an immediate but temporary transfer to a healthcare facility that specializes in the care of patients with spinal cord injuries.  Upon release from this facility, he requests that MPCH engage a specialist in spinal cord injury, with expertise in treating and managing the care of motor complete tetraplegic patients, to direct all aspects of his care.  He further requests that MPCH shall take all necessary steps to ensure the maintenance of his functioning; that MPCH shall have him assessed annually by an audiologist and provide him with working hearing aids; and that MPCH shall provide care performed by medical staff who have been trained by a spinal cord injury specialist.  He further requests that the DOC and MPCH ensure that all necessary medical care, hygiene care and activities of daily living occur on a regularly prescribed schedule that will not be interrupted as a means of behavioral management.

## Standard of Review

When considering a motion for a preliminary injunction, this Court weighs four factors: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the

---

[20] Reaves's initial motion for preliminary injunctive relief also included arguments and requested relief relating to his claim for unconstitutional conditions of confinement, on the basis of denial of socialization and human contact; unsanitary conditions; and denial of access to the outdoors.  His requests for socialization and outdoor access are encompassed in his ADA claims for the purposes of the preliminary injunction.  Regarding unsanitary conditions, the initial motion was filed before his move to MCI Shirley.  He does not presently ask for relief relating to this claim.

absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." *Jean v. Massachusetts State Police*, 492 F.3d 24, 26-27 (1st Cir. 2007) (citation omitted).  This Court is also guided by the terms of the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, which provides in pertinent part:

> Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief . . . .

18 U.S.C. § 3626(a)(2).

## Discussion

*1.   Likelihood of Success on the Merits: Deliberate Indifference to Serious Medical Needs*

"Prisoners retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 563 U.S. 493, 510 (2011).  This precept finds constitutional support in the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII.[21]  The Eighth Amendment is the source of "the principles that govern the permissible conditions under which prisoners are held," including "the medical treatment those prisoners must be afforded." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014), *cert. denied sub nom. Kosilek v. O'Brien*, 135 S. Ct. 2059 (2015).

---

[21] Reaves also asserts a deliberate indifference claim under Article 26 of the Massachusetts Declaration of Rights, which the Massachusetts Supreme Judicial Court has read "to be at least as broad as the Eighth Amendment to the Federal Constitution." *Good v. Comm'r of Correction*, 629 N.E.2d 1321, 1325 (Mass. 1994).  For the purposes of the instant motion, Reaves focuses his arguments on the federal claim.

"To incarcerate, society takes from prisoners the means to provide for their own needs," rendering each inmate entirely dependent on the State for his or her medical care. *Brown*, 563 U.S. at 510. "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care." *Id.* at 510-11. "Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment." *Kosilek*, 774 F.3d at 82 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A prison that deprives inmates of adequate medical care "is incompatible with the concept of human dignity and has no place in civilized society." *Brown*, 563 U.S. at 511.

Because the Eighth Amendment is focused on punishment, however, "not all shortages or failures in care exhibit the intent and harmfulness required to fall within its ambit." *Kosilek*, 774 F.3d at 82. Moreover, "[c]ourts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown*, 563 U.S. at 511. Nevertheless, courts "must not shrink from their obligation to 'enforce the constitutional rights of all persons'" and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* (quoting *Cruz v. Beto,* 405 U.S. 319, 321 (1972)).

In order to prove an Eighth Amendment violation based on inadequate medical care, a prisoner must satisfy two elements: "(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek*, 774 F.3d at 82; *see Estelle*, 429 U.S. at 106. When analyzing an Eighth Amendment claim, "the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination," and "similar evidence . . . may be relevant to both

32

components." *Kosilek*, 774 F.3d at 83 n.7 (quoting *Leavitt v. Corr. Med. Servs., Inc.,* 645 F.3d 484,

498 (1st Cir. 2011)).

As a threshold matter, the DOC argues that it cannot be held liable for any Eighth

Amendment violations because MPCH is solely responsible for providing medical and mental

health care to the DOC's inmates.   The DOC's contract with MPCH provides:

> The Contractor . . . shall be solely responsible for making all
> decisions with respect to the type, timing and level of Services
> needed by Inmates covered by the Program. This includes, without
> limitation, the determination of whether an Inmate is in need of
> clinical care, inpatient hospitalization, and/or referral to an outside
> specialist or otherwise needs specialized care.   Except as herein
> otherwise provided, the Contractor shall be the sole supplier and/or
> coordinator of all medical, mental health, forensic mental health and
> dental programs constituting services under this Contract, and, as
> such, shall have the sole authority and responsibility for the
> implementation, modification and continuation of any and all health
> care for Inmates.

(Docket No. 37-1 at 7-8.)   The DOC Defendants also cite to the DOC's policies, which  provide

that "Matters of medical, mental health and dental judgment are the sole province of the

responsible physicians, psychiatrists or dentists." 103 DOC 610.01(2).   In response, Reaves argues

that the DOC has a non-delegable duty to ensure the provision of constitutionally appropriate care.

I agree that the DOC's duty to provide medical care to incarcerated individuals is not

absolved by contracting with an entity such as MPCH. *See Ancata v. Prison Health Servs., Inc.*,

769 F.2d 700, 705 (11th Cir. 1985).   "Although [MPCH] has contracted to perform an obligation

owed by the [DOC], the [DOC] itself remains liable for any constitutional deprivations caused by

the policies or customs of [MPCH]." *Id.*   In this sense, the DOC's duty is non-delegable. *Id.*; *cf.*

*West v. Atkins*, 487 U.S. 42, 56 (1988) (holding that private prison doctors working under contract

act under color of state law for purposes of 42 U.S.C. § 1983 and stating, "Contracting out prison

medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody").

Furthermore, the Commissioner of the DOC has an obligation to "maintain . . . safety . . . at all state correctional facilities," and to "investigate grievances and inquire into alleged misconduct within state correctional facilities." Mass. Gen. Laws ch. 124, § 1(b), (i).   The Commissioner also retains the responsibility to ensure that the medical provider has met its contractual obligations, and the Associate Deputy Commissioner of Clinical Services is responsible for receiving complaints about medical care within the prison.  Michael Rodrigues, Deputy Superintendent of Classification and Programs at SBCC, testified that he is the DOC's liaison with MPCH at SBCC, which means that he regularly meets with medical staff in order to ensure that appropriate medical care is being provided to the inmates.  Additionally, the DOC's Health Services Division is responsible for ensuring that the medical contractor develops treatment plans for inmates with special needs. 103 DOC 620.04.  Furthermore, Reaves's claims do not arise from discrete medical judgments.  Rather, he alleges longstanding, systemic deficiencies in his care, spanning multiple medical providers, which have been raised repeatedly with the DOC and its contractual providers.  Under these circumstances, I find that the DOC is a proper defendant in Reaves's constitutional claims for deliberate indifference to serious medical needs.[22]

### A.  *Objective Prong*

To satisfy the objective prong of the deliberate-indifference inquiry, a prisoner must have a serious medical need and must show that the medical care provided by the prison "is not 'adequate,' as measured against 'prudent professional standards.'" *Nunes v. Massachusetts Dep't*

---

[22] The MPCH Defendants also argue that they are entitled to qualified immunity.  This argument is premature, because the instant motion is for injunctive relief, not damages.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Battista v. Clarke*, 645 F.3d 449, 452 (1st Cir. 2011).

*of Correction*, 766 F.3d 136, 142 (1st Cir. 2014) (quoting *United States v. DeCologero,* 821 F.2d 39, 43 (1st Cir. 1987)). A serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Kosilek*, 774 F.3d at 82 (citation omitted). There is no question that Reaves has serious medical needs stemming from his spinal cord injury and hearing impairment. The Defendants do not dispute this point.

The disputed issue is whether the Defendants have provided adequate care for Reaves's serious medical needs. The Eighth Amendment does not impose upon the Defendants "a duty to provide care that is ideal, or of [Reaves's] choosing." *Id.* Rather, the Defendants must provide medical services that are "on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. Derbes,* 369 F.3d 579, 583 (1st Cir. 2004) (quoting *DeCologero*, 821 F.2d at 43).

Reaves argues that Defendants' medical treatment falls short of prudent professional norms in five ways: failing to have his care overseen by a spinal cord injury specialist; failing to provide physical and occupational therapy; failing to provide a bowel program; failing to prevent and/or treat AD; and failing to consistently provide him with working hearing aids. As a remedy for these alleged deficiencies, he requests an immediate but temporary transfer to a healthcare facility that specializes in spinal cord injury care. Upon his return to MCI Shirley, he requests that his care be overseen by a spinal cord injury specialist and that the specialist's recommendations be followed.

As explained below, I find that Reaves is likely to succeed on his claim that Defendants have provided constitutionally inadequate care.[23] However, I also recognize that MPCH has made

---

[23] My findings in this regard are based on the record before me and have no bearing on Reaves's likelihood of success on his state law negligence claim.

efforts to improve his care since this lawsuit was initiated.   Due to the unstable nature of the situation and the ongoing factual developments, I am unable to determine whether he is currently being treated adequately.   Accordingly, I find that a comprehensive equitable remedy is not appropriate at this time, and I elect to give the Defendants an opportunity to rectify the aspects of Reaves's care that are potentially deficient. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994).   In lieu of equitable relief, I will appoint a monitor to observe Defendants' continued treatment of Reaves as this case progresses.

   *i.*   *Care not Overseen by Spinal Cord Injury Specialist*

   Reaves argues that his treatment is inadequate because his care is directed by physicians who do not have expertise in spinal cord injury medicine.   As Dr. Morse explained, spinal cord injury patients require specialized care, including bowel management, physical therapy, occupational therapy, and AD prevention and treatment.   Failure to receive this care can result in severe complications and death.   At SBCC, Reaves was under the care of Dr. Somers, who is not a spinal cord injury specialist.   Dr. Somers did not have him evaluated by a practitioner with spinal cord injury expertise until five months after he had filed the instant lawsuit, which was nearly two years after he had arrived at SBCC.

   The MPCH Defendants assert that they have always provided constitutionally adequate care, and that Reaves's claims became moot when he was taken to see Drs. Lee, Williams, and Wennemer.[24]   According to the MPCH Defendants, the difference between seeing a care provider who specializes in spinal cord injury medicine versus one who does not is a mere disagreement

---

[24] The MCPH Defendants' first memorandum was written before Reaves was taken to Drs. Williams and Wennemer.   In their response to Reaves's most recent proposed order, the MPCH Defendants include the visits to Drs. Lee, Williams, and Wennemer in their argument that they have provided constitutionally adequate care.   They continue to contend that Drs. Lee and Williams are spinal cord injury specialists, despite evidence to the contrary.

over the proper course of treatment, which does not rise to the level of deliberate indifference. *See Kosilek*, 774 F.3d at 82 (prison administrators do not have "a duty to provide care that is ideal, or of the prisoner's choosing."). They assert that because they have followed Dr. Lee's recommendations, Reaves is being give everything that he requested.

The medical records and testimony support Dr. Morse's opinion that spinal cord injury medicine requires specialized knowledge, and that the MPCH Defendants have not provided care that is commensurate with these expertise. Reaves has been evaluated by several physiatrists since 1998, and each has suggested similar modes of intervention to maintain and improve his health, including physical therapy, occupational therapy, mental health therapy, a comprehensive bowel program, and AD monitoring and prevention.[25] Most of these interventions did not become part of Dr. Somers's care plan until after Reaves saw Dr. Wennemer in late 2015. Some recommendations, such as physical therapy, apparently remain unimplemented. The contrast between Dr. Somers's care of Reaves and the care recommended by the spinal cord injury specialists suggests that a provider's specialized knowledge, or lack thereof, can have a significant effect on the course of treatment. Based on Dr. Morse's evaluation, Reaves suffers from severe complications of his injury that are the result of these very deficiencies in care, including his

---

[25] In 1998, the DOC's then-medical provider took Reaves to the Department of Rehabilitation Medicine at the New England Medical Center for an evaluation. The doctors recommended implementing a bowel program that would result in predictable daily or every-other-day bowel movements; physical therapy for improved mobility; twice-per-day ROM therapy on all extremities; ankle splints; hand splints; bracing; and strict adherence to a written schedule in order to build trust and encourage compliance with care. (Docket No. 15-8 at 3-5.) In 2003, a different doctor at the same clinic recommended a bowel program, "aggressive physical therapy," and twice-daily ROM therapy on all extremities. (Docket No. 15-8 at 7.) In 2006, Reaves was seen by a doctor at the Whittier Outpatient Rehabilitation Hospital, who noted that he "had intermittent problems with autonomic dysreflexia presenting as headaches," as well as issues with orthostatic hypotension. (Docket No. 15-18 at 1.) The doctor recommended splinting; aggressive wound care management; a scheduled bowel program; and a behavioral evaluation with a neuropsychologist and ongoing counseling to address his behavioral issues. (Docket No. 15-18 at 3-4.)

advanced contractures, which resulted from years without appropriate therapies. As noted above, Dr. Morse testified that she had never seen a spinal cord injury patient with complications as severe as those affecting Reaves. Moreover, the medical records from SBCC show that when he arrived in 2014—after having been in the DOC's care and custody for approximately eighteen years—he did not have a longstanding care plan that included any of the above-noted recommendations. This suggests that MPCH and the DOC's previous medical providers either did not have him evaluated by appropriate specialists or did not implement the specialists' recommendations.

I find that the DOC and its medical providers' failure to have Reaves's care overseen by a spinal cord injury specialist and/or to implement the recommendations of spinal cord injury specialists has likely resulted in constitutionally inadequate care. However, it is presently unclear whether Defendants are in the process of remedying this situation. Reaves has been seen by Dr. Wennemer, and MPCH's counsel has represented to this Court that he will be brought back to her for follow-up care. It is too early to say whether MPCH will take the steps necessary to improve Reaves's care on a permanent basis.

### ii.   *Physical and Occupational Therapy*

Next, Reaves argues that his care is inadequate because he has not been provided with appropriate physical and occupational therapies or adaptive devices. Dr. Morse explained that physical therapy is a necessary component of spinal cord injury care, for the prevention of the complications from which Reaves suffers, including advanced contractures. Dr. Morse also explained that occupational therapy is necessary to maintain physical function and increase independence, including the ability to do things that Reaves has lost the ability to do, such as participate in feedings and self-care. Dr. Morse further explained that because of the complex nature of spinal cord injuries, the physical and occupational therapy plans must be directed by a

provider with specialized knowledge.  The records do not indicate that Reaves has ever been offered a comprehensive physical or occupational therapy plan, or any plan directed by a spinal cord injury specialist.  No such plan was suggested or implemented at SBCC and there is no indication, as of yet, that one has been implemented at MCI Shirley.[26]

The MPCH Defendants argue that Reaves has and will continue to receive physical therapy.  They assert that he was offered ROM therapy twice per day at SBCC, with physical therapy evaluations completed every six months, and that he often refused this care.  However, the records show no ROM therapy refusals before September of 2015.  Reaves testified—and Ireland agreed—that he was not offered ROM therapy on his upper extremities until at least December of 2015, and staff were not formally trained on the performance of ROM therapy until approximately the same time.  There is no record of six-month physical therapy evaluations.  Reaves had one physical therapy consultation at SBCC in 2014 for neck pain and one consultation at LSH in 2015 during his inpatient stay, neither of which were with specialized providers.  One of these providers noted that, in order for Reaves to achieve a sitting position, he would need intensive physical therapy involving equipment that is not available at SBCC.

Regarding occupational therapy, the MPCH Defendants rely on the opinion of the occupational therapist who assessed Reaves at LSH in 2015 and determined that he was not a candidate for ongoing occupational therapy.  Like the physical therapists, this provider did not have expertise designing occupational therapy programs for persons with Reaves's type of injury,

---

[26] The record also contains testimony from Khalid Khan, MD, who is a Defendant in this case and who was the medical director at BSH during the time when Reaves was housed there from 2011 to 2014.  Dr. Khan testified during a proceeding in Superior Court in 2013 that Reaves was not offered physical therapy at BSH. (Docket No. 41-14 at 4.)  Dr. Khan also testified that he did not know what an appropriate physical therapy program would be for someone with Reaves's type of injury. (Docket No. 41-14 at 2.)

and the provider's opinion is contradicted by those of Drs. Morse and Wennemer.  Reaves was given an assortment of adaptive items in December of 2015, shortly before the hearings began in this case; however, he and Dr. Morse testified that these items are not useful to him in his current condition.  The records do not indicate any ongoing occupational therapy since he arrived at SBCC in 2014.

The MPCH Defendants further argue that the lack of adaptive devices such as a feeding cuff does not constitute inadequate medical care, because Reaves is being fed with or without the cuff.  As Dr. Morse explained, however, a person with Reaves's injury would normally be expected to achieve modified independence, such as the ability to sit in and operate a wheelchair, help dress and feed oneself, and exercise some control over one's environment.  These basic activities go beyond mere survival.  I find that Reaves is likely to succeed on his claim that the Defendants have not provided adequate care on the basis of a lack of comprehensive physical and occupational therapy, and that this violation has continued, at least until late February of 2016, which is the date of the most recent records provided pursuant to this motion.

  *iii.*  *Bowel Program*

Next, Reaves argues that his care is inadequate because he does not have a bowel management program.  Dr. Morse explained the importance of a comprehensive bowel program, including stool softeners and other interventions, with the goal of achieving regular, predicable bowel movements.  Dr. Wennemer also recommended a bowel program, as did the providers who saw Reaves in 1998, 2003, and 2006.

According to the MPCH Defendants, Reaves's current bowel management is medically appropriate and there are no health risks associated with his bowel movements or lack thereof.  Dr. Somers testified that Reaves is not constipated and that his current situation is adequate.  However,

the records from SBCC and MCI Shirley do not support that conclusion.  Reaves has had periods of five or more days with no bowel movements.  The records further indicate that he is sometimes offered laxatives, which, according to Dr. Morse, is not a bowel plan and is not sufficient to maintain Reaves's health.  The most recent care plan notes that "[a] suppository was ordered" and that it must be offered on a regular basis. (D ex. 19B at 749.)  It is unclear whether this is a laxative or a stool softener, and whether there will be any attempt to educate Reaves on the benefits of having regular bowel movements.  Dr. Morse opined that Reaves is chronically constipated—a condition that can be life threatening for someone with Reaves's injury.  The results of the recent KUB appear to support her opinion.  I find that Reaves is likely to succeed on his claim that Defendants have not provided adequate care in this area, including a lack of adequate patient education.  Based on the records before me, it appears that this violation continues.

   *iv.*   *Autonomic Dysreflexia*

   Reaves argues that his care is inadequate because measures have not been taken to prevent AD.  He did not arrive at SBCC with a plan addressing AD and there is no indication that staff were trained on the signs and symptoms of AD before late 2015 or early 2016.  There was no mention of AD in any written care plans until January of 2016, and there is no indication that Reaves has received any meaningful education on the risks, signs, symptoms, and prevention of AD.

   The MPCH Defendants argue that Reaves "does not suffer from autonomic dysreflexia." (Docket No. 47 at 16.)  This statement is plainly at odds with Dr. Morse's testimony.  She explained that all spinal cord injury patients with Reaves's level of injury are at risk for AD.  Moreover, the records show spikes in his blood pressure, and Dr. Wennemer observed an AD event while he was in her office in December of 2015.

The MPCH Defendants also contend that Reaves has refused treatment for AD.  It is undisputed that he sometimes refuses to have his blood pressure checked; however, as noted above, the records also show that there was no care plan regarding AD, and staff were not formally educated, prior to late December of 2015 or early January of 2016.  Reaves's stated rationale for refusing to have his blood pressure checked is that, in the past, nothing was done about it when it was high.  The medical records corroborate this opinion.  I find that Reaves is likely to succeed on his claim that Defendants have provided inadequate care by failing to take measures to prevent and treat AD.  However, I am unable to determine whether this violation continues.  Although there has purportedly been an in-service training at MCI Shirley, it is not clear whether the staff are currently making efforts to monitor his blood pressure, respond accordingly, and engage in effective patient education.

     *v.*     *<u>Hearing Aids</u>*

Finally, Reaves argues that his care is inadequate because he has not been provided with working hearing aids that are properly and consistently placed in his ears.  From a review of the records and Reaves's testimony, it is unclear whether he had functioning hearing aids at SBCC until late December of 2015.  It is undisputed that he arrived at the facility with five individual hearing aids; however, he testified that they did not work properly and/or were not properly inserted into his ears.  When he saw an audiologist in the fall of 2015, she fitted him with a new pair, which also implies that the old ones did not work properly.  It appears that he now has a functioning pair of hearing aids; however, it remains to be seen whether medical staff at MCI Shirley will be properly trained on how and when to insert the hearing aids into his ears.  I find that Reaves is likely to succeed in his claim that Defendants have provided inadequate care by

failing to procure and properly insert working hearing aids, but the record is not sufficiently developed to show whether this violation continues.[27]

   vi.   *Care Refusals*

   The MPCH Defendants argue that any deficiencies in Reaves's care are the result of his refusals of treatment.  They rely on Dr. Somers's observation that he is hostile, rude, and often ignores or verbally abuses the medical staff.  According to Dr. Somers, Reaves has refused to be treated by medical staff of color.  Reaves—who is African American and Cape Verdean—denies having any racial preference in relation to his medical care.  Dr. Somers also testified that Reaves had previously refused to visit outside hospitals that were unfamiliar to him.  However, there are no records of these refusals, and Reaves has been to numerous outside facilities for the spate of appointments that have occurred during the pendency of this lawsuit.

   Reaves is a difficult patient.  He admits that he sometimes becomes angry, loses control, and swears and spits at medical staff.  He is anxious and irrationally wary of certain medical interventions, and he expresses his fear and anger with outbursts and ill-placed sarcasm.  When he has an outburst, a correctional officer disciplines him by ordering the medical provider to leave the room or by taking away his few privileges.[28]  He often feels that these sanctions are unfairly

---

[27] Reaves also raises the issue of whether he has a functioning call button at MCI Shirley.  He had a call button at SBCC, which he could operate with his elbow.  As of February 9, 2016, he did not have one at MCI Shirley, but the DOC's counsel has since represented that it has been installed.

[28] Reaves is subject to a "phase" program for discipline, whereby certain privileges are taken away and then slowly reintroduced after he exhibits problematic behavior.  On phase II of the plan, he loses his writing privileges—a sanction that does not apply to inmates in the general population.  On phase III, he allegedly regains access to the radio, outside recreation, and socialization with other inmates.  However, this seems particularly ironic because, as explained *infra*, he has not been taken outside for recreation in seventeen years, and he is not permitted to socialize with other inmates.  He was not given a functioning radio at SBCC until January of 2016, and it remains unclear whether he is able to operate the remote control.

imposed.[29]  He testified that on at least three occasions at SBCC in 2014 and 2015, medical staff were asked to leave his room, and he was left naked, cold, and soiled in his own waste, for as long as three hours.  He testified that he sometimes ignores medical staff when he is angry, in an effort to prevent an outburst.  His silence, in turn, is seen by medical personnel as an affront.  It is clear that there is entrenched ill will between Reaves and the medical and correctional staff, which often interferes with his care.

Nevertheless, it is not difficult to imagine why Reaves has an unpleasant and dissatisfied demeanor.  He has been incarcerated for twenty years and has spent the last seventeen confined to a bed.  He began serving a life sentence with no possibility of parole while also coping with a permanent life-altering injury, imprisoning him in his body as well as in the confines of the correctional institution.  Because of the timing of his injury, he had to cope with his severe physical impairment in an atmosphere that is punitive.  As one outside spinal cord injury specialist who examined him in 2001 noted, "Attempted restriction of privileges including access to his wheelchair (and consequently time out of his room) has not been effective in modifying his behavior.  Yet, attempts at psychiatric and psychological intervention to address the root causes of his behavior, and intervene in his struggle with his caregivers, are nearly absent from the treatment record." (Docket No. 15-19 at 4.)  Over the years, he has witnessed a dramatic deterioration of his body, in the context of what appear to be long periods of substandard medical treatment.  There is evidence that he was physically assaulted by other inmates while incarcerated at BSH.  He testified that he has been insulted, harassed, and neglected by staff. Overlying all of his difficulties is a

---

[29] For example, this Court viewed a video from the fall of 2014, in which Reaves was receiving personal care from a CNA.  He was tipped onto his side, held in place by the CNA, and at one point during the care he hooked his arm onto hers.  The DOC classified this incident as an assault. From my viewing of the video, I am unable to agree or disagree with this classification.

brain injury, which he suffered in the same accident that caused his quadriplegia, the extent and potential behavioral consequences of which are almost entirely absent from the medical records.

Although all prisoners relinquish control over their day-to-day lives, most retain agency over their bodies for purposes of essential human activities. Reaves has no physical agency. He is dependent on medical staff to be fed, bathed, changed, dressed, and even to hear, because his contracted hands are unable to manipulate his hearing aids. He has not been outside for recreation in more than seventeen years. Because of his medical condition, correctional officers have not allowed him to socialize with other inmates or participate in prison programming. His only human interactions are with medical and correctional staff, whom he does not trust. Pursuant to policy, correctional officers are present during all of his medical and personal care, watching as he is fed, dressed, has his catheter changed, and is cleaned after every bowel movement. He cannot speak to a mental health professional outside the presence of a correctional officer, who also serves as his disciplinarian. To ask that he maintain a pleasant demeanor after twenty years of this existence is stretching the bounds of the human capacity for polite discourse.

Moreover, the medical records show that although Reaves refuses some medical interventions, he has not been offered most of the care that he now requests. Before December of 2015, there is no record that he was offered to see a spinal cord injury specialist at SBCC. He was never offered a comprehensive physical or occupational therapy program. Although he has now seen a specialist, it is concerning that there do not appear to be any plans for him to pursue physical and occupational therapy, nor has there been an attempt to implement a comprehensive bowel management program. Equally concerning is that two recent nursing plans, as well as the transfer notes from the primary care provider at MCI Shirley, state that Reaves should be encouraged to get out of bed, indicating a shocking ignorance of his condition. It is unclear whether the providers

45

at MCI Shirley will implement the remainder of Dr. Wennemer's other suggestions, including bladder studies.

I understand and appreciate that Reaves presents as difficult and challenging to the medical professionals who care for him regularly.  I have been repeatedly assured by his counsel that he is competent and capable of making his own medical decisions.  At some point, he must accept the consequences of refusing medical treatment after having had the benefits and risks properly explained.  However, there is evidence that he may change his mind about refusing some treatments after he is educated, as happened recently with the KUB.  The records from SBCC do not show that he had a mental health consultation regarding his behavioral issues, or for the purpose of encouraging compliance with medical care, until December of 2015.  Although he has now had two mental health consultations, there is no indication that he will receive ongoing mental health treatment at MCI Shirley.  He requested intensive therapy at SBCC and was told that this would not be feasible.  The need for appropriate psychological care and comprehensive patient education is consistent with Dr. Morse's testimony that spinal cord injury patients should be part of solid patient-provider partnerships that are built on trust, so that the patients can learn to make informed decisions about their care.  This is not a mere luxury—according to Dr. Morse, uneducated refusals of important interventions could be fatal to a person with Reaves's injury.

B.  *Subjective Prong*

"[E]ven if medical care is so inadequate as to satisfy the objective prong, the Eighth Amendment is not violated unless prison administrators also exhibit deliberate indifference to the prisoner's needs." *Kosilek*, 774 F.3d at 83 (citing *Estelle,* 429 U.S. at 105-06).  "[D]eliberate indifference 'defines a narrow band of conduct' . . . and requires evidence that the failure in treatment was purposeful." *Id.* (quoting *Feeney v. Corr. Med. Servs. Inc.,* 464 F.3d 158, 162 (1st

Cir. 2006); *see Estelle,* 429 U.S. at 105.   The level of culpability must go beyond malpractice.

*Estelle,* 429 U.S. at 106.   "[D]isagreements between prisoners and doctors about the proper course

of a prisoner's medical treatment" are also not sufficient for an Eight Amendment claim. *Watson*

*v. Caton,* 984 F.2d 537, 540 (1st Cir. 1993).

Deliberate indifference may "be exhibited by a 'wanton disregard' to a prisoner's needs."

*Kosilek*, 774 F.3d at 83 (quoting *Battista v. Clarke,* 645 F.3d 449, 453 (1st Cir. 2011)).   "[S]uch

disregard must be akin to criminal recklessness, requiring consciousness of 'impending harm,

easily preventable.'" *Id.* (quoting *Watson,* 984 F.2d at 540).   "[S]ubjective intent is often inferred

from behavior," and "a deliberate intent to harm is not required." *Battista*, 645 F.3d at 453 (citing

*Farmer,* 511 U.S. at 835.)   A prisoner can show wanton disregard by presenting evidence of

"denial, delay, or interference with prescribed health care." *Id.* (quoting *DesRosiers v. Moran,* 949

F.2d 15, 19 (1st Cir. 1991)).

Reaves argues that the Defendants are aware of his serious medical needs but have chosen

to ignore the advice of spinal cord injury specialists.   Since 1998, Reaves's care providers have

been presented with recommendations from several specialists regarding ROM therapy, supportive

equipment, AD monitoring, and bowel management. (Docket Nos. 15-8 at 4-5, 7; 15-18 at 3; 15-

19 at 16.)   Nevertheless, he arrived at SBCC without a written plan for any of these treatments.

After Dr. Morse examined Reaves in early 2014, her report was provided to Dr. Somers.   Although

the report listed a litany of insufficiencies in Reaves's care, Dr. Somers did not make changes to

his treatment plan.   As of now, it appears that MPCH still lacks a comprehensive plan for physical

therapy, occupational therapy, and bowel management.   He has informed MPCH of the

inadequacies in his treatment by sending letters through his counsel, and by filing grievances

addressing his need for a spinal cord injury specialist, physical therapy, bowel management,

orthotics, a universal cuff, and hearing aids. (Docket Nos. 15-21; 15-24.)  The MPCH Defendants, for their part, do not directly address the subjective prong of the analysis, relying instead on their contention that Reaves has always been offered constitutionally adequate care.

C. *Conclusion*

After carefully reviewing the medical records and listening to the testimonies of Reaves, Dr. Morse, Dr. Somers, and Ireland, I am convinced that Reaves is likely to succeed on his Eighth Amendment claim that the DOC and MPCH Defendants have been deliberately indifferent to his serious medical needs.  Reaves is a severely disabled man.  Despite his disability, at the time of his injury he retained the potential for a somewhat independent and relatively healthy existence. According to Dr. Morse, whom I found to be credible and informative, Reaves's current condition shows that he has not participated in therapies and treatments that are necessary for the healthy maintenance of spinal cord injury patients.  As a result, he has severe complications, which are functionally limiting and detrimental to his health and wellbeing.  Without significant changes to his care, his condition will continue to deteriorate.

Despite Defendants' reliance on Reaves's difficult personality, the records do not show that he was offered and refused constitutionally adequate care.  There is no indication that the DOC's previous medical providers attempted to implement a course of treatment that would have been reasonably commensurate with the recommendations made by Dr. Morse.  Likewise, there is no indication that the MPCH Defendants made any changes to the status quo after taking over his care in July of 2013, until the recent spate of appointments beginning in the fall of 2015 after Reaves initiated this lawsuit.  To date, it appears that the MPCH Defendants have not offered Reaves a comprehensive bowel program, including patient education, or comprehensive physical or occupational therapy plans.  Prior to December of 2015, there was no written protocol for AD,

and Reaves had not had many of the assessments that Dr. Wennemner later recommended he have on a regular basis, including a KUB, an EKG, and a chest x-ray.  ROM therapy had not been provided on his upper extremities, and staff had not been formally trained on how to implement this treatment on his lower extremities.  It appears that he did not have working hearing aids for most of the time that MPCH has cared for him.

To be sure, Reaves is not entitled to ideal care, and his status as an inmate limits his ability to choose medical providers and particular courses of treatment.  Moreover, I am aware that he is a difficult patient and that his condition requires expensive, long-term, specialized treatments, far beyond the needs of most of the DOC's prison population, and which are outside the skill-set of the DOC's on-staff medical providers.  Nevertheless, he is constitutionally entitled to be treated in a manner that is consistent with prudent professional norms.[30]  Instead of rising to this challenge, the records show that the DOC and its medical providers have treated Reaves with a disregard for the seriousness of his condition, which a jury could find was reckless.

However, the instant situation is significantly complicated by the recent and ongoing changes to Reaves's care.  There has been a precipitous increase in the type and frequency of his medical care since he initiated this lawsuit, which has continued since the close of the hearings.  I am impressed with MPCH's stated inclination to follow the recommendations of Dr. Wennemer and to continue to have Reaves's care monitored by a spinal cord injury specialist.  I am also wary,

_____

[30] To the extent that the DOC lacks the capacity to adequately care for Reaves, it is statutorily entitled to temporarily transfer him to an outside medical facility that is better equipped:

> Whenever the physician of any state correctional facility certifies that any prisoner held therein requires medical . . . treatment which cannot safely or properly be given in such state correctional facility or the hospital at the Massachusetts Correctional Institution, Norfolk, the commissioner may temporarily place such person in an appropriate hospital or medical facility to receive such treatment.

Mass. Gen. Laws ch. 127, § 117.

because the history of Reaves's incarceration shows that the Defendants have previously been unwilling or unable to provide him with adequate care.  It remains to be seen whether they will pay lip service to the suggestions of Drs. Wennemer and Morse, or whether they will make the significant changes necessary to improve Reaves's care on a longstanding basis.

Injunctive relief is appropriate to halt ongoing violations only, and I approach the task of formulating appropriate relief with caution—mindful that I must not become unnecessarily "enmeshed in the minutiae of prison operations." *Farmer*, 511 U.S. at 846-47 (quoting *Bell v. Wolfish,* 441 U.S. 520, 562 (1979)).  Accordingly, pursuant to my inherent authority I appoint a monitor to oversee the Defendants' ongoing compliance with the constitutional standard of care. *See, e.g., Rolland v. Patrick*, 483 F. Supp. 2d 107, 118 (D. Mass. 2007); *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.*, 931 F. Supp. 18, 45-46 (D. Mass. 1995), *aff'd sub nom. Picker Int'l Inc. v. Leavitt*, 94 F.3d 640 (1st Cir. 1996).  The monitor will review the ongoing medical treatments and submit monthly status reports to this Court.

## 2.   *Likelihood of Success on the Merits: ADA and Rehabilitation Act Claims*

Title II of the Americans with Disabilities Act (ADA) provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  In nearly identical language, the Rehabilitation Act precludes discrimination on the basis of disability by entities that receive federal funding. 29 U.S.C. § 794.[31]  Prisons are public entities for purposes of Title II of the ADA. *United*

---

[31] The Rehabilitation Act provides in pertinent part:

> No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

*States v. Georgia*, 546 U.S. 151, 154 (2006); *see* 28 C.F.R. § 35.152 (ADA regulations of correctional facilities).   Prisons are also subject to the Rehabilitation Act. *See Nunes v. Massachusetts Dep't of Correction*, 766 F.3d 136, 144 (1st Cir. 2014).   Reaves's ADA and Rehabilitation Act claims are properly analyzed together, because the standards of liability are identical. *Id.*

> To prevail on a claim under Title II of the ADA, a plaintiff must demonstrate:

> > (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

*Buchanan v. Maine*, 469 F.3d 158, 170-71 (1st Cir. 2006) (quoting *Parker v. Universidad de Puerto Rico,* 225 F.3d 1, 5 (1st Cir. 2000)).   A "qualified individual with a disability" is defined as:

> > [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).   "Disability" is defined elsewhere in the statutory scheme as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).   It is undisputed that Reaves is disabled pursuant to this definition.   A prison's "services, programs, or activities" include "recreational activities, medical services, and educational and vocational programs." *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) (internal quotation marks omitted.)

---

29 U.S.C. § 794(a).

"Title II imposes an affirmative obligation on public entities to make their programs accessible to qualified individuals with disabilities, except where compliance would result in a fundamental alteration of services or impose an undue burden." *Toledo v. Sanchez*, 454 F.3d 24, 32 (1st Cir. 2006) (citations omitted). The DOC bears the burden of demonstrating that an accommodation would "result in a fundamental alteration in the nature of [the] service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.150(a)(3). Furthermore,

> The decision that compliance would result in such alteration or burdens must be made . . . after considering all resources available for use in the funding and operation of the service, program, or activity, and must be accompanied by a written statement of the reasons for reaching that conclusion. If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

*Id.*

The DOC argues that it is entitled to sovereign immunity from Reaves's ADA claims. This argument is premature. What is currently at issue is Reaves's request for preliminary injunctive relief, not his claim for money damages. "Under *Ex parte Young,* state officers do not have Eleventh Amendment immunity from claims for prospective injunctive relief." *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 123 (1st Cir. 2003); *see Georgia*, 546 U.S. at 160 (Stevens, J., Concurring) ("Title II . . . authorizes prospective injunctive relief against the State"); *see also Surprenant v. Rivas*, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself."). Additionally, the DOC and its officers may be enjoined pursuant to the Rehabilitation Act. *See Diaz–Fonseca v. Puerto Rico,* 451 F.3d 13, 33 (1st Cir. 2006) ("The Commonwealth defendants do not have Eleventh Amendment

immunity against the . . . Rehabilitation Act claims, because they waived such immunity by accepting federal funds.") Thus, Reaves may proceed on his claims for prospective injunctive relief against the DOC and its officials in their official capacities.  Of this group, however, two officials serve in facilities in which Reaves does not currently reside.  Rodrigues is the Deputy Superintendent of Programs and Treatment at SBCC, and Pamela MacEachern is the Deputy Superintendent of Programs and Treatment at BSH.  Because these two officials are not currently in charge of Reaves's accommodations, the prospective injunctive relief that I order today will not apply to them.[32]

For purposes of preliminary injunctive relief, Reaves focuses his argument on six deficiencies in the DOC Defendants' compliance with Title II of the ADA: denial of access to outdoor recreation; denial of access to common areas for socialization and entertainment; denial of access to programming; denial of access to shower facilities; denial of sufficient access to a writing assistant; and denial of confidentiality in medical care.  Two DOC officials provided testimony: Michael Rodrigues, Deputy Superintendent of Classification and Programs and ADA coordinator at SBCC; and Colette Goguen, Deputy Superintendent of Reentry and ADA Coordinator at MCI Shirley.  As the ADA coordinator for SBCC, Rodrigues was responsible for ensuring that Reaves was appropriately accommodated for his disability and for receiving and responding to his disability-related grievances.  Goguen now serves this function at MCI Shirley.

---

[32] I reserve for a later date the issue of whether the DOC and its officials may be sued for damages under Title II of the ADA without running afoul of the Eleventh Amendment. *See Georgia,* 546 U.S. at 159; *Buchanan v. Maine,* 469 F.3d 158, 172 (1st Cir. 2006).

A.    *Outdoor Recreation*

Reaves has not been taken outside for recreation in more than seventeen years—since November of 1998.  On June 13, 2014, he made a request for outdoor recreation access, which Rodrigues denied for the following reasons:

> [B]ased on the last assessment, it is unlikely that you are safe to sit up in a wheelchair at this time. A physical therapy consultation and subsequent rehab physical therapy treatment is required before you will be able to safely participate in such activities. As such I am denying your request at this time based on safety issues.

(DOC ex. 11 at 7.)  In contrast to Rodrigues's purported rationale, Dr. Morse, Dr. Somers, and Ireland each testified that there was no medical reason why Reaves could not be taken outside at SBCC.  Although it is undisputed that he cannot sit in a wheelchair, there is no indication that any provider has recommended that he not participate in outdoor recreation on a mobile gurney. Rodrigues conceded during his testimony that there was no medical contraindication to Reaves being taken outside.

The DOC Defendants argue that Reaves's request for outdoor recreation is not reasonable because "there is a substantial security concern implicated with his request." (Docket No. 37 at 15.)  SBCC is a maximum-security facility that operates on a highly structured schedule.  Inmates in the general population spend approximately four hours per day outside of their cells, which includes scheduled time for outdoor recreation. There are two open yards.  During recreation time, there are upwards of 100 inmates in the yards at a time with no correctional officers present. Rodrigues testified that it would have been unsafe to put Reaves in the yard because he is physically helpless, and it would also have been dangerous to assign an officer to protect him, because the officer would have been greatly outnumbered by inmates.  When asked whether Reaves could have been brought outside when the general population was not using the yard,

Rodrigues replied that this would have been very difficult, because it would have required an alteration of the prison's established daily schedule.

In addition to the two yards, SBCC has individual recreation spaces for prisoners who are kept in segregation. When asked whether Reaves could be taken outside in one of these areas, Rodrigues replied that it would not be typical to place an inmate in that area unless the inmate was in segregation. He did not know if there was enough space in these areas to wheel a gurney in and out. He testified that he had not investigated other options, such as taking Reaves outside with a protective custody unit, or taking him to any other outdoor space that might be available on the premises. Reaves was the only quadriplegic inmate at SBCC. Rodrigues testified that he had no previous experience with quadriplegia before Reaves arrived, and he did not make any effort to contact others in the corrections community to learn how they have dealt with similarly situated inmates.

Like SBCC, MCI Shirley also has a year-round outdoor access program for inmates. Able-bodied inmates go outside daily, weather permitting. As of February 22, 2016—approximately one month after his arrival at MCI Shirley—Reaves had not been taken outside, and the DOC had not yet acquired a mobile gurney so that he could be moved from his cell. During her testimony, Goguen was unable to say when the gurney would arrive.

I do not question the DOC's judgment that it would be unsafe for Reaves to be in a yard with the general population, or that it would be unsafe to assign a correctional officer or another inmate to guard him. However, these are not the only options for Reaves to have outdoor recreation. The yards at SBCC and MCI Shirley are not used by the general prison population twenty-four hours per day. Neither Rodrigues nor Goguen could explain why Reaves could not have been, and is not now, taken outside at a different time, by himself, or with fewer inmates, or

to a different location.  Because he is confined to a bed, he could potentially be taken to an area

that is less secure than the main yard without presenting a security risk.  Instead of considering

these possibilities, the DOC Defendants appear to view any alteration of the established schedule

and practices of the prison to be an unreasonable request.  This posture is inconsistent with the

language and purpose of the ADA, which provides that a public entity may be required to make

"reasonable modifications to rules, policies, or practices" in order to accommodate a disabled

individual. 42 U.S.C. § 12131(2).

The DOC Defendants' complacency with the current situation, in which one of their

inmates is denied the ability to smell fresh air and feel sunlight on his face, for no other reason

than that he suffers from quadriplegia, is perplexing at best.  Not only is he being treated differently

from his able-bodied peers, but he is being denied access to an experience that is fundamental to

what it means to be human.  Indeed, it is surprising that as of late February of 2016—many years

after Reaves lost the ability to sit in a wheelchair—the DOC did not own a mobile gurney for

transporting him throughout the prison.[33]  I find that Reaves is likely to succeed on his claim that

the DOC Defendants have violated Title II of the ADA by failing to allow him access to outdoor

recreation.

B.    _Indoor Socialization and Recreation_

Reaves argues that the DOC Defendants have violated the ADA by not allowing him to

socialize with his peers in the prisons' common areas.  The DOC's "Program Description Booklet"

provides that the DOC "offers a wide variety of staff supervised recreational and leisure time

---

[33] A similar issue was noted in 2013 by a Superior Court judge who ruled on the DOC's petition
to expand the 2006 forced-care order.  The judge noted that Reaves had been unable to visit with
his daughter "for a period of years" because his gurney was not wheeled into the visiting room.
The judge "strongly urge[d] the [DOC] to make reasonable accommodations for [Reaves] that
would allow him reasonable visits with his family." (Docket No. 41-15 at 7 n.7.)

activities designed to reduce inmate idleness and teach pro-social skills to use their time constructively," and that "[t]hese services are available at all facilities." (Docket No. 15-27 at 2.) Even inmates who are held in departmental segregation are entitled to "a daily exercise and recreation period of at least one hour a day at least five days per week, outside if weather permits." 103 C.M.R. 421.20(2)(c).  According to the inmate orientation booklet from SBCC, "Inmates can avail themselves of recreation activities via the block recreation deck, tier time, yard, gym, and the weight room." (Docket No. 15-28 at 8.)

Aside from interactions with staff, Reaves spends his days lying in bed, sometimes watching television.  At SBCC, he was given no opportunity to socialize with other inmates except for his writing assistant, who visited him for one hour, five days per week, to assist with correspondence tasks.  Reaves had one social visit from his nephew, who was also incarcerated, but there are no plans for this to happen again in the future.  Reaves testified that he wants to socialize with other inmates, and he has made requests to this effect.  At one point, in response to a request for socialization, SBCC offered to give him a roommate—an uncommunicative man in a vegetative state.  Reaves rejected this offer.  Rodrigues acknowledged that, in the general prison population, double-bunking is not considered an alternative to socialization.

SBCC and MCI Shirley differ in their indoor recreation opportunities.  SBCC is a maximum security facility and does not have a common area in its infirmary.  Inmates in the general population spend approximately four hours per day outside of their cells, including time for indoor and outdoor recreation, use of the library, socializing, and use of the gym.  According to Rodrigues, it would have been a security concern to allow Reaves into the general population.

When asked whether Reaves could have been permitted to have visits from select inmates from the general population, Rodrigues answered that this kind of thing was "not typically done."[34]

MCI Shirley is a medium-security prison, and Reaves is being housed in the skilled nursing facility in the health services unit (HSU). MCI Shirley has an "inmate companion program," pursuant to which inmates are assigned to the HSU to work as companions and "environmental cleaners," which includes laundry and janitorial work. The HSU has a common activity room where a "cognitive skills" workshop is sometimes held. The room has a library cart that is stocked with puzzles and games, and there is a weekly bingo game. As of February 22, 2016, no one had offered to bring Reaves to the common activity room, and he was not offered any other socialization except for potential interactions with members of the inmate companion program.[35]

When enacting the ADA, Congress explained that although "physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, . . . society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination . . . persist[] in such critical areas as . . . public accommodations . . . and access to public services." 42 U.S.C. § 12101(1), (2), (3); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999) (isolation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community

---

[34] Rodrigues also testified that Reaves had other forms of entertainment, including a radio and a television in his cell. Reaves testified that he could not use the radio because it did not get reception and he was unable to operate the remote control. He had a television, which served as his main source of entertainment. In June of 2014, he made a written request for an accessible remote control for the television and radio. Rodrigues denied the request on the ground that he was already in possession of a remote control. However, according to Reaves, he was unable to use the remote that he had. A new one was eventually ordered, without evaluation of whether it was appropriate for Reaves's disability. It is not clear whether Reaves ever had a functional, accessible remote control during the two years that he was housed at SBCC.

[35] I do not consider Reaves's time with his writing assistant to be a social encounter.

life"); 28 C.F.R. § Pt. 35, App. B ("Integration is fundamental to the purposes of the Americans with Disabilities Act."). Public entities, including prisons, are required to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). An integrated setting is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. § Pt. 35, App. B.

I recognize that "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," and that prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (citations omitted). However, there is a dearth of evidence that the DOC Defendants have made any significant efforts to accommodate Reaves's request for socialization. Instead of proactively seeking solutions to the challenges that his disability presents, they have relied on the false precept that any deviations from standard operating procedure would constitute an unreasonable hardship based upon their effect on the daily routine of the institution. As noted above, this viewpoint is at odds with the concept of reasonable accommodation.

I do not question Rodrigues's judgment that it would have been unsafe to permit Reaves to interact unsupervised with the general population at SBCC. However, as ADA coordinator he was tasked with fashioning an appropriate and safe alternative, so that Reaves would not have to spend the remainder of his life in isolation, solely on account of his disability. On the record currently before me, it appears that Rodrigues did not fulfill this aspect of his duties. Although the DOC Defendants assert that they will provide Reaves with access to the common activity room at MCI Shirley's HSU, it remains to be seen whether this will occur, considering that as of the date of the

most recent hearing, they had not yet acquired a mobile gurney or formulated a plan for how he would be given access.  I find that Reaves is likely to prevail on his claim that the DOC Defendants have violated Title II of the ADA by failing to provide him opportunities to socialize with other inmates.

C.    *Programming*

Next, Reaves objects to his lack of access to educational programming.  When he requested access to programming at SBCC, Rodrigues referred him to the school principal to determine his educational needs.  The educational division tested him and determined that he had achieved high school equivalency, which meant that he qualified for vocational programs only.  Inmates are enrolled in vocational programs based on proximity to their release dates. Reaves is serving a life sentence with no possibility of being released.  He was not given access to any programming at SBCC.  SBCC's website also lists a variety of non-vocational programs, including "Alternatives to Violence," "Emotional Awareness and Healing," "Father's Parenting Program," "HIV/AIDS Education," "Menswork," and "Toastmasters." (Docket No. 15-30 at 1-2.)  It is not clear why Reaves was not given access to any of these programs.[36]

At MCI Shirley, only one program is offered in the common room of the HSU—a "cognitive skills" workshop which, according to Goguen, has not been offered for at least a year. Goguen testified that this is the only program in which Reaves will be permitted to participate at

---

[36] Reaves also requested access to a voice-operated computer, to be used for board games, electronic books, correspondence, educational programs, and college courses.  Rodrigues denied the request, explaining that it was not feasible to provide Reaves with a voice-activated computer because SBCC did not have such a device for any other inmates.  However, it is undisputed that Reaves was the only quadriplegic inmate at SBCC.  Rodrigues also denied Reaves's request on the basis that he already had access to books on tape.  It appears that some books were sent to the prison in May of 2015, but Reaves testified that he did not receive them.  He recalled having access to books on tape at some point in the past, and enjoying them, but they were taken away.  As of the date of his testimony, Rodrigues did not know whether Reaves had any books on tape.

MCI Shirley.  Other programs are offered outside of the HSU, in the "school building," including "Able Minds," "Alternatives to Violence Program," "BEACON," "Book Discussion," "Cognitive Skills," "Criminal Thinking," "Four Agreements," "Law Clerk Class," "Mens Work," "Path of Freedom," "Toastmasters," and "Violence Reduction." (P ex. 81 at 34-37.)  Goguen testified that Reaves will not be given access the school building because it is open to the general prison population.  She also testified that it would not be feasible for an instructor to come to Reaves's cell to conduct any of these programs, although she did not provide any specific reasons why this or some other alternative would not be an appropriate accommodation.  MCI Shirley hosts a support group for men who are serving life sentences, but Reaves has not been offered to participate.  As of February 22, 2016—nearly one month after Reaves's arrival—Goguen was unaware whether anyone at MCI Shirley had talked to him about participating in programs.

On this record, I am not satisfied that the DOC Defendants have adequately investigated reasonable accommodations for Reaves's disability.  Accordingly, I find that he is likely to succeed in his claim that the DOC Defendants have violated Title II of the ADA by denying him access to all prison programming at SBCC and all available programming at MCI Shirley.

D.   *Access to Shower Facilities*

According to Reaves, he has not had a shower in approximately sixteen and a half years—since September of 1999.  At SBCC, he requested a shower stretcher, and Rodrigues denied the request on the basis that the proposed stretcher was too long to fit into the shower.  In declining the request, Rodrigues also stated, "if Mr. Reaves actively participates in his treatment plan, shower chair options will be re-assessed." (P ex. 66 at 2.)  It is undisputed that there was no treatment plan in place at the time of this request that would have resulted in Reaves being able to sit in a shower chair.

Goguen testified that Reaves will not be permitted to shower at MCI Shirley because the facility does not have a gurney that would fit into the showers.  She did not know whether the new gurney that is currently being ordered would fit.  She testified that even if it did fit, there would be an issue with water spilling onto the floor, because the main showers are in the middle of the HSU.  There is also a shower in the HSU's common area, which is bounded by a curtain.  Goguen testified that she did not think that it would be feasible for Reaves to shower there, but she did not provide specific reasons to support this conclusion.  I am not convinced that the DOC Defendants have met their burden of investigating reasonable alternatives to allow Reaves to use the shower facilities.   I find that he is likely to succeed in his claim that they have violated Title II of the ADA in this regard.

E.   *Writing Assistant*

At SBCC, Reaves had an inmate writing assistant who would come to his cell for one hour, five days per week, to help him with legal and personal correspondence.  Goguen testified that he has also been provided with a writing assistant at MCI Shirley, but she did not know how often the assistant visits, how long he stays, or if he performs any writing tasks.  Goguen was not aware that a settlement agreement executed by the DOC and Reaves in 2005 requires the DOC to provide Reaves with access to a writing assistant at least three times per week. (Docket No. 15-33 at 2.)  Additionally, the DOC Defendants at MCI Shirley require a correctional officer to be present in Reaves's cell with his writing assistant, which means that he has no confidentiality in his correspondence.  Goguen testified that she was unaware whether this policy had been in place at SBCC, and she did not ask Rodrigues about the issue.

Reaves requests that he be given access to a writing assistant for a minimum of one hour per day, seven days per week, and that he be afforded confidentiality in his written correspondence.

The DOC Defendants assert that they should be given discretion in all matters relating to the writing assistant.  This request was not included in Reaves's initial papers relating to his motion for preliminary injunction, and his complaints regarding the writing assistant appear to have surfaced since his transfer to MCI Shirley.  Accordingly, the issue has not been fully briefed, and Reaves has not specified why he requests an increase from five to seven days per week.

Because the underlying facts are unclear, I am unable to determine whether Reaves is likely to succeed on this aspect of his ADA claim.  I will deny his request, to be reassessed if necessary at a later time in the context of a more fully developed record.

### F.    *Confidentiality in Medical Care*

In addition to his correspondence and writing activities, all of Reaves's medical, mental-health, and personal care occurs with a correctional officer in the room.  This was the policy at SBCC, and it is currently the policy at MCI Shirley.  Rodrigues testified that the policy exists for security reasons; however, he also testified that in other parts of the prison that contain able-bodied prisoners, a single correctional officer would be assigned to monitor multiple ongoing classes in the school area.  This issue was not briefed in Reaves's initial motion for preliminary injunctive relief.

Pursuant to Massachusetts public health regulations, "Inmates shall be examined in a room which provides for privacy and dignity to the inmate and examiner. When necessitated for security reasons, a correctional officer may be present." 105 C.M.R. 205.103.  To the extent that the DOC Defendants are treating Reaves differently than able-bodied inmates by requiring a correctional officer to be in the room during his medical care, this could be a violation of the ADA.  However, I decline to reach the issue until the record is more fully developed.

Regarding mental health care, Ireland testified that able-bodied inmates sit in a chair with leg shackles during their appointments, which enables them to maintain confidentiality while ensuring the safety of the provider.  Reaves cannot use this chair because he is unable to sit.  Ireland testified that correctional officers are present during his mental health appointments because he has a history of swearing and spitting.  This rationale appears to be inconsistent with the DOC's policy for able-bodied prisoners, because shackles would not prevent an able-bodied inmate from swearing or spitting.  Moreover, it is unclear why swearing or spitting would present a security risk in the context of a mental health appointment, during which the provider does not need to touch or be in close proximity to the patient.  Accordingly, I find that Reaves is likely to succeed on his claim that the lack of confidentiality in mental health care violates the ADA.

### 3. *Potential for Irreparable Harm*

In order to establish a likelihood of irreparable harm, a plaintiff may show that his "legal remedies are inadequate." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996).  "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Id.* at 19.

Regarding his medical claims, Reaves argues that he is at risk of suffering irreparable harm through permanent loss of physical capacity.  As explained above, absent changes in his care, he will lose what little joint functions he has left, as well as the potential for increased mobility, and he will continue to be at risk for AD and constipation, both of which could be fatal.  No amount of money could fully compensate him for these losses.  In response, the MPCH Defendants rely on their contentions that Reaves has always received adequate care; that any deficiencies in care are due to his refusals of treatment; and that his claims are now moot because MPCH has sent him to a physiatrist and has formulated a plan to implement the provider's suggestions.  I find that

Reaves has shown a risk for irreparable harm absent improvements in his medical care.  However, in light of the recent and ongoing changes to his care, I elect to give the Defendants an opportunity to comply with their constitutional mandates in lieu of immediate injunctive relief.

Regarding the ADA claims, Reaves argues that he will be irreparably harmed absent injunctive relief and that no amount of money could compensate him for the DOC's continuing failure to comply with federal antidiscrimination law.  His requests for access to the outdoors, socialization, and prison programing are necessary to end the isolated life that he has led for nearly two decades.  Without an injunction, he will continue to suffer the psychological consequences of this unhealthy existence.  No amount of money could compensate him for this harm.

### 4.  *The Balance of Burdens*

Reaves argues that the burden that a preliminary injunction would impose on Defendants is largely financial, whereas he stands to lose physical functioning and bears an increased risk of early death if he is denied immediate relief.  The MPCH Defendants do not address this prong of the preliminary injunction analysis.

Regarding the ADA claims, the DOC Defendants argue that the burdens imposed by an injunction will outweigh any benefits to Reaves.   As argued above, the DOC Defendants assert that it would be burdensome to alter the prison's schedule and staffing in order to accommodate Reaves's requests to be taken outdoors; it would be expensive to provide him with access to adaptive equipment such as a voice-activated computer; and there is no feasible way that he could be given access to the shower facilities.  I agree that the DOC may be burdened by this order of preliminary injunctive relief.   However, burden—so long as it is not undue—is a necessary component of reasonable accommodation.

### 5.   *The Public Interest*

Reaves argues that an injunction would be in the public interest, because the public interest is always served when constitutional rights are upheld.  The public has an especially strong interest in ensuring that its prisons are operated in a safe, constitutional, and non-discriminatory manner. As Justice Kennedy recently noted, quoting Dostoyevsky, "The degree of civilization in a society can be judged by entering its prisons." *Davis v. Ayala*, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., Concurring).

The MPCH Defendants, on the other hand, argue that a preliminary injunction would be against the public interest because it would require the court to micromanage Reaves's care and treatment.  This in turn would hamper MPCH's ability to perform under its contract with the DOC and would encourage other inmates "to seek to manipulate their health care by bringing similar suits." (Docket No. 47 at 25.)  The MPCH Defendants also argue that an injunction is too broad a remedy because "the issue concerns not the absence of care, but the choice of a certain course of treatment." (Docket No. 47 at 26.)  The DOC Defendants, for their part, assert that it is not in the public interest to grant preliminary injunctive relief because Reaves seeks to alter the status quo and has not shown that the exigencies of his present situation warrant such extraordinary relief.

I find that the public interest will be best served by ordering that the DOC provide Reaves with certain accommodations and by appointing a monitor to oversee the remaining issues. Although it is in the public interest to allow prison administrators discretion in how they choose to run their correctional facilities, it would be a collective disservice to every citizen, incarcerated or not, to allow ongoing violations of federal law.

## Conclusion

For the reasons set forth above, Reaves's motion for preliminary injunctive relief (Docket No. 14) is ***granted*** in part and ***denied*** in part, as follows:

1. The DOC Defendants who currently control Reaves's accommodations shall immediately provide him with the following accommodations in a manner that is medically appropriate:

   a. Access to outdoor recreation;

   b. Access to indoor recreation and socialization;

   c. Access to prison programming;

   d. Access to shower facilities; and

   e. Confidentiality in mental health care.

2. Pursuant to 18 U.S.C. § 3626(a)(2), this order for injunctive relief shall expire in ninety days, unless Reaves shows cause why it should be renewed.

3. I hereby appoint attorney David Kneeland, Worcester, MA, as a neutral monitor to oversee the DOC and MPCH's medical care of Reaves and the DOC's compliance with the above-listed accommodations.  The monitor shall receive monthly reports from counsel, including all updated medical records, and shall have the ability to access the institutions to monitor medical care, physical accommodations, and programming.  The monitor shall relate these findings to this Court, on a monthly basis, until the final resolution of this case or such other time as this Court may order.

4. Because the monitor is appointed to oversee the implementation of this injunction and in lieu of more invasive relief, the Defendants shall bear the associated costs of compensating the monitor at a reasonable rate to be set by this Court.

5.  This Court will hold a status conference on August 18, 2016 at 10:30 a.m.  In advance of
    this status conference, each party shall file an updated report of Reaves's present condition
    and current treatment plan.  These reports shall be factual and not argumentative.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**