UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY M. REAVES,

                                    Plaintiff,

            v.

DEPARTMENT OF CORRECTION;

CAROL HIGGINS O'BRIEN, former Commissioner of
Correction;

PAMELA MACEACHERN, Deputy Superintendent of Programs
and Treatment at Bridgewater State Hospital;

MICHAEL RODRIGUES, Deputy Superintendent of Programs
and Treatment at Souza-Baranowski Correctional Center;

STEPHANIE COLLINS, Assistant Deputy Commissioner of
Clinical Services and Director of Health Services Division;

MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL
HEALTHCARE;

MHM CORRECTIONAL SERVICES;

GERALDINE SOMERS, M.D., Medical Director at Souza-
Baranowski Correctional Center;

LEIGH PARISEAU, RN, Director of Nursing, Souza-
Baranowski Correctional Center;

JULIE IRELAND, Health Services Administrator,
Souza-Baranowski Correctional Center;

KHALID KHAN, M.D., Medical Director at Bridgewater State
Hospital;

BONNIE DAMIGELLA, RN, Director of Nursing, Bridgewater
State Hospital;

CIVIL ACTION
NO.  15-40100

JOHN MORIN, Deputy Superintendent, MCI Shirley Medium;

DIANA GARCIA, RN, Director of Nursing, Souza-Baranowski Correctional Center;

THOMAS GROBLEWSKI, DO, Medical Director, Massachusetts Partnership for Correctional Healthcare;

MARIA ANGELES, MD, Medical Director, MCI Shirley Medium;

ELIZABETH LOUDER, Health Services Administrator, MCI Shirley Medium;

CINDY SLOCUM, RN, Director of Nursing, MCI Shirley Medium;

                                        Defendants.

## FIRST AMENDED COMPLAINT

### <u>Preliminary Statement</u>

Dr. Leslie Morse, a spinal cord specialist with Spaulding Rehabilitation Hospital, examined Plaintiff Timothy M. Reaves and deemed his physical condition "an extreme example" of the progression of disabling and potentially life-threatening complications in a spinal cord injury patient.  The complications that Mr. Reaves currently is experiencing are the worst she has seen in her fourteen years of practice.  Dr. Morse opined that these "untreated secondary complications" were mostly "preventable with appropriate supportive care."

Mr. Reaves suffers from quadriplegia, frontal lobe injury and hearing loss and is presently in the custody of the Department of Correction ("DOC") serving a life sentence without possibility of parole.  Mr. Reaves has no choice but to rely on DOC and their health services providers, MHM Correctional Health ("MHM") and Massachusetts Partnership for Correctional Healthcare ("MPCH"), for his medical care, including care for his spinal cord injury.  Due to his disabilities, Mr. Reaves requires assistance to perform all daily living functions, including but not limited to eating, grooming, bathing, defecating, urinating, exercising, reading and writing.  Despite repeated requests, DOC, MHM and MPCH have knowingly failed to provide Mr. Reaves with necessary medical and rehabilitative health care.  DOC and its health services providers have failed to provide reasonable accommodations for Mr. Reaves' disabilities so that he may participate in and enjoy the benefits of programs and activities available to the prison population, as well as freely exercise his constitutional rights.  DOC also has imposed isolation conditions on Mr. Reaves that violate the constitutional prohibition against cruel and unusual punishment, has violated Mr. Reaves' due process rights

and has continually violated the terms of a 2005 settlement agreement reached between Mr. Reaves and DOC in litigation.

By this lawsuit, Mr. Reaves seeks to remedy violations of the constitutional, statutory and common law rights guaranteed to him by Articles 1, 10, 12, 26 and 114 of the Constitution of the Commonwealth of Massachusetts; the Eighth and Fourteenth Amendments to the United States Constitution; 42 U.S.C. §1983; the Americans with Disabilities Act, 42 U.S.C. §§12131, et seq.; the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); the Massachusetts Equal Rights Act, G.L. c. 93, § 103; the Massachusetts Civil Rights Act, G.L. c. 12, 11I and Massachusetts tort law.

### Parties

1.  Plaintiff Timothy Reaves is a quadriplegic prisoner currently incarcerated in the Health Services Unit of MCI Shirley Medium ("MCI Shirley"), a DOC facility in Shirley, Massachusetts. Mr. Reaves suffers from moderate to severe bilateral sensorineural hearing loss that interferes with his everyday communication needs. He also has damage to the frontal lobe of his brain which contributes to impulsivity and difficulty controlling frustrations. Prior to January 25, Mr. Reaves was incarcerated in the Health Services Unit at Souza-Baranowski Correctional Center ("Souza-Baranowski"), in Shirley, Massachusetts, a maximum security DOC facility. Prior to January 13, 2014, Mr. Reaves was incarcerated in the infirmary at the Bridgewater State Hospital ("Bridgewater") in Bridgewater, Massachusetts, a state psychiatric hospital and penal institution operated by DOC.

<u>DOC Defendants</u>

2.    Department Of Correction is an executive department of the Commonwealth of
      Massachusetts.  It is a "public entity" within the meaning of the Americans with
      Disabilities Act ("ADA,") *see* 42 U.S.C. § 12131(1), and a recipient of federal funding
      within the meaning of the Rehabilitation Act, *see* 29 U.S.C. § 794.

3.    Defendant Carol Higgins O'Brien was the DOC Commissioner from September 10, 2014
      through April 8, 2016.  Under G.L. c. 124, §§ 1 (d) and (q), her responsibilities included
      the establishment and enforcement of standards relating to the care, custody, and safety of
      all persons confined in state correctional facilities.  She was responsible for the
      administration of all such facilities in accordance with federal and state law.  Defendant
      Thomas Turco succeeded Defendant O'Brien as Commissioner on April 8, 2016.  He was
      automatically substituted for Defendant O'Brien with regard to the official capacity
      claims lodged against her.  The Commissioner maintains an office at DOC Central
      Headquarters, 50 Maple Street, Suite 3, Milford, Massachusetts 01757.

4.    Defendant Pamela MacEachern was at all times relevant to this action, the Deputy
      Superintendent of Programs and Treatment at Bridgewater.  She was directly responsible
      for the management and operation of Bridgewater, including responsibility for the care,
      custody and treatment of all persons incarcerated at Bridgewater; for the enforcement of
      rules and regulations promulgated by the Commissioner of Correction; and for ensuring
      the institution is managed and operated in accordance with state and federal law.  She was
      also the ADA coordinator at the prison, who, pursuant to federal regulation, 28 C.F.R. §
      35.107, is responsible for ensuring compliance with that law.  Defendant MacEachern's

regular place of business is Bridgewater State Hospital, 20 Administration Road, Bridgewater, Massachusetts 02324.

5.      Defendant Michael Rodrigues was at all times relevant to this action, the Deputy Superintendent of Programs and Treatment at Souza-Baranowski.  He was directly responsible for the management and operation of Souza-Baranowski, including responsibility for the care, custody and treatment of all persons incarcerated at Souza-Baranowski; for the enforcement of rules and regulations promulgated by the Commissioner of Corrections; and for ensuring the prison is managed and operated in accordance with state and federal law.  He was also the ADA coordinator at the prison, who, pursuant to federal regulation, 28 C.F.R. § 35.107, is responsible for ensuring compliance with that law.  Defendant Rodrigues' regular place of business is MCI Cedar Junction, 2405 Main St, South Walpole, MA 02071.

6.      Defendant John Morin is and was at all times relevant to this action, the Deputy Superintendent of Reentry at MCI Shirley.  He is directly responsible for the management and operation of MCI Shirley, including responsibility for the care, custody and treatment of all persons incarcerated at MCI Shirley; for the enforcement of rules and regulations promulgated by the Commissioner of Corrections; and for ensuring the prison is managed and operated in accordance with state and federal law.  He was also the ADA coordinator at the prison, who, pursuant to federal regulation, 28 C.F.R. § 35.107, is responsible for ensuring compliance with that law. His regular place of business is MCI Shirley, PO Box 1218, Shirley, Massachusetts 01464.

7. Stephanie Collins is the Assistant Deputy Commissioner of Clinical Services and Director of the DOC Health Services Division.  She is responsible for overseeing the administration of health care by the contracted medical provider to Massachusetts prisoners, including monitoring quality assurance.  Defendant Collins maintains an office at DOC Central Headquarters, 50 Maple Street, Suite 3, Milford, Massachusetts 01757.

Unless otherwise noted, each non-institutional DOC Defendant is sued in his or her individual and official capacities.

Medical Defendants

8. Defendant MHM Correctional Services, Inc. ("MHM") is a Virginia corporation that was contracted by DOC to provide health services to the population of prisoners and patients incarcerated at Bridgewater from the time Mr. Reaves arrived there until June 30, 2013. Medical staff who saw or treated Mr. Reaves at Bridgewater, or who otherwise addressed or failed to address his medical concerns there, prior to July 1, 2013 were MHM employees or agents.  Defendant MHM has a business office at 110 Turnpike Road, Suite 308, Westborough, MA 01581.

9. Defendant Massachusetts Partnership for Correctional Health, LLC ("MPCH") is a Massachusetts entity contracted by DOC to provide health services to the Massachusetts state prison population, beginning on July 1, 2013 and continuing to the present.  MPCH is owned by MHM and the Centene Corporation, via their jointly held Missouri entity, Centurion Managed Care, LLC.  Medical staff who saw or treated Mr. Reaves at MCI-Shirley or Souza-Baranowski, or who otherwise addressed or failed to address his medical concerns there were MPCH employees or agents.  Medical staff who saw or treated Mr.

Reaves at Bridgewater, or who otherwise addressed or failed to address his medical concerns there, on or after July 1, 2013, were also MPCH employees or agents. Defendant MPCH has a business office at 110 Turnpike Road, Suite 308, Westborough, MA 01581.

10. Thomas Groblewski, DO, is and was the Statewide Medical Director for MHM and MPCH and an employee of MHM and MPCH.  He is responsible for ensuring that all prisoners in Massachusetts DOC facilities receive adequate medical care, including the creation and implementation of appropriate treatment plans, medical restrictions, and accommodations.  As Statewide Medical Director, Defendant Groblewski is charged with providing the clinical and utilization management direction needed to meet the service delivery requirements of the medical contract with DOC.  His responsibilities include establishing directives, providing direction, and/or attending the following committees/ groups: Continuous Quality Improvement, Infection Prevention and Control, Pharmacy and Therapeutics, and Utilization Management.  Defendant Groblewski is responsible for approving and denying specialist referrals, including for Mr. Reaves, and at times functions as Mr. Reaves' primary care provider.  His regular place of business is 110 Turnpike Road, Suite 308, Westborough, MA 01581.

11. Khalid Khan, M.D., was the Medical Director at Bridgewater during the time Mr. Reaves was incarcerated there.  He was an employee of MHM until July 1, 2013 and thereafter was an employee of MPCH.  Defendant Dr. Khan was responsible for ensuring that all prisoners at Bridgewater receive adequate medical care, including the creation and implementation of appropriate treatment plans, medical restrictions, and accommodations. His responsibilities as Medical Director included ensuring inmate medical care is

appropriate, accurate and received in a timely manner and in compliance with relevant standards of care; developing and approving protocols used by nurse practitioners and nurses; applying ethical and legal principles to the treatment of inmates with medical problems in a correctional setting, ensuring that inmates receive appropriate care; supervising and evaluating medical services for inmates; assisting in oversight of in-service training on medically related topics; and monitoring records in all aspects of medical practices in the system, including timeliness and accuracy of medical records and timeliness and accuracy of inmate care practices.   Defendant Dr. Khan was Mr. Reaves' primary care physician at Bridgewater.  His regular place of business is Bridgewater State Hospital, 20 Administration Road, Bridgewater, Massachusetts 02324.

12.   Bonnie Damigella, RN, was the Director of Nursing at Bridgewater during the time Mr. Reaves was incarcerated there.  She was an employee of MHM until July 1, 2013 and thereafter was an employee of MPCH.  Her responsibilities included providing adequate medical care to prisoners at Bridgewater and training and supervising nursing staff.  As Director of Nursing, her responsibilities specifically included: providing clinical, educational and professional supervision for nursing and support staff; developing maintaining and implementing nursing policies and procedures that conform to current standards of nursing practice and operational policies while maintaining compliance with state and federal regulations; monitoring, reviewing and evaluating performance of assigned nursing and supporting staff and submitting written evaluations for all applicable staff; recruiting and selection of nursing and support staff to maintain sufficient, qualified staffing levels; ensuring medication and treatment orders are followed correctly and in compliance with state practice acts and legal principles; supervising order, proper use and

maintenance of medical supplies and equipment; and developing nursing education and training programs, including continuing education/ training. Her regular place of business is Bridgewater State Hospital, 20 Administration Road, Bridgewater, Massachusetts 02324.

13.     Geraldine Somers, M.D. is the Medical Director at Souza-Baranowski and an employee of MPCH.  Defendant Dr. Somers is responsible for ensuring that all prisoners at Souza-Baranowski receive adequate medical care, including the creation and implementation of appropriate treatment plans, medical restrictions, and accommodations.  Her responsibilities as Medical Director included ensuring inmate medical care is appropriate, accurate and received in a timely manner and in compliance with relevant standards of care; developing and approving protocols used by nurse practitioners and nurses; applying ethical and legal principles to the treatment of inmates with medical problems in a correctional setting, ensuring that inmates receive appropriate care; supervising and evaluating medical services for inmates; assisting in oversight of in-service training on medically related topics; and monitoring records in all aspects of medical practices in the system, including timeliness and accuracy of medical records and timeliness and accuracy of inmate care practices.   Defendant Dr. Somers was Mr. Reaves' primary care physician. Her regular place of business is Souza-Baranowski Correctional Center, PO Box 8000, Shirley, Massachusetts 01464.

14.     Leigh Pariseau, RN, was the Director of Nursing at Souza-Baranowski and an employee of MPCH when Mr. Reaves arrived at Souza-Baranowski in January 2014 through October at least October 19, 2014.  Her responsibilities included providing adequate medical care to prisoners at Souza-Baranowski and training and supervising nursing staff

As Director of Nursing, her responsibilities specifically included: providing clinical, educational and professional supervision for nursing and support staff; developing maintaining and implementing nursing policies and procedures that conform to current standards of nursing practice and operational policies while maintaining compliance with state and federal regulations; monitoring, reviewing and evaluating performance of assigned nursing and supporting staff and submitting written evaluations for all applicable staff; recruiting and selection of nursing and support staff to maintain sufficient, qualified staffing levels; ensuring medication and treatment orders are followed correctly and in compliance with state practice acts and legal principles; supervising order, proper use and maintenance of medical supplies and equipment; and developing nursing education and training programs, including continuing education/ training.  Her regular place of business was Souza-Baranowski Correctional Center, PO Box 8000, Shirley, Massachusetts 01464.

15.   Diana Garcia, RN, was the Director of Nursing at Souza-Baranowski beginning October 19, 2014 and during the time Mr. Reaves was incarcerated there.  She was an employee of MPCH.  Her responsibilities include providing adequate medical care to prisoners at Souza-Baranowski and training and supervising nursing staff.  As Director of Nursing, her responsibilities specifically included: providing clinical, educational and professional supervision for nursing and support staff; developing maintaining and implementing nursing policies and procedures that conform to current standards of nursing practice and operational policies while maintaining compliance with state and federal regulations; monitoring, reviewing and evaluating performance of assigned nursing and supporting staff and submitting written evaluations for all applicable staff; recruiting and selection of nursing and support staff to maintain sufficient, qualified staffing levels; ensuring

medication and treatment orders are followed correctly and in compliance with state

practice acts and legal principles; supervising order, proper use and maintenance of

medical supplies and equipment; and developing nursing education and training programs,

including continuing education/ training.  Her regular place of business is Souza-

Baranowski, Correctional Center, PO Box 8000, Shirley, Massachusetts 01464.

16.     Julie Ireland is the Health Services Administrator at Souza-Baranowski and an employee

of MPCH.  She is responsible for ensuring that prisoners at Souza-Baranowski receive

adequate and timely medical care.  Defendant Ireland is responsible for managing the

scheduling of medical appointments inside the prison as well as any specialty

appointments.  She is responsible for investigating patients' medical grievances and

arranging for suitable remedies.  Her additional responsibilities as Health Services

Administrator include authorizing expenditures, serving as medical liaison to facility

security administration; maintaining an ethical commitment to ensure patient

confidentiality within the limits of the correctional environment; ensuring care to

offenders is delivered by medical staff in a nonjudgmental/nondiscriminatory manner to

protect the autonomy, dignity and rights of offenders; and recruits and retains staff by

performing interviews, recommending hires and ensuring training of staff.  Her regular

place of business is Souza-Baranowski Correctional Center, PO Box 8000, Shirley,

Massachusetts 01464.

17.     Maria Angeles, MD, is the Medical Director at MCI Shirley and an MPCH employee.

Defendant Dr. Angeles is responsible for ensuring that all prisoners at MCI Shirley

receive adequate medical care, including the creation and implementation of appropriate

treatment plans, medical restrictions, and accommodations.  Her responsibilities as

Medical Director include ensuring inmate medical care is appropriate, accurate and received in a timely manner and in compliance with relevant standards of care; developing and approving protocols used by nurse practitioners and nurses; applying ethical and legal principles to the treatment of inmates with medical problems in a correctional setting, ensuring that inmates receive appropriate care; supervising and evaluating medical services for inmates; assisting in oversight of in-service training on medically related topics; and monitoring records in all aspects of medical practices in the system, including timeliness and accuracy of medical records and timeliness and accuracy of inmate care practices.   Defendant Dr. Angeles is Mr. Reaves' primary care physician.  Her regular place of business is MCI Shirley Medium, PO Box 1218, Shirley, Massachusetts 01464.

18.   Elizabeth Louder, LICSW, is the Health Services Administrator at MCI Shirley and an MPCH employee.  She is responsible for ensuring that prisoners at MCI Shirley receive adequate and timely medical care.  Defendant Louder is responsible for managing the scheduling of medical appointments inside the prison as well as any specialty appointments.  She is responsible for investigating patients' medical grievances and arranging for suitable remedies.  Her additional responsibilities as Health Services Administrator include authorizing expenditures, serving as medical liaison to facility security administration; maintaining an ethical commitment to ensure patient confidentiality within the limits of the correctional environment; ensuring care to offenders is delivered by medical staff in a nonjudgmental/nondiscriminatory manner to protect the autonomy, dignity and rights of offenders; and recruits and retains staff by performing interviews, recommending hires and ensuring training of staff.  Her regular place of business is MCI Shirley Medium, PO Box 1218, Shirley, Massachusetts 01464.

19.    Cindy Slocum, RN, is the Director of Nursing at MCI Shirley and an MPCH employee. Her responsibilities include providing adequate medical care to prisoners at MCI Shirley and training and supervising nursing staff.  As Director of Nursing, her responsibilities specifically included: providing clinical, educational and professional supervision for nursing and support staff; developing maintaining and implementing nursing policies and procedures that conform to current standards of nursing practice and operational policies while maintaining compliance with state and federal regulations; monitoring, reviewing and evaluating performance of assigned nursing and supporting staff and submitting written evaluations for all applicable staff; recruiting and selection of nursing and support staff to maintain sufficient, qualified staffing levels; ensuring medication and treatment orders are followed correctly and in compliance with state practice acts and legal principles; supervising order, proper use and maintenance of medical supplies and equipment; and developing nursing education and training programs, including continuing education/ training.  Her regular place of business is MCI Shirley Medium, PO Box 1218, Shirley, Massachusetts 01464.

20.    Unless otherwise noted, each non-institutional Medical Defendant is sued in his or her individual capacity.

### Jurisdiction and Venue

21.    The Court has subject matter jurisdiction over Mr. Reaves' claims pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights jurisdiction) and 1367 (supplemental jurisdiction).

22.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

## FACTS

### Chronological Overview

23.  On April 15, 1994, Mr. Reaves was injured and rendered quadriplegic.  He sustained incomplete fractures to his C-5 and C-6 vertebrae.  The incident in which Mr. Reaves was injured also resulted in his arrest.

24.  Between his April 15, 1994 injury and his April 25, 1996 conviction, Mr. Reaves was hospitalized at a series of public and private health care facilities including Morton Hospital, Brigham and Women's Hospital, Spaulding Rehabilitation Hospital and Lemuel Shattuck Hospital ("Shattuck").

25.  In 1995, a clinical neuropsychologist at Spaulding Rehabilitation Hospital examined Mr. Reaves and concluded that he had a frontal lobe injury.  A July 21, 1996 skull X-ray documented the presence of widened subarachnoid spaces in his frontal regions bilaterally, indicating atrophy of both frontal lobes of the cerebrum.

*April 25, 1996 to March 15, 1999: MCI Shirley*

26.  On April 25, 1996, Mr. Reaves entered the DOC system. DOC housed Mr. Reaves at the MCI Shirley Health Services Unit.

27.  When he entered the MCI Shirley Health Services Unit, Mr. Reaves was able to perform a wide variety of daily tasks with limited assistance, including: feed himself solid foods and liquids with the assistance of adaptive equipment; shave with an electric razor; wash his hands and face and brush his teeth independently; sit comfortably in his wheelchair for three to five hours; operate an electric wheelchair; and extend both arms, his hands and

his fingers to a fully open position.  Mr. Reaves came into the DOC system with hand and foot splints, sleeves to maintain extension in his elbows and an electric tilt space wheelchair.  He weighed approximately 140 pounds.

28. On January 30, 1998, DOC and its medical provider sent Mr. Reaves to New England Medical Center's Department of Rehabilitation Medicine for evaluation.  The evaluating doctors provided their resulting evaluations and treatment recommendations to the DOC medical provider.  New England Medical Center's recommendations included the following: that Mr. Reaves be placed on a bowel program that would result in daily or every other day bowel movements; that he receive frequent repositioning to prevent further skin breakdown and very close follow-up of areas prone to skin breakdown; that he work with a therapist on improving bed mobility using side rails and straps attached to a trapeze set-up above his bed; that he receive frequent passive range of motion exercises; that he have new ankle splints and hand splints to prevent hardening and fixture of his joints (i.e., contractures); that he receive tenodesis splints to maximize upper extremity function to allow a pincher-type grasp using his thumbs and wrist extension; and that a written daily schedule for his care be affixed to his bedside to improve Mr. Reaves' compliance with his care.  DOC and its medical providers took little to no apparent action to effectuate these recommendations.

*March 15, 1999 to October 11, 2007: Souza-Baranowski*

29. Between March 15, 1999, and October 11, 2007, DOC housed Mr. Reaves at the Health Services Unit at Souza-Baranowski, a maximum security institution.  Approximately the last four months of this period Mr. Reaves was inpatient at Shattuck receiving treatment for malnutrition and depression.

30.     On May 30, 2000, Mr. Reaves filed a lawsuit in Suffolk Superior Court, docket no. SUCV
        2000-02363, against the DOC and the then-contracted medical provider, Correctional
        Medical Services, Inc., alleging violations of his state and federal rights to freedom from
        cruel and unusual punishment, to due process and to freedom from discrimination on the
        basis of his disability, among other violations.

31.     On May 15, 2001, Edward Phillips, M.D., a physiatrist and Director of Outpatient
        Medical Services at Spaulding Rehabilitation Hospital, conducted an independent
        examination of Mr. Reaves at Shattuck at the request of Mr. Reaves' counsel.  Dr.
        Phillips' examination was accompanied by a review of relevant records and resulted in a
        written report detailing areas of deficient care and specifying necessary treatment in order
        to comply with the standard of care for spinal cord injury patients.  Mr. Reaves' former
        counsel provided Dr. Phillips' report to DOC and their contract medical provider.  Dr.
        Phillips found Mr. Reaves "isolated" with "decreased stimuli due to his long-standing
        hearing deficit, his lack of access and ability to control the phone and television, and
        difficulty holding a book in bed to read."  He found that any behavioral or perceived
        motivational difficulties with Mr. Reaves DOC dealt with punitively, by removing things
        like wheelchair access, rather than through "psychiatric and psychological intervention to
        address the root causes of his behavior and intervene in his struggle with his caregivers."
        His recommendations include assigning a "Consultation-Liaison psychiatrist (or
        psychologist) who can act as [Mr. Reaves'] advocate and provide a venue to voice his
        concerns"; organization of Mr. Reaves' treatment team; and a positive reward system of
        behavior modification to encourage compliance with the treatment plan, rather than the

punitive system of removing privileges.  DOC and its medical providers took little to no apparent action to effectuate these recommendations.

32.     Since at least 2003, an audiologist at Shattuck has prescribed hearing aids to Mr. Reaves to ameliorate his bilateral sensorineural hearing loss.

33.     Between October 2003 and January 2005, DOC and their medical provider again sent Mr. Reaves to New England Medical Center's Department of Rehabilitation Medicine for three evaluations by specialists in rehabilitation medicine.  The evaluating doctors provided their resulting evaluations and recommendations for needed treatment to the DOC medical provider.  Their recommendations included urology follow up care, aggressive physical therapy to permit access to the wheelchair, improved wound care, podiatry care, and close follow-up care by a physiatrist.

34.     In May 2005, Steve Williams, MD, a physiatrist at Boston University Medical Center, provided the then-Deputy Superintendent of Health Services for DOC with a thorough report and recommendation regarding proper care for Mr. Reaves.  Dr. Williams reported to DOC that Mr. Reaves' contractures, orthostatic hypotension, fecal incontinence, constipation, urinary incontinence, and occasional autonomic dysreflexia would be properly addressed in the setting of an acute rehabilitation unit that has experience in treating patients with spinal cord injuries.  Dr. Williams recommended an acute spinal cord injury rehabilitation stay in the range of 3-6 months to improve Mr. Reaves' functional status and health.

35. DOC and Mr. Reaves, both represented by counsel, resolved the claims between them in the litigation referenced in paragraph 25 by a signed Settlement Agreement, dated December 14, 2005.

36. DOC has failed to perform certain of its obligations under the Settlement Agreement as described in the following paragraphs of the Settlement Agreement: 6a, requiring DOC to take all necessary measures to implement the medical care plan recommended by its medical provider for Mr. Reaves; 6c, requiring DOC to provide Mr. Reaves with access to a television and a remote control; 6d, requiring DOC to provide Mr. Reaves a radio with tape recorder and remote control; 6e, requiring DOC to provide "tapes for the purpose of recording correspondence;" 6f, requiring DOC to provide access to books on tape; 6g, requiring DOC to provide the opportunity for haircuts and shaves at certain intervals; 6i, requiring the Superintendent to review all Mr. Reaves' disciplinary sanctions, considering their impact on him due to his disabilities; 6k, requiring DOC to ensure equal access to programs and services for which Mr. Reaves qualifies; 6l, requiring the ADA Coordinators to create and update a list of all Mr. Reaves' approved accommodations and modifications to programs, policies or rules; and 6n, requiring DOC to provide an appropriate bed for a person in Mr. Reaves' condition.

37. On March 24, 2006, Defendants sent Mr. Reaves for an outpatient evaluation by Gregory C. Malloy, M.D., a physiatrist at Whittier Rehabilitation Hospital.  Dr. Malloy provided his evaluation and recommendations to the medical provider at Souza-Baranowski. His recommendations included: splinting and repositioning; aggressive wound care management; a scheduled bowel program with daily suppository and digital stimulation; reevaluation of Mr. Reaves' wheelchair.  Dr. Malloy stated that Mr. Reaves' "complex

constellation of needs as a C5 quadriplegic" and "complex equipment needs" would be best addressed at a specialized care facility.  DOC and its medical providers took no apparent actions to effectuate these recommendations as they relate to Mr. Reaves' care in the prison.  The DOC and their medical provider did investigate placing Mr. Reaves at the Boston Medical Center rehabilitation clinic, however they did not meet the conditions necessary to place Mr. Reaves there.

38. During an inpatient stay at Shattuck in October 2006, the Shattuck physical therapy department performed physical therapy on Mr. Reaves five times a week.  By the end of October the physical therapist noted that progress had been made and Mr. Reaves was close to being able to get into his wheelchair.

*October 11, 2007 to January 20, 2011: MCI Shirley*

39. From October 11, 2007 to January 20, 2011 DOC housed Mr. Reaves at the Health Services Unit at MCI Shirley, a medium security institution.

40. At MCI Shirley, DOC held Mr. Reaves in near complete isolation in a single cell.  DOC Defendants provided Mr. Reaves no recreation time or activities, no access to the outdoors, no access to common spaces, no programming, and no social interaction with peers.  DOC provided very limited access to writing assistance.  The medical contractor provided limited physical therapy but DOC staff interfered with regular treatment.

41. On October 24, 2008, Dr. Phillips of Spaulding Rehabilitation Hospital conducted a second independent physical evaluation of Mr. Reaves.  Dr. Phillips' examination was accompanied by a review of relevant records and resulted in a written report detailing areas of deficient care and specifying necessary and recommended treatment in order to

comply with the standard of care for spinal cord injury patients.  Dr. Phillips found Mr.

Reaves to have "worsening contractures, decreased mobility, reduced self-care, and

marked worsening of his skin breakdown."  Dr. Phillips opined that "[w]hile quadriplegic

patients often survive to their full life expectancy Mr. Reaves is challenged by multiple,

preventable complications that will most likely shorten his life."  His recommendations

included: regular physical and occupational therapy for both upper and lower extremities

so as to avoid skin breakdown and compromising staff's ability to provide adequate

hygiene; better nutrition; a more sophisticated system of relieving pressure on Mr.

Reaves' body; and more contact and external stimuli.  Dr. Phillips again recommended

that the system of removing privileges be replaced with a system of providing additional

privileges as a reward for positive behavior.  Dr. Phillips' report was provided to the DOC

and their contract medical provider by counsel.  DOC and its medical providers took little

to no apparent action to effectuate these recommendations.

*January 20, 2011 to January 13, 2014: Bridgewater*

42.   From January 20, 2011 to January 13, 2014, DOC housed Mr. Reaves in the Health

Services Unit of Bridgewater.  He was housed there solely for medical purposes and not

as a psychiatric patient.

43.   At Bridgewater, DOC Defendants housed Mr. Reaves in a four-person dormitory room.

He was confined to his bed and DOC Defendants provided Mr. Reaves no recreation time

or activities, no access to the outdoors, no access to common spaces, no programming,

and rare social interaction with peers.  During much of his time there, DOC provided only

very limited access to the telephone and writing assistance.

44.     When he arrived at Bridgewater, Mr. Reaves required total care for all activities of daily
        living.  He was unable to sit in his wheelchair.  His hands, however, were not fully
        contracted and his fingers could be passively stretched to full extension.  He had a weak
        key grip allowing him to hold papers.

45.     Mr. Reaves entered Bridgewater with foot and wrist splints and was using folded pillows
        as makeshift foot-drop support.  Shortly after his arrival at Bridgewater, all of that
        equipment was taken away from him by Bridgewater DOC and Medical Defendants.
        Defendants put his wheelchair in storage and Mr. Reaves did not see it again until January
        7, 2014 at which time it was observed to have been damaged.  DOC provided Mr. Reaves
        with a small children's remote control device taped to a plastic box instead of a
        handicapped accessible remote control to operate his television, which he could operate
        only with extreme difficulty.  Defendant MacEachern refused to replace the headphones
        for hearing disabled persons Mr. Reaves used to listen to a television and radio after they
        broke from wear and tear.

46.     No list of accommodations was made or provided to Mr. Reaves by Defendant
        MacEachern while Mr. Reaves was at Bridgewater, as required by the Agreement.  This
        failure contributed to confusion and conflict over what property Mr. Reaves was permitted
        to have and how certain rules applied to him.  DOC also did not provide a working radio,
        tape player or access to books on tape at Bridgewater.

47.     On March 4, 2013 the Suffolk Superior court held a hearing at Bridgewater on a *Myers*
        petition filed by DOC.  The *Myers* petition sought to expand the reach of a pre-existing
        *Myers* Order, which is still in place and which allows DOC to use force to impose certain

types of medical care if it is refused by Mr. Reaves.  Dr. Khan and Mr. Reaves both
testified at that hearing.  In his testimony, Dr. Khan admitted that physical therapy was
not provided to Mr. Reaves at Bridgewater, stated that Mr. Reaves could not receive
physical therapy at Bridgewater and would have to go to an outside facility for such
treatment, and acknowledged that while there is a specific spinal injury protocol for
delivering physical therapy to quadriplegic patients, he did not know what that protocol
entailed as he was "not an expert in that." Based on the testimony at the hearing, Judge
Fahey obtained a verbal commitment from DOC to send Mr. Reaves to a specialist for
evaluation for physical therapy.

48.    On November 20, 2013, Dr. Mithilda Vullaganti performed a neurological consultation on
Mr. Reaves at Shattuck.  She recommended physical therapy, passive stretching, adequate
nutrition and regular repositioning to prevent pressure ulcers.  Defendants took no action
to effectuate these recommendations.

49.    On January 7, 2014, Leslie Morse, D.O., a physiatrist at Spaulding Rehabilitation Hospital
and Program Director of the Spaulding-Harvard Spinal Cord Injury Model System,
conducted an independent examination of Mr. Reaves at Bridgewater at the request of Mr.
Reaves' counsel.  Dr. Morse's examination was accompanied by a review of relevant
records and resulted in a written report detailing areas of deficient care and specifying
necessary and recommended treatment in order to comply with the standard of care for
spinal cord injury patients.  Dr. Morse noted the similar recommendations from
physiatrists who had evaluated Mr. Reaves over the years, and the failure of DOC and
their medical providers to follow the majority of those recommendations.  She strongly
disagreed with Defendants' position at the time that Mr. Reaves was not a good candidate

for physical therapy.  She noted laboratory results reflecting fecal contamination of Mr.

Reaves' lower extremity wounds and remarked on the urine soaked bandages that were

removed from Mr. Reaves at the time of her examination as well as overgrown nails on

his hands and feet.

50.    Dr. Morse recommended that necessary care would include oversight of Mr. Reaves' care

by a rehabilitation medicine specialist, daily continuous assistance with activities of daily

living from a personal care attendant, physical and occupational therapy to increase

functional independence and prevent further loss of function, improved hygiene practices,

wound care according to the Shattuck clinic recommendations, implementation of a bowel

care program, immediate and regular podiatry care, and education of the medical

providers about the risks of autonomic dysreflexia.  Counsel have since provided Dr.

Morse's report to DOC and their contract medical provider.  Defendants have ignored

several significant recommendations and to the extent that Defendants have made any

efforts to implement Dr. Morse's recommendations, their efforts have been inadequate.

*January 13, 2014 to January 25, 2016: Souza-Baranowski*

51.    DOC returned Mr. Reaves to the Souza-Baranowski Health Services Unit on January 13,

2014.  On his arrival at Souza-Baranowski, Mr. Reaves' physical condition had declined

with worsening contractures at his joints and horrific open wounds covering his legs and

feet. The specific cause and diagnosis of the wounds is undetermined, though medical

Defendants have identified them as cellulitis and as venous stasis ulcers, which have

frequently been complicated by infections.  Mr. Reaves continued to require total care for

all activities of daily living.

52.    At Souza-Baranowski, DOC Defendants housed Mr. Reaves alone in a cell.  He remained confined to his bed.  DOC Defendants provided Mr. Reaves no recreation time or activities, no access to the outdoors, no access to common spaces, and no programming. DOC Defendants permitted him social interaction with a peer on one occasion for one half hour.  DOC continued to provide Mr. Reaves with the children's remote control until November 18, 2014 when they provided a handicapped accessible remote control. Although DOC provided a working radio several months after Mr. Reaves arrived, DOC refused to provide the headphones until approximately October 2014 at which time they replaced them with headphones not made for the hearing disabled and with a cord not long enough to reach Mr. Reaves from the radio.  No list of accommodations was made or provided to Mr. Reaves by Defendant Rodrigues at Souza-Baranowski.  DOC has not provided a working tape recorder at Souza-Baranowski and did not begin providing access to audio books until approximately January 2015.  DOC withheld the audio books from Mr. Reaves for periods as long as two months.

53.    Medical Defendants sent Mr. Reaves to be evaluated by physiatrist Heidi Wennemer, MD, on December 15, 2015.  Dr. Wennemer expressed a concern regarding Mr. Reaves' autonomic dysreflexia, as he experienced a severe autonomic dysreflexic episode during their appointment.  She made several other recommendations for Mr. Reaves' care, some of which were followed, others, such as a recommendation that Mr. Reaves have bladder studies, were not followed by MPCH staff.

*January 25, 2016 to present: MCI Shirley*

54.    DOC Defendants returned Mr. Reaves to the MCI Shirley Health Services Unit on January 25, 2016 where DOC Defendants housed Mr. Reaves alone in a cell.  He remains

confined to his bed.  DOC's stated reason for transferring Mr. Reaves to MCI Shirley was to enable Mr. Reaves to access outdoor recreation.  Yet DOC did not have a transportation gurney to transport Mr. Reaves outdoors upon his arrival at MCI Shirley and did not procure one for months.  DOC did not offer Mr. Reaves outdoor recreation until August 2016.

55.  From March 15 – June 21, 2016, Mr. Reaves spent months hospitalized at Lemuel Shattuck Hospital for severe bowel impaction.  Medical providers at Lemuel Shattuck Hospital lacked experience managing impaction in spinal cord injury patients with neurogenic bowel.  Defendants' refusal to send Mr. Reaves to outside specialists with the appropriate background in spinal cord injury medicine caused him to suffer months of unnecessary hospitalization and failed treatments.

56.  On July 15, 2016, the United States District Court for the District of Massachusetts issued a preliminary injunction in this case requiring DOC to provide Mr. Reaves certain accommodations for equal access to services and programs and appointing a monitor to oversee Mr. Reaves' medical care.

57.  Even after this Order, DOC Defendants did not offer Mr. Reaves meaningful access to outdoor recreation, indoor recreation, programming, or socialization opportunities.  Defendants failed to obtain a medically appropriate gurney for Mr. Reaves to leave his cell, and failed to offer him substantially similar programming and socialization opportunities within his cell while he is confined to it.

58.   Medical Defendants failed to provide Mr. Reaves appropriate medical care, including
      range of motion therapy, adequate hygiene care, and regular dressing changes for the
      wounds on his legs and feet.

59.   Medical Defendants sent Mr. Reaves to be evaluated by spinal cord injury specialist
      Stephanie Cho, MD at Spaulding Rehabilitation Hospital in November 2016 and again in
      February 2017.  Defendants treat Dr. Cho's recommendations as mere recommendations
      that they are free to accept or deny based on their own assessment of need.

### Unconstitutional Medical Care

60.   From the time of Mr. Reaves' arrival at Bridgewater until July 1, 2013, MHM contracted
      with DOC to provide comprehensive health services to the population at Bridgewater.
      Under its agreement with MHM, DOC retained ultimate authority to evaluate the level
      and quality of medical services provided to prisoners.  Pursuant to the agreement, DOC
      was required to conduct a comprehensive audit of the medical care program at least every
      four months.  MHM was required to furnish weekly summary reports containing
      information used to measure contract compliance.

61.   MPCH contracted with DOC to provide comprehensive health services to the
      Massachusetts state prison population, including Bridgewater, MCI Shirley and Souza-
      Baranowski, beginning on July 1, 2013.  Under its contract with MPCH, DOC retained
      ultimate authority to oversee the level and quality of medical services provided to
      prisoners.  Pursuant to the agreement, DOC is required to conduct a comprehensive audit
      of the medical care program at each prison facility at least every four months.  MPCH is

required to furnish weekly summary reports containing information used to measure contract compliance.

62.   Additionally, paragraph 6a of the Settlement Agreement between Mr. Reaves and DOC requires that DOC take all necessary measures to implement any medical care plan for Mr. Reaves recommended by its medical care provider in accordance with DOC policy.

63.   MHM and MPCH employees at the Health Services Units at MCI Shirley, Souza-Baranowski and Bridgewater have insufficient experience and training in caring for patients with quadriplegia.  Neither Defendants Dr. Khan and RN Damigella at Bridgewater nor Defendants Dr. Somers and RN Pariseau at Souza-Baranowski, nor Dr. Angeles and RN Slocum at MCI Shirley, nor other medical staff at those facilities or within MPCH, possess sufficient training or experience in rehabilitation medicine or the treatment of quadriplegics to direct Mr. Reaves' medical care.

64.   No Defendant or MHM or MPCH employee, including the Statewide Medical Director Dr. Groblewski, sought the services of a physician who specializes in this care to inform and direct Mr. Reaves' treatment plan or need for accommodations during his incarceration at Bridgewater or Souza-Baranowski until Mr. Reaves filed the initial Complaint in this case.  Mr. Reaves' medical care is managed at the institution level by medical staff with no expertise in spinal cord injury care and decisions about accommodations are made by a Deputy Superintendent with no expertise in spinal cord injury accommodations.  As a direct and entirely foreseeable consequence of Defendants' deliberate indifference, Mr. Reaves has consistently been deprived of even minimally adequate health care during his incarceration.

65. Defendants MHM and MPCH have a custom and policy of refusing to have a spinal cord injury specialist oversee and direct Mr. Reaves' care.  Dr. Groblewski has failed to send Mr. Reaves to a spinal cord injury specialist until after the Preliminary Injunction Motion was filed in this case.

66. Defendants MHM and MPCH have a custom and policy of refusing to implement the recommendations of outside medical care providers, including the recommendations of specialists, as evidenced by the allegations discussed in paragraph 69, infra.  Dr. Groblewski has failed to require timely implementation of specialist recommendations at the site level.

67. Defendants MHM and MPCH have a custom and policy of allowing DOC staff to interfere with the treatment decisions of the medical providers and the provision of necessary medical care and a custom and policy of withholding care as punishment, as evidenced by the allegations discussed in paragraph 69, infra.

68. Defendant DOC, Defendant Higgins O'Brien, and Defendant Collins have provided insufficient monitoring and enforcement of DOC's health services contracts with MHM, MPCH and previous healthcare providers.  Said DOC Defendants have a custom or policy of excusing the delivery of inadequate medical care to prisoners in their care and custody.  Specifically, these DOC Defendants have allowed DOC's contractual medical providers to provide exclusive care to prisoners including Mr. Reaves despite major staff shortages, routine denial of outside specialist appointments for DOC prisoners, failure to develop treatment plans, failure to adequately monitor nursing staff and implementation of care orders, and failure to meet relevant standards of care.

69.     Illustrations of the substandard and constitutionally inadequate care provided to Mr.

        Reaves abound during the period of his incarceration at Bridgewater, Souza-Baranowski

        and MCI Shirley and include, without limitation, the following:

   a)      All Defendants' failure to have a treatment plan for Mr. Reaves until at least

            December 2014 when Souza-Baranowski Medical Defendants placed an

            inadequate nursing plan in his medical record and failed to implement it;

   b)      All Medical Defendants' failure to arrange for Mr. Reaves' treatment plan and

            daily care to be coordinated by a medical professional with specific expertise

            in the treatment of patients with spinal cord injury and quadriplegia;

   c)      All Defendants' failure to provide or make available adaptive devices

            necessary for a minimal degree of mobility, autonomy and personal care,

            including an appropriate "universal cuff" or hand clip -- a device which

            previously enabled Mr. Reaves to eat independently and perform some self-

            care;

   d)      All Defendants' failure to evaluate Mr. Reaves for and provide Mr. Reaves

            with devices necessary to prevent further decline of Mr. Reaves' physical

            condition, including splints, elbow sleeves, foot drop pillows, and other

            orthotics;

   e)      All Medical Defendants' failure to evaluate Mr. Reaves for and provide Mr.

            Reaves with rehabilitative therapy for Mr. Reaves' contractures, including

            surgery, therapeutic heat, stretching, and trials of serial casting or dynamic

            splinting;

f)      All Defendants' failure to evaluate Mr. Reaves for and provide him with occupational therapy and to implement a fixed daily care schedule of physical therapy including passive range of motion exercises of upper and lower extremities by a qualified therapist at least twice daily;

   i.   At Bridgewater, no physical therapy was performed, including passive range of motion exercises;

   ii.  At Souza-Baranowski, one nurse performed some range of motion exercises on Mr. Reaves' legs during her shifts, though there was no nursing plan calling for it until December 1, 2014 and no physical therapist prescribed the necessary exercises. No medical staff performed any range of motion work on Mr. Reaves' upper extremities;

   iii. At MCI Shirley, no physical therapist evaluated Mr. Reaves until after the Preliminary Injunction issued in July 2016. No physical therapist has adequately trained nursing staff as to how to perform range of motion on Mr. Reaves' extremities. Nursing staff are not sufficiently trained in how to perform range of motion therapy on Mr. Reaves without injuring him further. Nursing staff regularly marks Mr. Reaves as refusing range of motion therapy when he has not refused, and has also marked Mr. Reaves as receiving range of motion therapy that he did not receive;

   iv.  DOC staff have objected that Mr. Reaves' care takes up too much time due to the DOC requirement that an officer be present during all care provided to Mr. Reaves. The requirement that DOC staff be present whenever Mr.

Reaves receives medical care violates Department of Public Health

Minimum Standards, which protect prisoners' medical privacy by

restricting correctional officers from being present during medical care

unless there is a security concern.

g)  All Medical Defendants' failure to treat the open wounds that covered Mr.

Reaves' legs from his upper thighs to his feet in accordance with the

prescriptions of the Shattuck Wound Clinic, causing Mr. Reaves' wounds to

spread and fester.  Medical Defendants have falsely alleged that Mr. Reaves

refused dressing changes that were in fact necessary and desired, and  have

failed to maintain a proper stock of the needed supplies for dressing his

wounds;

   i.  For example, during the sixteen days from October 23 through November

8, medical staff at MCI Shirley changed the dressings just twice --- on

October 23 and November 6.  Dressing changes were not offered to him

every day and on several occasions when he accepted the offer of a

dressing change, no nurse returned to perform it;

   ii.  Medical staff at MCI Shirley ran out of bactroban ointment for Mr.

Reaves' legs and failed to promptly procure that medication, despite it

being prescribed treatment for the dressings.  Mr. Reaves had no

bactroban ointment from October 23 until November 16, a period of 28

days;

h)      The failure of Defendants Dr. Khan, RN Damigella, Dr. Somers, RN Pariseau, HSA Ireland, RN Garcia, Dr. Angeles, RN Slocum, HSA Louder and the medical staff under their supervision to observe basic hygiene procedures frequently leaving Mr. Reaves in his own waste, for example;

    i.  On November 18, 2016, the MCI Shirley Defendants and medical staff failed to provide Mr. Reaves a bed bath until after 6 pm, forcing him to lie in his own feces from approximately 10:45 am through 6 pm;

    ii.  On November 19, 2016, the MCI Shirley Defendants and medical staff did not respond to Mr. Reaves' requests to have his sheets and dressings changed after urine leaked from his condom catheter and soaked his bed and dressings.  Although Mr. Reaves made nursing staff aware that urine had leaked onto his bedsheets as early as roughly 12:30 pm, nursing staff did not clean him until his scheduled bed bath at 2 pm;

i)      Failure of all Defendants to treat or make accommodations for Mr. Reaves' substantial hearing loss, including failure to schedule and take him to recommended annual audiological evaluations, failure to maintain Mr. Reaves' ears free of excess wax consistent with audiological recommendations, failure to keep the prescribed hearing aids in working order; failure to provide the hearing aids to Mr. Reaves and properly place them in his ears; and failure to provide Mr. Reaves a captioned telephone so that he can meaningfully use telephone services;

j)      All Medical Defendants' failure to maintain Mr. Reaves' fingernails and
toenails at a reasonable length to avoid ingrown nails, which is highly
dangerous for quadriplegics because it triggers autonomic dysreflexia;

k)      All Defendants' failure to provide Mr. Reaves with adequate adaptive
equipment to allow bathing in a shower rather than in bed;

l)      All Medical Defendants' failure to adjust Mr. Reaves' diet and implement a
daily bowel regimen in order to alleviate Mr. Reaves' constipation secondary
to his quadriplegia and improve his nutrition so as to maximize his ability to
heal the wounds on his lower extremities;

m)      All Medical Defendants' failure to direct medical staff to change Mr. Reaves'
condom-type urinary catheter at a frequency meeting the minimally adequate
standard of care in the community in order to maintain hygiene, reduce the risk
of urinary tract infection and comply with a physician's recommended
protocol;

n)      On occasions when Mr. Reaves has refused care or food, failure of all
Defendants to counsel him, to explore the reasons for these refusals such as
illness or lack of hunger due to constipation, or to explore techniques to
encourage Mr. Reaves' cooperation and participation in his health care.  Mr.
Reaves' previous care plan called for caregivers to return after a fifteen minute
cooling down period when Mr. Reaves refused care.  At Bridgewater, Souza-
Baranowski and MCI Shirley caregivers routinely record that care was refused
after a single offer;

o)   Failure of Souza-Baranowski Medical Defendants to abide by the standard of
     care during the insertion of nasogastric tubes by an RN at Souza-Baranowski
     in April 2014, with no follow up x-ray to determine if the tubes were properly
     placed and through which they fed hi m only water from the sink in his cell;

p)   All Defendants' routine interference with or refusal to provide Mr. Reaves
     with medical care and false reporting that Mr. Reaves refused care, causing
     Mr. Reaves to regularly be denied medical or personal care at times when
     these services were necessary and welcome.  For example:

     i.   At Bridgewater, Souza-Baranowski and MCI Shirley, Defendants have
          engaged in a practice of treating Mr. Reaves' complaints about his care or
          about the way in which care is performed as a refusal of properly
          performed care;

     ii.  From approximately November 2013 until the time Mr. Reaves left
          Bridgewater, Medical Defendants there repeatedly refused to feed Mr.
          Reaves his meals when he objected to staff wearing a precautions jacket to
          feed him.  This pattern developed after a nurse came to feed him wearing a
          precautions jacket that she wore to clean human waste from another
          patient in Mr. Reaves' dormitory only moments before, without cleaning
          herself in any way in the interim.  Mr. Reaves refused to eat food that she
          fed him in this unsanitary manner.  No alternative arrangement was
          offered.  The pattern of staff wearing precautions jackets to feed him after
          this incident appeared to be an attempt to provoke Mr. Reaves into

objecting to the staff garb, allowing staff to record him as refusing the meal;

iii. On September 16, 2014, CNA Daria left Mr. Reaves in bed unbathed, unclothed and with no blankets covering him because an officer told her to leave the cell when Mr. Reaves swore.  Mr. Reaves remained cold and completely exposed for hours until other providers came in and clothed him;

iv. On January 20, 2015, LPN Carmen and CNA Dori came to Mr. Reaves' cell to bathe him.  CNA Dori refused to change Mr. Reaves' catheter because he wouldn't respond to questions.  In the course of the bed bath, LPN Carmen and CNA Dori refused to clean Mr. Reaves' genital area. After an angry exchange, CO Cupp declared that medical staff should leave the cell.  All staff left Mr. Reaves in the room partially bathed and wet, unclothed, and with no blankets covering him for approximately an hour;

v. On January 21, 2015, CO Gallagher came to Mr. Reaves' cell at lunch time and asked him to choose whether he wanted his lunch or a bath. When Mr. Reaves insisted that he needed both his lunch and a bath, CO Gallagher advised that Mr. Reaves would get neither one.  Staff did not feed Mr. Reaves lunch that day and did not give him his bath until the next shift at 6:00 pm;

vi. On November 21, 2016, CO Melanson stood at the foot of Mr. Reaves'
bed while CNA Lucia and CNA Chantay Mitchell bathed Mr. Reaves.
Near the end of the bed bath, CO Melanson ordered nursing staff to leave
Mr. Reaves' cell.  All medical and correctional staff left Mr. Reaves
completely naked in his bed while he was still wet from his bath.  They did
not cover him with a sheet before leaving the cell.  Mr. Reaves was forced
to lie uncovered and exposed for thirty-five minutes.  At one point CO
Melanson reentered Mr. Reaves' cell to remove Mr. Reaves' television as
punishment, but did not cover Mr. Reaves;

vii. On February 25, 2017, as apparent punishment for Mr. Reaves
hitting a jug of water, medical staff refused to change the dressings on his
legs that day as well as the following day, February 26;

q) Failure of all Defendants to treat or accommodate Mr. Reaves' increased needs
for heat or temperature control due to his physical condition.

i. For example, at Bridgewater correctional staff repeatedly left open a door
to the outside, even after orders not to do so, causing Mr. Reaves to be
cold.  Mr. Reaves' complaints about the practice were met with disdainful
comments like officer Taylor's suggestion on approximately September
19, 2013 that she could "leave it open as long as [she] likes" and that "the
cold is all in your head";

     ii. On February 25, 2017, RN Noelle left the window in Mr. Reaves' cell open and no medical or correctional staff returned to close the window until approximately 11 pm that night;

r)    Failure of all Defendants to treat or accommodate Mr. Reaves' needs for an appropriate bed, appropriate bedding and supportive pillows for his medical needs;

s)    Failure of Defendant DOC to abide by the requirements of paragraph 6a of the Agreement that DOC take all measures to implement the care plan of the medical provider;

t)    Failure of all Defendants to ensure that Mr. Reaves was moved to a specialized care facility, as recommended by providers including Dr. Steve Williams, where he could be provided with appropriate care.

70.    As a result of the inadequate care enumerated in the preceding paragraphs, Mr. Reaves' medical condition has deteriorated considerably, and he has suffered harm including:

a)    Mr. Reaves suffers the continued inability to sit in a wheelchair, causing him to spend the overwhelming majority of his time lying on his back in bed, isolated from other prisoners and resulting in drastic limitations on his ability to access programming and ordinary prison activities such as visitation, outdoor access and recreation time;

b) Mr. Reaves has been prevented from performing simple self-care tasks such as grooming and eating, stripping away any level of independence a person with his physical ability could achieve;

c) Mr. Reaves has developed new or worsening joint contractures in his hips, knees, elbows, and left wrist that prevent these joints from moving or bending. All of his fingers are now contracted, curling inward in a fist type position.  He now suffers from severe limitations from these contractures, including but not limited to:

   i. Mr. Reaves can no longer form even a weak "key grip" such as to hold a piece of paper;

   ii. Mr. Reaves is now at serious risk of developing hip contractures so fixed that they would prevent his legs from being moved apart and would therefore make critical hygiene procedures all but impossible;

   iii. It is now unlikely that Mr. Reaves will be able to regain the ability to sit up in a chair or to reverse many of the contractures that have developed from lack of treatment;

d) Mr. Reaves' weight has decreased, and he suffers from malnutrition;

e) Mr. Reaves has suffered symptoms of autonomic dysreflexia on several occasions which have gone unexplained and unexplored by medical staff;

f) Mr. Reaves has suffered urinary tract infections;

g)   Mr. Reaves has been exposed to unhygienic conditions from being left in his own waste, resulting in urine soaked bandages and fecal contamination of his wounds;

h)   Mr. Reaves has been without the use of the hearing aids prescribed to him and unable to hear what officers, medical staff, attorneys and others are saying to him, leading to further isolation and increased difficulty in communicating with staff;

i)   MHM and MPCH have utterly failed to establish the therapeutic relationship that is essential to Mr. Reaves' improved health and rehabilitation.  The Medical Defendants' deliberate indifference has caused Mr. Reaves to be anxious, frustrated, distrustful of most caregivers, and fearful for his life;

j)   Mr. Reaves suffered unnecessarily for years with open wounds covering his legs and repeated infections, including MRSA, and continues to endure daily dressing changes on both legs and feet.  The condition of his skin is weakened by the extended presence of these wounds;

k)   Mr. Reaves has regularly been denied medical or personal care at times when these services were necessary and welcome, and has been denied basic hygiene care; and

l)   Mr. Reaves has suffered pain, cold, extreme discomfort and emotional distress from this abysmal treatment.

Disability Discrimination and Failure to Accommodate Mr. Reaves' Disabilities

71.    DOC and Defendant ADA Coordinators MacEachern, Rodrigues and Morin have

discriminated against Mr. Reaves on account of his disabilities, have denied him many

rights and privileges provided to able-bodied general population prisoners with

comparable classification scores, including rights and privileges provided to prisoners in

the most restrictive segregation units, have applied facially neutral policies that

disparately affect Mr. Reaves because of his disabilities, and have refused to provide him

appropriate and reasonable accommodations.

72.    DOC and Defendants MacEachern, Rodrigues and Morin have discriminated and continue

to discriminate against Mr. Reaves on account of his disabilities and have failed to

accommodate Mr. Reaves' physical disabilities as follows:

a)    Defendants MacEachern and Rodrigues flatly refused to allow Mr. Reaves to

socialize with his peers or to access common areas as able-bodied prisoners are

allowed to do, thereby depriving him of contact with his peers, recreation and

mental stimulation therefrom.

i.    In fact, on March 17, 2015, after counsel read the draft Complaint aloud to

Mr. Reaves the night before, Correctional Program Officer Elaine Simas

came into Mr. Reaves' cell and informed him that as an "accommodation"

DOC intended to move a man in a "vegetative state" into his cell.  Mr.

Reaves interpreted this as both an attempt to coerce him not to file his

Complaint and to intimidate him into ceasing his complaints about

Defendants' isolation of him and Defendants' failure to accommodate his

disabilities by providing opportunities for him to access opportunities to socialize.

    ii. DOC did not offer Mr. Reaves access to common areas for socialization until after the Court's Preliminary Injunction Order of July 15, 2016. Defendant Morin continues to refuse to provide Mr. Reaves a medically appropriate means of socializing with his peers and accessing common areas.  While Mr. Reaves is unable to access the dayroom for socialization, DOC and Defendant Morin refuses to offer Mr. Reaves socialization opportunities in his cell;

b)    All Defendants have discriminated against Mr. Reaves on account of his disabilities by relying on biases and stereotypes that persons with Mr. Reaves' disabilities should not interact with able-bodied peers or recreate and have no need for mental stimulation;

c)    All Defendants have failed to provide Mr. Reaves a meaningful opportunity to go outdoors except when going to the hospital or transferring prisons, as able-bodied prisoners are allowed to do;

d)    All Defendants failed to provide Mr. Reaves with a shower facility and necessary accommodations to allow Mr. Reaves to shower or have his hair groomed and washed with water and shampoo as able-bodied prisoners are able to do, and so have failed to provide Mr. Reaves with showers altogether. In November 2016, spinal cord injury specialist Dr. Stephanie Cho opined that

Mr. Reaves cannot now safely use a shower gurney in light of the open

wounds that have recurred at MCI Shirley;

e)     All Defendants have failed to evaluate Mr. Reaves for and provide him with a

suitable universal cuff or hand clip that would allow him some degree of

autonomy in accessing the meals that DOC provides to other prisoners by

feeding himself as able bodied prisoners do.  While Mr. Reaves at one point

had a suitable universal cuff, Defendants removed that cuff from his

possession and have since provided him with a universal cuff that is not

appropriate for or usable by a person with his physical limitations;

f)     All DOC Defendants have denied Mr. Reaves the procedural protections of

DOC's usual disciplinary system because of his disabilities and have instead

subjected him to an alternative disciplinary system called the Phase System,

discussed in more detail infra, which bypasses the disciplinary process

applicable to all other prisoners, does not provide notice or a hearing, and has

no opportunity for appeal;

g)     All DOC Defendants have disciplined Mr. Reaves for conduct that is entirely

attributable to Mr. Reaves' disability.  For example, on October 11, 2014

medical staff tipped Mr. Reaves onto his side in order to clean his backside and

change his sheets.  Mr. Reaves clung to the arm of CNA Sumner who was

directly in front of him, so that he could hold his body in that position; a

technique that was taught to him during his time at Spaulding Rehabilitation

Hospital.  CNA Sumner and the Correctional Officer monitoring this

interaction alleged that Mr. Reaves' conduct was an assault, and DOC disciplined Mr. Reaves through the Phase System for two days;

h)   All Defendants have failed to evaluate Mr. Reaves for and provide Mr. Reaves with suitable handicap accessible equipment which would enable him to independently watch and listen to television as able-bodied prisoners are able to do, including a handicap accessible remote control device and headphones for the physically handicapped and hearing impaired, and as is required under the Settlement Agreement;

i)   All Defendants consistently have refused to provide adequate accommodations so that Mr. Reaves can effectively communicate with others outside the prison and utilize DOC and MPCH grievance systems as able-bodied prisoners are able to do;

   i.   Mr. Reaves is unable to write or manipulate papers due to his disability and must dictate correspondence to another person;

   ii.   All Defendants have failed to ensure that Mr. Reaves is evaluated for and provided with an effective means to record correspondence;

   iii.   Defendants MacEachern, MHM, MPCH and DOC have refused to allow Mr. Reaves' attorneys to file DOC and medical grievances on his behalf as an accommodation of his disabilities;

   iv.   Defendants MacEachern, Rodrigues, Morin, MHM, MPCH and DOC have refused to provide Mr. Reaves access to word-processing technologies and

voice-activated computers that would enable him to access educational
programming and independently access the grievance system or draft
correspondence as an accommodation of his disabilities;

v. Defendants' previous accommodation, that all of Mr. Reaves' writing and
organizational needs be satisfied with the assistance of a prisoner whom
Defendants allowed to assist Mr. Reaves a maximum of one hour a day,
five days a week, was inadequate, as the length of time was insufficient
and as it deprived Mr. Reaves of reasonable and appropriate autonomy and
requires that he divulge private legal and medical information to a fellow
prisoner.  At MCI Shirley, Mr. Reaves has no prisoner writing assistant
and must rely on a correctional programming officer for all his
transcription needs.  The correctional programming officer's availability is
sporadic and Mr. Reaves' writing needs are not met;

vi. Defendants also block Mr. Reaves' access to the grievance process by
refusing commonsense accommodations of his inability to sign papers.
Historically, Defendants allowed Mr. Reaves' prisoner writing assistant to
sign papers on his behalf by either writing his name and noting that he is
unable to sign, or by inking Mr. Reaves' thumb to make a thumbprint on
papers, including medical and institutional grievances.  After Mr. Reaves
complained that DOC staff were charging items to his canteen account
without his permission, Deputy Rodrigues instituted a new policy barring
Mr. Reaves' writing assistant from assisting him in making a thumbprint
to indicate his signature.  Defendants have refused to accept grievances

marked with a thumbprint that the writing assistant assisted Mr. Reaves
with making.  Defendants have also refused to accept grievances that are
signed by Mr. Reaves' writing assistant and that state that Mr. Reaves is
unable to sign due to his disability.  Instead, Defendants now require that a
member of medical staff thumbprint documents for Mr. Reaves, including
grievances.  This requirement unreasonably involves medical staff in
personal affairs with which they have no concern, forces Mr. Reaves to
present grievances against particular nurses from whom he receives care
on a daily basis to those same nurses for a thumbprint, and generally
presents an obstacle to the grievance processes due to the difficulties and
the time delays involved;

j)      All Defendants have failed to accommodate Mr. Reaves' disabilities so that he
may maintain the limited level of privacy in personal care that able-bodied
prisoners in the Health Services Units are afforded.  Defendants discriminate
against Mr. Reaves by requiring that a correctional officer be present during all
interactions with medical staff, a requirement which is not necessary in Mr.
Reaves case, is not imposed on other prisoners, and which impedes Mr.
Reaves' ability to communicate freely with his medical professionals and
contributes to tension with medical and correctional staff alike.  Defendants
require that Mr. Reaves receive personal hygiene care in a cell that does not
have a privacy curtain, with the result that Mr. Reaves is exposed to passersby
even when not clothed;

k)      All DOC Defendants have failed to accommodate Mr. Reaves' disabilities so

that he may participate in the educational and rehabilitative programming

offered to able-bodied prisoners.  All DOC Defendants' failure to ensure equal

access to programming has denied Mr. Reaves all access to programming,

leaving him lying in bed all day unable to move, with nothing to do but watch

television, and has caused him further isolation and distress;

   i. At Bridgewater, Defendant MacEachern informed Mr. Reaves that he was

      ineligible for any programming because he was not a psychiatric patient

      and was housed there because he is physically disabled;

  ii. At Souza-Baranowski, Defendant Rodrigues failed to make

      accommodations to allow Mr. Reaves to participate in any programming,

      work, educational or avocational endeavors that are available to able-

      bodied prisoners;

 iii. As of April 29, 2014, DOC's Personalized Program Plan, which is an

      individualized assessment of appropriate programming, for Mr. Reaves

      reflected the absence of attention to programming for Mr. Reaves as it

      showed that he had not received any testing or assessment for what

      programming he might require or be eligible to participate in, nor had

      DOC or any Defendant identified any programs to recommend;

  iv. Mr. Reaves' current Personalized Program Plan shows that he is eligible

      for the Computer Skills Course, but Mr. Reaves has not been able to

      participate in this course due to Defendants' discrimination and failure to

accommodate.  Nor has DOC staff discussed or offered this course to Mr.

Reaves;

   v.   Mr. Reaves has agreed to go to the MCI Shirley dayroom to participate in

the Cognitive Skills Course if he is moved in his medical bed, but

Defendants have failed to agree to this reasonable accommodation;

l)   All Defendants have failed to make accommodations for Mr. Reaves'

substantial hearing loss so that he can access the services and benefits that the

prison extends to its able-bodied prisoners, including but not limited to

meaningful access to medical services, telephone services and any other

service that requires hearing.  Defendants' failure to accommodate his hearing

loss includes failure to provide adequate hearing aids, Telecommunication

Device for the Deaf (TDD or TTY) and refusal to allow Mr. Reaves' prisoner

assistant to serve as an interpreter when Mr. Reaves makes telephone calls.

Defendants have failed to provide Mr. Reaves a captioned telephone service as

recommended by the audiologist at Lemuel Shattuck Hospital, despite the fact

that Mr. Reaves is unable to effectively communicate over the telephone.  This

failure has been ongoing and persists in the face of repeated requests by Mr.

Reaves and his counsel for appropriate accommodations.  Despite medical

evidence and these requests, medical and correctional staff have repeatedly

claimed that Mr. Reaves has no hearing problem;

m)   All Defendants have failed to make appropriate accommodations for Mr.

Reaves to receive social or family visitors from outside the prison.  On March

26, 2015, eleven days after it was requested, Souza-Baranowski Defendants allowed a visit to Mr. Reaves from a social visitor outside of prison. The arrangements required repeated contacts from the visitor to Deputy Rodrigues. Prior to the visit, medical staff moved Mr. Reaves from his bed onto a gurney that was wheeled into another area of the Health Services Unit. This process was reversed after the visit. The transfers from bed to gurney and back were done roughly and improperly, causing Mr. Reaves' upper body to snap back onto the bed when he was returned, and causing him such pain and discomfort that he feels unable to again request a visit due to the risk of being treated roughly;

n)     All Defendants have discriminated against Mr. Reaves on account of his disabilities by denying him medically necessary physical therapy out of reliance on stereotypes that persons with Mr. Reaves' disabilities cannot or will not benefit from physical therapy;

o)     All Defendants have discriminated against Mr. Reaves on account of his disabilities by denying him medically necessary care and accommodations out of reliance on stereotypes that persons with Mr. Reaves' disabilities cannot or will not benefit from such accommodations and stemming from their inclination against accommodating a prisoner, regardless of the level of his need; and

p)     All Defendants have failed to ensure consistency in the accommodations made for Mr. Reaves.

**Violations Caused by the Phase System**

73.   As explained in paragraph 72(f) of this Complaint, DOC Defendants used a "Phase System" for Mr. Reaves at Bridgewater, Souza-Baranowski and MCI Shirley that substitutes for the disciplinary system.  DOC first implemented that system at MCI Shirley in March 2009.

74.    According to the Phase System, if Mr. Reaves engages in prohibited behavior, e.g., spitting, swearing or threatening, DOC staff place him on Phase 1 and remove all property and privileges from him so that he retains only his bed, clothes, legal mail and legal telephone calls.

75.   According to the Phase System, after eight hours of "behavioral stability" DOC staff place Mr. Reaves on Phase 2 and allow him books on CD, writing assistance and telephone privileges.

76.   Despite extended periods of behavioral stability, DOC did not provide Mr. Reaves access to audio books until approximately January 2014.  Writing assistance, as described in paragraph 72(i)(v), was not available at Souza Baranowski except for a maximum of five hours a week and is not regularly available at MCI Shirley.

77.   According to the Phase System, after forty-eight hours of "behavioral stability" DOC staff place Mr. Reaves on Phase 3, permitting "all property and privileges, specifically including television, radio, recreation outside when medically approved and socialization with another prisoner."

78. Defendants Higgins O'Brien, Collins, MacEachern, Rodrigues, Dr. Khan and Dr. Somers have never allowed Mr. Reaves "recreation" or access to the outside.  DOC allowed him sporadic recreation time up until 1998.  Defendants Morin and Dr. Angeles did not provide Mr. Reaves "recreation" or access to the outside until after the July 15, 2016 Preliminary Injunction Order and still do not offer Mr. Reaves medically appropriate recreation or outdoor access.

79. Defendants Higgins O'Brien, MacEachern, Collins and DOC rarely permitted Mr. Reaves socialization time with another prisoner during his incarceration at Bridgewater regardless of what phase he was on.

80. Defendants Higgins O'Brien, Rodrigues, Collins and DOC did not allow Mr. Reaves socialization time with another prisoner during his incarceration at Souza-Baranowski regardless of what phase he was on until January 8, 2015 when he was allowed a half-hour visit with a relative also incarcerated at Souza-Baranowski.  These Defendants have not allowed socialization time since that date.

81. Defendants Morin, Collins and DOC do not allow Mr. Reaves socialization time with another prisoner of his choice at MCI Shirley regardless of what phase he is on.  In practice, he is very infrequently allowed contact with another prisoner and this contact generally occurs only as an indirect consequence of prisoners' performance of care tasks for Mr. Reaves.

82. The implementation of the sanctions set forth in the Phase System is immediate and provides no hearing or other form of due process to Mr. Reaves to dispute the allegations against him.  There is no appeal process for the Phase System.

83.   Because Defendants Higgins O'Brien, Collins, MacEachern, Rodrigues, Morin and DOC deny Mr. Reaves writing assistance to accommodate his disability during Phase 1 sanctions and have prohibited counsel from assisting Mr. Reaves with filing grievances. Mr. Reaves is unable to even file a timely grievance about improper imposition of sanctions.

84.   Due to Mr. Reaves' disability and the denial of accommodations that would allow him to participate in the regular programs of the prison available to able-bodied prisoners, the removal of privileges in the Phase System constitute total isolation and restriction for Mr. Reaves.  Because he is quadriplegic, immobile, and housed in the Health Services Unit, when on sanctions Mr. Reaves is left to lie alone in bed unable to undertake any activity to stimulate his senses, such as journaling, exercising or reading, as an able-bodied prisoner in isolation might do.

85.   In practice at Bridgewater, Souza-Baranowski and MCI Shirley the immediate nature of the implementation of the Phase System has resulted in medical providers leaving the cell before completing care they were there to engage in, thereby denying Mr. Reaves medical care and personal care, causing Mr. Reaves to lie uncleaned in urine or excrement, refusing to feed him meals, bathe him, change the dressing on his wounds or provide other necessary care.  Examples of this practice are illustrated in paragraph 69(p) of this Complaint.

86.   Because the length of both restrictive phases depends on a subjective determination by DOC staff of "behavioral stability," there is no finite period of time nor any cap on the length of time that sanctions can be imposed for either of the restrictive phases.

87.   In practice at Bridgewater, Souza-Baranowski and MCI Shirley, sanctions have repeatedly extended beyond eight or forty-eight hours of "behavioral stability," because staff either neglected to or intentionally did not return Mr. Reaves' privileges.

88.   The Superintendents at Bridgewater, Souza-Baranowski and MCI Shirley have not reviewed all disciplinary outcomes and sanctions of Mr. Reaves as required by the Settlement Agreement.

89.   Due to all Defendants' implementation of the Phase System, Mr. Reaves has suffered repeated violations of his rights, including the following:

   a)  removal of all privileges and property, leaving him in total isolation and sensory deprivation;

   b)  imposition of sanctions with no due process;

   c)  improper imposition of sanctions for behavior Mr. Reaves did not commit;

   d)  removal of the accommodation of writing assistance, Mr. Reaves' only means to write, thereby preventing him from filing a grievance or writing to his attorney;

   e)  denial of meals, medical care and personal hygiene care.

**Failure to Protect Mr. Reaves from Known Abusers**

90.   Defendants DOC and MacEachern failed to protect Mr. Reaves from known abusers while he was in their care and custody.

91.   As early as February 2013, DOC Defendants were on notice that Bridgewater patients were targeting Mr. Reaves due to his vulnerable status, as a Bridgewater patient entered

Mr. Reaves' dormitory room several times in February of 2013 and assaulted Mr. Reaves by licking his feet.

92.   On or about July 15, 2013 a Bridgewater patient who did not live in Mr. Reaves' dormitory entered the room, approached Mr. Reaves' bed and punched him in the abdomen.  Mr. Reaves yelled, causing the patient to leave.  Staff did not respond until approximately ten to fifteen minutes later.

93.   On November 9, 2013, the same patient who assaulted Mr. Reaves multiple times in February was allowed to gain access to him and assault him again. This patient, who was supposed to be on a one-to-one watch, came into Mr. Reaves' dormitory room and licked Mr. Reaves' feet while RN Ann Homer was feeding Mr. Reaves breakfast.  The patient did not live in Mr. Reaves' dormitory room.

94.   The same patient came into Mr. Reaves' dormitory and assaulted him again on or about December 13, 2013 and January 12, 2014.

95.   Moreover, there were additional occasions at Bridgewater where other patients entered Mr. Reaves' dormitory room and assaulted or otherwise abused Mr. Reaves, including but not limited to masturbating in front of him, threatening him and throwing things at him.

96.   As a result, Mr. Reaves suffered physical pain, bruising, extreme fear for his physical safety due to his inability to protect himself, and other mental and emotional distress.

97.   Mr. Reaves complained about these assaults to numerous correctional and medical staff, filed grievances, and had his lawyer raise these issues with the DOC administration and legal department.

COUNT I

Cruel and Unusual Punishment: Deliberate Indifference to Serious Medical Need

98.    Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

99.    The actions and omissions of Defendants Dr. Khan, RN Damigella, Dr. Somers, RN
       Pariseau, HSA Ireland, RN Garcia, Dr. Angeles, HSA Louder, RN Slocum, Dr.
       Groblewski, Collins, MHM and MPCH, including failing to determine and provide care
       for Mr. Reaves that is informed by his specific serious medical needs as a quadriplegic,
       failing to follow recommendations for care provided to them by specialist clinics, failing
       to treat Mr. Reaves' hearing disability, and as is described more completely in paragraphs
       60 through 69, demonstrate deliberate indifference to the serious medical needs of Mr.
       Reaves and constitute cruel or unusual punishment that unlawfully deprives Mr. Reaves of
       the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United
       States Constitution, and 42 U.S.C. § 1983.

100.   The actions and omissions of Dr. Groblewski, including failing to provide Mr. Reaves
       care from a spinal cord injury specialist and/or that is informed by spinal cord injury
       expertise, and failing to ensure that Mr. Reaves receives care from other proper outside
       specialists with spinal cord injury expertise, such as physical therapists, occupational
       therapists, nutritionists, urologists, and gastroenterologists, and as is described more
       completely in paragraphs 60 through 69, demonstrate deliberate indifference to the serious
       medical needs of Mr. Reaves and constitute cruel or unusual punishment that unlawfully
       deprives Mr. Reaves of the rights guaranteed to him by the Eighth and Fourteenth
       Amendments of the United States Constitution, and 42 U.S.C. § 1983.

101.  The actions and omissions of RN Damigella, RN Pariseau, RN Garcia, RN Slocum, HSA
      Ireland, and HSA Louder in failing to properly train and supervise nursing staff on the
      proper care of patients with quadriplegia and hearing impairment have resulted in the
      constitutional deficiencies described in paragraph 69, demonstrate deliberate indifference
      to the serious medical needs of Mr. Reaves and constitute cruel or unusual punishment
      that unlawfully deprives Mr. Reaves of the rights guaranteed to him by the Eighth and
      Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

102.  The actions and omissions of Defendants O'Brien, MacEachern, Rodrigues, Morin, and
      Collins, including failing to oversee the contracted medical providers care of Mr. Reaves,
      improper interference with medical care, failing to follow recommendations for care
      provided to them by specialist clinics, failing to care for Mr. Reaves' hearing disability,
      and as is described more completely in paragraphs 60 through 69, demonstrate deliberate
      indifference to the serious medical needs of Mr. Reaves and constitute cruel or unusual
      punishment that unlawfully deprives Mr. Reaves of the rights guaranteed to him by the
      Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. §
      1983.

103.  The customs and policies of Defendants MHM and MPCH, including the custom and
      policy of refusing to provide Mr. Reaves with constitutional levels of medical care over a
      period of years, refusing to have a spinal cord specialist oversee Mr. Reaves' care,
      refusing to follow the recommendations of outside specialists, and allowing DOC to
      interfere with and dictate medical care decisions, have directly resulted in the
      unconstitutional care provided to Mr. Reaves, as is described more completely in
      paragraphs 60 through 69.

104.   All Defendants have failed to ensure that there was adequate medical staff available to care for Mr. Reaves.  The Medical Defendants have failed to have an occupational therapist on staff, failed to hire sufficient physical therapists to care for Mr. Reaves, and failed to ensure that the Health Services Units where Mr. Reaves has resided had adequate staff to provide Mr. Reaves necessary hygiene and other medical care.  As a result of these deliberate staff shortages, Mr. Reaves has been provided constitutionally inadequate care.

105.   These Defendants' actions and omissions have caused Mr. Reaves' physical condition to decline and have caused him pain and suffering as described more completely in paragraph 70.

## COUNT II

<u>Violation of Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts: Deliberate Indifference to Serious Medical Need</u>

106.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

107.   The actions and omissions of Defendants Dr. Khan, RN Damigella, Dr. Somers, RN Pariseau, HSA Ireland, RN Garcia, Dr. Angeles, HSA Louder, RN Slocum, Dr. Groblewski, Collins, MHM and MPCH, including failing to determine and provide care for Mr. Reaves that is informed by his specific serious medical needs as a quadriplegic, failing to follow recommendations for care provided to them by specialist clinics, failing to treat Mr. Reaves' hearing disability, and as is described more completely in paragraphs 60 through 69, demonstrate deliberate indifference to the serious medical needs of Mr. Reaves and constitute cruel or unusual punishment that unlawfully deprives Mr. Reaves of the rights guaranteed to him by Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts, and as enforceable through G.L. c. 12, § 11I.

108.    The actions and omissions of Dr. Groblewski, including failing to provide Mr. Reaves
        care from a spinal cord injury specialist and/or that is informed by spinal cord injury
        expertise, and failing to ensure that Mr. Reaves receives care from other proper outside
        specialists with spinal cord injury expertise, such as physical therapists, occupational
        therapists, nutritionists, urologists, and gastroenterologists, and as is described more
        completely in paragraphs 60 through 69, demonstrate deliberate indifference to the
        serious medical needs of Mr. Reaves and constitute cruel or unusual punishment that
        unlawfully deprives Mr. Reaves of the rights guaranteed to him by Article 26 of the
        Declaration of Rights of the Constitution of the Commonwealth of Massachusetts, and as
        enforceable through G.L. c. 12, § 11I.

109.    The actions and omissions of RN Damigella, RN Pariseau, RN Garcia, RN Slocum, HSA
        Ireland, and HSA Louder in failing to properly train and supervise nursing staff on the
        proper care of patients with quadriplegia and hearing impairment have resulted in the
        constitutional deficiencies described in paragraph 69,  demonstrate deliberate indifference
        to the serious medical needs of Mr. Reaves and constitute cruel or unusual punishment
        that unlawfully deprives Mr. Reaves of the rights guaranteed to him by Article 26 of the
        Declaration of Rights of the Constitution of the Commonwealth of Massachusetts, and as
        enforceable through G.L. c. 12, § 11I.

110.    The actions and omissions of Defendants O'Brien, MacEachern, Rodrigues, Morin, and
        Collins, including failing to oversee the contracted medical providers care of Mr. Reaves,
        improper interference with medical care, failing to follow recommendations for care
        provided to them by specialist clinics, failing to accommodate Mr. Reaves' hearing
        disability, and as is described more completely in paragraphs 60 through 69, demonstrate

deliberate indifference to the serious medical needs of Mr. Reaves and constitute cruel or unusual punishment that unlawfully deprives Mr. Reaves of the rights guaranteed to him by Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts, and as enforceable through G.L. c. 12, § 11I.

111.   All Defendants have failed to ensure that there was adequate medical staff available to care for Mr. Reaves.  The Medical Defendants have failed to have an occupational therapist on staff, failed to hire sufficient physical therapists to care for Mr. Reaves, and failed to ensure that the Health Services Units where Mr. Reaves has resided had adequate staff to provide Mr. Reaves necessary hygiene and other medical care.  As a result of these deliberate staff shortages, Mr. Reaves has been provided constitutionally inadequate care.

112.   Defendants O'Brien, MacEachern, Rodrigues, Morin and Collins are sued under Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts in their individual capacities.

113.   These Defendants' actions and omissions have caused Mr. Reaves' physical condition to decline and have caused him pain and suffering as described more completely in paragraph 70.

## COUNT III

Violation of Title II of the Americans with Disabilities Act (ADA)

114.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

115.   Title II of the ADA prohibits a "public entity" from discriminating against a "qualified
individual with a disability . . . by reason of such disability."  42 U.S.C. § 12132.

116.   Mr. Reaves is an individual with a disability as defined by the Americans with Disabilities
Act.  42 U.S.C. § 12131(2); § 12102(1).

117.   Mr. Reaves, an individual incarcerated by DOC, is otherwise "qualified" to access the
services and benefits provided by DOC.

118.   Defendant DOC is a "public entity" under Title II of the ADA, as defined in 42 U.S.C. §
12131(1).

119.   Defendants MacEachern, Rodrigues and Morin are sued under Title II of the ADA in their
official capacities.

120.   Defendants DOC, MacEachern, Rodrigues and Morin have discriminated against Mr.
Reaves on account of his disabilities and have failed to provide reasonable
accommodations so that he may access the services, programs and activities available to
the general prisoner population, as more completely alleged in paragraphs 71 and 72.

121.   Defendants DOC, MacEachern, Rodrigues and Morin have discriminated against Mr.
Reaves on the basis of his disabilities by treating him in a manner disparate from that of
other similarly situated prisoners.

122.   Defendants DOC, MacEachern, Rodrigues and Morin have deprived Mr. Reaves of his
right to be free from discrimination on the basis of disability as guaranteed by Title II of
the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.

COUNT IV

<u>Violation of the Rehabilitation Act</u>

123.    Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

124.    The Rehabilitation Act prohibits a "program or activity receiving Federal financial

assistance" from "exclud[ing] from . . . participation," "den[ying] the benefits of, or . . .

subject[ing] to discrimination"  an "otherwise qualified individual with a disability."  29

U.S.C. § 794(a).

125.    Mr. Reaves is an individual with a disability within the meaning of the Rehabilitation Act,

29 U.S.C. § 794.

126.    Mr. Reaves, an individual incarcerated by DOC, is "otherwise qualified" to access the

services and benefits provided by DOC.

127.    Defendant DOC is a recipient of federal funding within the meaning of the Rehabilitation

Act, *see* 29 U.S.C. § 794.

128.    Defendant DOC has discriminated against Mr. Reaves on account of his disabilities and

has failed to provide reasonable accommodations so that he may access the services,

programs and activities available to the general prisoner population, as more completely

alleged in paragraphs 71 and 72 and thereby has deprived Mr. Reaves of his right to be

free from discrimination on the basis of disability as guaranteed by Section 504 of the

Rehabilitation Act, 29 U.S.C. § 794(a).

COUNT V

Violation of Article 114 of the Constitution of the Commonwealth of Massachusetts

129.  Mr. Reaves repeats and realleges the allegations set forth in all in previous paragraphs.

130.  Article 114 of the Constitution of the Commonwealth provides that no "otherwise qualified handicapped individual" may "solely by reason of his handicap" be discriminated against in the context of "any program or activity within the commonwealth."

131.  Mr. Reaves, as a disabled individual incarcerated by DOC, is a "handicapped individual" "otherwise qualified" to access the services and benefits provided by DOC.

132.  Defendants MacEachern, Rodrigues and Morin have discriminated against Mr. Reaves by failing to provide reasonable accommodations so that Mr. Reaves may enjoy the benefits of services, programs and activities available to the general prisoner population, as described more completely in paragraphs 71 and 72.

133.  Defendants MacEachern, Rodrigues and Morin are sued under Article 114 and G.L. c. 93, § 103 in their individual capacities.

134.  Defendants MacEachern, Rodrigues and Morin have discriminated against Mr. Reaves on the basis of his disabilities by treating him in a manner disparate to that of other similarly situated prisoners.

135.  Defendants MacEachern, Rodrigues and Morin have deprived Mr. Reaves of his right to be free from discrimination on the basis of disability in violation of Article of Amendment

114 to the Massachusetts Constitution, as enforceable by G.L. c. 93, § 103 and G.L. c. 12, § 11I.

## COUNT VI

### Cruel and Unusual Punishment: Conditions of Confinement

136.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

137.   Defendants O'Brien, MacEachern, Rodrigues, Morin, Collins, MPCH, MHM, Dr. Groblewski, Dr. Angeles, RN Slocum, HSA Louder, Dr. Somers, RN Garcia, RN Pariseau, HSA Ireland, Dr. Khan, and RN Damigella have held and continue to hold Mr. Reaves in conditions, more completely described in paragraphs 23 through 97, that deny him the minimal measure of necessities required for civilized living.

138.   These Defendants' actions and omissions in creating these conditions have caused Mr. Reaves harm including but not limited to suffering years of isolation from peers, extended time spent lying in his own waste and resulting deterioration and emotional distress.

139.   The actions of these Defendants demonstrate deliberate indifference to Mr. Reaves' health and safety and constitute cruel or unusual punishment that unlawfully deprives Mr. Reaves of the rights guaranteed to him by the Eighth and Fourteenth Amendments of the United States Constitution, and 42 U.S.C. § 1983.

## COUNT VII

### Violation of Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts: Conditions of Confinement

140.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

141.   Defendants O'Brien, MacEachern, Rodrigues, Morin, Collins, MPCH, MHM, Dr. Groblewski, Dr. Angeles, RN Slocum, HSA Louder, Dr. Somers, RN Garcia, RN Pariseau, HSA Ireland, Dr. Khan, and RN Damigella have held and continue to hold Mr. Reaves in conditions, more completely described in paragraphs 23 through 97, that deny him the minimal measure of necessities required for civilized living.

142.   Defendants O'Brien, MacEachern, Rodrigues, Morin and Collins are sued under Article 26 of the Declaration of the Constitution of the Commonwealth in their individual capacities.

143.   These Defendants' actions and omissions in creating these conditions have caused Mr. Reaves harm including but not limited to suffering years of isolation from peers, extended time spent lying in his own waste and resulting deterioration and emotional distress.

144.   The actions of these Defendants demonstrate deliberate indifference to Mr. Reaves' health and safety and constitute cruel or unusual punishment that unlawfully deprives Mr. Reaves of the rights guaranteed to him by Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts and as enforceable through G.L. c. 12, § 11I.

## COUNT VIII

### Cruel and Unusual Punishment: Failure to Protect

145.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

146.   Defendant MacEachern failed to take reasonable measures to guarantee Mr. Reaves'

safety from attacks by other prisoners while he was housed in the infirmary at

Bridgewater, despite having been on notice of the risk to Mr. Reaves.

147.   Instead, Defendant MacEachern held Mr. Reaves in conditions that she knew posed a

substantial risk of, and resulted in, serious harm to Mr. Reaves, as more completely

described in paragraphs 90 through 97.

148.   The actions of Defendant MacEachern demonstrate deliberate indifference to Mr. Reaves'

health and safety, and constitute cruel and unusual punishment that unlawfully deprives

Mr. Reaves of the rights guaranteed to him by the Eighth and Fourteenth Amendments of

the United States Constitution, and 42 U.S.C. § 1983.

COUNT IX

Violation of Article 26 of the Declaration of Rights of the Constitution of the Commonwealth
of Massachusetts: Failure to Protect

149.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

150.   Defendant MacEachern failed to take reasonable measures to guarantee Mr. Reaves'

safety from attacks by other prisoners while he was housed in the infirmary at

Bridgewater, despite having been on notice of the risk to Mr. Reaves.

151.   Defendant MacEachern is sued under Article 26 of the Declaration of Rights of the

Constitution of the Commonwealth in her individual capacity.

152.   Instead, Defendant MacEachern held Mr. Reaves in conditions that she knew posed a

substantial risk of, and resulted in, serious harm to Mr. Reaves, as more completely

described in paragraphs 90 through 97.

153.   The actions of Defendant MacEachern demonstrate deliberate indifference to Mr. Reaves'

health and safety, and constitute cruel or unusual punishment that unlawfully deprives Mr.

Reaves of the rights guaranteed to him by Article 26 of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts and as enforceable by G.L. c. 12, § 11I.

COUNT X

Violation of Procedural Due Process

154.  Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

155.  Defendants O'Brien, MacEachern, Rodrigues, Morin and Collins have implemented a Phase System of disciplinary sanctions for Mr. Reaves, described in paragraphs 73 through 89.  This system contains no procedural protections.

156.  When viewed in the context of his quadriplegia and other impairments, the institution of sanctions described in the Phase System imposes an atypical and significant hardship on Mr. Reaves in relation to the ordinary incidents of prison life and denies him the minimal civilized measure of life's necessities.

157.  This deprivation has caused Mr. Reaves to suffer long periods of unwarranted isolation and sensory deprivation.

158.  These Defendants' imposition of this system unlawfully deprives Mr. Reaves of his right to procedural due process secured to him by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

COUNT XI

Violation of Articles 1, 10 and 12 of the Declaration of Rights of the Constitution of the
Commonwealth of Massachusetts: Procedural Due Process

159.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

160.   Defendants O'Brien, MacEachern, Rodrigues, Morin and Collins have implemented a

Phase System of disciplinary sanctions for Mr. Reaves, described in paragraphs 73

through 89.  This system contains no procedural protections.

161.   Defendants O'Brien, MacEachern, Rodrigues, Morin and Collins are sued under Articles

1, 10 and 12 of the Declaration of Rights of the Constitution of the Commonwealth in

their individual capacities.

162.   When viewed in the context of his quadriplegia and other impairments, the institution of

sanctions described in the Phase System imposes an atypical and significant hardship on

Mr. Reaves in relation to the ordinary incidents of prison life and denies him the minimal

civilized measure of life's necessities.

163.   This deprivation has caused Mr. Reaves to suffer long periods of unwarranted isolation

and sensory deprivation.

164.   These Defendants' imposition of this system unlawfully deprives Mr. Reaves of his right

to procedural due process secured to him by Articles 1, 10, and 12 of the Declaration of

Rights of the Constitution of the Commonwealth of Massachusetts and as enforceable by

G.L. c. 12, § 11I.

## COUNT XII

### Violation of the Massachusetts Civil Rights Act

165.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

166.   Defendants' actions and omissions have repeatedly interfered with Mr. Reaves' enjoyment of his right to seek and receive adequate medical care, his right to be free from discrimination on account of his disabilities, his right to constitutional conditions of confinement, and his right to engage in freedom of expression.

167.   The Defendants have interfered with these rights by attempting to punish Mr. Reaves and punishing Mr. Reaves for insisting that his medical care and conditions of confinement comport with state and federal law and as more completely described in the instances of threats, intimidation and coercion described in paragraphs 69(p), 69(q), 72(a)(i), 72(g), 72(i), 72(l) and 72(m).

168.   Dr. Groblewski and Dr. Somers interfered with these rights by attempting to punish Mr. Reaves and punishing Mr. Reaves for insisting that his medical care and conditions of confinement comport with state and federal law when, after Mr. Reaves' filed the original Complaint in this matter, they sent him to be evaluated for amputation of both his legs.

169.   The Defendants' actions and omissions in using threats, intimidation and coercion to violate Mr. Reaves' rights is a violation of G.L. c. 12, § 11I.

## COUNT XIII

### Negligence: Medical Malpractice

170.   Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

171.   Defendants MHM and MPCH are not public employers as defined by G.L. c. 258.

172.   As set forth above, from July 1, 2013 to present Defendant MPCH has been contractually obligated to provide and has assumed responsibility for providing adequate medical care to Mr. Reaves.  During the period of Mr. Reaves' incarceration at Bridgewater prior to July 1, 2013, Defendant MHM was contractually obligated to provide and had assumed responsibility for providing adequate medical care to Mr. Reaves.  MPCH is owned by MHM and the Centene Corporation, via their jointly held Missouri entity, Centurion Managed Care, LLC.

173.   Defendants MHM and MPCH, through Defendants Dr. Khan, Dr. Somers, Dr. Angeles, Dr. Groblewski, RN Damigella, RN Garcia, RN Pariseau, HSA Ireland, RN Slocum, HSA Louder, and other agents and employees, breached their duty to provide adequate medical care to Mr. Reaves and failed to conform to good medical practice as described more completely in paragraphs 60 through 69.

174.   The actions and omissions of RN Damigella, RN Pariseau, RN Garcia, RN Slocum, HSA Ireland, and HSA Louder in failing to properly train and supervise nursing staff on the proper care of patients with quadriplegia and hearing impairment have resulted in the constitutional deficiencies described in paragraph 69 and constitute a breach of the duty to provide adequate medical care to Mr. Reaves.

175.   Dr. Khan breached his duty to provide adequate medical care to Mr. Reaves and failed to conform to good medical practice as described more completely in paragraphs 69(a) through (n), (p) through (r) and (t), including by failing to properly train and supervise medical staff caring for Mr. Reaves.

176.   Dr. Somers breached her duty to provide adequate medical care to Mr. Reaves and failed to conform to good medical practice as described more completely in paragraphs 69(a) through (r) and (t), including by failing to properly train and supervise medical staff caring for Mr. Reaves.

177.   Dr. Angeles breached her duty to provide adequate medical care to Mr. Reaves and failed to conform to good medical practice as described more completely in paragraphs 69(a) through (n), (p) through (r) and (t), including by failing to properly train and supervise medical staff caring for Mr. Reaves.

178.   Dr. Groblewski has exercised direct oversight and management of Mr. Reaves' medical care as Statewide Medical Director, and so owed Mr. Reaves a duty of care.  Dr. Groblewski breached his duty to provide adequate medical care to Mr. Reaves and failed to conform to good medical practice as described more completely in paragraphs 60 through 69.  Dr. Groblewski breached his duty to provide adequate care to Mr. Reaves by failing to provide Mr. Reaves care from a spinal cord injury specialist and/or care that is informed by spinal cord injury expertise, by failing to ensure that Mr. Reaves receives care from other proper outside specialists with spinal cord injury expertise, and by failing to properly train and supervise medical staff caring for Mr. Reaves.

179.   All Medical Defendants breached their duty to provide Mr. Reaves adequate medical care by failing to ensure that there was adequate staff available to care for Mr. Reaves.  The Medical Defendants have failed to have an occupational therapist on staff, failed to hire sufficient physical therapists to care for Mr. Reaves, and failed to ensure that the Health Services Units where Mr. Reaves has resided had adequate staff to provide Mr. Reaves necessary hygiene and other medical care.

180.    As a direct and proximate result of the negligence of MHM, MPCH, Dr. Khan, Dr.
Somers, Dr. Angeles, Dr. Groblewski, RN Damigella, RN Garcia, RN Pariseau, HSA
Ireland, RN Slocum and HSA Louder, Mr. Reaves has suffered serious physical and
psychological injuries, including as described more completely above in paragraph 70.

181.    Mr. Reaves made proper presentment of these claims as required by G.L. c. 258, § 4 and
G.L. c. 231, § 60L.  More than six months has passed from the date of presentment of the
claims.  More than 90 days has passed from the date of additional presentment of claims
to Dr. Groblewski, Dr. Angeles, RN Garcia, RN Slocum, HSA Ireland and HSA Louder.

COUNT XIV

Intentional Infliction Of Emotional Distress

182.    Mr. Reaves repeats and realleges the allegations set forth in all previous paragraphs.

183.    Defendants O'Brien, MacEachern, Rodrigues, Morin, Collins, MHM, MPCH, Dr. Khan,
Dr. Somers, Dr. Angeles, Dr. Groblewski, RN Damigella, RN Garcia, RN Pariseau, HSA
Ireland, RN Slocum and HSA Louder, knew or should have known that their actions and
omissions as described throughout the Complaint would cause severe emotional distress
to Mr. Reaves.

184.    Defendants O'Brien, MacEachern, Rodrigues, Morin and Collins are sued for intentional
infliction of emotional distress in their individual capacities.

185.    Dr. Groblewski and Dr. Somers intentionally inflicted emotional distress on Mr. Reaves
when they sent him to be evaluated for amputation of both his legs without discussing this
drastic procedure with him first.

186. These Defendants' actions were extreme, outrageous and beyond the bounds of civilized decency.

187. These Defendants' actions proximately caused Mr. Reaves to suffer severe emotional distress.

## REQUEST FOR RELIEF

FOR THE ABOVE REASONS, Mr. Reaves respectfully requests that this Court:

1. Grant judgment in Mr. Reaves' favor on all counts of the Complaint;

2. Declare that Defendants have violated Mr. Reaves' rights under the constitutional provisions, federal and state laws described in the enumerated Counts above;

3. Preliminarily and permanently enjoin the Defendants from denying adequate medical, and rehabilitative care to Mr. Reaves, specifically:

   a. Enjoin Defendants from failing to provide Mr. Reaves with physical and occupational therapy to prevent further loss of function;

   b. Enjoin Defendants from failing to engage a physician who specializes in the care of patients with quadriplegia to direct Mr. Reaves' care and treatment;

   c. Enjoin Defendants from failing to have Mr. Reaves evaluated by a medical professional experienced in fitting quadriplegics for adaptive devices and from failing to provide the equipment deemed necessary and appropriate;

   d. Enjoin Defendants from failing to provide Mr. Reaves with accommodations allowing him to access basic services provided by the prison, including but not limited to programming, education, access to the outdoors and common spaces, recreation and opportunities for socialization;

e.  Enjoin Defendants from failing to care for Mr. Reaves' neurogenic bowel and adequately address symptoms of autonomic dysreflexia;

f.  Enjoin Defendants from failing to adequately address Mr. Reaves' partial deafness;

4.  Permanently enjoin the Defendants from discriminating against Mr. Reaves because of his disabilities;

5.  Permanently enjoin the Defendants from taking any action to interfere with Mr. Reaves' right to maintain this action, or from retaliating in any way against Mr. Reaves for bringing this action;

6.  Award Mr. Reaves damages, plus his reasonable attorneys' fees and costs incurred in bringing this action, and interest as allowed by law; and

Grant Mr. Reaves such other and further relief as the Court deems just and equitable.

PLAINTIFF REQUESTS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE

Timothy M. Reaves

By his attorneys,

_____/s/ Maggie Filler_____

Lauren Petit, BBO #640410
Joel H. Thompson, BBO #662164
Maggie Filler, California Bar #287836, *pro hac vice*
Prisoners' Legal Services
10 Winthrop Square, 3rd floor
Boston, MA  02110
617-482-2773
lpetit@plsma.org
jthompson@plsma.org
mfiller@plsma.org

Dated:  March 6, 2017

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 23, 2017.  Service will be made on the newly named defendants in accordance with Federal Rule of Civil Procedure 4.


_____*/s/ Maggie Filler*_____

Maggie Filler                                                            Dated: March 23, 2017