UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

TIMOTHY REAVES,               )
                                      )
          Plaintiff,       )
                                      )
v.                             )      CIVIL ACTION
                                      )      NO. 15-40100
DEPARTMENT OF CORRECTION, ET AL.,   )
                                      )
          Defendants.     )

_____

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND LAW

1. Timothy Reaves is 54 years old. Reaves testimony.

2. Mr. Reaves is a prisoner in the custody of the Department of Correction (DOC). Reaves testimony. He has been living in a single cell in the Health Services Unit (HSU) at MCI Shirley since January 2016. *Id.*

3. Carol Mici is the Commissioner of the DOC.

4. Dr. Morse is a well-qualified expert in the care of patients with spinal cord injury. Ex. 34, Morse testimony.

5. Mr. Reaves suffers from quadriplegia and numerous complications from that condition. Stipulation 3; Morse testimony; Reaves testimony.

6. Mr. Reaves suffers from moderately severe to profound hearing loss in both ears. Ex. 5, p. 10; Reaves testimony.

7. Mr. Reaves suffers from Traumatic Brain Injury. Ex. 18, pp. 3-6, 8, 9; Ex. 39; Morse testimony; Reaves testimony.

8. Mr. Reaves' quadriplegia and related physical conditions are serious medical needs. Stipulation 3; Morse testimony.

9.  Mr. Reaves has suffered a marked decline in his condition since Dr. Morse last saw him in December 2015. Morse testimony

10. At MCI Shirley, DOC and their medical contractor have provided Mr. Reaves inadequate medical care that does not meet the standard of care. Morse testimony.

11. The inadequate care is causing him harm, will have an impact on his life expectancy, and is likely to cause death. Morse testimony.

12. Mr. Reaves requires care outside of a prison. Morse testimony.

13. Dr. Maria Angeles is the Medical Director at MCI Shirley and the treating doctor for Mr. Reaves. Angeles testimony. She does not have any specialized training in caring for a person with Spinal Cord Injury (SCI). *Id*.


14. DOC contracts with a private company to directly perform the medical and mental health care services for prisoners in Massachusetts prisons. Collins testimony.

15. The current contracted medical provider is now called Wellpath, though they were called CCS when they took the contract in July 2018. Collins testimony.

16. Because DOC is a state agency, it begins the process of choosing a contractor by publishing a Request for Response (RFR) describing the DOC population that will be served and the services DOC seeks to have provided. Ex. 28; Collins testimony.

17. Interested companies make a response and submit a bid for how much they would charge to provide the requested services. Collins testimony.

18. DOC considers the submitted bids and awards the contract to the company who it determines provides the best value for the Commonwealth. Collins testimony.

19. Defendant Stephanie Collins, DOC's Assistant Deputy Commissioner (ADC) of Clinical Services since April 2014, is responsible for overseeing the provision of medical and mental health services throughout the DOC. Collins testimony.

20. ADC Collins shares responsibility with other DOC employees for negotiating the contract with the medical contractor. Collins testimony.

21. To assist her in carrying out her role overseeing medical and mental health services in the DOC, ADC Collins has the assistance of a Senior Medical Consultant who is a licensed physician whose job it is to advise the ADC of Clinical Services. Collins testimony.

22. ADC Collins shares responsibility with the contracted Program Medical Director for organizing health education and training for staff.  Collins testimony.

23. ADC Collins is responsible for monitoring contractor compliance with the contract and determining whether the contractor is performing as DOC described in the RFR. Collins testimony.

24. DOC Health Services Division employs registered nurses and mental health professionals as Regional Administrators who perform systematic audits at each DOC facility to evaluate the quality and appropriateness of care for all prisoners. Their main focus is to ensure contract compliance and to evaluate the contractor's standards of practice, review the contractor's response to prisoner medical grievances, and assess the efficacy of clinical guidelines and the contractor's policies and procedures. Ex 28, p. 11; Collins testimony.  These nurses report to Health Services Division employees who report directly to ADC Collins.  Collins testimony.

25. DOC Health Services Division employs a Director of Contract Compliance who reports to ADC Collins and is responsible for the day to day management and contractual oversight of

the Department's comprehensive medical, dental and mental health services to ensure these services are provided to the prison population. Ex. 28, p. 5.

26. ADC Collins is responsible for approving the selection and assignment of Medical Directors by the Contractor. Ex. 28, p. 8, Collins testimony.

27. Defendant ADC Collins monitors staffing levels of the medical provider to ensure sufficient medical staffing at each HSU to provide adequate care for the patients there.  Ex. 28, pp. 105, 106, 113; Collins testimony.  She also has the authority to require staffing changes be made by the medical provider based on the evolving needs of a facility population.  *Id*.

28. DOC requires that Lemuel Shattuck Hospital be the primary outpatient and inpatient hospital provider for the DOC.  Ex. 28, p. 29; Collins testimony.

29. DOC mandates that the contractor will provide therapeutic diets by order from a physician.  Ex. 28, p. 46; Collins testimony.  It also states that the DOC's main "heart healthy" menu eliminates the need for most diets.  *Id*.

30. Defendant ADC Collins has the authority to penalize the medical contractor for not meeting the contract requirements.  Ex. 28, pp. 160-161; Collins testimony.

31. DOC operates a formulary from which the contract medical providers are able to prescribe medication.  Ex. 28, p. 89; Collins testimony.

32. ADC Collins heads the DOC Pharmacy and Therapeutics Committee which sets the medication guidelines it requires the medical contractor to adhere to.  Ex. 28, p. 87; Collins testimony.

33. ADC Collins has the final authority to determine what medications are in the formulary.  Ex. 28, p. 93.

34. At the monthly meetings of the Pharmacy and Therapeutics Committee, DOC tracks prescribing patterns for each medical provider.  Ex. 28, p. 89; Collins testimony.

35. The process of providing diagnostic testing and specialty consult appointments to prisoners is managed by the Utilization Review procedure of the medical contractor.  Ex. 28, pp. 98-100; Collins testimony.

36. DOC mandates that a monthly report of specialty consult requests be submitted by Wellpath to the ADC containing, for each such request: the prisoner name, referring physician, date of referral, action taken by the approving authority on the request, date of specialty clinic appointment, result of consultant review, summary of alternative treatment plans, and the date the prisoner was notified of the disposition of the consultation request.  Ex. 28, p. 98; Collins testimony.

37. DOC also mandates that the contractor make available to the DOC Health Services Division, which Defendant ADC Collins heads, real-time electronic records of specialty consult referrals including: the initiation of a referral, the utilization review, the appointments and outcome, upon request.

38. ADC Collins also receives reports from the contractor about any specialty care referrals that are deferred or denied.   Ex. 28, p. 99; Collins testimony.

39. If the contractor's approving authority denies the consultation recommendation, the prisoner's medical record must document the denial, an alternative treatment plan, and notification to the prisoner of the denial and any alternative treatment plan.  Ex. 28, p. 99; Collins testimony.

40. DOC requires the contractor to provide these reports and information so that DOC Health Services Division can easily see whether the care recommended by specialists is being provided by Wellpath.  Collins testimony.

41. DOC performs regular audits of the medical contractor in various areas.  Ex. 28, pp. 140-142; Collins testimony. Every six months, DOC audits the contractor's medical records including Medication Administration Records, Physician's Orders, and Specialty Consult referrals, and mental health records. Ex. 28, p. 140; Collins testimony.

42. DOC also performs regular Clinical Outcome audits and Performance Measurement audits of the contractor's care.  Ex. 28, pp. 141.

43. DOC requires the medical contractor to hold regular meetings for each discipline, i.e. nursing, CNAs, physicians, and to provide the agendas for those meetings to the ADC.  Ex. 28, p. 127, Collins testimony.

44. Defendant ADC Collins, or her designee, also participates in regular meetings between DOC and Wellpath, including a weekly executive meeting to discuss issues of concern to DOC or Wellpath, quarterly Health Services meetings and Quarterly Continuous Quality Improvement meetings and Patient Care Safety Review meetings.  *Id*.

45. DOC requires that the contractor provide regular reports to ADC Collins' office including monthly reports on utilization review, staffing levels by position, staffing vacancies, off-facility transfers and statistical reports.  Ex. 28, p. 162.

46. ADC Collins has the power to request and obtain information about specific issues or patients.  Collins testimony.  She could also request a Clinical Case Conference to review the status of a patient presenting complex medical, mental health or behavioral problems.  Ex. 28, p. 24, Collins testimony.

47. DOC payment to the medical contractor essentially consists of an amount corresponding to medical staff pay and another amount that is a per-diem rate per prisoner.  Ex. 28, p. 151, Collins testimony.

48. DOC mandates that Interfacility Case Conferences occur when a prisoner with complex medical needs moves from prison to prison.  Ex. 28, p. 127; Collins testimony.  ADC Collins is not sure if an Interfacility Case Conference occurred when Mr. Reaves transferred to MCI Shirley in 2016.  Collins testimony.

49. ADC Collins has received correspondence from and on behalf of Mr. Reaves expressing concerns about the medical care provided to him.  Ex. 22; Collins testimony.  She is aware that he has filed grievances about medical concerns.  Ex. 21; Collins testimony.

50. ADC Collins received a letter from Mr. Reaves' counsel presenting the claims against her and other defendants in this case, prior to the case being filed.  Collins testimony.  She also received a copy of the Complaint that detailed the claims when process was served in July 2015.  *Id.* ADC Collins was aware of this Court's July 15, 2016 Order granting a Preliminary Injunction against DOC.  *Id.*  She also reviewed the monthly status reports submitted by DOC's previous medical contractor, MPCH, and by Mr. Reaves, detailing the status of both medical care and accommodations issues.  *Id.*

51. In her role as the ADC of Clinical Services, Defendant ADC Collins has become familiar with Mr. Reaves.  Collins testimony.  She is aware that he has significant needs, including medical, behavioral and mental health as well as need for disability accommodations.  *Id.*  ADC Collins has known that Mr. Reaves is quadriplegic, hearing disabled and that he has a Traumatic Brain Injury.  *Id.*

52. ADC Collins is aware that DOC has sought and obtained a Myers Order permitting DOC to provide certain care, including taking vital signs and force feeding by nasogastric tube, to Mr. Reaves by force if he does not voluntarily accept it. *Id*.

53. DOC and its medical contractor sent Mr. Reaves to Dr. Stephanie Cho at Spaulding Rehabilitation Hospital for specialty consultations related to his Spinal Cord Injury (SCI). Ex. 19; Reaves testimony.

54. Mr. Reaves has seen Dr. Cho on November 28, 2016, February 28, 2017 and April 12, 2018. Ex. 19; Angeles testimony.

55. Following Mr. Reaves' first appointment with Dr. Cho on November 28, 2016, she made a number of recommendations and orders for Mr. Reaves' care. Ex. 19, pp. 1-7; Angeles testimony; Reaves testimony.

56. In order for Dr. Cho's specialist recommendations and orders to be carried out, Dr. Angeles must take action on them. Angeles testimony.

57. On November 28, 2016, Dr. Cho ordered that Mr. Reaves should be referred to Massachusetts General Hospital (MGH) orthopedics to be evaluated for tendon release surgery. Ex. 19, p. 5; Angeles testimony, Reaves testimony.

58. Tendon release surgery would release the contractures in Mr. Reaves' hips and knees so that his body could be moved into a sitting position. Morse testimony, Reaves testimony. This would allow Mr. Reaves to sit in a wheelchair. Ex. 19, p. 5; Angeles testimony; Morse testimony; Reaves testimony. Sitting up would increase his quality of life and may also help with his bowel management. Morse testimony.

59. DOC has not provided this evaluation for tendon release surgery to date. Angeles testimony; Reaves testimony.

60. Mr. Reaves was scheduled for an evaluation for this purpose in January 2017. Reaves testimony. He went on the trip for that evaluation and was transported to several places, but the evaluation never occurred. Reaves testimony.

61. DOC next scheduled Mr. Reaves to go for an evaluation for tendon release surgery on January 18, 2018. Angeles testimony; Reaves testimony.

62. On the date of the scheduled appointment, Mr. Reaves was gravely ill and could not attend the appointment, although he very much wanted to. Morse testimony; Reaves testimony.  Due to the severity of Mr. Reaves' illness, it would not be appropriate to characterize his not going to this appointment as a refusal.  Morse testimony.

63. Since the January 18, 2018 appointment was canceled, it has not been rescheduled, or if it has been rescheduled, the date of the new appointment has not yet occurred. Angeles testimony; Reaves testimony.

64. Mr. Reaves wants to have tendon release surgery to improve his quality of life. Reaves testimony. Dr. Angeles knows that Mr. Reaves wants to have the surgery. Angeles testimony.

65. On November 28, 2016, Dr. Cho recommended that Mr. Reaves have a urodynamic study with a urologist who specializes in spinal cord injuries. Ex. 19, p. 2; Angeles testimony; Morse testimony.

66. A urodynamic study is necessary to properly evaluate and treat Mr. Reaves' neurogenic bladder. Morse testimony.  DOC and their medical provider have not sent Mr. Reaves to have a urodynamic study. Angeles testimony, Morse testimony.

67. Dr. Cho also recommended that DOC send Mr. Reaves to a physical therapist and an occupational therapist who are SCI trained, but this was not done.  Ex. 19; Morse testimony.

68. DOC does not provide Mr. Reaves with occupational therapy at MCI Shirley. Reaves testimony.

69. DOC provided Mr. Reaves with adaptive feeding equipment at the end of 2015 while he was still at Souza-Baranowski Correctional Center. Angeles testimony; Reaves testimony.

70. DOC and their medical contractor do not use the adaptive feeding equipment at MCI Shirley. Angeles testimony; Reaves testimony.

71. Mr. Reaves often eats semi-independently using a method he has devised with the plastic water pitcher provided to him at Shirley. Morse testimony; Reaves testimony. Staff or another prisoner will place food in the container and place the container on Mr. Reaves' chest. *Id*. Mr. Reaves will then work to push the handle of the pitcher down into the middle of his contracted right hand and use his limited shoulder motion to get the pitcher to his mouth. *Id*.

72. Mr. Reaves is severely malnourished. Ex. 14, pp. 79-111; Angeles testimony; Morse testimony.

73. Mr. Reaves does not eat red meat or pork. Ex 22, p. 18; Reaves testimony.

74. Mr. Reaves has requested a diet that does not include red meat or pork and that includes increased fiber and vegetables to address his nutritional deficiencies and decrease constipation. Ex. 22, p. 18; Reaves testimony.  Dr. Cho has three times recommended that the fiber in Mr. Reaves' diet be increased.  Ex. 19, pp. 2, 10, 15.

75. DOC could provide Mr. Reaves a diet without red meat, but they have not. Angeles testimony. Mr. Reaves receives the regular prison diet with red meat. Angeles testimony; Reaves testimony. When DOC serves Mr. Reaves items he does not eat, such as red meat, he goes without a main source of protein for those meals. Reaves testimony.

76. Dr. Morse observed ants crawling on the container Mr. Reaves uses to store food beside his bed. Morse testimony.

77. Mr. Reaves purchases food from the prison canteen when he is able. Reaves testimony. There are no fruits or vegetables offered in the canteen for purchase. *Id*. Raisin bran was previously available, but is no longer available. *Id*.

78. When Mr. Reaves is at Lemuel Shattuck Hospital, they honor his dietary restrictions and needs by feeding him meals with no red meat or pork and giving him salads every day.  Reaves testimony.

79. Mr. Reaves has a small, hard call bell taped to his bed. He rings the bell by banging against it with his elbow. Angeles testimony; Reaves testimony.

80. Trying to ring the call bell with his elbow sometimes causes Mr. Reaves' elbow to bleed. Reaves testimony.

81. On February 8, 2017, DOC Physical Therapist Tricia Mellody recommended that Mr. Reaves be provided with a different call bell with a large, soft pod button. Ex. 11, p. 2. The DOC has not provided Mr. Reaves with a new call bell to date, despite their own physical therapist's documented recommendation. Angeles testimony; Collins testimony; Reaves testimony.

82. Mr. Reaves does not receive regular of range of motion (ROM) care at MCI Shirley. Angeles testimony; Reaves testimony.

83. Mr. Reaves has received occasional ROM care from selected medical staff, including then-Director of Nursing Cindy Slocum, RN Jessica Coe, and RN Kayla Hall.  Reaves testimony.

84. Video footage of ROM care provided by then-DON Slocum and by RN Hall showed that the ROM care they provided was inadequate. Morse testimony. The inadequacies included too few repetitions to be effective and therapy done too quickly. *Id.*

85. ROM care to Mr. Reaves joints during daily complete care using gentle PROM (passive range of motion) to all extremities is a component of Mr. Reaves' treatment plan. Ex. 10, p. 2; Angeles testimony.

86. ROM care is sometimes offered at inopportune times, such as during Mr. Reaves' deposition and during a meeting with his attorneys. Reaves testimony. Sometimes when Mr. Reaves verbally accepts ROM care, it is not conducted. *Id*. ROM care is not offered on a daily basis.  *Id*.  Mr. Reaves accepted an offer of ROM care from RN Sam Landry during a recent attorney meeting.  *Id*.  RN Landry did not know how to provide the care and went to get the Nurse Practitioner who came to the cell and explained that they were too busy to provide the care then but would come back later to do it.  *Id*.  Around 2:00 pm RN Landry and CNA Arielle returned to Mr. Reaves' cell and the CNA asked Mr. Reaves if he wanted ROM.  *Id*.  Mr. Reaves said that he already answered that question in the morning, and the CNA said she took that as a refusal of the care.  *Id*.  Mr. Reaves wanted the ROM and did not refuse it.  *Id*.

87. Mr. Reaves wants to receive ROM care. Reaves testimony. When he receives it, he feels less pain and discomfort. *Id*. When it is done consistently, he has fewer spasms, his body

does not feel as tight, and he feels stronger and hungrier. *Id*. When he does not receive ROM

care, he feels stiff and inflexible. *Id*.

88. When Mr. Reaves refuses an offer of repositioning, he is not intending to refuse ROM.

Reaves testimony. Repositioning is offered on a regular basis.  *Id*.

89. Mr. Reaves has received ROM care at SBCC, on his lower extremities, and at Lemuel

Shattuck Hospital. Reaves testimony. The former Director of Nursing, Cindy Slocum, did

ROM at MCI Shirley after his bath a few times. *Id*.

90. ROM would have a positive impact on Mr. Reaves' contractures and could preserve the

remaining movement he has. Morse testimony. It should be performed for 10-15 minutes

twice per day. *Id*.

91. Loss of the movement Mr. Reaves still has, especially movement that allows him to feed

himself, would be catastrophic. Morse testimony.


92. Mr. Reaves regularly refuses staff offers of repositioning because it hurts his shoulders to be

repositioned on his side. Morse testimony; Reaves testimony.

93. If Mr. Reaves were to accept repositioning, he would be turned onto his hips, which would

result in skin breakdown on those areas. Morse testimony. Mr. Reaves cannot be effectively

repositioned. *Id*.   Mr. Reaves has been able to avoid pressure ulcers on his underside for

years without repositioning.  Ex. 19, pp. 2, 10, 15; Reaves testimony, Morse testimony.


94. Mr. Reaves currently has pressure ulcer on his sacrum. Morse testimony. The development

of this ulcer is not because Mr. Reaves refuses repositioning. *Id*. Causes of the sacral ulcer

include poor hygiene, poor nutritional intake, and the surface Mr. Reaves lies on. *Id*.

95. The best treatment for the pressure ulcer on Mr. Reaves' sacrum is to maximize pressure relief by the surface used in his bed. Morse testimony.

96. On November 28, 2016, Dr. Cho ordered that the DOC provide Mr. Reaves with a Hill Rom bed with airflow mattress and an overlay air mattress on top to prevent pressure ulcers. Ex. 19, p. 7. She repeated that recommendation at her two other examinations of Mr. Reaves.  Ex. 19, pp. 10, 15.

97. DOC has not complied with Dr. Cho's November 28, 2016 order regarding Mr. Reaves' bed, specifically by failing to provide the overlay. Ex. 19, p. 7; Collins testimony; Morse testimony. DOC has relied on the advice of the salesperson for the bed manufacturer rather than on Dr. Cho's specialist recommendation.  Angeles testimony, Reaves testimony.  The current bed is one of the causes of the pressure ulcer on Mr. Reaves' sacrum. Morse testimony.

98. If the sacral ulcer progresses, it is very likely to lead to infection or even sepsis, and Mr. Reaves is likely to require hospitalization. Morse testimony.

99. DOC and the medical contractor sent Mr. Reaves to the Spaulding wheelchair clinic to be evaluated for a wheelchair on April 19, 2017. Ex. 19, pp. 11-12. Their referral request to the clinic specified that they sought a manual wheelchair.  *Id.* In or around December 2017, defendants provided a manual wheelchair to Mr. Reaves despite his objections to using a manual chair. Ex. 4, p. 8; Collins testimony; Kelly testimony; Reaves testimony.

100.   Mr. Reaves refuses to use the manual wheelchair for fear of developing pressure ulcers. Reaves testimony.

101.   Mr. Reaves is at risk of pressure ulcers if he were to use the manual wheelchair. Morse testimony. An electric wheelchair would allow Mr. Reaves to relieve pressure himself

through the use of electronic controls. *Id*. A manual wheelchair is not medically appropriate because it does not allow Mr. Reaves to relieve pressure to prevent pressure ulcers. *Id*. Mr. Reaves' refusal to use the manual wheelchair is reasonable. *Id*.

102.   Mr. Reaves informed the DOC that he needs an electric wheelchair and requested that his previous electric wheelchair be repaired, but Defendants have refused to do that. Ex. 4, pp. 7-8; Kelly testimony; Reaves testimony.

103.   Autonomic Dysreflexia is a syndrome that occurs in people who have suffered a spinal cord injury above T6. Angeles testimony; Morse testimony. It is a life-threatening emergency caused by an irritant below the level of the injury. *Id*. Potential triggers include constipation, fecal impaction, a blocked catheter, ingrown toenails and fingernails, infections, or other irritants below the level of injury. *Id*.

104.   Mr. Reaves is at risk for Autonomic Dysreflexia. Ex. 10, p. 4; Angeles testimony; Morse testimony. He has multiple reasons to be dysreflexic and his records reflect that he continues to experience frequent episodes of Autonomic Dysreflexia. Morse testimony.

105.   Symptoms of Autonomic Dysreflexia include headaches, visual disturbances, nasal congestion, flushing, sweating above the level of the injury, or blood pressure elevated 20 points above baseline. Morse testimony.

106.   The major concern with Autonomic Dysreflexia is stroke. Angeles testimony; Morse testimony.

107.   Mr. Reaves' fingernails are currently overgrown, and have been that way throughout his time at MCI Shirley. Ex. 24, pp. 1-6; Morse testimony; Reaves testimony.

108.   The DOC Physical Therapist Tricia Mellody noted on February 8, 2017 that Mr. Reaves'
       fingernails were long and she was concerned for his skin integrity. Ex. 17, p. 2. She also
       wrote that she spoke to the CNA, LPN, the charge nurse, the Director of Nursing and the
       doctor about this issue as well as others. *Id*. Dr. Angeles is the doctor referred to in this
       report. Angeles testimony.

109.   Dr. Angeles recognizes that excessively long fingernails puts Mr. Reaves at risk for skin
       integrity issues, but does not recognize that they subject him to the risk of Autonomic
       Dysreflexia. Angeles testimony.

110.   Excessively long fingernails do, in fact, subject Mr. Reaves to the potential of and risks
       from Autonomic Dysreflexia. Morse testimony.

111.   Mr. Reaves' fingernails are curling and causing skin breakdown on his fingers and the
       palms of his hands. Ex. 24; Morse testimony.

112.   The last time anyone at MCI Shirley cut any of Mr. Reaves' fingernails was the Director
       of Nursing Michelle, and it was sometime last year. Reaves testimony.

113.   There is nothing indicated in Mr. Reaves' treatment plan describing who should trim Mr.
       Reaves' nails or how often. Ex. 10, pp. 1-4; Angeles testimony.

114.   Mr. Reaves bites the fingernails he can reach, but the nails he can't reach continue to
       grow long. Reaves testimony.

115.   Photographs of Mr. Reaves' fingernails from 2016 and 2018, Ex. 24, are consistent with
       the state of Mr. Reaves' fingernails as of May 7, 2019. Morse testimony.

116.   Mr. Reaves has a fungal infection in one of the fingernails on his left hand, as well as in
       several of his toenails. Ex. 24, pp. 2, 4; Morse testimony. Fungal infections are common in

toenails, but Dr. Morse testified she had never seen a fingernail infection like this before. Morse testimony.

117.    The fungal infection in Mr. Reaves' fingernail is caused by lack of care. Morse testimony.

118.    Dr. Morse identified the state of Mr. Reaves' fingernails, including the fungal infection, the curling nails, and the skin breakdown caused by his nails, as one of the most concerning issues related to Mr. Reaves' current health. Morse testimony.

119.    Constipation or long periods of time without a bowel movement create a risk of Autonomic Dysreflexia for Mr. Reaves. Morse testimony, Angeles testimony, Ex. 10, p. 4.

120.    Dr. Angeles wrote an order and included in her treatment plan for Mr. Reaves that she is to be notified if he goes more than one day without a bowel movement. Ex. 10, p. 2; Ex. 17, p. 2; Angeles testimony. Nonetheless she is often not aware when Mr. Reaves goes for many days without a bowel movement. Angeles testimony.

121.    Between January 27, 2019 and February 21, 2019, Mr. Reaves went for 26 days without a bowel movement. Ex. 16, pp. 9-167; Angeles testimony; Morse testimony. Mr. Reaves had a bowel movement on January 26, 2019. Ex. 16, p. 169. His next recorded bowel movement was not until February 22, 2019. Ex. 16, pp. 7-8.

122.    Dr. Angeles met with Mr. Reaves four times between January 27, 2019 and February 21, 2019. Ex. 16, pp. 155-56, 123-24, 82-83, 33-34; Angeles testimony. Her progress notes from those meetings indicate she was not aware of how long Mr. Reaves had gone without a bowel movement, that she did not discuss with him the number of days that had gone by without a bowel movement or the risk of autonomic dysreflexia caused by constipation, and that she did not offer him bowel medications or discuss any treatment options. *Id*.

123.    Dr. Angeles was not in fact aware that Mr. Reaves had gone for 26 days without a bowel

movement. Angeles testimony. She did not take any action to treat Mr. Reaves' severe

constipation.  Ex. 14, pp. 97-106; Ex. 16, pp. 9-167; Angeles testimony.

124.    Twenty-six days without a bowel movement creates a risk for autonomic dysreflexia,

bowel rupture, stroke, fistula, and impact on other organs. Morse testimony.

125.    Between November 21, 2018 and December 2, 2018, Mr. Reaves did not have a bowel

movement for twelve days. Ex. 16, pp. 180-245; Angeles testimony. Mr. Reaves had two

bowel movements on November 20, 2018. Ex. 16, 246-47, 250-51. His next bowel

movement was recorded on December 3, 2018. Ex. 16, 174-79.

126.    Dr. Angeles met with Mr. Reaves one time during this period, on November 26, 2018,

when Mr. Reaves had gone six days without a bowel movement. Ex. 16, pp. 215-16. Her

progress note from that meeting indicates she was not aware of how long Mr. Reaves had

gone without a bowel movement, that she did not discuss with him the number of days that

had gone by without a bowel movement or the risk of autonomic dysreflexia, and that she did

not offer him bowel medications or discuss any treatment options for this issue. *Id*.

127.    The Medication Administration Records for November and December 2018 show that no

bowel medications were offered to or refused by Mr. Reaves during this time period. Ex. 14,

pp. 85-96.

128.    Between October 27, 2018 and November 10, 2018, Mr. Reaves did not have a bowel

movement for fifteen days. Ex. 16, pp. 252-319; Angeles testimony.

129.    Dr. Angeles met with Mr. Reaves two times during this period, on October 29, 2018 and

November 5, 2018. Ex. 16, pp. 312-13, 280-81. Her progress notes from those meetings

indicate she was not aware of how long Mr. Reaves had gone without a bowel movement,

that she did not discuss with him the number of days that had gone by without a bowel movement or the risk of autonomic dysreflexia, and that she did not offer him bowel medications or discuss any treatment options. *Id*.

130.    The Medication Administration Records for October and November 2018 show that no bowel medications were offered to or refused by Mr. Reaves during this time period. Ex. 14, pp. 81-87.

131.    The bowel program for Mr. Reaves is inadequate. Morse testimony. After a certain number of days without a bowel movement, even if Mr. Reaves had refused daily bowel program care, additional care should be triggered. Appropriate care would include an x-ray, followed by magnesium citrate (a medication taken by mouth) and another x-ray. Morse testimony. Instead, the doctor is often not even aware of how many days have passed without a bowel movement. Angeles testimony.

132.    Mr. Reaves' medical records from MCI Shirley and from outside hospitals reflect numerous instances of blood pressures indicative of Autonomic Dysreflexia episodes, consistently throughout his time at MCI Shirley. Morse testimony.

133.    The records also demonstrate that when Mr. Reaves complains of other Autonomic Dysreflexia symptoms, such as headache, visual disturbances, or sweating, staff at MCI Shirley do not respond appropriately. Morse testimony. This indicates that staff at MCI Shirley do not understand the symptoms, triggers, or treatment for Autonomic Dysreflexia. *Id*.

134.    The diagnostic criteria for Autonomic Dysreflexia include a systolic blood pressure 20 points or more above the patient's baseline. Morse testimony.

135.     Mr. Reaves' baseline systolic blood pressure is in the 80 to 100 range. Angeles testimony; Morse testimony.

136.     On June 21, 2016, Dr. Angeles wrote an order that she be notified if Mr. Reaves' systolic blood pressure was above 140. Ex. 17, p. 1; Angeles testimony.

137.     On March 27, 2018, Dr. Angeles wrote an order that she be notified if Mr. Reaves' systolic blood pressure was above 160. Ex. 17, p. 2; Angeles testimony.

138.     A systolic blood pressure of 140 or 160 would put Mr. Reaves' blood pressure far higher than the diagnostic criteria of 20 points above the baseline for autonomic dysreflexia, and indicate he is at serious risk of stroke. Morse testimony.

139.     DOC and Defendants Collins were put on notice by a September 8, 2017 letter from Mr. Reaves and his counsel that Mr. Reaves experienced lightheadedness and visual disturbances on the morning of September 8, 2017, and several other times. Ex. 22, pp. 15-16. Mr. Reaves reported these symptoms of Autonomic Dysreflexia to the Correctional Program Officer (CPO) Katie and asked to speak with the doctor. *Id*. CPO Katie then informed Mr. Reaves that Health Services Administrator (HSA) Elizabeth Louder said that Mr. Reaves cannot see the doctor unless he makes the request to the charge nurse at morning rounds. *Id*.

140.     Defendant Collins responded to this letter on September 15, 2017. Ex. 22, p. 17; Collins testimony. In her letter, Defendant Collins wrote that Dr. Angeles met with Mr. Reaves on September 11, 2017, three days after he reported experiencing lightheadedness and visual disturbances. *Id*.

141.     Lightheadedness and visual disturbances are symptoms of Autonomic Dysreflexia. Angeles testimony; Morse testimony. When Mr. Reaves reports these symptoms, it should be

treated as a medical emergency. Morse testimony. It is inappropriate and dangerous to prevent Mr. Reaves from speaking with the doctor or delay his access to the doctor. *Id*.

142.    Mr. Reaves sometimes gets headaches. Reaves testimony. When he reports these headaches to medical staff, he is offered tylenol or motrin. *Id*. He also sometimes gets lightheaded, dizzy, and sees spots in his vision. *Id*. When he reports this to medical staff they do not do anything. *Id*.

143.    Headaches, lightheadedness, and visual disturbances are all symptoms of Autonomic Dysreflexia. Angeles testimony; Morse testimony.

144.    Nasal congestion is also a symptom of Autonomic Dysreflexia. Angeles testimony; Morse testimony.

145.    Mr. Reaves is prescribed pseudoephedrine for nasal congestion. Ex. 14. Mr. Reaves should always be assessed for Autonomic Dysreflexia prior to being given pseudoephedrine. Morse testimony.


146.    Because of his injury, Mr. Reaves' body cannot control his own temperature. Morse testimony. His body will take on the temperature of the room he is in. *Id*. He also cannot adjust his own clothes or the blankets on his bed to compensate for the heat or cold. *Id*.

147.    Mr. Reaves does not have control over the temperature in his cell. Reaves testimony. *Id*.

148.    The temperature in his cell is often too hot or too cold. Reaves testimony. Visitors and staff complain about the temperature. *Id*. Mr. Reaves has observed some staff members put on a sweatshirt to come into his cell when it is cold. *Id*.

149.    In the winter DOC taped trash bags to the windows when it was too cold in Mr. Reaves' cell. Reaves testimony.  Those bags still seal the windows as of May 2019.  *Id*.

150.    Because Mr. Reaves' body cannot control its own temperature, when his cell is too hot he

is at risk for heat stroke. Morse testimony.  This risk is the same whether the temperature is

hot when Mr. Reaves is outdoors or in his cell.  DOC prevents Mr. Reaves from going

outdoors when the temperature is below 50 degrees or above 85 degrees.  Ex. 35, Angeles

testimony, Reaves testimony.


151.    When offered care by certain staff members, Mr. Reaves consistently refuses the care,

including bathing, medical care, and meals. Angeles testimony; Collins testimony; Reaves

testimony.

152.    Mr. Reaves specifically does not accept care offered by RN Kayla or CNA Colleen

Johnson. Angeles testimony; Collins testimony; Reaves testimony.

153.    Mr. Reaves has spoken to Dr. Angeles about the fact that he will not accept care offered

by these staff members. Reaves testimony.

154.    DOC is aware that CNA Colleen Johnson has pending criminal charges against Mr.

Reaves and he has filed grievances objecting to her continued provision of care to him. Ex.

20, p. 2; Ex. 21, p. 3; Collins testimony.  Mr. Reaves has also filed grievances about RN

Kayla Hall having touched his anus over his stated objection.  Ex. 21, pp. 1, 2.  Both

155.    ADC Collins was aware that the monitor appointed by this Court in connection with the

Preliminary Injunction Order repeatedly recommended that CNA Colleen Johnson no longer

offer Mr. Reaves care. Angeles testimony; Collins testimony; Docs. 194, 209, 212, 225.ADC

Collins was aware that the monitor's instructions were akin to an order from the

judge.  Collins testimony.

156.    DOC did not take any action to ensure compliance with this recommendation despite that knowledge. Collins testimony.

157.    CNA Colleen Johnson and RN Kayla Hall continued to offer care, including meals, to Mr. Reaves on a regular basis despite DOC's knowledge of his complaints and of his refusal to accept such care.  Ex. 35, generally; Angeles testimony; Reaves testimony.

158.    On at least five occasions at MCI Shirley, DOC staff have ordered medical staff to leave Mr. Reaves' room while they were in the middle of providing care. Morse testimony, Reaves testimony.

159.    As a result, staff have left abruptly in the middle of bathing Mr. Reaves, leaving him naked and wet without clothes or blankets. Reaves testimony. Mr. Reaves is not able to put clothes on or pull up his blankets. *Id*. He has to wait until the next shift starts and someone comes in to assist him *Id*.

160.    Mr. Reaves is unable to tend to his hygiene care for himself. Angeles testimony; Reaves testimony.

161.    Mr. Reaves' hygiene is very poor. Morse testimony. His bedding is soiled and covered in dead skin from his legs and feet. *Id*. His hair and beard are encrusted with dead skin and food. *Id*. He has fungal infections in his toenails and fingernails. *Id*. Mr. Reaves is at great risk of infection due to the open wounds on his legs and sacrum.  *Id*.

162.    No one offers to brush Mr. Reaves' teeth or cut his fingernails. Reaves testimony. He cannot perform these actions himself. *Id*.

163.    The DOC receives federal financial assistance, for purposes of the Rehabilitation Act.
Stipulation 1.

164.    Mr. Reaves' quadriplegia is a disability, for purposes of the Americans with Disabilities
Act and the Rehabilitation Act. Stipulation 2.

165.    Mr. Reaves' hearing loss interferes with his ability to communicate, a major life activity.
Ex. 5, p.10; Reaves testimony. His hearing disability is apparent to those who interact with
him.  Ex. 18, pp. 2, 3; Ex. 42, p. 133; Morse testimony.

166.    Mr. Reaves is further disabled as the result of bifrontal lobe atrophy/traumatic brain
injury suffered in an accident in 1994 at the time of his arrest. Ex.18, pp. 3, 4, 6; Ex. 39, pp.
1-2.

167.    The DOC was fully aware of all Mr. Reaves disabilities. Ex. 4; Ex. 5; Ex. 36; Ex. 42, pp.
26-27, 133; Angeles testimony; Collins testimony; Kelly testimony.

168.    Access to the outside, to socializing, to programs and education, and to the effective use
of the telephone, are all programs, services, or activities offered by the DOC. Stipulation 5.

169.    Mr. Reaves has been excluded from these programs by reason of his disabilities. Ex. 4;
Ex. 26; Collins testimony; Kelly testimony; Reaves testimony.

170.    Mr. Reaves meets the requirements of the above programs, services, or activities offered
by the DOC with a reasonable accommodation. Collins testimony; Kelly testimony; Morse
testimony; Reaves testimony.

171.    Mr. Reaves has requested reasonable accommodations of his disabilities in order to
participate in the programs, services, and activities of the DOC but they have been denied.
Ex. 4; Ex. 21, pp. 7-15; Ex. 22, pp. 6-10, 19-21; Ex. 36; Ex. 42, pp. 98, 106-108, 109-110,
115, 136; Kelly testimony; Reaves testimony.

172.    During the time Mr. Reaves has been incarcerated at MCI Shirley, three people have

served as Deputy Superintendents of Reentry at that prison. Stipulation 5. Each Deputy was

also the ADA Coordinator. *Id*. Colette Goguen held this position when Mr. Reaves was

transferred to MCI Shirley on January 25, 2016. *Id*. John Morin followed Ms. Goguen on

August 8, 2016. *Id*; Ex. 42, pp. 4-5, 19-21. Sheila Kelly took over the position on September

5, 2017 and holds this position currently. Stipulation 5; Kelly testimony.


173.    Mr. Reaves was mobile and had available recreation and socialization through the use of

an electric wheelchair during the first years of his incarceration. Reaves testimony.

174.    At some point his electric wheelchair was damaged and never repaired or replaced by the

defendants. Ex. 4, pp. 8-12; Ex. 36, pp. 2-3; Reaves testimony.

175.    As a result, Mr. Reaves has been bedridden in his cell for almost twenty years. Reaves

testimony. He is not able to leave his cell except to go to outside hospitals. *Id*.

176.    On June 13, 2014, Mr. Reaves filed two written "Request For Reasonable

Accommodation" forms to have his electric wheelchair repaired so that he could attend

programming and go outside for recreation. Ex. 36, pp. 2-3.

177.    Both requests were denied and the electric wheelchair was not repaired by the defendants.

Ex. 36, pp. 2-4; Kelly testimony; Reaves testimony.

178.     As a result of this Court's Order of July 16, 2016, some attempts were made by

defendants to provide Mr. Reaves with access to recreation. Collins testimony; Kelly

testimony; Reaves testimony.

179.    The DOC provided a gurney to transport Mr. Reaves out of his cell for recreation and

socialization. Ex. 23, p. 5; Reaves testimony.

180.    Mr. Reaves declined to use the gurney because of his well-founded fear that the gurney

would cause him painful and dangerous pressure ulcers. Reaves testimony.

181.    On November 28, 2016, Dr. Stephanie Cho, the spinal cord injury specialist hired by

defendant DOC to evaluate and treat Mr. Reaves recommended, after examining Mr. Reaves,

that he not be moved outside on the gurney because of the risk of pressure ulcers. Ex. 19, pp.

2, 6. She recommended that a recliner wheelchair be used. Ex. 19, p. 6.

182.    Despite Dr. Cho's order and Mr. Reaves' clear statements that he wouldn't use the

gurney, defendants continued to insist on the use of the gurney for outdoor recreation and

socialization for the next nine months. Ex. 22, p. 9; Reaves testimony.

183.    In or about December 2017, Defendants provided a manual wheelchair to Mr. Reaves for

outside recreation and socialization. Ex. 4, pp.7-8; Collins testimony; Kelly testimony;

Reaves testimony.

184.    Mr. Reaves stated he would not use the wheelchair for fear of pressure ulcers. Ex. 4, pp.

6-12; Kelly testimony; Reaves testimony.

185.    On February 28, 2018 Mr. Reaves again made a written "Request For Reasonable

Accommodation" for the repair or replacement of his electric wheelchair. Ex. 4, pp. 6-12;

Reaves testimony. In this request he explained that the electric wheelchair has controls that

allow him to do pressure release on his own. *Id*. Manual wheelchairs require him to depend

on others to adjust his posture and release pressure on his buttocks. *Id*. He had suffered

extremely serious pressure ulcers in the past because of the use of a manual wheelchair. Ex.

4, pp. 6-12.

186.    Nurses leave Mr. Reaves alone and unattended for large stretches of time and don't

provide scheduled care when there is a Code 99 emergency at the prison or when he uses foul

language with them. Angeles testimony; Reaves testimony. They also leave Mr. Reaves

unattended because of lack of time. *Id*. As a result, in a manual wheelchair Mr. Reaves would

not receive the pressure release he needs. Ex. 4, pp. 6-12; Ex. 22, p. 21; Angeles testimony;

Morse testimony; Reaves testimony. Mr. Reaves is afraid to use the manual wheelchair

because he is afraid of being left by staff and of suffering ulcers and dizziness with no way to

help himself. Morse testimony; Reaves testimony.

187.    On March 18, 2018 Defendant Kelly denied Mr. Reaves' reasonable accommodation

request for an electric wheelchair. Ex. 4, pp. 7-8.  She did not explain why he could not have

one or why the referral to the wheelchair clinic specifically asked for a manual chair.

*Id*.  Mr. Reaves has not been able to leave his cell for recreation or socialization to the

present date. Kelly testimony; Reaves testimony. He remains bedridden in his cell. *Id*. The

damaged electric wheelchair also remains in his cell. *Id*.

188.    Since July 2016, DOC staff document daily offers of socialization with a prisoner and of

writing assistance at 3:00 p.m. and 4:00 p.m.  Ex. 35, generally.  Nearly every time, staff

record that Mr. Reaves refuses the offers.  *Id*.  Mr. Reaves maintains that those offers are not

made.  Reaves testimony.  The DOC Daily Activity Sheets reflect that on November 18,

2016 Mr. Reaves refused the 3:00 and 4:00 offers.  Ex. 35.      In contrast, video footage

from Mr. Reaves' cell shows that between 1:26 p.m. and 5:31 p.m. on that day, no person

enters Mr. Reaves' cell to offer socialization or writing assistance.  Stipulations 6- 11.  The

Daily Activity Sheets reflect that on November 20, 2016, DOC provided both socialization

and writing assistance to Mr. Reaves in the 3:00 and 4:00 time slots.  Ex. 35.  In contract,

video footage from Mr. Reaves' cell shows that at no time from 9:00 a.m. to 9:00 p.m. on

this day was a prisoner in Mr. Reaves' cell.  Stipulations 12, 13.1

189.   Mr. Reaves is hearing disabled and needs hearing aids. Ex. 5, pp. 6, 8, 10; Ex. 42, p. 133; Angeles testimony; Kelly testimony; Reaves testimony. He has very poor word recognition in both ears, only 8% in his left ear. Ex. 5, pp. 6, 8, 10. Even with hearing aids he cannot hear unless he can see the speaker and lip read. *Id*; Reaves testimony.

190.   DOC staff, nurses, and mental health clinicians often talk to Mr. Reaves from the cell door and he is unable to hear or understand them. Reaves testimony.

191.   On January 25, 2016, Audiologist Vicki A. Wilson at Lemuel Shattuck Hospital informed defendants that Mr. Reaves needed a speech to text (Captel) telephone. Ex 5, p. 8.  The Medical Director of MPCH, Dr. Groblewksi, agreed that the equipment was medically necessary by electronic mail that same day.  Ex. 7, p. 4.  Under the applicable DOC policy at the time, once an accommodation was found to be medically necessary, it should be recorded and provided, without need for further request.  Ex. 1, p.3.  The current DOC policy for accommodations provides for the same thing.  Ex. 1, p. 21.  Colette Goguen, then- ADA Coordinator and now Superintendent at MCI Shirley, joined the e-mail chain discussing this recommendation for Mr. Reaves on January 27, 2016. Ex. 7, p. 11.  ADC Collins joined the chain on February 11, 2016, by e-mail from Ms. Goguen stating her understanding that DOC was required to purchase the equipment for Mr. Reaves.  Ex. 7, p. 9.

192.   On December 5, 2017 Mr. Reaves made a "Request For Reasonable Accommodation" for a telephone with speech to text capabilities (which he in-expertly referred to as TTY capabilities). Ex. 4, pp. 3-5, 13-16. In his Request he further advised the defendants that he suffered from a brain injury. *Id*.

193.    Defendant Kelly granted the request stating "You can have access to TTY phone." Ex. 4, p. 15; Kelly testimony; Reaves testimony.

194.    A TTY telephone requires Mr. Reaves to type a message rather than speak into the telephone. Kelly testimony. Mr. Reaves is physically unable to type. *Id*; Reaves testimony.   A TTY telephone is not the equipment recommended by the audiologist and acknowledged as necessary by MCI Shirley and the medical contractor.  Ex. 7.

195.    Regardless, DOC and Defendant Kelly did not actually offer or provide access to a TTY phone to Mr. Reaves. Kelly testimony; Reaves testimony.

196.    Defendants DOC and Deputy Superintendent Kelly knew or should have known that Mr. Reaves needed a Captel phone when he made his Reasonable Accommodation Request. Ex. 22, pp. 5, 8, 19; Kelly testimony; Reaves testimony.

197.    On April 2, 2018, counsel for Mr. Reaves wrote to Defendants Collins and Kelly requesting a Captel telephone on Mr. Reaves' behalf, given ADC Collins' testimony at a deposition that DOC had obtained some Captel telephones.. Ex. 22, p. 19.

198.    The defendants did not provide Mr. Reaves a Captel telephone. Ex. 21, pp.7-8, 15.

199.    On September 3, 2018, five months after the request for the Captel telephone by his attorney, Mr. Reaves filed a grievance for failure to provide a Captel telephone. Ex. 21. pp. 7, 8.

200.    On September 11, 2018, the Grievance was denied for technical reasons; specifically that Mr. Reaves had failed to attach the "Informal Complaint Form" to his Grievance and because he claimed the incident grieved about was "ongoing" and did not list a specific date. Ex. 21, p. 15.

201.    On March 14, 2019, over three years since the audiologist had recommended a Captel telephone for Mr. Reaves, his attorney again wrote to Defendants Collins and Kelly requesting a Captel telephone for Mr. Reaves. Ex 22, pp. 20-21.

202.    Captel telephones have been available to general population, mobility-able prisoners at MCI-Shirley since at least January 17, 2019. Ex. 6.

203.    On March 22, 2019, Defendant Kelly wrote to counsel for Mr. Reaves and stated that she would speak to Mr. Reaves and provide him access to the Captel telephone. Ex. 22, p. 22.

204.    To date, despite DOC's knowledge of Mr. Reaves' need for this equipment and the specialist's recommendation for it, and despite the fact that MCI Shirley in fact has at least two Captel telephones, DOC has not given Mr. Reaves access to a Captel telephone. Kelly testimony; Reaves testimony.  Not having the ability to hear and understand his family on the telephone leaves Mr. Reaves feeling frustrated and isolated.  Reaves testimony.  Being unable to hear and understand his attorneys leaves him frustrated and interferes with his communications with counsel.  *Id*.  Mr. Reaves sometimes makes calls despite the fact that he can't hear them so that he can tell information to the person he is talking with and because it is the only way for him to connect with people outside prison.  *Id*.

205.    MCI Shirley offers a wide variety of educational, vocational, and therapeutic programs to prisoners. Ex. 2, pp 3-10, 34-40; Anderson testimony; Kelly testimony.

206.    Mr. Reaves is interested in all kinds of programming and has consistently requested programming. Ex. 3; Ex 22, pp.6-10, 21; Ex. 36, pp 1-2; Reaves testimony.

207.    On January 22, 2014, Mr. Reaves' CPO recommended that he take the TABE test in order to determine his academic level for educational programming. Ex. 3, p. 1; Kelly testimony. Mr. Reaves agreed to do so and the testing was completed. Ex. 3, p.1.

208.    On June 13, 2014, Mr. Reaves submitted a written "Request For Reasonable Accommodation Of Special Need" requesting a voice to text computer so that he could play board games, chess, read a book, write letters, and take higher education classes, including correspondence courses. Ex. 36, p.1. The request was denied. *Id*.

209.    On June 13, 2014, Mr. Reaves submitted a written "Request For Reasonable Accommodation Of Special Need" requesting access to educational programming, correspondence courses, and especially a computer class. Ex. 22, p. 2; Reaves testimony.

210.    The programming was never provided despite Mr. Reaves request. Kelly testimony; Reaves testimony.

211.    On November 6, 2014, Mr. Reaves was recommended by his CPO to take the Computer Skills course. Kelly testimony. He readily accepted the recommendation. Nonetheless the course was never provided to him. Kelly testimony; Reaves testimony.

212.    On August 23, 2016, Mr. Reaves again agreed with his CPO to participate in the Computer Skills course. Ex. 3, p. 2; Reaves testimony; Kelly testimony. Again, DOC did not offer it to him. Reaves testimony; Kelly testimony.

213.    Mr. Reaves' "Personalized Program Plan" for 2018 continues to note that he was recommended the Computer Skills course and accepted to take it. Ex. 3, p. 3. To date, the course has not been offered to Mr. Reaves. Kelly testimony; Reaves testimony.

214.    A voice activated computer would allow Mr. Reaves to take the Computer Skills course, play chess, read books, take classes or correspondence courses, write to his family or counsel

without assistance from DOC staff or another prisoner, and do many other things on his own. Kelly testimony; Reaves testimony.

215.    The viability of voice activated computer at MCI-Shirley was investigated by defendant Collins at the request of another prisoner. Collins testimony. She determined that there was no security or other objection to providing one. *Id*. Nonetheless no such computer has been provided to Mr. Reaves. Ex. 42, pp. 106-107; Collins testimony; Kelly testimony; Reaves testimony.

216.    Even should Mr. Reaves be able to go to the Computer Skills course at the prison school by wheelchair with a companion, he would not be able to use the mouse or keyboard due to his disability. Kelly testimony. He would be a mere observer at the course without a voice activated computer. Kelly testimony; Morse testimony; Reaves testimony.

217.    DOC has not  has not offered Mr. Reaves any academic courses even though he completed the TABE testing to determine his proper educational placement. Collins testimony; Kelly testimony; Reaves testimony.  At MCI Shirley, DOC offers college level courses the Mr. Reaves qualifies for in conjunction with Mount Wachusett Community College.  Ex. 9.  No one from DOC has informed Mr. Reaves of this opportunity for classwork.  Reaves testimony.

218.    On two occasions DOC staff offered Mr. Reaves the Cognitive Skills program to be given in his cell. Collins testimony; Kelly testimony; Reaves testimony.

219.    The first section of the course was scheduled to be given in the morning of April 6, 2017 by Imam Ibrahim Aysu. Aysu testimony. Imam Aysu arrived at 1:15pm or later. *Id*. Mr. Reaves declined to participate in the class at that time because the hour long class would have meant that he would have missed his 2:00 p.m. bath. Reaves testimony. Without his

bath, Mr. Reaves feels "less than human." *Id*.  Mr. Reaves asked Imam Aysu to return at another time to do the class.  *Id*. The Imam did not return to offer the class another time.  Aysu testimony; Reaves testimony.

220.   Mr. Reaves refused a different section of the course offered to him on May 5, 2017 because he did not like the Chaplain who was to teach it. Kurtz testimony; Reaves testimony. He had a history of not speaking to the Chaplain. *Id*.

221.   Neither Imam Aysu nor Chaplain Kurtz discussed Mr. Reaves' refusal with his supervisor, sought advice from mental health staff, nor attempted to approach Mr. Reaves to offer the course to him again. Aysu testimony; Kurtz testimony. Neither was aware or had been advised of Mr. Reaves' traumatic brain injury. *Id*.

222.   The Cognitive Skills course is the only program DOC offers in the HSU- a prisoner can take one section every two months. Aysu testimony; Kelly testimony. A section takes between 1.5-2 hours. *Id*. There are a total of 7 sections. *Id*. In a single year the maximum study that Mr. Reaves could have received with the Cognitive Skills course is between 10-12 hours, or an average of about an hour of programming a month. *Id*.

223.   Nonetheless, on June 8, 2017, Mr. Reaves, by letter to defendants from his attorney, requested to take the Cognitive Skills course with Imam Aysu if it could be scheduled at 10:00 a.m. so as not to conflict with his meals or bath. Ex. 22, p. 4.

224.   Defendants have not offered Mr. Reaves the Cognitive Skills course again despite his request. Aysu testimony; Kelly testimony; Kurtz testimony.

225.   There are many volunteer programs, such as Alternative To Violence, the BEACON program, Music Theory, Path to Freedom, and Restorative Justice that Mr. Reaves could take in his cell on a one to one basis. Ex. 2, pp. 3-10, 34-40; Kelly testimony.

226.    Neither Defendant Kelly, nor her predecessor, John Morin, have ever tried to make arrangements with volunteer providers to give Mr. Reaves any programming in his cell. Ex. 42, p. 115; Kelly testimony.

227.    Although there are many vendor provided programs such as Violence Reduction that could be provided to Mr. Reaves in his cell, Defendant Kelly has made no effort to arrange such programming for Mr. Reaves. Kelly testimony.

228.    No consideration has been given by Defendants to explore the viability of providing a video system that would allow Mr. Reaves to take classes or programs offered to able-bodied prisoners at MCI Shirley through a video hook-up in his cell, even though a video system exists at MCI Shirley for court appearances. Kelly testimony.

229.    DOC has provided prisoners at MCI Shirley the opportunity to access services through tablets available for prisoners to purchase in the prison canteen and use at MCI Shirley. Ex. 8; Anderson testimony; Collins testimony, Kelly testimony.

230.    A person who buys a tablet can use to it watch movies, listen to music, play games (including chess, solitaire and word games), send and receive email outside the prison, read books, watch relaxation videos and check their canteen account. Ex. 8; Anderson testimony. DOC has never informed Mr. Reaves about or offered him the opportunity to purchase a tablet, or any device adapted for his disabilities so that he could access those services DOC provides through tablets. Collins testimony; Reaves testimony.

231.    DOC's Daily Activity Sheets demonstrate that no programming is offered to Mr. Reaves.  Ex. 35, generally.

232.    At the time of the injury that left Mr. Reaves quadriplegic in 1994, a CT Scan revealed that he had also suffered brain injury. Ex. 39, p. 1.

233.    In 1996, another CT Scan ordered because of mental status changes in Mr. Reaves, revealed bi-frontal brain atrophy. Ex. 39, p.2.

234.    The CT Scans indicate severe brain damage. Morse testimony. The predictable result is behavioral problems and loss of impulse control. *Id*.

235.    Defendants have not ordered CT scans of Mr. Reaves brain since 1996 to check for further brain deterioration. Ex. 13.

236.    Mental health clinicians at Lemuel Shattuck Hospital who have treated Mr. Reaves during his various stays report that he has suffered multiple traumatic brain injuries that limit his impulse control and ability to censor his speech. Ex. 18, pp. 3, 4, 6.

237.    Mr. Reaves notified Defendant Kelly that he suffered disability due to a brain injury by a written "Request For Accommodation" on December 5, 2017. Ex 4, p. 13. Defendant Collins was also aware that Mr. Reaves suffered from Traumatic Brain Injury. Collins testimony.

238.    Defendant Kelly has the authority to grant reasonable accommodations on her own initiative, even without a request from a prisoner. Kelly testimony.

239.    She did not investigate Mr. Reaves' notification of his brain injury. Kelly testimony. She did not consult medical or mental health personnel or in any way consider Mr. Reaves' need for accommodation for his brain injuries. *Id*. According to Defendant Collins, the DOC's Phase System does not take his TBI into consideration. Collins testimony.

240.    On January 29, 2016, Mr. Reaves, through his counsel, requested regular mental health treatment, several times a week, by MCI Shirley clinicians. Ex. 22, p. 3. However, no mental health treatment was offered or given until July 2016. Ex. 13.

241.    On July 22, 2016, Mr. Reaves again requested mental health several times a week in order to vent his anger and frustration. Ex. 13, pp. 1, 11. The defendants denied him the requested mental health treatment. *Id.*

242.    On August 26, 2016, an Initial Treatment Plan was created for Mr. Reaves by the MCI Shirley mental health director. Ex. 13, pp. 12-13. It provided for meeting with a primary care clinician only once or twice a month for psychoeducation and anger management techniques. *Id.* There is no recognition of Mr. Reaves' Traumatic Brain Injury in the diagnosis. *Id.*

243.    Mr. Reaves was almost never seen by his primary care clinician more than once a month, and was often seen less. In 2018 he was seen only six times by his primary care clinician. Ex. 13, pp. 14, 17, 28, 30-31, 37,39, 43-45, 54-55, 61-62, 65, 70, 106, 119, 129, 135, 137, 141, 143, 148.

244.    Often the primary care clinician sent a proxy to see Mr. Reaves. In 2018, half the PCC visits were by a proxy. Ex. 13, pp. 44, 65, 106, 119, 129.

245.    Often the primary care clinician visits occurred while Mr. Reaves was meeting with his CPO or watching television. Ex. 13, pp. 30-31, 39, 43, 45, 54-55, 62.  On two occasions, mental health staff recorded that Mr. Reaves gave them a "thumbs up," despite the fact that it is physically impossible for him to have done that.  Ex. 13, pp. 65, 86; Morse testimony; Reaves testimony.

246.    At times, mental health clinicians, including the primary care clinician, visited Mr. Reaves and spoke to him from the door of his cell (where he can't hear) with the door opened and also in the presence of correctional officers. Ex. 13, pp. 77, 82, 88, 90, 114, 119, 129, 135, 137, 141, 143, 148; Kelly testimony.  This occurred despite this Court's July 15, 2016 Order for no officers to be present during mental health treatment. Kelly testimony.

247.    Mr. Reaves did not engage with his primary care clinician. Ex. 13, pp. 36, 74, 146.

248.    Nonetheless, no significant changes were made to his Treatment Plan, nor was his

diagnosis amended to account for his Traumatic Brain Injury. Ex. 13 pp. 12-13, 34-36, 71-74,

145-146.

249.    No attempt appears to have been made by mental health clinicians to reason with Mr.

Reaves or to convince him to accept medical or mental health treatment other than to

discontinue hunger strikes. Ex. 13. According to Dr. Morse, when Mr. Reaves refuses

medical treatment, it may be due to his TBI. Morse testimony.

250.    During periodic visits to Lemuel Shattuck Hospital, Mr. Reaves received mental health

treatment on a regular basis, several times a week. Ex. 18, pp. 1-3; Reaves testimony. He

engaged with his clinician, Dr. McMackin regularly. Ex. 18, pp. 1-3. His sessions each lasted

for 30 minutes. *Id*. He shared his frustrations with his medical treatment with Dr. McMackin

and even discussed his relationship with his daughter. *Id*. The sessions are very helpful. *Id*;

Reaves testimony. They relieve his stress. *Id*.  The psychiatrist at Shattuck prescribed

Seroquel for Mr. Reaves and Mr. Reaves took a dose of it before discharge.  Ex. 18, p. 12- .

Despite that information being in the discharge report provided to MCI Shirley, no attempt

was made at MCI Shirley to continue the medication.  Angeles testimony, Reaves testimony.


251.    Mr. Reaves is not able to leave his cell except to go to the hospital. Reaves testimony. He

has been bedridden in isolation for almost twenty years. *Id*.

252.    DOC and Defendants Collins and Kelly have not provided Mr. Reaves with appropriate

accommodations that would allow him to go outdoors for recreation at MCI Shirley. Collins

testimony; Kelly testimony; Reaves testimony. As a result, Mr. Reaves has not been outdoors for recreation during his time at MCI Shirley. Reaves testimony.

253. DOC and Defendants Collins and Kelly have not provided Mr. Reaves with appropriate accommodations that would allow him to go to the recreation room in the HSU at MCI Shirley and socialize with other people. Kelly testimony; Reaves testimony. As a result, Mr. Reaves has not been to the recreation room during his time at MCI Shirley. Reaves testimony.

254. DOC and Defendants Collins and Kelly have not provided Mr. Reaves with appropriate accommodations that would allow him to attend programs or participate in educational opportunities at MCI Shirley. Collins testimony; Kelly testimony; Reaves testimony.

255. Mr. Reaves is subject to a phase system of punishment which is punitive and is imposed by the DOC. Collins testimony; Reaves testimony. Under the phase system, in response to alleged bad behavior, all of Mr. Reaves' property is removed, including his television, and he is denied access to the telephone and writing assistance. Ex. 39. Mr. Reaves is not capable of writing without assistance. Reaves testimony.

256. Defendant Collins has failed to implement a behavior management system that takes into account Mr. Reaves' medical and mental health condition. Collins testimony.

257. Denying Mr. Reaves' writing assistance as a punishment is inappropriate and should not happen. Collins testimony.

258. DOC staff sometimes order medical staff to stop providing care and leave Mr. Reaves' room. Reaves testimony. Medical staff have left abruptly in the middle of bathing Mr. Reaves, leaving him naked and wet on his bed without clothes or blankets. *Id*. Mr. Reaves is

not able to put clothes on or pull up his blankets. *Id*. He has to wait until the next shift starts

and someone comes in to assist him *Id*.

## CONCLUSIONS OF LAW

1.  The DOC cannot contract away its responsibility to provide for the prisoners in its custody

    adequate medical care that meets the standard of care in the community.

2.  The DOC retains significant involvement and control over the provision of medical care to its

    prisoner population. Proposed findings ¶¶ 14-52.

3.  Mr. Reaves' quadriplegia and related physical conditions are serious medical needs.

    Proposed finding ¶ 8.

4.  Mr. Reaves has suffered a marked decline in his physical condition since Dr. Morse last saw

    him in December 2015. Proposed finding ¶ 9.

5.  The care provided by the DOC, through its contract medical provider, is inadequate and does

    not meet the standard of care. Proposed findings ¶¶ 8-162.

6.  DOC's contractor has failed to follow the recommendations and orders of the SCI specialist,

    Dr. Stephanie Cho. Proposed findings ¶¶ 55-67, 96-97.

7.  Specifically, DOC's contractor has failed to have Mr. Reaves evaluated for tendon release

    surgery. Proposed findings ¶¶ 57-64. They have failed to have Mr. Reaves undergo a

    urodynamic study. Proposed findings ¶¶ 65-67. They have failed to provide Mr. Reaves the

    bed ordered by Dr. Cho to prevent pressure ulcers. Proposed findings ¶¶ 95-97.

8.  Mr. Reaves is suffering from severe malnutrition, and DOC's contractor has not provided a

    diet that he can eat. Proposed findings ¶¶ 72-78.

9.  DOC's contractor has continued to send medical staff members from whom Mr. Reaves will not accept care or meals to offer care and meals, in direct violation of the repeated recommendation of the monitor appointed by this Court. Proposed findings ¶¶ 151-57. This has contributed to Mr. Reaves' malnutrition.

10. DOC's contractor has failed to provide necessary range of motion care. Proposed findings ¶¶ 82-87. As a result, Mr. Reaves has suffered a marked decline in his physical condition, including loss of range of motion in his hips, knees, and hands. Proposed finding ¶ 9.

11. DOC's contractor has continued to offer Mr. Reaves' repositioning, despite the fact that he cannot be effectively repositioned and would likely develop pressure ulcers on his hips were he to accept repositioning. Proposed findings ¶¶ 92-93.

12. DOC's contractor has failed to provide any occupational therapy to Mr. Reaves at MCI Shirley. Proposed findings ¶¶ 68-71.

13. DOC's contractor has failed to adequately monitor and treat Mr. Reaves for Autonomic Dysreflexia, a life-threatening condition that creates a risk of stroke. Proposed findings ¶¶ 103-106. DOC's contractor fails to respond adequately to symptoms of Autonomic Dysreflexia, including Mr. Reaves' complaints of headaches, visual disturbances, nasal congestion, flushing, sweating above the level of the injury, and blood pressure elevated 20 points above baseline, and triggers for Autonomic Dysreflexia, including constipation, fecal impaction, a blocked catheter, ingrown toenails, infections. Proposed findings ¶¶ 103-105, 133.

14. DOC's contractor has written orders that inadequately monitor Mr. Reaves' blood pressure for Autonomic Dysreflexia. Proposed findings ¶¶ 134-38.

15. DOC's contractor inadequately monitors and treats Mr. Reaves' bowel movements and constipation, creating a serious risk of Autonomic Dysreflexia. Proposed findings ¶¶ 119-131.

16. DOC's contractor inadequately cares for Mr. Reaves' fingernails. No one offers to or does trim Mr. Reaves' fingernails, forcing him to chew the fingernails he is able to reach, and allowing the others to grow to dangerously long, impairing the integrity of the skin on Mr. Reaves' palms and putting him at risk for Autonomic Dysreflexia. Mr. Reaves' fingernails are consistently extremely long, often curling into a spiral, putting him in danger of Autonomic Dysreflexia. Proposed findings ¶¶ 107-18.

17. DOC's contractor provides inadequate hygiene care to Mr. Reaves. He is inadequately cared for, resulting in soiled beard, soiled bedding, and a fungal infection in his fingernail and toenails. Proposed findings ¶¶ 116-18, 160- 62.

18. DOC's contractor fails to adequately control the temperature in Mr. Reaves' cell, putting Mr. Reaves in danger of heat stroke. Proposed findings ¶¶ 146-50.

19. DOC's contractor has failed to provide Mr. Reaves a medically appropriate wheelchair that would allow him to leave his bed and his cell. Proposed findings ¶¶ 99-102.

20. Defendant ADC Collins had access to sufficient information to find that she knew of the failures of the DOC's contractor to provide adequate specialty consult appointments, and to follow the recommendations of the specialty consulting providers.  Proposed findings ¶¶ 36-48.

21. Defendant ADC Collins had notice of Mr. Reaves' complaints about inadequate medical care.  Proposed findings ¶¶ 49, 50.

22. Defendant ADC Collins did not take action to ensure that the DOC's contractor provided adequate care despite her knowledge of their failure to do so and the complaints by Mr. Reaves and on his behalf seeking adequate care.  Proposed findings ¶¶ 49-162.

23. Defendants have been and are deliberately indifferent to Mr. Reaves' serious medical needs. *Id*.

24. Mr. Reaves' disabilities, including his quadriplegia, hearing disability and Traumatic Brain Injury, entitle him to the protection of the ADA and the Rehabilitation Act. Proposed findings ¶¶ 5-8, 163- 167.

25. DOC staff knew of Mr. Reaves' disabilities and did not make reasonable accommodations for those disabilities.

26. DOC has not provided a meaningful accommodation to allow Mr. Reaves to go outdoors or out of his cell, because they have not provided him a medically appropriate way to do that.  Proposed findings ¶¶ 173-188.

27. DOC does not offer Mr. Reaves the opportunity to regularly socialize with other prisoners as an able-bodied prisoner at MCI Shirley can do.     Proposed findings ¶ 188.

28. DOC has not provided Mr. Reaves with access to the Captel telephone necessary to accommodate his severe hearing disability, despite the specialist having recommended it over three years ago and despite the fact that MCI Shirley currently has Captel telephones available to prisoners.  Proposed findings ¶¶ 189-204.

29. DOC has not offered Mr. Reaves a meaningful opportunity to engage in programming or education offered by DOC.  Proposed findings ¶¶ 205-231.

30. DOC staff on two occasions offered Mr. Reaves an hour of Cognitive Skills programming.  Mr. Reaves asked that the first program be offered at a different time so that

he could receive his bath and he refused to participate in the second program offer. Proposed findings ¶¶ 218-224.

31. DOC offers many other programs and classes to able-bodied prisoners at MCI Shirley.  Proposed findings ¶¶ 205-217.

32. DOC has not offered Mr. Reaves participation in the Computer Class, despite his requests to take it and despite the fact that his Personalized Program Plan requires it.  Proposed findings ¶¶ 209-216.

33. DOC has not offered Mr. Reaves participation in the Mount Wachusett Community College courses it provides at MCI Shirley, despite his requests for college courses and the TABE testing indicating his eligibility.  Proposed findings ¶¶ 207-209, 217.

34. DOC has refused to provide Mr. Reaves with a voice-activated computer or adaptive equipment comparable to the tablets it provides to prisoners at MCI Shirley to allow him to access the DOC provided services such as email, music, computer games.  Proposed findings ¶¶ 205-231.

35. DOC has refused to make any accommodations for Mr. Reaves' TBI, despite their knowledge that he suffers from it.  Proposed findings ¶¶ 232-250.

Conditions

36. Defendants Kelly and Collins deprived Mr. Reaves of the minimal civilized measure of life's necessities by failing to prevent his isolation, to offer him a medically acceptable manner of getting out of his cell and outdoors, to offer him reasonable accommodations to allow his participation in the programs, classes and services for which he is otherwise eligible despite his disability, to provide him with a nutritionally adequate diet and failing to provide him

with adequate hygiene and abandoning him while he is naked and unable to cover himself as a punishment.  Proposed findings ¶¶ 251-258.

37. Mr. Reaves has been harmed by Defendants' failures.  Proposed findings ¶¶ 9, 11, 72-78, 107-118, 146-150, 154-162,  173, 175, 186, 188, 204, 242, 246, 251-258.

38. DOC has refused to provide adequate care and conditions of confinement to Mr. Reaves.  They have repeatedly ignored specialists' recommendations, directives of the montior appointed in this case and Court Orders.  DOC must transfer Mr. Reaves out of prison custody and into a community medical facility that can provide constitutionally adequate care.

Respectfully submitted,

Plaintiff Timothy Reaves,
By his attorneys,

  /s/ Lauren Petit
Lauren Petit, BBO #640410
lpetit@plsma.org
  /s/ Becky Schapiro
Rebecca Schapiro, BBO #688781
bschapiro@plsma.org
  /s/ Peter Berkowitz
Peter Berkowitz, BBO #600879
pberkowitz@plsma.org

Prisoners' Legal Services of Massachusetts
10 Winthrop Square, 3d Floor
Boston, MA 02110
(617) 482-2773

Date: May 29, 2019

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

       */s/ Lauren Petit*

Lauren Petit