| | |
|---|---|
| TIMOTHY M. REAVES,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF CORRECTION, CAROL HIGGINS O'BRIEN, MICHAEL RODRIGUES, PAMELA MACEACHERN, STEPHANIE COLLINS, MHM CORRECTIONAL SERVICES, INC., MASSACHUSETTS PARTNERSHIP FOR CORRECTIONAL HEALTHCARE, GERALDINE SOMERS, LEIGH PARISEAU, JULIE IRELAND, KHALID KHAN, AND BONNIE DAMIGELLA,<br><br>Defendants. | CIVIL ACTION<br><br>NO. 4:15-40100-TSH |

# MEMORANDUM AND ORDER

### July 30, 2019

**HILLMAN, D.J.**

Timothy M. Reaves ("Mr. Reaves") is a 54-year-old quadriplegic inmate currently in the custody of the DOC. Since January 2016, he has been living in a single cell in the Health Services United ("HSU") at MCI Shirly. He suffers from significant complications of his quadriplegia, severe hearing loss, and traumatic brain injury.

Mr. Reaves was convicted of first-degree murder on a theory of joint venture. *See Commonwealth v. Reaves*, 434 Mass 383 (2001). Massachusetts does not recognize capital punishment, yet the Department of Corrections ("DOC") is, through its lack of treatment of his quadriplegia and its complications, slowly killing him. Before that happens, and for the reasons

stated below, he will be transferred to a facility better equipped and more amendable to care for his medical needs.

## Findings of Fact[1]

In 1994, Mr. Reaves was involved in a high-speed motor vehicle chase, during which he was a passenger in the back seat of a vehicle being pursued by the police. The chase occurred immediately after a drive-by shooting and ended when the vehicle crashed at a high rate of speed. Mr. Reaves suffered a spinal cord injury, which resulted in quadriplegia. Mr. Reaves's spinal cord injury is a "C6 ASIA B" injury. "ASIA" stands for "American Spinal Injury Association." "C6" refers to the injury's level in the spine. "B" classifies the injury as motor complete, meaning that Reaves cannot contract any muscles below the level of injury, but sensory incomplete, meaning that he has some preserved sensation.

In addition to the spinal cord injury, Mr. Reaves suffered a traumatic brain injury. Ex. 39, at 1. In 1996, a CT Scan revealed bi-frontal brain atrophy. Ex. 39, at 2. He has been diagnosed with a personality disorder and episodes of atypical depression. Ex. 18, at 8. He is also hearing-impaired. *Id.* These additional injuries have complicated his quadriplegia care and have significantly impacted his incarceration.

DOC contracts with a private company to provide medical care for the Commonwealth's inmates. The current medical provider is Wellpath. Defendant Stephanie Collins, DOC's Assistant Deputy Commissioner of Clinical Services, is responsible for overseeing the provision of medical services and monitoring the compliance of companies contracted to provide services.

---

[1] "In an action tried on the facts without a jury . . . the court must find the finds specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). The Court will state the facts insofar as they are necessary for its conclusions of law. *See Jordan v. Am. Eagle Fire Ins. Co.*, 169 F.2d 281, 291 n.38 (D.C. Cir. 1948) ("Special findings need not be made of facts not necessary to the determination." (citation omitted)). Because the Court finds that the ADA, Rehabilitation Act, and Conditions of Confinement claims are moot, it will not recite some of the facts that are most relevant to those claims.

Collins also has the authority to require staffing changes to meet evolving medical needs and penalize contractors for deficient performance. Dr. Maria Angeles is the Medical Director at MCI Shirly and Mr. Reaves' current treating physician. She has no specialized training in spinal cord injuries. *See* Ex. 33.

Collins testified that she has received correspondence from and on behalf of Mr. Reaves expressing concerns about his medical care. For instance, she received a letter from Mr. Reaves' counsel outlining the claims against her prior to this case being filed. Defendant Collins also received a copy of the Complaint and is aware of this Court's Preliminary Injunction issued on July 15, 2016 against the DOC. She also received the monthly reports from the monitor appointed by the Court as part of its Preliminary Injunction Order. *See Reaves v. Dep't of Correction*, 195 F. Supp. 3d 383, 427 (D. Mass. 2016). Finally, she received the monthly status reports submitted by the DOC's previous medical contractor.

On November 28, 2016, February 28, 2017, and April 12, 2018, the DOC and its contractor sent Mr. Reaves to Dr. Stephanie Cho at Spaulding Rehabilitation Hospital for specialty consultations related to his spinal cord injury.[2] Following the first appointment, Dr. Cho made several recommendations to improve Mr. Reaves care. *See* Ex. 19. She recommended that Mr. Reaves be referred to Massachusetts General Hospital ("MGH") to be evaluated for tendon release surgery, which would release the contractures in his knees and hips and allow him to sit upright. *Id.* at 2. The ability to sit would increase Mr. Reaves quality of life and possibly assist his bowel movements.[3] Dr. Cho also recommended that Mr. Reaves undergo a urodynamic study to evaluate

---

[2] Dr. Cho is a spinal cord injury specialist who was hired by the DOC to evaluate and treat Mr. Reaves.
[3] An evaluation for tendon release surgery was scheduled twice at MGH. In January 2017, Mr. Reaves had an appointment at MGH. He was transported to several places, but the evaluation never occurred. On January 18, 2018, Mr. Reaves had a second appointment scheduled but was ill and consequently could not attend the appointment.

his neurogenic bladder. *Id.* The DOC has not sent Mr. Reaves to have this study and has proffered no explanation why. Dr. Cho also recommended that Mr. Reaves have an evaluation with a gastroenterologist. *Id.* Mr. Reaves has not been evaluated by a gastroenterologist, again with no explanation.

Mr. Reaves is alarmingly malnourished. He has requested a diet that does not include red meat or pork (which he does not eat) and includes increased vegetables and fiber to address his nutritional deficiencies and mitigate his constipation. Dr. Cho has recommended three times that the fiber in Mr. Reaves' diet be increased, *see id.* at 2, 10, 15, yet the DOC has not changed Mr. Reaves diet. When Mr. Reaves receives red meat or pork, he does not eat it and foregoes the main source of protein for that meal. Mr. Reaves' treatment plan also includes range of motion therapy. *See, e.g.*, Ex. 10, at 2. However, Mr. Reaves does not receive regular range of motion care at MCI Shirly. While he has received occasional range of motion care, video footage shows that care is inadequate.

Reaves's counsel retained Leslie Morse, DO, a physiatrist who specializes in spinal cord injuries to examine Reaves and testify at trial as a spinal cord injury specialist. *See* Ex. 34. Dr. Morse is board certified in physical medicine and rehabilitation. She is currently the Department Chair and Professor of Rehabilitation Medicine at the University of Minnesota School of Medicine. *Id.* She sees spinal cord injury patients as a direct provider and in the course of her research. She has also supervised medical students and residents in the field of spinal cord injury and produced numerous publications on the topic. *Id.*

Dr. Morse testified that the current range of motion therapy includes too few repetitions and is done too quickly to be effective. Further, when the care is offered, it is at suspiciously inopportune times. For instance, Mr. Reaves testified that the DOC offered range of motion

4

therapy during his deposition and during a meeting with his attorneys. And sometimes when he accepts the therapy, it is not provided. Mr. Reaves feels less tight and stronger when he receives range of motion therapy; it positively impacts his contractures and could help preserve the remaining movement he has. Loss of that movement, especially the movement that enables Mr. Reaves to feed himself, would be catastrophic to his well-being.

Mr. Reaves currently has a pressure ulcer on his sacrum. This ulcer is caused by poor hygiene, inadequate nutritional intake, and inappropriate bedding. On November 28, 2016, Dr. Cho requested that the DOC provide Mr. Reaves with a Hill Rom bed with an airflow mattress and an overlay air mattress topper to prevent ulcers. Ex. 19, at 2. She has reiterated this recommendation after each of two later examinations, and the DOC has yet to provide the air mattress topper.

According to Dr. Morse, Mr. Reaves is also at significant risk for Autonomic Dysreflexia, a life-threatening condition that occurs in people with a spinal cord injury above T6. Autonomic Dysreflexia is caused by an irritant below the level of the spinal injury. For instance, it may be caused by constipation, fecal impaction, a blocked catheter, ingrown toenails or fingernails, infections, or other irritants. Dr. Morse testified that, while reviewing Mr. Reaves' medical records, she observed instances of blood pressure changes indicative of Autonomic Dysreflexia.[4] On one occasion, his blood pressure was 57 over 49, which, according to Dr. Morse, is "not compatible long-term with . . . life." Records indicate that Mr. Reaves has also complained of other symptoms of Autonomic Dysreflexia such as headache, visual disturbances, and sweating. It is Dr. Morse's opinion that staff at MCI Shirley do not respond appropriately to these symptoms. According to Mr. Reaves, when he reports symptoms such as lightheadedness, dizziness, or spots

---

[4] The diagnostic criteria for Autonomic Dysreflexia include a systolic blood pressure twenty points or more above the patient's baseline.

5

in his vision, medical staff does not do anything. Dr. Morse testified that these symptoms should be treated as a medical emergency.

Mr. Reaves' fingernails have not been cut since last year. According to Dr. Angeles, Mr. Reaves refuses to let certain staff members cut his nails. Dr. Angeles also testified, however, that Mr. Reaves does allow a podiatrist to cut his toenails. In addition, there is nothing in Mr. Reaves' treatment plan that indicates who should trim his nails or how often they should be cut. Mr. Reaves testified that he does not refuse to have his nails cut. His fingernails are currently so long that they curl into the palms of his hands and are causing skin breakdown. He has a fungal infection in one fingernail and several toenails.[5] The overgrown nails also increase Mr. Reaves' likelihood of developing Autonomic Dysreflexia. Dr. Angeles testified that she never noticed his fingernails were long.[6]

In addition to his overgrown nails, Mr. Reaves' overall hygiene is incredibly poor. His bedding is often soiled and covered in dead skin from his legs and feet. His hair and beard are caked with dead skin and food. According to Mr. Reaves, no one offers to brush his teeth or cut his fingernails and he cannot perform these actions himself.[7]

From January 27, 2019 to February 21, 2019, Mr. Reaves did not move his bowels. While Dr. Angeles indicated in her treatment plan that she must be notified if Mr. Reaves goes more than one day without a bowel movement, she is often unaware when Mr. Reaves goes several days without a bowel movement. Dr. Angeles met with Mr. Reaves four times between January 27, 2019 and February 21, 2019. *See* Ex. 16, at 33-34, 82-83, 123-24, 155-56. Nonetheless, she

---

[5] While Dr. Morse testified that fungal infections are common in toenails, she has never observed a fungal infection in a fingernail.
[6] Dr. Angeles also testified, however, that she was aware of this Court's preliminary injunction order almost three years ago where the Court noted Mr. Reaves overgrown nails. *See Reaves*, 195 F. Supp. 3d at 395.
[7] Dental hygiene is, however, part of Mr. Reaves' treatment plan. *See* Ex. 10, at 3.

testified that she was unaware that Mr. Reaves had gone twenty-six days without a bowel movement.[8]

Dr. Morse testified that Mr. Reaves' bowel program is inadequate. According to her, after several days without a bowel movement, treating physicians should order an x-ray, followed by magnesium citrate taken orally, and then another x-ray. This severe constipation puts Mr. Reaves at risk of developing Autonomic Dysreflexia. It also puts Mr. Reaves at risk of a bowel rupture, stroke, fistula, and can impact the function of other organs

On several occasions, DOC staff have ordered medical staff to leave Mr. Reaves' room while providing care. Consequently, staff has left Mr. Reaves while bathing him, leaving him naked and wet without clothes or blankets. Mr. Reaves cannot put on his clothes or pull up his blankets. Instead, he is forced to wait until the next shift starts before staff can assist him.

Mr. Reaves is a difficult patient. He admits that he often swears at staff. When he has an outburst, correctional officers often remove medical staff from Mr. Reaves' cell. Mr. Reaves testified that on several occasions, this has occurred during his bath. *See e.g.*, Ex. 21, at 1. Consequently, Mr. Reaves was left naked, wet, and without blankets until the next shift assisted him.[9] Mr. Reaves also regularly refuses care. *See generally* Ex. 35. Often, those refusals occur, when care is offered by certain staff members. For instance, Mr. Reaves does not accept care from RN Kayla Hall or CNA Coleen Johnson.[10] He has filed grievances informing Dr. Angeles that he

---

[8] This bout of constipations is also not anomalous. For instance, Mr. Reaves also went from November 21, 2018 to December 2, 2018 without a bowel movement. Again, despite meeting with Mr. Reaves on November 26, 2018, Dr. Angeles' treatment notes do not indicate any awareness of Mr. Reaves' severe constipation. From October 27, 2018 to November 10, 2018, Mr. Reaves did not have a bowel movement. Again, Dr. Angeles met with Mr. Reaves two times during this period but did not indicate she was aware of his constipation in her treatment notes.

[9] According to Mr. Reaves, on one occasion he had to wait from 3:00 p.m. when correctional officers removed medical staff until 11:00 p.m. when the next shift of medical staff assisted him.

[10] CNA Johnson alleges that on September 28, 2016, Mr. Reaves spit on her when she entered his cell to offer him lunch. Ex. 20, at 1. She has pending criminal charges against Mr. Reaves based on this incident.

will not accept care offered by those staff members.[11] The Court appointed monitor repeatedly recommended that CNA Johnson no longer offer care to Mr. Reaves. *See, e.g.*, Docket No. 225, at 2 ("Again, I reiterate that in the best interests of all parties involved, Ms. Johnson **should not** have any further contact with Mr. Reaves." (emphasis in original)). Defendant Collins testified that the DOC failed to comply with these recommendations despite knowing that they were akin to orders from this Court.

The monitor also recognized some of the deficiencies in Mr. Reaves noted above. For instance, on October 31, 2016, the monitor noted that "Mr. Reaves has still not been seen by a spinal cord case specialist since this Honorable Court's Order" and that "too much time has passed without this examination occurring. On numerous occasions, this Honorable Court has placed significant emphasis on this occurring, yet to date it has not." (Docket No. 113, at 2). On April 6, 2017, the monitor noted photographs "supportive of [the] allegation" that Mr. Reaves received "a lack of appropriate care." (Docket No. 155, at 2). The same day, the monitor noted that "Dr. Cho's recommendations are not followed as vigorously as might be expected given this Court's Order and impending trial." *Id.* Specifically, the monitor repeatedly reported that the DOC has still not provided an air mattress overlay recommended by Dr. Cho. *See* Docket No. 200, at 2; Docket No. 203, at 1; Docket No. 207, at 2; Docket No. 209, at 2; Docket No. 212, at 1; Docket No. 225, at 2. The Defendants contended that the overlay would interfere with the ability to effectively weigh Reaves, since the scale was in his bed. (Docket No. 207, at 2). However, the monitor seemed to question the sincerity of this rationale by observing that "it doesn't appear that Mr. Reaves is weighed on a regular basis." *Id.*

---

[11] In fact, of the 824 meals that Mr. Reaves refused, 405 of them were either explicitly offered by CNA Johnson or occurred during a shift where CNA Johnson offered him other care. Another 72 of the meals were either offered by RN Hall or were offered during a shift where she had offered him other care. Accordingly, it appears that most of the meals Mr. Reaves refused are likely linked to Johnson or Hall.

Before testifying at this trial, Dr. Morse again examined Mr. Reaves. She concluded that he presently suffers from severe complications of his injury. She also noted a marked decline in his condition since she last saw him in December 2015, which she attributes to a lack of proper medical attention.

### Rulings of Law

The purpose of injunctive relieve is to prevent future violations. *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928). "[T]he determination whether circumstances warrant injunctive relief lies in the discretion of the trial court, and the burden of persuasion lies with the moving party." *Lovell v. Brennan*, 728 F.2d 560, 563 (1st Cir. 1984) (citation omitted).

To issue a permanent injunction, the Court must find that: "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007); *see also Ciba-Geigy Corp. v. Bolar Pharmaceutical Co. Inc.*, 747 F.2d 844, 850 (3d Cir. 1984) ("In deciding whether a permanent in junction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof). If so, the court must then consider the appropriate remedy." (citation omitted)).

"All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur." *United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952). "[W]hile not necessary as a matter of law, a

showing of past violations may be crucial in practice to a suit for injunctive relief." *Lovell*, 728 F.2d at 563.

1. *Deliberate Indifference (Counts I)*

"Prisoners retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 563 U.S. 493, 510 (2011). The Eighth Amendment, which prohibits "cruel and unusual punishment," U.S. Const. amend. VIII, is the source of "the principles that govern the permissible conditions under which prisoners are held," including "the medical treatment those prisoners must be afforded." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014), *cert. denied sub nom. Kosilek v. O'Brien*, 135 S. Ct. 2059 (2015).

"To incarcerate, society takes from prisoners the means to provide for their own needs," rendering each inmate entirely dependent on the State for his or her medical care. *Brown*, 563 U.S. at 510. "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care." *Id.* at 510-11. "Undue suffering, unrelated to any legitimate penological purpose, is considered a form of punishment proscribed by the Eighth Amendment." *Kosilek*, 774 F.3d at 82 (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). A prison that deprives inmates of adequate medical care "is incompatible with the concept of human dignity and has no place in civilized society." *Brown*, 563 U.S. at 511.

Because the Eighth Amendment is focused on punishment, however, "not all shortages or failures in care exhibit the intent and harmfulness required to fall within its ambit." *Kosilek*, 774 F.3d at 82. Moreover, "[c]ourts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown*, 563 U.S. at 511. Nevertheless, courts "must not shrink from their obligation to 'enforce

the constitutional rights of all persons'" and "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Id.* (quoting *Cruz v. Beto,* 405 U.S. 319, 321 (1972)); *see also Brown*, 563 U.S. at 511, ("If government fails to fulfill this obligation, the courts have a responsibility to remedy the resulting Eighth Amendment violation.").

In order to prove an Eighth Amendment violation based on inadequate medical care, a prisoner must satisfy two elements: "(1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference to that need." *Kosilek*, 774 F.3d at 82; *see Estelle*, 429 U.S. at 106. When analyzing an Eighth Amendment claim, "the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination," and "similar evidence . . . may be relevant to both components." *Kosilek*, 774 F.3d at 83 n.7 (quoting *Leavitt v. Corr. Med. Servs., Inc.,* 645 F.3d 484, 498 (1st Cir. 2011)).[12]

---

[12] As I previously found, the DOC's duty to provide medical care to incarcerated individuals is not absolved by contracting with an independent medical provider. *Reaves*, 195 F. Supp. 3d at 408; *see also Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985). "Although [Well Path] has contracted to perform an obligation owed by the [DOC], the [DOC] itself remains liable for any constitutional deprivations caused by the policies or customs of [MPCH]." *Ancata*, 769 F.2d at 705. Therefore, the DOC's duty is non-delegable. *Id.*; *cf. West v. Atkins*, 487 U.S. 42, 56 (1988) (holding that private prison doctors working under contract act under color of state law for purposes of 42 U.S.C. § 1983 and stating, "[c]ontracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody").

Defendants argue that "[n]either the Commissioner nor ADC Collins had themselves provided any medical treatment to Reaves." (Docket No. 310, at 7). It follows, according to Defendants, that they cannot be held liable for Mr. Reaves' deficient treatment. As noted above, however, Defendant Collins is responsible for overseeing the provision of medical services and monitoring contract compliance with companies contracted to provide services. She has the authority to require staffing changes to meet evolving medical needs and penalize contractors for deficient performance. Because Mr. Reaves' claims do not arise from discrete medical judgments, but rather from longstanding, systemic deficiencies in his care, spanning multiple medical providers, which have been raised repeatedly with the DOC and its contractual providers, Defendants Collins is a proper defendants in Mr. Reaves's constitutional claims for deliberate indifference to serious medical needs. Because I find below that there is insufficient evidence to establish Defendant Mici's liability, I will not address whether her responsibilities as Commissioner may similarly establish liability for systemic deficient care.

*a. Objective Prong: "Serious Medical Need"*

To satisfy the objective prong of the deliberate-indifference inquiry, a prisoner must have a serious medical need and must show that the medical care provided by the prison "is not 'adequate,' as measured against 'prudent professional standards.'" *Nunes v. Massachusetts Dep't of Correction*, 766 F.3d 136, 142 (1st Cir. 2014) (quoting *United States v. DeCologero,* 821 F.2d 39, 43 (1st Cir. 1987)). A serious medical need is "one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Kosilek*, 774 F.3d at 82 (citation omitted). There is no question that Mr. Reaves has serious medical needs stemming from his spinal cord injury.

The Eighth Amendment does not impose upon the Defendants "a duty to provide care that is ideal, or of [Reaves's] choosing." *Id.*; *see also Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015) ("[A] serious medical need does not require that an inmate receive the best possible treatment that money can buy." (quotation marks and citation omitted)). Rather, Defendants must provide medical services that are "on a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards." *United States v. Derbes,* 369 F.3d 579, 583 (1st Cir. 2004) (quoting *DeCologero*, 821 F.2d at 43). "[I]t's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003). Accordingly, "an Eighth Amendment claim may be based on a defendant's conduct in exposing an inmate to an unreasonable risk of future harm." *Id.* at 188; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) (holding that correctional officials may not ignore medical conditions that are "very likely to cause

serious illness and needless suffering" in the future, and that such prospective harm may form the basis of an Eighth Amendment claim, even where the inmate has "no serious current symptoms"); *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 501 (1st Cir. 2011).

Dr. Morse testified that treating serious spinal cord injuries like Mr. Reaves' requires specialized training. Further, she testified that almost every organ system is impacted, and these secondary conditions and complications require specialized training as well. Specifically, complications commonly arise from skin breakdown, loss of function due to contractures, osteoporosis, neurogenic bowel and bladder, and all require specialized training to treat appropriately. Not only is Mr. Reaves not receiving specialized care for these complications, the care that he is receiving can be charitably characterized as negligent. For instance, Mr. Reaves went over ten days without a bowel movement on three different occasions without Dr. Angeles knowing, his hygiene (which is critical) is appalling, and his diet is non-responsive to his nutritional and digestive needs.

Dr. Morse stressed that Mr. Reaves is severely malnourished, his nails are curling into his palms and causing skin breakdown, he has fungal infections in his fingers and toes, a pressure ulcer on his sacrum, and venous stasis ulcers on both of his legs. Further, when Dr. Morse examined Mr. Reaves, his bedding was soiled and there was bloody drainage from his sacral wound.

If his sacral wound progresses, Mr. Reaves will be prone to infection. According to Dr. Morse, the most effective treatment for his sacral ulcer would be to maximize hygiene, improve his nutritional intake, and comply with Dr. Cho's recommendations. The DOC, however, has not complied with any of Dr. Cho's recommendations. The DOC has failed to rectify Mr. Reaves' inadequate bedding, increase the fiber in his diet, send him for a urodynamic study, or an

evaluation with a gastroenterologist. And while the DOC claims to provide Mr. Reaves with Range of Motion therapy, as noted above, video footage demonstrates this therapy is deficient.

Significantly, Mr. Reaves' caretakers do not respond appropriately to symptoms of Autonomic Dysreflexia, nor do they evidence an appreciation of its seriousness. Dr. Morse observed several instances of blood pressure changes indicative of Autonomic Dysreflexia. Further, Mr. Reaves has complained of other symptoms of Autonomic Dysreflexia such as headache, visual disturbances, or sweating. According to Dr. Morse, staff at MCI Shirley did not respond appropriately to these symptoms. According to Mr. Reaves, when he reports symptoms such as lightheadedness, dizziness, or spots in his vision, medical staff does not do anything. Dr. Morse testified that these symptoms should be treated as a medical emergency.

Mr. Reaves is presently suffering from the consequences of deficient medical care. His emaciated frame, coiled nails, caked beard, and raw wounds make this finding inescapable. Moreover, the DOC is putting Mr. Reaves at grave risk of catastrophic future harm.

b. *Subjective Prong: "Wanton Disregard"*

"The subjective prong relies entirely on whether the [the defendant] had a purposeful intent while neglecting [the plaintiff's] treatment." *Perry*, 782 F.3d at 79; *see also Estelle*, 429 U.S. at 105. "[E]ven if medical care is so inadequate as to satisfy the objective prong, the Eighth Amendment is not violated unless prison administrators also exhibit deliberate indifference to the prisoner's needs." *Kosilek*, 774 F.3d at 83 (citing *Estelle,* 429 U.S. at 105-06). To be deliberately indifferent, a defendant typically must have had "actual or constructive knowledge" of a "grave risk of harm" and failed to take "easily available measures to address the risk." *Camilo–Robles v. Hoyos*, 151 F.3d 1, 6-7 (1st Cir. 1998); *see also Kosilek*, 774 F.3d at 83 ("[D]eliberate indifference 'defines a narrow band of conduct' . . . and requires evidence that the failure in treatment was

14

purposeful." (quoting *Feeney v. Corr. Med. Servs. Inc.,* 464 F.3d 158, 162 (1st Cir. 2006)). "The typical example of a case of deliberate indifference would be one in which treatment is denied in order to punish the inmate." *Perry*, 782 F.3d at 79 (quotation marks and citation omitted).

Deliberate indifference may also be demonstrated, however, "by a 'wanton disregard' to a prisoner's needs." *Kosilek*, 774 F.3d at 83 (quoting *Battista v. Clarke,* 645 F.3d 449, 453 (1st Cir. 2011)). That disregard "must be akin to criminal recklessness, requiring consciousness of 'impending harm, easily preventable.'" *Id.* (quoting *Watson v. Caton,* 984 F.2d 537, 540 (1st Cir. 1993)). A prisoner can show wanton disregard by presenting evidence of "denial, delay, or interference with prescribed health care." *Battista*, 645 F.3d at 453 (quoting *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir. 1991)).[13]

Defendant Collins has actual knowledge of Mr. Reaves' condition and the complaints relating to his care. She received several letters from, and on behalf of Mr. Reaves expressing concerns about his medical care. *See* Ex. 22. One letter was sent before this case was filed and outlined claims against Defendant Collins. Another dated January 29, 2016, attached Dr. Morse's 2014 report concerning Mr. Reaves' declining health and deficient care. *See id.* at 3. Defendant Collins also received a copy of the Complaint and is aware of this Court's lengthy and detailed Preliminary Injunction against the DOC. Thus, she was aware that Dr. Morse believed that a spinal cord injury specialist was "an absolutely critical component of Mr. Reaves' care" in order "to avoid premature death." *Reaves*, 195 F. Supp. 3d at 396. Further, Defendant Collins was aware of this Court's conclusion that Mr. Reaves was likely to succeed on his deliberate indifference claim and that "[w]ithout significant changes to his care, his condition will continue to deteriorate." *Id.*

---

[13] The First Circuit has also made clear that "the subjective deliberate indifference inquiry may overlap with the objective serious medical need determination" and that "similar evidence . . . may be relevant to both components." *Leavitt*, 645 F.3d at 498 (1st Cir. 2011) (internal quotation marks and brackets omitted); *see also DesRosiers v. Moran*, 949 F.2d 15, 18-19 (1st Cir. 1991).

at 416-17. In addition, Defendant Collins oversees the provision of medical services and monitors contract compliance with companies contracted to provide services. She received monthly status reports submitted by the DOC's previous medical contractor regarding Mr. Reaves' care and had the authority to require staffing changes to meet his evolving medical needs and penalize contractors for deficient care.[14]

Defendant Collins also received a copy of each of Dr. Cho's reports and their attendant recommendations for changes in Mr. Reaves care. Therefore, Defendant Collins was aware that Dr. Cho repeatedly recommended that the fiber in Mr. Reaves' diet be increased, that he be evaluated by a gastroenterologist, that he undergoes a urodynamic study, and that he be provided a mattress topper to mitigate the risk of potentially fatal ulcers. When asked if she carries out the recommendations of outside experts, Defendant Collins responded: "Not all the time." In the case of Mr. Reaves, the more accurate answer is "never."

I find that Defendant Collins was clearly aware of facts from which she could infer the substantial risk of serious harm to Mr. Reaves. As that inference is nearly inescapable, I also find that Defendant Collins made that inference. *See Farmer*, 511 U.S. at 837. And despite making that small inferential leap, she failed to ensure that Mr. Reaves received adequate medical care.

*c. Appropriate Remedy*

---

[14] No evidence was presented, however, that links Defendant Mici to the constitutionally deficient care. For instance, no evidence suggests that Defendant Mici supervised anyone, formulated any policies, or had the power to alleviate Mr. Reaves' suffering. *See Williams v. Hager*, 2011 WL 883989, at *2 (D. Mass. 2011) (dismissing claim against DOC Commissioner for deliberate indifference where no evidence suggested an affirmative link between his actions or omissions and the constitutional violation); *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 582 (1st Cir. 1994). In short, there is no "affirmative link" to establish that Defendant Mici's "conduct led inexorably to the constitutional violation." *Hegarty v. Somerset County*, 53 F.3d 1367, 1380 (1st Cir. 1995); *see also Ancata*, 769 F.2d at 706 ("If plaintiff can establish, as she alleged, that the sheriff was personally involved in the acts depriving Anthony Ancata of his constitutional rights, or that he breached a duty imposed by state law and that breach caused the plaintiff's injury, then he would be fully responsible for his own actions and/or policies.").

Typically, "[t]he federal courts will not interfere in the internal operation and administration of a prison unless its authorities have abused their discretion resulting in mistreatment of the prisoner-applicant." *Haggerty v. Wainwright*, 427 F.2d 1137, 1138 (5th Cir. 1970). Where courts do find a constitutional violation, however, they have "broad discretion to frame equitable remedies so long as the relief granted is commensurate with the scope of the constitutional infraction." *Todaro v. Ward*, 565 F.2d 48, 54 n.7 (2d Cir. 1977); *see also Milliken v. Bradley*, 433 U.S. 267, 280 (1977).

As noted above, on July 15, 2016, this Court issued a preliminary injunction against the DOC mandating several changes in Mr. Reaves' care and appointing a monitor to oversee the implementation of the injunction and the care of Mr. Reaves. *See Reaves*, 195 F. Supp. 3d 383. In that order, because of the deficient care the DOC was providing Mr. Reaves at the time, the Court found that Mr. Reaves was likely to succeed on the merits of his deliberate indifference claim. *Id.* at 416. Almost three years later, Mr. Reaves' condition has further deteriorated, and it is obvious that the DOC is unwilling to provide appropriate care for him.

District courts have used their broad equitable powers to order the transfer of inmates to facilities better equipped to provide for their medical needs. *See, e.g.*, *Johnson v. Harris*, 479 F. Supp. 333 (S.D.N.Y. 1979) (ordering prison to either transfer inmate to facility equipped to provide for his medical needs or, if such a facility is not available, insure he is provided with adequate care as a result of deliberate indifference to inmate's serious medical needs by continually ignoring special diet requirements for inmate with serious diabetic condition); *United States v. Wallen*, 177 F. Supp. 2d 455, 458 (D. Md. 2001) (ordering a pretrial detainee to be transferred to an infirmary or a hospital where "the Marshal's Service cannot assure this Court that it will provide the medical care that the Constitution mandates so long as he is held at MCAC"); *see also* ABA Standards for

Criminal Justice, 23-6.2 (3d ed. 2011) ("A prisoner who requires care not available in the correctional facility should be transferred to a hospital or other appropriate place for care.").

Here, MCI Shirley is neither able nor willing to provide for Mr. Reaves' medical needs. His treating physician, Dr. Angeles, has no training in spinal cord injuries and the record is replete with consistent deficiencies in Mr. Reaves' care. Further, beyond the lack of appropriate expertise, Defendant Collins has demonstrated a woeful disregard for Mr. Reaves' well-being by repeatedly refusing to implement the recommendations of specialists. As a result, Mr. Reaves' condition has needlessly and significantly declined to the point that he may soon die.

Accordingly, the appropriate remedy is for Mr. Reaves to be transferred to a non-DOC facility where he will be treated by a physician with the training to care for his substantial and numerous medical needs.

*2. ADA and Rehabilitation Act (Counts III & IV)*

Transfer of Mr. Reaves from MCI Shirley moots his claims pursuant to Title II of the ADA and the Rehabilitation Act for a permanent injunction against the transferring facility. *See Ford v. Bender*, 768 F.3d 15, 29 (1st Cir. 2014) ("A prisoner's challenge to prison conditions or policies is generally rendered moot by his transfer or release."); *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) ("[A] transfer from a prison facility moots an action for injunctive relief against the transferring facility."). Further, the Court does not find that that there is "a reasonable expectation that the same complaining party [will] be subject to the same action again." *Murphy*, 455 U.S. at 482, 102 S.Ct. 1181; *see also Washington v. Harper*, 494 U.S. 210, 219, 110 S.Ct. 1028 (1990) (holding that prisoner's claims were not moot despite transfer to a non-offending facility because "[t]he alleged injury would likely recur").

**Order**

For the reasons stated above, Mr. Reaves shall be immediately transferred to a non-DOC facility that treats spinal cord injuries and has a spinal cord injury specialist on staff with the appropriate training to care for his medical needs.

**SO ORDERED.**

/s/ *Timothy S. Hillman*
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**