

PLS

PRISONERS' LEGAL SERVICES OF MASSACHUSETTS

50 Federal Street, 4th Floor • Boston, MA 02110
www.plsma.org
fb.me/prisonerslegalservices
@PLSMA
Main: 617-482-2773
Fax: 617-451-6383
State prisoner speed dial: 9004 or 9005 • County prisoner collect calls: 617-482-4124

AFFIDAVIT OF LAUREN PETIT, ESQ.

I, Lauren Petit, do hereby swear and depose:

1. I am co-counsel for Mr. Reaves.
2. My office filed a petition for medical parole on behalf of Mr. Reaves on June 28, 2018, on the basis of his permanent physical incapacity due to quadriplegia. The parole plan proposed in the petition was for Mr. Reaves to be placed at Tewksbury Hospital. Subsequently, it was determined that Mr. Reaves could not go to Tewksbury Hospital, requiring creation of a new parole plan.
3. At the time of the petition, and until the Supreme Judicial Court's January 28, 2020 decision in *Buckman v. Commissioner*, DOC required the petitioner to create his own medical parole plan. Accordingly, it is Plaintiff's understanding that DOC took no steps to find any placement for Mr. Reaves, at least until this Court's Order of July 31, 2019.
4. DOC's position meant that the petition could not be allowed without Mr. Reaves submitting a finalized parole plan, which Plaintiff was still working on. The Commissioner is required to issue a written decision on a petition within 45 days of receiving it. In order to avoid a denial of the petition by default, and after the Commissioner refused to issue a conditional grant of parole, Plaintiff stayed his petition on August 8, 2018, after it had been with the Commissioner's office for 36 days. The Commissioner has made at least two conditional grants of medical parole to other prisoners since that time. Plaintiff lifted the stay on his

petition in writing on January 16, 2020, simultaneous to submitting the information about his current parole plan. Nine days after that, on January 25, the Commissioner's decision was due under the statutory deadline.

5. Plaintiff continued to try to create a viable parole plan, mainly focusing on a nursing facility in Western Massachusetts and iCare, a company that runs several nursing facilities in Connecticut. ICare facilities routinely accept patients who have recently left prison or jail in Connecticut. Plaintiff has been in regular communication with various administrators in iCare, including Chief Operating Officer Mike Landi, to facilitate their consideration of Mr. Reaves as a patient. ICare staff met with Mr. Reaves, reviewed current Shattuck Hospital records, Spaulding Hospital records and records from MCI Shirley and spoke to Shattuck providers about Mr. Reaves' care.

6. The Shattuck records reviewed by iCare reflected that Mr. Reaves regularly ate the vegetarian meals provided to him, consistently participated in physical therapy, psychiatry appointments and bathing.

7. ICare recommended three of their facilities as best suited to care for Mr. Reaves. Of the three, Plaintiff focused on Fresh River Healthcare in East Winsor, because there was some hope that Massachusetts Medicaid could cover Mr. Reaves' initial time there prior to his being accepted to Connecticut Medicaid.

8. Fresh River offers 24 hour nursing, nutrition care, physical, occupational and recreational therapy, wound care and psychiatry. They are committed to ensuring Mr. Reaves' access to the outdoors and to obtaining any necessary equipment to care for him.

9. ICare has a staff physiatrist who works in each of their ten facilities. He is Board certified in physical medicine and rehabilitation, though not in spinal cord injury care.

10. I have reached out to Gaylord Specialty Care, a hospital nearby that specializes in spinal cord injury care, to set up acceptance of Mr. Reaves as an outpatient for spinal cord injury specialty care there. Dr. Leslie Morse, Plaintiff's consulting expert, is familiar with the outpatient director and connected us for this purpose. She is confident that this arrangement would adequately provide for Mr. Reaves' spinal cord injury care needs.
11. The nursing facility has stated its willingness to work with Gaylord to ensure that facility staff are trained to provide appropriate care for Mr. Reaves' needs; indeed they have worked in concert with Gaylord on other patients and the iCare physiatrist was previously employed at Gaylord.
12. Mr. Reaves initially had reservations about this parole plan. Counsel arranged for Mr. Reaves to regularly meet with Dr. Robert McMackin, a Shattuck psychologist who has worked with Mr. Reaves for decades, to assist Mr. Reaves in making a reasoned decision. Counsel also suggested that Mr. Reaves discuss the matter with family, however he has been frustrated in this effort because as of late February, DOC had not provided him with a Cap-Tel phone that he could effectively use to hear his family members. However the meetings with Dr. McMackin have been helpful and on February 25, Dr. McMackin and I met together with Mr. Reaves and he agreed that this parole plan should move forward.
13. Stephanie Collins has stated that after the Court's Order, DOC directed their medical contractor to try to find placement for Mr. Reaves. It is my understanding that that effort has been coordinated by Christina Devincent, a Wellpath employee who had never met Mr. Reaves until she came to his cell on October 4, 2019, the day that iCare staff were there to meet with him. Further, I understand that her attempts to place Mr. Reaves have consisted of

sending a "Patient Profile Summary" created from Wellpath's medical records system to each of the facilities. This summary is replete with indications of refusals of care.

14. Mr. Reaves agreed that DOC could apply for Medicaid on his behalf in order to pay for the hospital care he has received at Shattuck over the past several years. He has similarly agreed to apply for Medicaid coverage promptly upon residing in Connecticut, including the need to place the money awarded to him in settlement of his claims for inadequate care against the previous DOC medical provider into a special needs trust.
15. I have conferred with outside counsel who specializes in the creation of special needs trusts. He advises that the trust must be a "payback" trust which will require that upon Mr. Reaves' passing any remaining money must be used to pay back public insurance for care received. That will prevent Mr. Reaves from leaving any of the settlement funds to his daughter in a will. The funds also severely restrict Mr. Reaves' ability to gift any money to his daughter or sisters during his life. Finally, that counsel has advised that the trust should not be created until it is determined what state Mr. Reaves will live in.
16. DOC counsel has informed Plaintiff that the Medicaid application cannot be submitted until he actually resides in Connecticut. DOC provided me with the application and I have completed all portions which can be completed at this point.

Signed under the pains and penalties of perjury, this 9th day of March, 2020

*/s/Lauren Petit*

Lauren Petit, Esq.