1                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
2

3

4     Timothy M. Reaves,              )
                       Plaintiff,     )
5                                     )
                                      )
6     vs.                             )    Case No. 15cv40100-TSH
                                      )
7                                     )
      Department of Correction,       )
8     et al.,                         )
                       Defendants.    )
9


10

      BEFORE:  The Honorable Timothy S. Hillman
11

12

                       Remote Continued Motion Hearing
13

14

15

                                 United States District Court
16                               Courtroom No. 2
                                 595 Main Street
17                               Worcester, Massachusetts
                                 April 15, 2020
18

19

20

21

22
                         Marianne Kusa-Ryll, RDR, CRR
23                          Official Court Reporter
                         United States District Court
24                        595 Main Street, Room 514A
                           Worcester, MA 01608-2093
25                      508-929-3399 justicehill@aol.com
                     Mechanical Steno - Transcript by Computer

```
 1     APPEARANCES:

 2     Prisoners' Legal Services
       Lauren Petit, Esquire
 3     10 Winthrop Square
       Boston, Massachusetts 02110
 4     on behalf of the Plaintiff

 5     Department of Corrections
       Edward J. O'Donnell, Esquire
 6     Bridgewater State Hospital
       20 Administration Road
 7     Bridgewater, Massachusetts 02324
       on behalf of the Defendants Department of Correction,
 8     Carol Higgins O'Brien, Michael Rodrigues, Pamela MacEachern,
       and Stephanie Collins
 9
       Department of Corrections
10     Margaret S. Melville, Esquire
       Legal Division
11     70 Franklin Street, Suite 600
       Boston, Massachusetts 02110
12     on behalf of the Defendants Department of Correction,
       Carol Higgins O'Brien, Michael Rodrigues, Pamela MacEachern,
13     and Stephanie Collins

14

15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Carol Mici (By Ms. Petit) | 6 | | | |

E X H I B I T S

No.          Description                                    Page

7          August 8, 2018, White-Petit email exchange.       14

1                   P R O C E E D I N G S

2         THE CLERK:  Okay.  Case No. 15-40100, Reaves versus

3    the Department of Corrections.

4         Counsel, please note your appearance for the record.

5         MS. PETIT:  Lauren Petit for the plaintiff, Timothy

6    Reaves.

7         THE COURT:  Good morning, Ms. Petit.

8         MS. PETIT:  Good morning.

9         MR. O'DONNELL:  Good morning, your Honor.  Ted

10   O'Donnell for the Department of Correction.

11        THE COURT:  Good morning, Mr. O'Donnell.

12        Mr. Castles, would you swear in the commissioner,

13   please.

14        THE CLERK:  Please raise your right hand.

15        Do you solemnly swear the testimony you are about to

16   give this Court will be the truth, the whole truth, and nothing

17   but the truth so help you God?

18        THE WITNESS:  I do.

19        THE CLERK:  Please state your name and spell your last

20   name for the record.

21        THE WITNESS:  Carol Mici, M-I-C-I.

22        THE COURT:  Good morning, Commissioner, and thank you

23   for appearing via video.

24        Ms. Petit, you may inquire.

25                        DIRECT EXAMINATION

1  BY MS. PETIT:

2  Q.   Good morning, Commissioner Mici.

3  A.   Good morning.

4  Q.   You are aware of this Court's July 31, 2019, order that

5  DOC must immediately transfer Mr. Reaves to a noncorrectional

6  facility; is that right?

7  A.   Correct.

8  Q.   And is it fair to say that you were aware of that order

9  when it was first issued?

10  A.   Yes.

11  Q.   And did you understand that order to require you as the

12  commissioner to do anything?

13  A.   I was not the commissioner at the time of the order, but

14  since then, yes.  The order was July of 2019, I believe.

15  Q.   Right.

16  A.   Oh, I was the commissioner.  My apologies.  All the days

17  are blending together.

18  Q.   Okay.  And what -- what is your understanding of what that

19  order requires you as the commissioner to do?

20  A.   That the staff within the Department in working with

21  parole would work with any entity on the outside to try to

22  secure a placement for Mr. Reaves.

23  Q.   And what actions did you take in response to the order?

24  A.   Just what I stated, that the staff that work for me needed

25  to actively search.  That includes Wellpath, DOC, and parole,

1   if applicable at the time, to search for a placement that his

2   medical needs could be met.

3   Q.   So just to clarify, what I'm understanding you to say is

4   that you in response to the order you delegated that

5   responsibility to certain staff who you supervise?

6   A.   Correct.

7   Q.   Okay.  We've previously stipulated that DOC moved

8   Mr. Reaves to the Shattuck Hospital correctional wing on

9   August 3rd.

10          Would you agree that that move does not fully comply

11   with the order?

12   A.   Correct.  It's -- it's still a Department of Correction

13   unit or ward.

14   Q.   Okay.  And there's also no spinal cord injury specialist

15   there; is that right?

16   A.   To my knowledge, there is not.

17   Q.   Mr. Reaves accepts care more readily at Shattuck Hospital

18   than he did at Shirley; is that right?

19   A.   I -- I -- I would not know the answer to that today.

20   Q.   Okay.  You've never inquired how -- how things were going

21   with Mr. Reaves at Shattuck in terms of his care?

22   A.   So personally, I have not, but, yes, my staff have.

23   Q.   And have they reported to you?

24   A.   That he is at the Shattuck and doing okay, yes.  But I

25   don't have -- I don't -- I couldn't tell you any particulars

1  about his everyday care.

2  Q.   Okay.  Have you ever spoken directly with Christina

3  Devincent of Wellpath about finding placement for Mr. Reaves?

4  A.   I personally have not spoken to her.

5  Q.   Did you in any way convey to Ms. Devincent through, you

6  know, correspondence or through another person how -- how she

7  needed to -- to present Mr. Reaves in order to be able to

8  secure placement?

9  A.   So I've had a couple of conference calls over the past few

10  months that I know that Wellpath was involved with, and it has

11  been discussed that we need to take every step possible to try

12  to secure placement; but generally, the deputy commissioner

13  that works for me and the assistant deputy commissioner that

14  oversee clinical services handle that area and report to me as

15  necessary.

16  Q.   And those deputies would be Deputy Hallett and Deputy

17  Sullivan; is that right?

18  A.   Those are the assistant deputy commissioners, correct, and

19  then also Assistant Deputy Commissioner Jenn Gaffney.

20  Q.   I see.  Did you at any point convey to anyone regarding

21  finding placement for Mr. Reaves that his traumatic brain

22  injury should be highlighted?

23  A.   So his specific medical needs, everything needs to be

24  highlighted.  He has to go to a place that they can handle all

25  of his medical care.

1    Did I specifically talk about specific diagnoses, no,

2    I didn't.  I -- I personally have not.

3    Q.   Did you ever request to see the information packet that

4    Ms. Devincent was distributing to potential placements to get a

5    sense for how they represented Mr. Reaves and his needs?

6    A.   Yes.

7    Q.   And when did you review that packet?

8    A.   That was, I believe, it was part of a conference call.

9    The date, I do not know, but I did see -- I did see a copy of

10   what was being presented to the outside entities.

11   Q.   And hopefully you were provided with the exhibits that

12   were entered by agreement in the previous hearing, what was

13   marked as Exhibit 2, which is a patient profile summary.

14        Do you have that?

15   A.   I believe I do.  Exhibit 2, I do, yes.

16   Q.   Okay.  Is this what the packet was that you reviewed?

17   A.   It looks to be the same packet, yes.

18   Q.   Okay.  And this packet is medical records from when

19   Mr. Reaves was at MCI-Shirley, correct?

20   A.   Yes, that's the address on it, correct.

21   Q.   And at some point the medical records from MCI-Shirley

22   became stale and were no longer up-to-date, wouldn't that be

23   right?

24   A.   I mean I think they're important, but certainly as things

25   progressed and you need to add, you need to add to the medical

1    record as well --

2    Q.   And --

3    A.   -- to keep them up-to-date.

4    Q.   And is it your understanding that records from Shattuck

5    would indicate much greater compliance by Mr. Reaves with his

6    care than the records from Shirley?

7    A.   I would need to see the records from the Shattuck so I

8    couldn't answer that fully.  I -- I have not seen those

9    records.

10   Q.   This Court also denied defendant's motion requesting a

11   stay of the Court's July 31st order for the transfer; is that

12   right?

13   A.   Can you repeat that, please.  When did that occur?

14   Q.   Well, on September 19th of 2019, were you aware that this

15   Court denied defendant's motion to stay its order requiring the

16   transfer of Mr. Reaves?

17   A.   Yes.

18   Q.   And did you take any specific action in response to that

19   denial of the stay?

20   A.   Yes, I -- you know, again, dates and times I'm not sure,

21   but certainly there has been correspondence throughout this

22   process as to what -- what our next steps can be.

23   Q.   And what were some of the next steps that were suggested?

24   A.   We had to continue to seek for placement on the

25   outside -- I mean, we had to continue our search.

1    Q.   Did you ever communicate directly with the head of the

2    Department of Public Health, agency head to agency head, to

3    explain to them the DOC's need to comply with this order and

4    request that they accept Mr. Reaves as a patient?

5    A.   So I did not, but my deputy commissioner did.  To her

6    counterpart.

7    Q.   Which deputy commissioner?

8    A.   That would be Jenn Gaffney.

9    Q.   And did either you or Deputy Gaffney or any other DOC

10   staff person discuss with the Department of Public Health the

11   statutory provision in General Laws Chapter 127 Section 151 and

12   whether that statute requires DPH to accept medical parolee at

13   Tewksbury Hospital?

14            MR. O'DONNELL:  Objection.

15            THE WITNESS:  I would not know the -- I don't know

16   what specifics if -- if, you know, Mass. General Laws were

17   quoted, but I know that --

18            MR. O'DONNELL:  Objection.

19            THE COURT:  Sustained.

20   BY MS. PETIT:

21   Q.   So one way for the DOC to comply with the Court's order

22   was to grant Mr. Reaves's petition for medical parole to an

23   outside facility; is that right?

24   A.   Yes.

25   Q.   And the DOC also had the ability to transfer Mr. Reaves to

1    a non-DOC hospital in Massachusetts for treatment, as they do

2    with other patients who require treatment that's not available

3    at the hosp -- at the prison; is that right?

4    A.   I'm not following.  On medical parole or just in a general

5    sense while in custody?

6    Q.   While in custody?

7    A.   While in custody it, we do use outside hospitals, correct,

8    for treatment.

9    Q.   So that could have been another option for a way to comply

10   with the Court's order?

11   A.   We certainly do try to use the Shattuck for anything

12   long-term.  I -- I would not think that would be compliant,

13   because the inmate would still be in custody.  That wasn't --

14   that's not medical parole or a release to an outside entity.

15   Q.   Is it your understanding that the order required a release

16   or a transfer?

17   A.   I have to look at the order again.  At least to transfer

18   to a facility that could handle his needs.

19   Q.   So we've stipulated between the parties that Mr. Reaves

20   filed a petition for medical parole on June 28, 2018, and that

21   the superintendent thereafter forwarded his recommendation to

22   the then commissioner, who was Commissioner Turco, on July 9th

23   of 2018.

24        The medical parole statute requires that the

25   commissioner issue a decision within 40 day -- 45 days of

1    receiving the superintendent's recommendation; is that correct?

2    A.   Yes.

3    Q.   There was -- we've also stipulated that there was a

4    hearing on Mr. Reaves's petition for medical parole on

5    August 7th of 2018.

6         You were present at that hearing, weren't you?

7    A.   I was at that hearing, yes.

8    Q.   And then Commissioner Turco was prepared to issue a

9    decision on Mr.  Reaves's petition the following day, on

10   August 18th; isn't that right?

11   A.   It -- I -- I didn't issue the decision.  I don't know if

12   that was the date or not.  I would have to look at the

13   paperwork.

14   Q.   Okay.  So if you could turn to what would be

15   exhibit -- the exhibit that has been agreed for Exhibit 7,

16   which is a set of emails between Nancy White, the DOC General

17   Counsel and myself, dated August 8, 2018.

18   A.   Which exhibit?

19   Q.   It's a new one; seven, it would be.  So it should have

20   been emailed to you this morning is my understanding.

21              THE COURT:  Are you moving that in?

22              MR. O'DONNELL:  Your Honor, I would like to -- I would

23   like to lodge an objection.

24              THE COURT:  Hold up.  So let's start,

25   Ms. -- Ms. Petit, are you moving that?

1    MS. PETIT:  I thought that we had agreed this morning

2  that all of these would be moved in.

3    THE COURT:  All right.  Mr. O'Donnell, what do you

4  want to say?

5    MR. O'DONNELL:  I -- I don't dispute that that exhibit

6  may come in, but I don't know that the commissioner has any

7  awareness of it, and so I don't know why she's being questioned

8  about it.  It can speak for itself, it's a written document.

9    THE COURT:  All right.  Well, it's admitted as 7, and

10  let's see where this goes.

11    Ms. Petit, you may inquire, and we'll take it on a

12  question-by-question basis.

13    (Exhibit No. 7 was admitted into evidence.)

14    MS. PETIT:  Thank you.

15  BY MS. PETIT:

16  Q.  So, Commissioner, if you could look at Exhibit 7 on the

17  very first page of the first email from Nancy White at the

18  bottom of the large paragraph -- oh, no.  Sorry.  At the top of

19  the --

20  A.  I don't have anything marked Exhibit 7.  So you're going

21  to have to guide me.  I have nothing here.

22  Q.  All right.  Do you have a document that is an email

23  exchange between Nancy White and myself and a few other folks

24  on there dated Wednesday, August 8, 2018?

25  A.  (Witness reviewing documents.)  It stops after six.

1   Q.   Right.  Those were the exhibits that were entered in the

2   last hearing last week.  So there's another group of, I think,

3   four exhibits that I understand that Mr. O'Donnell emailed to

4   you this morning so...

5   A.   Okay.  So maybe you can describe it and date it again, I'm

6   sorry, and I can find it through here.

7   Q.   Sure.  It's August 8, 2018.  And it's a document that

8   contains a few emails back and forth between Nancy White and

9   myself and a few other folks on there.

10        MR. O'DONNELL:  Your Honor, I'd like to re -- relodge

11   my objection.  If the Commissioner is not familiar with this

12   document, it's in evidence.  Attorney Petit can use it in

13   argument or in her written, you know, filing.  I don't see why

14   Commissioner Mici is being asked about it if she is so

15   unfamiliar with it.

16        THE COURT:  Well, I actually haven't heard a question

17   about it because we still haven't -- the witness hasn't been

18   able to find the documents.

19        THE WITNESS:  I don't have it.  Sorry.  I cannot find

20   it here.

21        THE COURT:  Let's move on then, Ms. Petit.

22        MS. PETIT:  Okay.  Well, I think it's important that

23   the agreed exhibits get sent to the Commissioner.

24        Ted, are you able to send that or should I do it if

25   she didn't receive the email that you intended to send earlier?

1    MR. O'DONNELL:  I sent an email to her executive

2  assistant, Michelle Farrell, after receiving the exhibits from

3  you this morning, and I asked Ms. Farrell to get them to the

4  commissioner.

5    MS. PETIT:  Okay.

6  BY MS. PETIT:

7  Q.   All right.  Were you involved in discussion with

8  Commissioner Turco and anyone else immediately following the

9  August 7, 2018, hearing on Mr. Reaves's parole petition about

10 whether that petition should be granted?

11 A.   I'm sure I was part of conversations because I was the

12 deputy commissioner overseeing clinical services, but there

13 was -- there was many of them, and it was quite a long time

14 ago, so, I mean, can't be specific, but I'm sure I was a part

15 of a conversation or two about it.

16 Q.   And you don't recall whether a decision was arrived at?

17 A.   No, I didn't say that.  I know a decision was derived.  I

18 just -- I don't recall every meeting we had about this

19 particular case or any other, yeah, that's all.

20 Q.   Okay.  So let me ask then was a decision arrived at

21 immediately following that hearing about whether Mr. Reaves's

22 petition should be granted?

23 A.   Yes, a decision was made.

24 Q.   And were you present for that?

25 A.   It was a decision in writing, I believe.  I -- I may have

1   been cc'd.  I don't know that I was part of the decision

2   process.

3   Q.   And at that time there was no finalized parole plan in

4   place for Mr. Reaves; is that right?

5   A.   That's correct.

6   Q.   Also at that time the Department of Correction interpreted

7   the medical parole statute to require that the petitioner

8   deliver a finalized parole plan to the Department prior to any

9   parole, medical parole, being granted; is that right?

10  A.   Yes.

11  Q.   On February 13th you sent a letter, which it -- which you

12  should have as Exhibit 3, to Kevin Keefe at Massachusetts

13  Parole Board regarding your consideration of Mr. Reaves's

14  petition; is that right?

15  A.   Yes.

16  Q.   And he responded to you on February 18th indicating that

17  the parole transfer process couldn't begin until after the

18  parole was granted; isn't that right?

19  A.   Yes.

20  Q.   He also listed some information about people who would

21  need to be contacted in order to take part in -- in parts of

22  the process that would need to be taken care of?

23  A.   Yes.

24  Q.   And did you contact the people listed there or did

25  anyone -- did you contact them personally or direct anyone else

1   to contact those people?

2   A.   I'm just reviewing the -- the group of people.  And I'm

3   just -- can you just tell me which letter back from Kevin Keefe

4   you're referring to?  I'm sorry.  There's a lot of documents in

5   front of me.

6   Q.   Sure.  It would be Exhibit 4.

7   A.   Okay.  Thank you.  (Reviewing document.)  Okay.

8   Q.   I'm looking at the paragraph at the top of page 2 of

9   Exhibit 4.

10  A.   Okay.  So the only person I spoke to on this list would

11  have been Mr. Landi.  The other, it would be Jenn Gaffney and

12  Allison Hallett's units would handle that piece and handled

13  and worked it out with those people or at least reached out to

14  them for next steps.

15  Q.   And so did you direct them to do that?

16  A.   Yes, they -- yes, because Jennifer Gaffney is cc'd and so

17  is Stephanie at the bottom of this.  So, yes, they were aware

18  that we -- and we certainly talked about it.

19  Q.   And are you -- are you aware of whether those

20  conversations were, in fact, had by them?  Conversations with

21  insurance?

22  A.   Well, I'm assuming only the -- I don't know specifically

23  with these people, but certainly we had made some progress and

24  gotten some information since then, so conversations certainly

25  did occur.

1    Q.    Okay.  And what's the information that you're referring to

2    that was received since then?

3    A.    So just the whole of how if -- if Mr. Reaves was accepted

4    at the iCare center in Connecticut, how would Medicaid in

5    Connecticut be achieved; do you need to be a resident?  You

6    know, we have people who specialize somewhat in MassHealth here

7    in Massachusetts, so we were trying to figure out how it worked

8    in Connecticut.  So there has been a lot of back and forth for

9    several weeks or months now trying to figure out that process.

10   Q.    Okay.  Has the requirement that someone be transferred to

11   another state's Department of Correction before they could be

12   paroled to another state ever been placed on anyone else?

13   A.    Can you repeat that, please.

14   Q.    Has DOC ever placed on another medical parole petitioner

15   the requirement that they first transfer to the Department of

16   Correction in another state?

17   A.    I personally have not done that, no.

18   Q.    And have -- has the DOC ever placed on another medical

19   parole petitioner the requirement that they be accepted by a

20   health insurance plan prior to being released?

21   A.    In Massachusetts, absolutely, I have -- I make sure

22   there's Medicaid in place before they get released.  I have not

23   done that in another state if that's what you are asking.

24   Q.    Well, has -- have you ever made a grant conditional on the

25   acceptance by any health insurance, public or otherwise?

1    A.   For a -- for a medical parole, no, it hasn't been part of

2    the condition -- conditioner or written into the statement, but

3    I haven't had any other cases like this.

4    Q.   And -- and when you say "like this," do you mean in the

5    sense that he's parole -- he would be -- his plan is to parole

6    to a different state?

7    A.   Correct.  And -- right.  It's just the first time I've

8    encountered this.

9    Q.   Did you yourself or did you direct anyone else to seek

10    assistance from the parole board to determine how that process

11    works when the parole board transfers parole to another state

12    for their regular parole process?

13    A.   Yes.

14    Q.   Did you have that conversation or did someone else have

15    that conversation?

16    A.   I -- I had that conversation as well as many other people

17    where -- where we talked about it several times.

18    Q.   And what did you learn about what the regular practice is

19    for the parole board?

20    A.   And it's discretionary.  I think there's a 45-day period

21    that it could take; that the, you know, the supervision needs

22    to be the same in both states.  It -- I mean, that's kind of

23    the gist of the process.

24    Q.   Okay.  So what I'm asking specifically is whether you've

25    had any communication with the parole board about how the

1    health insurance piece works when a parolee is transferring to

2    another state?

3    A.   I have not had that about in general.  I had it about

4    Mr. Reaves, but I haven't had it about anyone else that I can

5    recall.

6    Q.   The medical parole statute requires that the commissioner

7    issue a decision within 45 days of receiving the

8    superintendent's recommendation, correct?

9    A.   Correct.

10   Q.   And is there a process in place from the Department to

11   ensure that you respond in a timely way within that deadline?

12   A.   Yes.

13        MS. PETIT:  We've stipulated that the time line for

14   the Commissioner's decision was stayed on August 8, 2018, and

15   that the plaintiff submitted a supplement to his petition on

16   January 16th of 2020 with a completed parole plan.  Sorry.

17   I've -- okay.

18   Q.   When you received the January 16th supplement that lifted

19   the stay that was in place, didn't it?

20   A.   Yes.

21   Q.   And at that time there were only 15 days remaining on your

22   45-day time period to issue a decision, weren't there?

23        MR. O'DONNELL:  Objection.

24        THE COURT:  Overruled.  You may answer.

25        THE WITNESS:  If -- yes, I have to look at the dates

1   again, but if you're saying there was 15 more, I -- from the

2   date it was -- their stay was removed you said was it

3   January 16th?

4   Q.   So the -- the superintendent's recommendation went to

5   Commissioner Turco on July 9th, and the stay was put in place

6   on August 8th of 2018 --

7   A.   Yeah.

8   Q.   -- which I -- I looked at a calendar, and it looks like

9   30 days to me.

10  A.   Yes.

11  Q.   And so that would leave 15 days on the commissioner's time

12  period when the stay is lifted; is that right?

13  A.   Sure.

14          MR. O'DONNELL:  Objection.

15          THE WITNESS:  Yeah.

16          THE COURT:  Overruled.

17  Q.   So if 15 days from January 16th of 2020 is January 31st,

18  why did you not issue a decision on Mr. Reaves's parole

19  petition by that date?

20  A.   So when I issue a parole decision, it has to have all the

21  pieces in place.  I need to make sure that the inmate has a

22  place to go; that insurance is in place; that we have done all

23  the outreach we can so the parole is successful.  To issue a

24  decision before I have any of that information is not really

25  responsible.  So it took a little bit longer, but there was a

1  lot -- there's a lot more involved in this case than some of

2  the other medical paroles that I have encountered.  So it

3  wasn't just --

4  Q.   What --

5  A.   -- lackadaisical.  It was just trying to get the right

6  information so I could put the decision together.

7  Q.   The supplement on January 16th of 2020 which lifted the

8  stay included the clinical acceptance at iCare in Connecticut,

9  right?

10  A.   Yes.

11  Q.   So there -- there was a place to go on the 16th?

12  A.   According to a piece of paper there was, but I -- I

13  have -- I've talked to Mike Landi and I went to his Connect --

14  I went to his facility.  It's not the Connecticut one.  I need

15  to make sure it's appropriate; and this is my decision, so yes,

16  I probably do a little more digging than maybe others.  Not in

17  just -- not in just this medical parole, in many of them, so

18  yes, it took some time.  Whether he had been placed or not he

19  has to have insurance.  Somebody has to pay for this.

20  Q.   There has been other petitioners for medical parole, more

21  than one, who has been released without MassHealth in place;

22  isn't that right?

23  A.   I can think of one that we -- yes, that because the person

24  was over a certain age we're learning too.  Medical parole is

25  new.  So, yes, and we scrambled, but we made sure that person

1    got their medical care for all the time that the person wasn't

2    covered.  And even though the person wasn't in my custody, I

3    was on the phone almost every day to make sure that person was

4    covered.  So I don't want to ever have to go through that

5    again.  That's not fair to the person on medical parole.

6    Q.   In fact, that happened again just last week, didn't it?

7    A.   I -- I don't know.  Not to my knowledge.  I'd have to be

8    reminded.  There has been a lot of medical paroles that have

9    gone out in the last couple of weeks, so I was not aware of

10   that one.

11   Q.   But in any case your testimony is that it has not been a

12   requirement for any other medical parole petitioner that the

13   insurance actually be in place prior to the grant; is that

14   correct?

15   A.   No, I disagree.

16        MR. O'DONNELL:  Your Honor, I object.

17        THE COURT:  Well, overruled.  You may answer,

18   Commissioner.

19        THE WITNESS:  So have I put it in writing on the

20   medical parole petition or the approval or the denial, no, but

21   do I make sure it's in place because I learned from that person

22   who was over a certain age and had assets?  Yes.  I asked those

23   questions, and I put more checkmarks in place before the person

24   goes out.  And I personally asked to be notified before the

25   person goes out so I know that everything's in place.

1   BY MS. PETIT:

2   Q.   If I were to represent to you that there is one woman who

3   my office represented on medical parole who was released to a

4   home in Massachusetts without her MassHealth being put in place

5   by the DOC and one man who was granted medical parole and

6   released last week to a home without MassHealth in place, would

7   you have any reason to disagree with that?

8   A.   I would not disagree with the female.  I am unaware of the

9   male.

10          MS. PETIT:  Your Honor, I would like to proffer that

11   there was a male whose name I can give if -- if the Court is

12   interested in -- in that, who was released on medical parole

13   last week by the Department of Correction without MassHealth in

14   place.

15          THE COURT:  Let's keep going.

16          MR. O'DONNELL:  Your Honor, I object.

17          THE COURT:  Hold up.  Let's keep -- let's finish with

18   the Commissioner, and you can make your proffer.

19   BY MS. PETIT:

20   Q.   The Department of Correction policy on medical parole

21   specifically allows for a conditional grant to be made

22   conditioned upon the receiving state accepting the parolee for

23   parole supervision; is that right?

24   A.   Yes.

25   Q.   And that was true in -- on January 16th as well as on

1   March 20th when you made your decision?

2   A.   Yes.

3   Q.   In your decision, which I believe is Exhibit 5, if you

4   need to refer to it, the one condition that you imposed is that

5   Mr. Reaves be accepted by the State of Connecticut for parole

6   supervision, correct?

7   A.   Yes.

8   Q.   And Mr. Reaves thumbprinted the interstate parole contract

9   for that on April 1st of this year?

10  A.   Yes.  Yes.

11  Q.   And that -- that request was then submitted to Connecticut

12  parole?

13  A.   Correct.

14  Q.   Have you received any response to that request?

15  A.   From Connecticut parole?

16  Q.   Yes.

17  A.   I have not received anything from Connecticut parole, no.

18  Q.   And is it your understanding that Connecticut parole is

19  currently not accepting interstate transfers for parole

20  supervision due to the COVID pandemic?

21  A.   Yes.  I got that notice, yes.

22  Q.   Okay.  Is it your understanding that they'll still accept

23  and consider the requests though they won't actually accept the

24  physical transfer?

25  A.   That is my understanding, yes.

1    Q.    A second condition that you placed on Mr. Reaves's grant

2    of medical parole is that he be accepted for Connecticut

3    Medicaid coverage prior to the grant becoming effective,

4    correct?

5    A.    Yes.

6    Q.    And Mr. Reaves can't actually apply for Connecticut

7    Medicaid until he is a resident of the State of Connecticut;

8    isn't that right?

9    A.    That is what I am told.

10   Q.    So how -- what is your understanding of how it will be

11   possible for Mr. Reaves to meet that condition?

12   A.    Well, we're still trying to work that piece out, but what

13   I did think of was if I could paper -- I have quotes going --

14   paper transfer Mr. Reaves to the Connecticut Department of

15   Correction knowing they have at least two opportunities for

16   medical parole.  I believe they have compassionate release as

17   well.  If I could make him a resident of the State of

18   Connecticut could he get Medicaid that way; and then once

19   that's in place, transfer him to a facility that has accepted

20   him.

21        I had a conversation with the commissioner from

22   Connecticut in the last 30 days probably to see if that was

23   possible, and I know that he has reached out to me.  He doesn't

24   have an answer yet, but it is something that he certainly is

25   contemplating.  My intention is not to put Mr. Reaves in the

1    Connecticut Department of Correction.  My intention is to help

2    him get Medicaid to get him to the place where he can get the

3    care he needs and be out on medical parole.

4    Q.   So would Mr. Reaves be able to be medically paroled to

5    Connecticut without first accepting an interstate transfer to

6    the Connecticut Department of Corrections?

7    A.   That's the question -- I don't know.  We're still trying

8    to figure that out.  I -- I think it's absolutely possible

9    from -- from the conversations.  It's just no one has given me

10   that acceptance yet.  So I -- I -- I'm hoping to hear.

11   Obviously, COVID has not helped this case or many others.  So

12   we're really in a waiting game right now.  I think it's

13   absolutely possible.  I was just trying to think outside the

14   box to try to expedite this process because we're having so

15   much -- there was so much red tape involved in the medical part

16   of this or the Medicaid/Medicare, whatever it's called, in

17   Connecticut.  So that's all I was trying to do.

18   Q.   So if there was a way to achieve the transfer of

19   Mr. Reaves without a transfer to Connecticut DOC, would you be

20   willing to amend your grant of parole to take that condition

21   away?

22   A.   Yes, if it's workable.  Certainly I would entertain what

23   the -- how -- how it could work.  And if it -- if it would work

24   for everybody, yes.

25   Q.   And just to clarify, I think this is what I correctly

1    understood from what you said, but let me know.  You have no

2    confirmation at this point that -- that a transfer, whether

3    paper or in person to Connecticut will solve the Medicaid issue

4    for Mr. Reaves?

5    A.   I -- I do not have that confirmation yet.

6    Q.   So despite the issues with medical parole, the Department

7    of Correction still has an obligation to comply with the

8    Court's order to transfer Mr. Reaves, does it not?

9    A.   It does.

10   Q.   Would you say that Mr. Reaves is at great risk if he were

11   to contact COVID?

12        MR. O'DONNELL:  Objection.

13        THE COURT:  Sustained.

14   BY MS. PETIT:

15   Q.   There are both prisoner and staff members at the Lemuel

16   Shattuck correctional floor who have tested positive for COVID;

17   is that right?

18   A.   I'm aware of one inmate who has been moved from the floor,

19   and I believe there is one staff member that I am aware of.

20   I would have to -- I mean, I have a tracking system but I

21   believe that is true, Ms. Petit.

22   Q.   If you had granted Mr. Reaves's petition by January 31st,

23   which would have been 15 days after the January 16th

24   supplement, he could potentially have been transferred to

25   Connecticut prior to the -- all of the restrictions that COVID

1   has brought on sort of across the system; is that right?

2           MR. O'DONNELL:  Objection.

3           THE COURT:  Sustained.

4           THE WITNESS:  So I don't think I can answer that --

5           THE COURT:  Don't --

6           THE WITNESS:  -- because it's not in my hands.

7           THE COURT:  You don't have to answer that,

8   Commissioner.

9           THE WITNESS:  Oh, I'm sorry.  Thank you.  You said

10  "sustained."

11          THE COURT:  Next question, please.

12  BY MS. PETIT:

13  Q.   Have you done anything -- given the restrictions and sort

14  of roadblocks that COVID has placed at different steps

15  throughout this process, have you done anything since the COVID

16  pandemic has had that impact to ensure that things are set up

17  for Mr. Reaves to transfer immediately upon those restrictions

18  being lifted?

19  A.   Well, what I can say to that is that I haven't stopped

20  working on the case just because COVID hit.  It's -- it's a --

21  it's something that's active.  As much as this morning as I got

22  an email from parole about it, which I haven't read yet because

23  I was slated for this, but I haven't stopped any -- none of my

24  staff have stopped efforts for this.

25  Q.   And what are those efforts focused on at this point?

1    A.   Working with parole to get him to the facility in parole

2    and making sure he has insurance to cover it, to cover all the

3    expenses.

4              MS. PETIT:  Thank you.  I have no further questions.

5              THE COURT:  Mr. O'Donnell.

6              MR. O'DONNELL:  I don't have any follow-up for the

7    commissioner, your Honor.

8              THE COURT:  Thank you.

9              Thank you, Commissioner.  You're free to ring off or

10   stay if you want.

11             THE WITNESS:  I'm going to wing off, but thank you.

12             THE COURT:  You're welcome.

13             MS. PETIT:  Thank you.

14             THE WITNESS:  Bye-bye.

15             THE COURT:  So, counsel, do you -- do you want some

16   time to submit proposed findings and rulings?

17             MR. O'DONNELL:  Yeah, I would, your Honor.  Yes,

18   please.

19             THE COURT:  Ms. Petit?

20             MS. PETIT:  Yes, please.

21             THE COURT:  How -- how much time do you all want?

22             MR. O'DONNELL:  I'd like at least two weeks, your

23   Honor.  There's a number of other things I have on my plate.

24             THE COURT:  That's fine.

25             Ms. Petit, does that work for you as well?

1          MS. PETIT:  Yeah, I could do it sooner than that, but

2     if that's what we need then --

3          THE COURT:  If -- if there's any reason that -- that

4     he is going to be transferred or you need us to do something,

5     let me know, but it sounds like the COVID is going to put a

6     stay on this at least for the time being.

7          MS. PETIT:  Well, I think that COVID is putting a stay

8     on the actual physical move, but I think -- I think we may have

9     gotten some good news this morning in -- in an email that may

10    be the same one that the Commissioner was referencing or

11    related one saying that he has been accepted by Connecticut

12    parole for transfer.  So I think we're moving a

13    little -- moving a little bit.

14         THE COURT:  I think that's -- that's a big one if

15    that's the case.

16         MS. PETIT:  Right.

17         THE COURT:  All right.  Why don't you and

18    Mr. O'Donnell -- I know Mr. O'Donnell, I know both of you are

19    very, very busy.  So let's go out two weeks.

20         Marty, let's have a -- let's have a -- a two-week date

21    for -- and we'll do -- we'll give you each a chance to make a

22    closing argument.

23         MS. PETIT:  And you want the proposed facts before

24    that?

25         THE COURT:  Let's -- let's do this.  Let's do two

1  weeks for the proposed findings and rulings and then a couple

2  of days thereafter for me to digest them before I hear you.

3          And if that email that you received this morning needs

4  anything from the Court, you don't have to wait for two weeks.

5  Just get in touch with Mr. Castles.

6          MS. PETIT:  Very good.

7          THE CLERK:  How's May 5th at 10:30?

8          MS. PETIT:  For the argument?

9          MR. O'DONNELL:  Yeah, that -- that's fine for me.

10         MS. PETIT:  I can do that.

11         THE COURT:  Okay.  See you.  Stay safe and be well.

12         MS. PETIT:  Thank you very much.

13         MR. O'DONNELL:  Thank you.

14         (At 11:32 a.m., Court was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

1                       C E R T I F I C A T E

2

3              I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10        /s/ Marianne Kusa-Ryll                    4/17/2020

11        Marianne Kusa-Ryll, RDR, CRR              Date

12        Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25